No. 2022-1392

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,

Plaintiffs-Appellees,

v.

UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, CHRISTOPHER MAGNUS, Commissioner of U.S. Customs and Border Protection,

Defendants-Appellants

Appeal from the United States Court of International Trade
Case No. 1:20-cv-03941, Judge Gary S. Katzmann

**OPENING BRIEF OF DEFENDANTS-APPELLANTS**

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
MICHAEL T. GAGAIN
Assistant General Counsel
Office of the United States Trade
  Representative
Washington, D.C. 20508

JOSHUA E. KURLAND
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 616-0477
Fax: (202) 353-0461
Email: Joshua.E.Kurland@usdoj.gov

May 11, 2022

*Attorneys for Defendants-Appellants*

# <u>TABLE OF CONTENTS</u>

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE .............................................................. 3

STATEMENT OF FACTS .................................................................... 3

I.     Section 201 Safeguard Duties ........................................................ 3

II.    Administrative Proceedings And The *Invenergy* Litigation ........................... 8

III.   The ITC Monitoring Report And *Proclamation 10101* ................................ 12

IV.   Trial Court Proceedings ................................................................ 14

V.    Safeguard Extension Proceedings ................................................... 17

SUMMARY OF THE ARGUMENT ...................................................... 18

ARGUMENT ..................................................................................... 21

I.     Standard Of Review ..................................................................... 21

II.    The Trial Court's Narrow Reading Of Section 2254 As Permitting Only "Trade-Liberalizing" Modifications To Safeguard Measures Conflicts With The Text, Structure, Purpose, And History Of Section 2254 ............... 22

      A. The Trial Court's Interpretation Erroneously Places A Limit On The President That Is Not Found In The Statute's Text .......................... 23

      B. The Trial Court's Interpretation Renders The Term "Modification" In Section 2254(b)(l)(B) Superfluous ...................................... 28

      C. Multiple Aspects Of The Statutory Scheme Indicate That Congress Did Not Limit The President's Exercise Of Section 2254(b)(1)(B) Authority To "Trade-Liberalizing" Actions ........................... 31

D. The Statute's Evident Purpose Further Contradicts The Trial
     Court's Interpretation ................................................................37

E. The Trial Court's Concern About Section 2254(b)(1)(B) Becoming
     A "Loophole" For The President To Take New Actions Is Inaccurate ...40

III.   The Trial Court Erred In Treating The President's Actions As "Increases"
       To The Safeguard Action That Violate The Statute .....................................42

CONCLUSION .....................................................................................46

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Bates v. United States*,
    522 U.S. 23 (1997)........................................................................... 25, 30

*Hibbs v. Winn*,
    542 U.S. 88 (2004)............................................................................28

*Invenergy Renewables LLC v. United States*,
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) .......................................11

*Invenergy Renewables LLC v. United States*,
    552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) .......................................11

*Jama v. Immigr. and Customs Enf't*,
    543 U.S. 335 (2005)........................................................................ 25, 32

*Maple Leaf Fish Co. v. United States*,
    762 F.2d 86 (Fed. Cir. 1985) ......................................................... 21, 25

*MCI Telecomm. Corp. v. AT&T Co.*,
    512 U.S. 218 (1994)..........................................................................23

*Motion Sys. Corp. v. Bush*,
    437 F.3d 1356 (Fed. Cir. 2006) ........................................................25

*Nat'l Ass'n of Mfrs. v. Dep't of Treasury*,
    10 F.4th 1279 (Fed. Cir. 2021) .........................................................39

*Russello v. United States*,
    464 U.S. 16 (1983)................................................................ 26, 30, 37

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018) .................................................. *passim*

*Solar Energy Indus. Ass'n v. United States*,
   553 F. Supp. 3d 1322 (Ct. Int'l Trade 2021) ............................................... *passim*

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ........................................................................................40

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
   566 U.S. 560 (2012) ........................................................................................35

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967) ........................................................................................39

*Transpacific Steel LLC v. United States*,
   4 F.4th 1306 (Fed. Cir. 2021) ...................................................... *passim*

*United States v. George S. Bush & Co.*,
   310 U.S. 371 (1940) ...................................................................... *passim*

*United States* v. *Will*,
   449 U.S. 200 (1980) ........................................................................................43

*Wolfe v. McDonough*,
   28 F.4th 1348 (Fed. Cir. 2022) ...................................................................28

**Statutes**

19 U.S.C. § 2251 ...........................................................................................2, 3

19 U.S.C. § 2251(a) .....................................................................................4, 38

19 U.S.C. § 2252(d) .....................................................................................7, 34

19 U.S.C. § 2252(e) ..................................................................................4, 7, 34

19 U.S.C. § 2253(a) ...................................................................... *passim*

19 U.S.C. § 2253(e) ...................................................................... *passim*

iv

19 U.S.C. § 2254(a) ................................................................... 5, 12, 34

19 U.S.C. § 2254(b) .................................................................... *passim*

19 U.S.C. § 2254(c) ...................................................................... 4, 17

19 U.S.C. § 2481(6) .................................................................. 7, 24, 35

Omnibus Trade and Competitiveness Act of 1988,
    Pub. L. 100-418, 102 Stat 1107 (Aug. 23, 1988)....................................36

Trade Act of 1974,
    Pub. L. 93-618, 88 Stat. 1978 (Jan. 3, 1975) .......................................36

## Legislative History

H.R. Conf. Rep. 100-576 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547 ........ 26, 36

H.R. Rep. No. 93-571 (1973) .............................................................. 8, 35

S. Rep. No. 93-1298 (1974) ............................................................... 8, 36

Trade Reform Act of 1973,
    H.R. 10710, § 601(6), 93rd Cong. (1st Sess. 1973)................................7

## Presidential Proclamations

*Proclamation 9693: To Facilitate Positive Adjustment to Competition From*
    *Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not*
    *Partially or Fully Assembled Into Other Products) and for Other Purposes*,
    83 Fed. Reg. 3,541 (Jan. 23, 2018) ............................................. *passim*
\
*Proclamation 10101: To Further Facilitate Positive Adjustment to Competition*
    *from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not*
    *Partially or Fully Assembled into Other Products),*
    85 Fed. Reg. 65,639 (Oct. 16, 2020) ......................................... *passim*

*Proclamation 10339: To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*,
87 Fed. Reg. 7,357 (Feb. 4, 2022) ........................................................18

*Proclamation 7314: To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*,
65 Fed. Reg. 34,899 (May 26, 2000) ....................................................40

**Administrative Determinations**

*Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*,
Inv. No. TA-201-075, USITC Pub. 4739 (Nov. 2017)...........................................8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*,
Inv. No. TA-201-075, USITC Pub. 5021 (Feb. 2020)................................... 12, 27

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure*,
Inv. No. TA-201-075, USITC Pub. 5032 (Mar. 2020) ................................. 13, 27

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*,
Inv. No. TA-201-075 (Extension), USITC Pub. 5266 (Dec. 2021) .............. 17, 42

*Exclusion of Particular Products From the Solar Products Safeguard Measure*,
84 Fed. Reg. 27,684, 27,685 (USTR June 13, 2019)...........................................10

*Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*,
84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) ..........................................................10

*Procedures to Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*,
    85 Fed. Reg. 4,756 (USTR Jan. 27, 2020)............................................................11

*Determination on the Exclusion of Bifacial Solar Panels from the Safeguard*,
    85 Fed. Reg. 21,497 (USTR Apr. 17, 2020)........................................................11

## Miscellaneous

*Modification*, *Black's Law Dictionary* (11th ed. 2019)...........................................24

*Modify*, *Black's Law Dictionary* (11th ed. 2019) ...................................................24

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for appellants states that he is unaware of any other appeal in or from this civil action that was previously before this Court or any other appellate court, and is also unaware of any case pending before this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

Pursuant to Rule 28(a)(5) of the Rules of this Court, counsel for appellants states that this Court's jurisdiction rests upon the following bases:

(a) The Court of International Trade possessed jurisdiction to entertain this action pursuant to 28 U.S.C. § 1581(i).

(b) The statutory basis for this Court's jurisdiction to entertain this appeal is 28 U.S.C. § 1295(a)(5).

(c) The United States Court of International Trade entered its final judgment in this case on November 16, 2021.  Our appeal was timely filed, pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B), on January 14, 2022.

## STATEMENT OF THE ISSUES

Section 201 of the Trade Act of 1974, 19 U.S.C. § 2251, *et seq.* (called the safeguard statute), directs the President to "take all appropriate and feasible action within his power" to meet the statute's objective of providing relief to domestic industries facing serious injury from import competition.  Section 204(b)(1)(B) of the statute, 19 U.S.C. § 2254(b)(1)(B), authorizes the President to make a "modification" to a Section 201 safeguard measure if certain conditions are met. After determining that the requisite conditions were met in this case, the President modified his Section 201 safeguard measure concerning imports of solar products to revoke an improvidently-granted exclusion for "bifacial" (double-sided) solar panels and to slow the rate at which the measure would phase down in its fourth year.  The questions presented are:

1.      Whether, in using the term "modification" in Section 204(b)(1)(B), Congress limited the President to "trade-liberalizing" modifications, prohibiting the President from modifying a safeguard to revoke an improvidently-granted exclusion and to slow the rate at which the measure phases down in its fourth year.

2.      Whether the trial court erred in treating the President's actions to restore application of the safeguard measure to bifacial panels and to slow the rate at which the measure phased down in its fourth year as trade-restricting "increases" to the safeguard measure.

## STATEMENT OF THE CASE

Defendants-appellants (collectively, the United States) appeal the Court of International Trade's judgment in *Solar Energy Industries Association v. United States*, 553 F. Supp. 3d 1322 (Ct. Int'l Trade 2021) (*SEIA*), which set aside the President's modifications contained in *Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products),* 85 Fed. Reg. 65,639 (Oct. 16, 2020) (*Proclamation 10101*).  The trial court held that the President's authority to modify a safeguard measure under 19 U.S.C. § 2254(b)(1)(B) is limited solely to "trade-liberalizing" modifications, and that *Proclamation 10101* thus went beyond the President's statutory authority.  The court also enjoined the Government from effectuating or enforcing *Proclamation 10101* and ordered U.S. Customs and Border Protection (CBP) to refund any corresponding duties it had collected from the plaintiffs.

## STATEMENT OF FACTS

### I.     Section 201 Safeguard Duties

Congress enacted Section 201 of the Trade Act of 1974 (19 U.S.C. § 2251, *et seq.*) as a mechanism for the President to provide relief to domestic industries facing serious injury from import competition, through temporary trade measures known as "safeguards."  Safeguard measures are intended to facilitate domestic

industry efforts to "make a positive adjustment to import competition" and to "provide greater economic and social benefits than [their] costs." 19 U.S.C. § 2251(a). When the prerequisites for imposing a safeguard measure are met, the President shall "take all appropriate and feasible action within his power" that the President determines will meet these objectives. *Id.*; 19 U.S.C. § 2253(a)(1).

Safeguard proceedings typically begin with a domestic industry petition to the International Trade Commission (ITC) to investigate whether imports are causing or threatening to cause serious injury to the industry. If the ITC makes an affirmative determination, it recommends action to the President, who retains sole discretion regarding the type, duration, and amount of relief to provide, subject to several statutory limitations. 19 U.S.C. §§ 2252(e)(1), 2253(a)(1). If the President determines to impose a safeguard, the measure is initially limited to a maximum of four years. 19 U.S.C. § 2253(e)(1)(A). However, following a further domestic industry petition, if the ITC determines and the President agrees that safeguard relief remains necessary and that there is evidence that the industry is making a positive adjustment to import competition, the President may extend the safeguard measure for up to four additional years. 19 U.S.C. §§ 2254(c), 2253(e)(1)(B).

Certain types of safeguard actions, such as the imposition of duties, must be "phased down at regular intervals during the period in which the action is in effect," if it lasts for more than one year. 19 U.S.C. § 2253(e)(5). This provision

places an overarching limit on changes that may be made to a safeguard measure, without further restricting the President within that overall requirement.

The provision at issue here, 19 U.S.C. § 2254, requires the ITC to monitor developments in the domestic industry's progress and adjustment efforts, and if the initial safeguard measure or any extension lasts longer than three years, to provide a report to the President and Congress. 19 U.S.C §§ 2254(a)(1), (a)(2). Upon receiving this midterm report, Congress, in section 2254(b) entitled "Reduction, modification, and termination of action," empowered the President to make certain changes to the safeguard measure. *Id.* § 2254(b). These changes are covered by sections 2254(b)(1)(A) and (B). Section 2254(b)(1)(A) provides solely for the "reduction" or "termination" of the measure if the domestic industry's adjustment efforts are lacking or changed economic circumstances have made the measure ineffective. Section 2254(b)(1)(B), by contrast, provides the President additional authority by permitting "reduction, *modification*, or termination" of the measure following receipt of the ITC's report if the President "determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, *modification*, or termination on such basis, that the domestic industry has made a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1)(B) (emphasis added).

Section 2254(b)(1)(B) is one of several provisions in the safeguard statute that either authorize changes to a safeguard measure or include the terms "modify" or "modification." These provisions permit the President to make modifications in connection with safeguard measures that may be trade-restricting to achieve the safeguard statute's objectives, and do not limit the President to imposing trade-liberalizing modifications by reducing safeguard measures. Among the section 2254(b) provisions permitting "Reduction, modification, and termination" of a safeguard measure, section 2254(b)(2) authorizes the President to "take such additional action . . . as may be necessary to eliminate any circumvention of any action previously taken under [section 2253]." 19 U.S.C. § 2254(b)(2). Similarly, section 2254(b)(3) permits the President to "reduce, modify, or terminate" a safeguard measure based on an ITC determination seeking to render the ITC's previous actions consistent with an adverse World Trade Organization (WTO) decision, without regard to whether the revisions lessen or increase the trade restrictiveness of the measure. 19 U.S.C. § 2254(b)(3).

Other parts of the safeguard statute, specifically sections 2252 and 2253, also use the term "modification" in a way that clearly connotes the President taking trade-restrictive action. For example, section 2253(a)(3) lists, among the safeguard actions that the President may impose, the "*modification* or imposition of any quantitative restriction on the importation of the article into the United States"

(connoting a "modification" that makes a quota more restrictive).  19 U.S.C.

§ 2253(a)(3) (emphasis added).  Section 2252(e)(2)(C) similarly authorizes the ITC

to recommend that the President make trade-restrictive quota modifications as part

of a safeguard measure.  19 U.S.C. § 2252(e)(2)(C).  Another provision, section

2252(d)(5)(C), uses similar terminology in the context of authorizing provisional

relief under the statute.  *Id.* § 2252(d)(5)(C).  Consequently, multiple provisions of

the safeguard statute indicate that "modifications" made under the statutory

scheme may be either trade-restricting or trade-liberalizing.

Finally, Chapter 12 of Title 19 (which encompasses the Trade Act and

safeguard statute) contains a general definition of "modification," which, although

silent on whether modifications must be "trade-liberalizing," entails legislative

history that indicates otherwise.  The open-ended definition states that, in Chapter

12, "[t]he term 'modification', as applied to any duty or other import restriction,

*includes* the elimination of any duty or other import restriction."  19 U.S.C.

§ 2481(6) (emphasis added).  A precursor bill to the Trade Act of 1974—the

Trade Reform Act of 1973—contained multiple safeguard provisions ultimately

incorporated into the Trade Act, as well as a definition of "modification" mirroring

the definition currently in section 2481(6).  Trade Reform Act of 1973, H.R.

10710, § 601(6), 93rd Cong. (1st Sess. 1973).  The House report accompanying

this bill explains that "[t]he term 'modification,' as applied to any duty or other

import restriction, includes the elimination, *or imposition*, of any duty or other

import restriction, *as well as changes or increases and decreases in the existing*

*duty or import restriction*." H.R. Rep. No. 93-571, at 89 (1973) (emphasis added).

The Senate version of the bill, the Trade Reform Act of 1974, likewise contained

the definition of "modification" with an accompanying report explaining that

"[t]he term 'modification,' as applied to any duty or other import restriction, would

include the elimination of any duty or other import restriction, *as well as changes*

*in the existing duty or import restriction*." S. Rep. No. 93-1298, at 230 (1974)

(emphasis added). This history indicates that the statutory definition does not

require a "modification" to be "trade-liberalizing."

## II.    **Administrative Proceedings And The *Invenergy* Litigation**

In January 2018, following an ITC investigation, the President issued

*Proclamation 9693*, 83 Fed. Reg. 3,541 (Jan. 23, 2018), imposing a safeguard

measure on imports of certain solar products.[1] *See generally Silfab Solar, Inc. v.*

---

[1] In that investigation, the ITC found that the United States had seen an "explosive" increase in demand for solar products, but that, despite "extremely favorable demand conditions" during the investigation period, "dozens of U.S. facilities closed their operations," and the domestic industry as a whole suffered net losses of hundreds of millions of dollars. *Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*, Inv. No. TA-201-75, USITC Pub. 4739, at 33-37 (Nov. 2017), *available at* https://www.usitc. gov/publications/safeguards/pub4739-vol_i.pdf. Hence, the ITC unanimously concluded that increased imports were a substantial cause of serious injury, or threat thereof, to the domestic solar manufacturing industry. *Id*. at 1.

*United States,* 892 F.3d 1340 (Fed. Cir. 2018).  The safeguard measure, in broad terms, imposed additional duties on imports of solar panels and on imports of solar cells above a quota (known as a tariff-rate quota).  *Proclamation 9693*, 83 Fed. Reg. at 3,542 ¶ 8.  The President determined that the additional duties would be 30 percent *ad valorem* in the safeguard measure's first year, ultimately phasing down to 15 percent in the measure's fourth year.  *Id.* at Annex I (text at ¶¶ (f) and (h)).

In addition, the President stated that "if I determine that the conditions under section 204(b)(1) of the Trade Act (19 U.S.C. 2254(b)(1)) are met, I shall reduce, *modify*, or terminate the action established in this proclamation accordingly."  *Id.* at 3542 ¶ 12 (emphasis added); *see also id.* at 3542-43 ¶ 12 (stating that the President would reduce, modify, or terminate safeguard measure if he determined within 30 days that doing so was necessary based on consultations with WTO members).

The President delegated authority to the United States Trade Representative (USTR) to grant "exclusion of a particular product from the safeguard measure" if "the USTR determines, after consultation with the Secretaries of Commerce and Energy, that a particular product should be excluded."  *Id*. at 3,543-44.  Annex I to *Proclamation 9693*, listing corresponding modifications to the Harmonized Tariff Schedule of the United States (HTSUS), further states that USTR is "authorized to modify or terminate any such [exclusion] determination" while the safeguard measure remained effective.  *Id.* at Annex I (text included in ¶ (d)).

Pursuant to its procedures to consider requests for exclusion from the safeguard measure, USTR in June 2019 granted an exclusion for bifacial solar panels consisting of bifacial solar cells.[2] *Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27,684, 27,685 (USTR June 13, 2019). Subsequently, however, concerns arose that the bifacial exclusion would provide a significant loophole for purchasers to avoid the safeguard duties. In October 2019, after consulting the Secretaries of Commerce and Energy—but without public notice and comment—USTR withdrew the exclusion. *Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54,244 (USTR Oct. 9, 2019). USTR based the October 2019 withdrawal on newly available information demonstrating that: (1) global production of bifacial panels was increasing; (2) the exclusion would likely result in significant increases in bifacial panel imports; and (3) bifacial panels likely would compete with domestically produced products in the United States market. *Id.* at 54,245.

Parties representing segments of the solar industry relying on imported panels challenged the October 2019 withdrawal, arguing that USTR's withdrawal violated the Administrative Procedure Act (APA). The trial court enjoined USTR's withdrawal decision as a rulemaking that was subject to and likely in violation of the APA. *See Invenergy Renewables LLC v. United States*, 422 F.

---

[2] "Bifacial" refers to products that generate power on both sides.

10

Supp. 3d 1255 (Ct. Int'l Trade 2019) (*Invenergy I*).  Due to injunctive relief and

voluntary action by USTR, the October 2019 withdrawal never became effective.

To address the trial court's concerns in *Invenergy I* about the failure to

provide notice and comment, USTR in January 2020 published procedures for

interested parties to comment on whether USTR should maintain, withdraw, or

take other action within its authority regarding the bifacial exclusion.  *Procedures

to Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels

From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 4,756 (USTR Jan.

27, 2020).  Following notice and comment, USTR in April 2020 again withdrew

the exclusion.  *Determination on the Exclusion of Bifacial Solar Panels from the

Safeguard*, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020).  Among several factual

findings, USTR found that the exclusion was "undermining the objectives of the

safeguard measure" and should therefore be withdrawn.  *Id.* at 21,499; *see also id.*

at 21,498 (noting USTR's procedures had indicated that it would "grant only those

exclusions that do not undermine the objectives of the safeguard measures").

Ultimately, however, and following a series of decisions in the *Invenergy*

litigation, the trial court again ruled that USTR's actions violated the APA and

enjoined the April 2020 withdrawal.  *Invenergy Renewables LLC v. United States*,

552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) (*Invenergy VI*).  The trial court entered

judgment in *Invenergy* in November 2021 and the decision was not appealed.

11

### III.     The ITC Monitoring Report And *Proclamation 10101*

While *Invenergy* was pending, the ITC completed its required midterm review of the safeguard measure under 19 U.S.C. § 2254(a).  In February 2020, the ITC reported to the President the results of its monitoring of developments regarding the domestic industry, including the progress and specific efforts domestic industry workers and firms had made toward a positive adjustment to import competition.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*, Inv. No. TA-201-075, USITC Pub. 5021 (Feb. 2020) (*ITC Feb. 2020 Report*), *available at* https://www.usitc.gov/publications/other/pub5021 .pdf.  Among other issues, the ITC highlighted domestic producers' reports that the bifacial exclusion was a major adverse factor depressing solar module prices, hindering their adjustment efforts, and limiting the safeguard measure's positive impact.  *Id.* at 7, VI-4–5; *see also id.* at I-74–76, VI-4–5 (also discussing issues related to bifacial exclusion's impact on United States market).

Likewise, in a March 2020 report addressing the probable economic effects of potential modifications to the safeguard measure, issued pursuant to 19 U.S.C. § 2254(a)(4), the ITC determined that continued "exclusion for imports of bifacial modules . . . is likely to have significant effects on prices and trade in both modules and cells."  *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or*

*Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure*, Inv. No. TA-201-075, USITC Pub. 5032, at ES-3 (Mar. 2020) (*ITC Mar. 2020 Report*), *available at* https://www.usitc.gov/publications/other/pub5032.pdf.  The ITC stated that "bifacial modules are likely to account for a growing share of the market over the next few years and can substitute for monofacial products in all market segments," and that "[i]mports of bifacial modules that are exempt from safeguard tariffs put significant price pressure on U.S. module producers, as these modules can be produced at virtually the same cost as monofacial modules." *Id*. at III-4.  Hence, the ITC concluded that "lower-priced bifacial modules will likely drive down U.S. market prices for modules." *Id*. at III-5; *see also id.* at ES-4–5, I-4–5, II-9–10, II-15–18, III-1, III-4–7, D-7–10 (discussing impact of bifacial exclusion).

Following the ITC's issuance of its midterm report, section 2254(b)(1)(B), as noted, empowers the President to reduce, modify, or terminate a safeguard measure if the President "determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition."  19 U.S.C. § 2254(b)(1)(B).

The President, through USTR, received a petition from a majority of the domestic industry's representatives requesting that he: (1) withdraw the previously

13

granted bifacial exclusion; and (2) slow down the rate of reduction of the safeguard duty in its fourth year, so that the duties would reduce from 20 to 18 percent, rather than to 15 percent (while still remaining consistent with the requirement under 19 U.S.C. § 2253(e)(5) that the duties phase down over time). *Proclamation 10101*, 85 Fed. Reg. at 65,640.

The President then issued *Proclamation 10101*, in which he determined that:

1. "[T]he domestic industry has begun to make positive adjustment to import competition, shown by the increases in domestic module production capacity, production, and market share";

2. "[T]he exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in Proclamation 9693 in light of the increased imports of competing products such exclusion entails, and that it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels"; and

3. "[T]he exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-year action I proclaimed in Proclamation 9693, and that to achieve the full remedial effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent."

*Id. Proclamation 10101* thus restored application of the safeguard duties to bifacial panels and eased the reduction in the duty rate so that it would reduce from 20 to 18 (rather than 15) percent in the measure's fourth year. *Id.* at Annex.

## IV.    **Trial Court Proceedings**

In December 2020, the Solar Energy Industries Association (SEIA), a trade association representing certain sectors of the domestic solar industry, and other

parties, filed a complaint challenging *Proclamation 10101*. The plaintiffs claimed

that the President had violated various statutory procedures in issuing

*Proclamation 10101*. They additionally alleged that *Proclamation 10101* violated

19 U.S.C. § 2254(b)(1)(B) with respect to the nature and contents of the petition

the President must receive prior to taking action, and that it further violated the

provision's substantive requirements by allegedly making the safeguard measure

more trade-restrictive. For this latter argument, the plaintiffs claimed that the

statute restricts the President solely to making "trade-liberalizing" modifications.

Following dispositive cross-motions, the trial court granted summary

judgment to plaintiffs-appellees. The trial court rejected all of their procedural

challenges to *Proclamation 10101*, including by holding: (1) that the President had

received a valid domestic industry petition; (2) that the bifacial exclusion did not

constitute a "termination" of the safeguard with respect to bifacial panels; (3) that

the President had complied with section 2254 in finding that the domestic industry

"has begun to make" rather than "has made" a positive adjustment to import

competition; and (4) that the President had lawfully considered the costs and

benefits of his actions. *SEIA*, 553 F. Supp. 3d at 1330-40.

The trial court held, however, that *Proclamation 10101* had violated a

substantive requirement of 19 U.S.C. § 2254(b)(1)(B). Specifically, although

finding the term "modification" in section 2254(b)(1)(B) to be ambiguous, the trial

court held that section 2254(b)(1)(B) must be read in context "to authorize only trade-liberalizing modifications to safeguard measures." *Id.* at 1342. The court further held that *Proclamation 10101*'s two modifications, revoking the bifacial exclusion and slowing the phase-down in the duty rate for year four, made the safeguard measure more (rather than less) restrictive, and therefore exceeded the President's authority under section 2254(b)(1)(B). *Id.* at 1343.

In support of its ruling, the trial court reasoned that dictionary definitions of "modify" and "modification" allow two possible readings—one in which "modify" means to "make less extreme," and one in which "modify" refers to "the making of a limited change in something." *Id.* at 1341. Given that ambiguity, the trial court considered the overall statutory scheme, which it characterized as "a variety of interpretive and substantive requirements, as well as specific deadlines for both further investigation and the proclamation of relief." *Id.* at 1342. The court then reasoned that "[i]nterpreting Section 204(b)(1)(B) to permit both trade-restricting and trade-liberalizing modifications would run counter to this detailed statutory scheme" because "the President would be permitted to increase safeguard measures without complying with the statutory requirements necessary to initially impose those safeguards" and "there is no indication in the statute that Congress intended Section 204 to provide a loophole for the institution of harsher safeguards without the standard procedural restrictions." *Id.*

Given this reading, the trial court held that the bifacial exclusion's withdrawal, and the slowed rate of decrease in the safeguard duties for the measure's planned final year compared to what the President had previously proclaimed, "constituted both a clear misconstruction of the statute and action outside the President's delegated authority." *Id.* at 1327, 1343. The trial court thus set aside *Proclamation 10101*, enjoined the Government from enforcing the proclamation, and ordered CBP to refund all safeguard duties collected from plaintiffs-appellees pursuant to *Proclamation 10101*, with interest. *Id.* at 1343-44.[3]

## V.    **Safeguard Extension Proceedings**

While this case was pending before the trial court, members of the domestic industry filed a petition with the ITC under 19 U.S.C. § 2254(c), seeking extension of the solar safeguard measure. Subsequent to the trial court's decision, the ITC issued its report, recommending that the President extend the measure. *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*, Inv. No. TA-201-075 (Extension), USITC Pub. 5266 (Dec. 2021), *available at* https://www.usitc.gov/publications/other/pub5266.pdf. Consistent with the President's and USTR's prior factual findings in *Proclamation 10101* and USTR's April 2020 withdrawal determination, the ITC noted the dramatic increase

---

[3] CBP determined that none of the named plaintiffs had imported merchandise subject to *Proclamation 10101*, so that there was nothing to refund.

in imports of bifacial panels (which are interchangeable with non-bifacial panels) to the point at which they had recently comprised a large portion of the market. *Id.* at 36, V-12–V-13. The ITC also repeatedly identified the bifacial exclusion as a source of harm to the domestic industry that was weakening the industry's progress in making a positive adjustment under the safeguard measure. *Id.* at 33, 42, 50.

Following a notice and comment process and a public hearing, the President determined to extend the solar safeguard measure "as modified by Proclamation 10101 (to the extent permitted by law)." *Proclamation 10339: To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 87 Fed. Reg. 7,357, 7,358 ¶ 9 (Feb. 4, 2022). In doing so, and after noting the *SEIA* decision, the President excluded bifacial panels from the safeguard extension, and set the duties at a rate that continued to phase down from the 15 percent fourth-year rate required under the decision. *Id.* at 7,358 ¶¶ 6, 9. The President's extension decision thus does not affect the legal issues before this Court, while making them primarily retrospective in nature.

## SUMMARY OF THE ARGUMENT

This Court should reverse the trial court's erroneous ruling that section 2254(b)(1)(B) limits the President's authority to make a "modification" to a safeguard measure solely to "trade-liberalizing" actions. The statute's text,

structure, purpose, and history all indicate that Congress did not intend such a restrictive reading of the President's authority to implement a "modification."

First, nothing in section 2254(b) or other parts of the statute's text applicable to modifications under section 2254(b)(1)(B) contains such a restriction. The trial court's insertion of one—despite recognizing that the statutory language was otherwise ambiguous—improperly imposes a constraint that Congress did not.

The trial court's interpretation of section 2254(b)(1)(B) also poses textual problems because it conflicts with language indicating that Congress, in providing the President flexibility to make a "modification" to a safeguard measure, intended that term to carry a separate meaning from the "reduction" or "termination" of the measure authorized by section 2254(b)(1)(A). Indeed, the trial court's narrow interpretation renders "modification" in section 2254(b)(1)(B) superfluous.

More broadly, despite the trial court's focus on the statutory scheme, the court's interpretation conflicts with multiple aspects of the safeguard statute indicating that Congress did not restrict the President's ability to make limited adjustments to a safeguard measure under section 2254(b)(1)(B). These aspects include: (1) other section 2254(b) provisions authorizing non-liberalizing changes to safeguards; (2) other safeguard provisions that *unequivocally* use "modification" to connote trade-restrictive actions, as supported by legislative history showing that Congress intended the statute's open-ended definition of "modification" to include

both restricting and liberalizing actions; (3) additional legislative history showing that Congress *removed* language reflecting the trial court's interpretation from the legislation; (4) the statutory directive that the President "take all appropriate and feasible action within his power" to provide relief to a domestic industry that is suffering serious injury from imports; and (5) procedural provisions. such as the section 2253(e)(5) phase-down requirement, that resolve the trial court's expressed concern that section 2254(b)(1)(B) would be a "loophole" for the President to institute increased safeguards without procedural protections.

Individually and collectively, these numerous aspects of the safeguard statute indicate that Congress gave the President flexibility to modify safeguard measures consistent with the prevailing circumstances, and refute the contrary gloss the trial court placed on section 2254(b)(1)(B).  Indeed, this case illustrates why Congress would delegate the issue to the President.  The President faced a situation in which the ITC found that the safeguard had helped the domestic industry to start adapting to import competition, but was being hindered (absent modification) by the unanticipated effects of an improvidently-granted exclusion.

Finally, even if "modification" in section 2254(b)(1)(B) were construed as prohibiting the President from implementing an "increase" to the safeguard measure, *Proclamation 10101* should still be sustained as lawful because the modifications at issue are neutral in relation to the original safeguard measure.

*Proclamation 10101* merely restores the *status quo ante* with respect to the measure's coverage of bifacial panels, and consistent with statutory requirements, also continues the phasing-down of duty rates in the safeguard's fourth year. Hence, the President's actions in *Proclamation 10101* do not "increase" the safeguard measure, as the trial court presumed.

## **ARGUMENT**

### I.   **Standard Of Review**

This Court reviews matters of statutory interpretation *de novo*. *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1318 (Fed. Cir. 2021). Because this case involves a Presidential determination under the safeguard statute, the grounds to set the determination aside are "limited." *Silfab*, 892 F.3d at 1346. Courts review such Presidential action only for "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Id.* (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)). Further, "[t]he President's findings of fact and the motivations for his action are not subject to review." *Id.* at 1349 (quoting *Maple Leaf*, 762 F.2d at 88). Indeed, "the judgment of the President . . . on the facts . . . is no more subject to judicial review . . . than if Congress itself had exercised that judgment." *Id.* (quoting *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940)).

## II.    The Trial Court's Narrow Reading Of Section 2254 As Permitting Only "Trade-Liberalizing" Modifications To Safeguard Measures Conflicts With The Text, Structure, Purpose, And History Of Section 2254

The text, structure, purpose, and history of 19 U.S.C. § 2254(b)(1)(B) all indicate that Congress empowered the President to make appropriate modifications to a safeguard measure following the ITC's midterm report, without placing further restrictions on the nature of the President's authority.  Multiple aspects of section 2254 contradict the trial court's reading of the statute as implicitly limiting the President to making "modifications" that are "trade-liberalizing."  The better reading of the statute, and the one that should be sustained under the highly deferential standard of review applicable here, does not contain this restriction.

Our analysis begins with the statutory language—which does not contain the limitation the trial court read into section 2254(b)(1)(B)—before turning to the broader statutory context and other traditional tools of statutory construction.  Both the text and context indicate that Congress gave the President flexibility to address circumstances affecting the domestic industry's positive adjustment efforts that are identified in the ITC monitoring and reporting process, and did not prohibit the President from making limited changes to the safeguard measure even if they increase the measure's restrictiveness.  Thus, the President did not "clearly misconstrue" the statute in issuing *Proclamation 10101*.

**A. The Trial Court's Interpretation Erroneously Places A Limit On The President That Is Not Found In The Statute's Text**

Section 2254(b)(1)(B) empowers the President, after a majority of domestic industry representatives submits a petition requesting a "reduction, modification, or termination" of an existing safeguard measure, to make these types of changes. Despite the neutrality of this modification language, the trial court construed it as limiting any "modification" to one that is "trade-liberalizing." *SEIA*, 553 F. Supp. 3d at 1327, 1342-43. Nothing in the safeguard statute's text, however, limits the President's authority under section 2254(b)(1)(B) only to modifications that liberalize trade. It simply provides, if certain conditions are met, that the President may modify (in addition to reduce or terminate) a safeguard action that the President has previously proclaimed. 19 U.S.C. § 2254(b)(1)(B).

Congress thus took a neutral approach to the types of modification that the President may make. The trial court itself recognized that general definitions of "modification" do not compel the result it reached. *SEIA*, 553 F. Supp. 3d at 1341. The term "modify" connotes a moderate change, *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 225 (1994), but it ordinarily does not say anything about the direction of that change. *See id.* (collecting definitions of "modify"). The primary legal definition of "modification," for example, would cover either a tax increase

or decrease of 1 percent.[4] *Modification*, *Black's Law Dictionary* (11th ed. 2019)

("1. A change to something; an alteration or amendment <a contract modification>.

2. A qualification or limitation of something <a modification of drinking habits>");

*see also Modify* (first definition: "1. To make somewhat different; to make small

changes to (something) by way of *improvement, suitability, or effectiveness* <the

focus group helped the inventors modify their invention>.") (emphasis added).  By

way of further example, the proclamation establishing the solar safeguard measure

also implemented "Modifications" to the HTSUS under the Trade Act consisting of

"technical corrections" that both *added and deleted* provisions affecting the

eligibility of goods from Argentina for special treatment.  *See Proclamation 9693*,

83 Fed. Reg. at 3,543-44 ¶ 14, cl. 5, Annex II.

Clearly, the President's actions in *Proclamation 10101* can be described in

ordinary parlance as "modifications" to the safeguard measure.  Both restoration of

bifacial panels to the measure and the slowed phase-down of duties in the fourth

year involve limited changes to subsidiary aspects of the action.  Indeed, the trial

court recognized that the term "modification" can mean "the making of a limited

change in something."  *SEIA*, 553 F. Supp. 3d at 1341.  Nonetheless, it read a

---

[4]  As we discuss below, the Trade Act's general, open-ended definition of
"modification" as "*includ[ing]* the elimination of any duty or other import
restriction," 19 U.S.C. § 2481(6) (emphasis added), also does not resolve the issue
but entails legislative history that strongly suggests Congress intended the term to
encompass both increases and decreases in restrictiveness.

"trade-liberalizing" limitation into "modification" as used in section 2254(b)(1)(B) that Congress did not itself include. *See George S. Bush*, 310 U.S. at 378-80 (cautioning against this approach). Contrary to the trial court's approach, the Supreme Court has explained that "[w]e do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply[.]" *Jama v. Immigration and Customs Enf't*, 543 U.S. 335, 341 (2005) (cited by trial court at *SEIA*, 553 F. Supp. 3d at 1333); *see Bates v. United States*, 522 U.S. 23, 29 (1997) (similar statement); *cf. Transpacific*, 4 F.4th at 1318-33 (reversing trial court holding that provision requiring President to act within specified time implicitly limited President to acting in that period).

The trial court's engrafting of an unstated criterion onto the safeguard statute is particularly inappropriate because of the "limited" review of Presidential action, under which "relief is only rarely available." *Silfab*, 892 F.3d at 1346 (citation omitted). Courts may set aside such action only for "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Id.* (quoting *Maple Leaf*, 762 F.2d at 89); *see SEIA*, 553 F. Supp. 3d at 1330, 1335, 1340 (invoking this standard). This Court has also explained that courts may consider whether "the President has violated an *explicit* statutory mandate." *Id.* (quoting *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (emphasis added)). Here, the statute contains no such mandate,

while the trial court acknowledged with respect to section 2254(b)(1)(B) itself that "the terminology of the statute is ambiguous." *SEIA*, 553 F. Supp. 3d at 1341.

When Congress leaves a gap for the President to fill, such as by declining to prescribe whether a "modification" authorized by section 2254(b)(1)(B) must be trade-liberalizing, "[t]he President's method of solving the problem was [not] open to scrutiny[.]" *George S. Bush*, 310 U.S. at 378-79 (upholding President's determination regarding how to handle foreign exchange value issue that was not addressed in statute). Nothing in the safeguard statute limits the President's authority under section 2254(b) only to making modifications that liberalize trade. The trial court imposed a requirement, based on its perceived notions of the statute's purpose, to reject an otherwise valid definition of "modification" in a provision explicitly giving the President modification authority. The trial court's decision thus contravenes the Supreme Court's holding in *George S. Bush* that "[t]o imply [this limitation] would be to add what Congress has omitted[.]" *Id.*[5]

---

[5] As we discuss below, this is particularly so in light of the legislative history showing that Congress specifically *removed* proposed language that would have limited the statute. *See* H.R. Conf. Rep. 100-576, at 687 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1720 (proposing language); *Russello v. United States*, 464 U.S. 16, 23-24 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended."). More generally, although concluding that it was not required to consider legislative history, the trial court briefly addressed those arguments and stated that "Plaintiffs still prevail, as that history is not decisive." *SEIA*, 553 F. Supp. 3d at 1342. But if the legislative history is unclear, it suggests that Congress left a gap for the President to fill. Because Presidential gap-filling is

This case also illustrates why, as a practical matter, Congress would refrain from prescribing the nature of the modifications that the President may make, and thereby afford the President flexibility to tighten a safeguard measure when the domestic industry is making progress in adjusting to imports.  Although the ITC found that the domestic solar industry had started to make a positive adjustment, it also found that the bifacial exclusion had impaired that progress because it was resulting in an unanticipated flood of bifacial products into the United States that was significantly affecting prices for solar products and hindering the safeguard measure's positive impact.  *See*, *e.g.*, *ITC Feb. 2020 Report*, USITC Pub. 5021, at 7, VI-4–5; *ITC Mar. 2020 Report*, USITC Pub. 5032, at ES-3, III-4–III-5. Accordingly, consistent with the statute's mandate to "take all appropriate and feasible action within his power" to facilitate a domestic industry's efforts to make a positive adjustment to import competition, the President found that revoking the exclusion was necessary to ensure the safeguard measure's effectiveness. *Proclamation 10101*, 85 Fed. Reg. at 65,640.

In short, the trial court's reading of section 2254(b)(1)(B) lacks a basis in the statute's text.  In light of Congress's silence on the specific issue, the court erred by failing to affirm the President's reasonable interpretation.

---

not reviewable, ambiguity in the legislative history should favor the President's interpretation, not plaintiffs-appellees' interpretation.

## B. The Trial Court's Interpretation Renders The Term "Modification" In Section 2254(b)(l)(B) Superfluous

The trial court's interpretation of section 2254(b)(l)(B) is also erroneous because it renders Congress's inclusion of the term "modification" in the provision superfluous.  "The presumption against surplusage . . . provides that a 'statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'"  *Wolfe v. McDonough*, 28 F.4th 1348, 1354-55 (Fed. Cir. 2022) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).  Section 2254(b)(l)(B) allows the President to reduce, *modify*, or terminate a safeguard action, following the ITC's midterm report, based upon the requisite petition "requesting such reduction, modification, or termination."  19 U.S.C. § 2254(b)(1)(B).  To interpret "modification" as allowing only a reduction to the safeguard action makes the terms "modification" and "reduction" redundant.

That Congress gave "modification" a distinct meaning is apparent from the contrast in the range of actions that the President can take under sections 2254(b)(1)(A) and 2254(b)(1)(B).  Section 2254(b)(1)(A) *solely* permits the President to proclaim the "reduction" or "termination" of a safeguard measure based on inadequate domestic industry adjustment efforts or changed economic circumstances.  19 U.S.C. § 2254(b)(1)(A).  Section 2254(b)(1)(B) *additionally* authorizes the President to make a "modification" to the safeguard measure when the domestic industry has made a positive adjustment—indicating the Congress

saw "modification" as something distinct from "reduction" or "termination" of the safeguard action.  19 U.S.C. § 2254(b)(1)(B).  Although modifications certainly *can* be "trade-liberalizing," they can also be intended to support the industry's positive adjustment efforts and ensure the measure's effectiveness.

The trial court sought to give "modification" a distinct meaning by suggesting that it allows for an "increase" in the volume of imports permitted under a previously-imposed quota, which would be "trade-liberalizing."  *SEIA*, 553 F. Supp. 3d at 1342 & n.9.  But this example makes little sense because an "increase" in the volume of a quota is a "reduction" in the safeguard action; it allows more imports to enter into the United States not subject to safeguard duties. This example thus provides no distinction between the "reduction" and "modification" of a safeguard measure.

The trial court's example is also contradicted by the textual distinctions between sections 2254(b)(1)(A) and (B).  Because section 2254(b)(1)(A) refers solely to "reduction" or "termination" (but not modification) of a safeguard measure, if raising the quota level were a "modification" that is distinct from "reduction" or "termination," the President would lack authority to do it under section 2254(b)(1)(A).  That is, the President would *lack* authority to ease the safeguard measure's restrictiveness in this way because section 2254(b)(1)(A) would not authorize such trade-liberalizing "modifications" distinct from a

reduction or termination of the safeguard measure. That is clearly not the case, and would be contrary to section 2254(b)(1)(A)'s evident purpose to permit loosening of a safeguard measure when the domestic industry's inadequate efforts or changed economic circumstances warrant doing so. *See* 19 U.S.C. § 2254(b)(1)(A).

The trial court itself compared section 2254(b)(l)(B) to the actions permitted by section 2254(b)(l)(A) as evidence that Congress intended solely "to provide an escape hatch from those safeguards where domestic industry has adequately adapted to import competition." *SEIA*, 553 F. Supp. 3d at 1342. Because subparagraph (A) only permits "reduction" and "termination," it does not support restrictively interpreting "modification" in subparagraph (B). If anything, it supports a reading that does not render "modification" superfluous. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Bates*, 522 U.S. at 29-30 (quoting *Russello*, 464 U.S. at 23 (additional citation omitted)).

Thus, the trial court erred by adopting an interpretation that renders the term "modification" superfluous.

### C. Multiple Aspects Of The Statutory Scheme Indicate That Congress Did Not Limit The President's Exercise Of Section 2254(b)(1)(B) Authority To "Trade-Liberalizing" Actions

Numerous aspects of the safeguard statute contradict the trial court's holding that the President's authority to modify a safeguard measure permits only "trade-liberalizing" actions. Rather, the broader statutory scheme and relevant legislative history indicate that Congress gave the President the flexibility to make limited modifications to support progress being made by the domestic industry, without requiring such modifications to be either trade-liberalizing or restricting.

The trial court found that the safeguard statutory scheme includes "a variety of interpretive and substantive requirements, as well as specific deadlines for both further investigation and the proclamation of relief." *SEIA*, 553 F. Supp. 3d at 1342. It then reasoned that "[i]nterpreting Section 204(b)(l)(B) to permit both trade-restricting and trade-liberalizing modifications would run counter to this detailed statutory scheme," because under that view, "the President would be permitted to increase safeguard measures without complying with the statutory requirements necessary to initially impose those safeguards." *Id.* But the detailed statutory scheme, in fact, supports the opposite conclusion.

First, the statute does not require every action affecting a safeguard measure to be "trade-liberalizing." The *only* part of the statute that calls for liberalization, which the trial court did not cite in its opinion, is 19 U.S.C. § 2253(e)(5). That

provision requires certain types of actions, such as duties, to be "phased down at regular intervals during the period in which the action is in effect." *Id.* Notably, section 2253(e)(5) does not address exclusions. Consequently, *Proclamation 10101,* which slowed but continued the downward trajectory of the duty rate, while restoring those duties on bifacial panels, is consistent with the statutory phase-down requirement. Given that the Supreme Court is reluctant to "assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply"—especially "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest"—the existence of section 2253(e)(5) underscores the trial court's error in reading an unstated limitation into section 2254(b)(1)(B). *Jama,* 543 U.S. at 341.

Second, the trial court's suggestion that section 2254 is intended solely as an "escape hatch" that prohibits trade-restricting modifications "without complying with the statutory requirements necessary to initially impose those safeguards" is contradicted by multiple other aspects of the safeguard statute. *SEIA*, 553 F. Supp. 3d at 1342. These provisions make clear that Congress's use of "modification" in section 2254(b)(1) does not entail the restrictive meaning the trial court ascribed, and gave the President flexibility to make modifications such as those here.

Specifically, for example, the section 2254(b) provisions permitting "Reduction, modification, and termination" of safeguard actions include section

2254(b)(2), which authorizes the President "to take such additional action under section 2253 of this title as may be necessary to eliminate any circumvention of any action previously taken under such section."  19 U.S.C. § 2254(b)(2).  This provision contemplates that the President may *further restrict* the measures in the initial safeguard the President announces to combat "circumvention."  Nothing in sections 2253 and 2254 requires the President to follow procedures akin to the statute's initial requirements before addressing circumvention.  Indeed, section 2254(b)(2) prescribes *fewer* procedures for the President to take action than either of the two provisions under section 2254(b)(1).  *See id.*

Similarly, section 2254(b)(3) authorizes the President to "modify" a safeguard measure to bring it into conformity with a WTO decision, without regard to whether the modification loosens or further restricts the measure.[6]  19 U.S.C. § 2254(b)(3).  The existence of sections 2254(b)(2) and 2254(b)(3) belies the trial court's holding that the statute's "intricate framework" restricts all modifications to those that are "trade-liberalizing."  *SEIA*, 553 F. Supp. 3d at 1341.

Further, as we discussed above, section 2254(b)(l)(A) permits only the "reduction" or "termination" (but not modification) of a safeguard measure if the President determines either that the domestic industry's adjustment efforts have

---

[6]  The President could respond to a WTO ruling, for example, by applying a safeguard measure to merchandise from one or more countries that were previously exempted from the measure, which would be more trade-restrictive.

been inadequate or that changed economic circumstances have impaired the measure's effectiveness.  19 U.S.C. § 2254(b)(1)(A).  By contrast, Congress in section 2254(b)(1)(B) conferred additional authority on the President to modify a safeguard measure if the President determines that the domestic industry has made a positive adjustment to import competition.  This distinction logically suggests that Congress intended to give the President greater flexibility to take action when progress is being made, to protect and ensure the continuation of that progress.  *See Id.* § 2254(a) (noting ITC role to monitor "the progress and specific efforts made by workers and firms . . . to make a positive adjustment to import competition").

Beyond section 2254 itself, an especially stark refutation of the trial court's reasoning lies in Congress's use of "modification" in sections 2252 and 2253 of the safeguard statute in a manner that *unequivocally* connotes the President taking trade-restrictive action when proclaiming the initial safeguard action.  Sections 2252(e)(2)(C) and 2253(a)(3) authorize the ITC to recommend, and the President to then impose, safeguard measures consisting of "a *modification* or imposition of any quantitative restriction on the importation of the article into the United States" (connoting trade-restrictive modification of a quota).  19 U.S.C. §§ 2252(e)(2)(C), 2253(a)(3) (emphasis added).  The use of "modification" in yet another provision, section 2252(d)(5)(C), also reflects Congress authorizing trade-restrictive actions in the context of providing provisional relief under the statute.  *Id.* § 2252(d)(5)(C).

34

These provisions demonstrate that the term "modification" in the Trade Act of 1974 was *not* intended to refer solely to trade-liberalizing actions.

It is "a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.,* 566 U.S. 560, 571 (2012) (internal quotation marks omitted). That principle applies here to foreclose the trial court's overly narrow interpretation of "modification" in section 2254(b)(1)(B).

This point is underscored by the legislative history of the Trade Act's general definition of "modification" in 19 U.S.C. § 2481(6). As we explain above, precursor bills to the final act contained this open-ended definition (as well as safeguard provisions) and were accompanied by congressional explanations showing that Congress viewed the definition as *including* trade-restrictive actions. The House report accompanying the Trade Reform Act of 1973 explains that "[t]he term 'modification,' as applied to any duty or other import restriction, includes the elimination, *or imposition*, of any duty or other import restriction, *as well as changes or increases and decreases in the existing duty or import restriction*." H.R. Rep. No. 93-571, at 89 (emphasis added). The report accompanying the Senate's version of the bill, the Trade Reform Act of 1974, explains that "[t]he term 'modification,' as applied to any duty or other import restriction, would include the elimination of any duty or other import restriction, *as well as changes*

*in the existing duty or import restriction*." S. Rep. No. 93-1298, at 230 (emphasis added).[7] This history strongly suggests that the statutory definition of "modification"—consistent with the term's trade-restrictive use in sections 2252 and 2253—includes potentially trade-restrictive actions.

Congress enacted section 2254(b)(1)(B) against this backdrop of text and history treating the term "modification" as connoting both increases and decreases to import restrictions. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418 § 1401, 102 Stat 1107 (Aug. 23, 1988). Indeed, the legislation even included several of the safeguard statute's unequivocally trade-restricting "modification" provisions discussed above. *See id.* Thus, it was error for the trial court to interpret the legislation as solely authorizing "trade-liberalizing" actions.

Section 2254(b)(1)(B)'s specific legislative history even further illustrates that Congress did not require a "modification" to be a one-way downward ratchet. An earlier unenacted version of the legislation stated that, upon receipt of the ITC midterm report, "the President may reduce, modify (*but not increase*), or terminate any action . . ." H.R. Conf. Rep. 100-576, at 687 (1988), *reprinted in* 1988

---

[7] The Trade Act of 1974 ultimately incorporated the definition of "modification" that appeared in the precursor bills. *See* Trade Act of 1974, Pub. L. 93-618 § 601(6), 88 Stat. 1978, 2072 (Jan. 3, 1975). A House conference report, which appears to be the only legislative history accompanying the final act as passed, does not discuss the "modification" definition. Consequently, there is nothing to suggest that Congress's discussions of the "modification" definition in the precursor bills is not equally applicable to the Trade Act as passed.

U.S.C.C.A.N. 1547, 1720 (emphasis added).  Congress *removed* this limit in enacting section 2254(b)—and, again, it did so against the backdrop of statutory text and history otherwise treating the term "modification" as connoting both increases and decreases to an import restriction.

The trial court held that the legislative history was not decisive, and even favored the plaintiffs.  *See SEIA*, 553 F. Supp. 3d at 1342 & n.9.  But it is hard to reconcile Congress's removal of language precluding increases with the conclusion that Congress nonetheless intended to restrict the President in that way.  *See Russello*, 464 U.S. at 23-24 ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended."); *George S. Bush*, 310 U.S. at 378-79 ("To imply [this limitation] would be to add what Congress has omitted[.]").  The trial court's reading, in effect, re-inserts a limitation that Congress deliberately removed.

## D. The Statute's Evident Purpose Further Contradicts The Trial Court's Interpretation

In adopting a restrictive definition of "modification," the trial court misconstrued the statute's purpose.  The overarching purpose of the safeguard statute (including section 2254) is to support domestic industries facing serious injury from import competition.  The statute, twice, directs the President to "take all appropriate and feasible action within his power" to facilitate domestic industry efforts to adjust, while providing greater economic and social benefits than costs.

19 U.S.C. §§ 2251(a), 2253(a)(1). Yet, the trial court interpreted section 2254 as solely "intended to provide an escape hatch from [the] safeguards" such that "interpreting the statute to permit trade-restricting modifications would undermine the broader statutory scheme." *SEIA*, 553 F. Supp. 3d at 1342.

To the contrary, "evident purpose always includes effectiveness." *Transpacific*, 4 F.4th at 1323 (citation omitted). The trial court's analysis of statutory purpose failed to acknowledge Congress's repeated directive to the President to act to meet the statute's objectives. 19 U.S.C. §§ 2251(a), 2253(a)(1). Congress delegated broad discretion to the President to determine what measures are needed to meet those statutory objectives, and the President's exercise of that discretion is not subject to judicial review. *Silfab*, 892 F.3d at 1349. Here, the President determined—based on factual findings not subject to review—that the bifacial exclusion was undermining the safeguard measure he had imposed to the detriment of the domestic industry and that a modification was necessary. *See Proclamation 10101*, 85 Fed. Reg. at 65,640. Indeed, he even indicated in the original proclamation establishing the safeguard measure that such modifications might be necessary to effectuate the measure's purpose if the conditions set forth in section 2254(b)(1) were met. *Proclamation 9693*, 83 Fed. Reg. at 3,542 ¶ 12.

Consistent with the overarching statutory purpose, section 2254(b)(1)(B) is one of several section 2254 provisions authorizing the President to make necessary

38

changes to a safeguard measure.  But under the trial court's reading, the President is powerless to use this section 2254(b)(1)(B) modification authority to address a loophole that is undermining a safeguard measure's effectiveness, in this case an exclusion granted improvidently based on the President's delegated authority. "Remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).  As demonstrated by this case, the trial court's reading of "modification" hampers the President's ability to accomplish the statute's evident purpose.  *Cf. Transpacific*, 4 F.4th at 1323 ("It is enough to say that the Trade Court's categorical narrow reading of § 1862(c)(1)— precluding all impositions adopted after the 15-day period in implementation of a plan announced within the period—obstructs the statutory purpose.").

This misreading of purpose led to an absurd result: the trial court *barred* the President, despite his explicit authority to make modifications following a midterm review under section 2254(b)(1)(B), from "tak[ing] all appropriate and feasible action within his power" to meet the statute's objective.  *Cf. Nat'l Ass'n of Mfrs. v. Dep't of Treasury*, 10 F.4th 1279, 1288 (Fed. Cir. 2021) (finding absurd, and thus invalid, interpretation that read "a restriction that does not exist" into statute).

Our understanding of the statute's purpose is supported by historic Presidential exercise of section 2254 authority.  We are aware of at least one instance in which the President has modified a safeguard measure in a trade-

restrictive manner following the ITC's midterm report. *See Proclamation 7314: To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*, 65 Fed. Reg. 34,899 (May 26, 2000).  In that case, the President, based on increased imports of wheat gluten from Poland that had impaired the effectiveness of the safeguard, added imports from Poland to the safeguard measure, which imposed quantitative limitations on imports from a certain set of countries.[8] *See id.*; *see also Transpacific*, 4 F.4th at 1326 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) ("We think history and practice give the edge to this latter position.")).

### E. The Trial Court's Concern About Section 2254(b)(1)(B) Becoming A "Loophole" For The President To Take New Actions Is Inaccurate

The trial court's holding is further based on a flawed concern that the President would use the modification provision as a "loophole" to sidestep the requirements to impose a safeguard.  Section 2254(b)(1)(B) *does* contain preconditions to modify a safeguard measure that are separate and different from those applicable to an initial safeguard action.  These include receipt of an ITC midterm report, which the trial court recognized.  *See SEIA*, 553 F. Supp. 3d at 1342.  Section 2254(b)(1)(B) also requires a majority of the domestic industry representatives to have filed a petition requesting the modification.  Yet another requirement is that the President must find that the domestic industry has made a

---

[8] President Clinton invoked 19 U.S.C. § 2254(b)(1)(A), rather than 19 U.S.C. § 2254(b)(1)(B), but that does not detract from this historical example of a "modification" under section 2254(b)(1) including trade-restrictive action.

positive adjustment to import competition—a requirement not present in, and distinguishing section 2254(b)(l)(B) from, the more limited adjustments authorized by section 2254(b)(l)(A). Again, these preconditions are consistent with Congress providing the President greater flexibility to take action when progress is being made, including to protect and ensure continuation of that progress.

The trial court's apparent concern about giving the President unfettered authority to institute harsher safeguards without procedural restrictions, *see SEIA*, 553 F. Supp. 3d at 1342, also fails to appreciate the overall requirement in section 2253(e)(5) that duties imposed under a safeguard measure be phased down over time. This provision not only limits the President to the duty rate of the original safeguard measure, but also the procedural requirements that led the President to institute the measure. Section 2253(e)(5) ensures that any duty rate modification will not exceed the original measure's scope, and thus, for example, precludes the President from using section 2254(b)(1)(B) to raise the duties beyond the previous year's level. Likewise, the President remains bound by section 2253(e)(3)'s limitation that the President may not take a safeguard action to impose or increase a duty rate to more than 50 percent *ad valorem* above the rate existing at the time the action is taken. *See* 19 U.S.C. § 2253(e)(3). Thus, contrary to the court's holding, "interpreting the statute to permit trade-restricting modifications," does not "undermine the broader statutory scheme." *See SEIA*, 553 F. Supp. 3d at 1342.

Finally, contrary to the trial court's "loophole" rationale, the trial court's interpretation has significant consequences for both current and future safeguard measures, as illustrated by the ITC's report regarding potential extension of the solar safeguard. The ITC noted the dramatic increase in imports of bifacial panels (which are interchangeable with non-bifacial panels) to the point at which they comprise a large portion of the market, and repeatedly identified the bifacial exclusion as a source of harm to the domestic industry that was weakening its progress in making a positive adjustment to import competition. *See* USITC Pub. 5266 at 33, 36, 42, 50, V-12–V-13. If the President cannot use the statutory modification authority to address developments like these in the future—regardless of whether the President determines to do so in a particular case—it will curtail the President's ability to provide a safeguard remedy for suffering United States industries as Congress intended.

## III. The Trial Court Erred In Treating The President's Actions As "Increases" To The Safeguard Action That Violate The Statute

Alternatively, even if the term "modification" does not encompass measures that heighten the severity of the safeguard measure, the trial court nonetheless erred in setting aside *Proclamation 10101*.

The trial court's holding presupposes that *Proclamation 10101* is a trade-restricting "increase" in the safeguard action that resulted in the "institution of harsher safeguards." *SEIA*, 553 F. Supp. 3d at 1342. *Proclamation 10101* did not

42

"increase" the safeguard measure.  The President's rescission of USTR's exclusion for bifacial solar panels did not cause duties to be imposed on any goods not subject to the original safeguard measure; it simply restored the measure's original scope.  Likewise, the portion of *Proclamation 10101* that addressed the fourth-year tariff level did not mandate a duty rate higher than the duty rate established by the original safeguard measure; it simply slowed the pace at which the duty rate would phase down in that fourth year.  Neither action increased the duty beyond 20 percent, the rate established in *Proclamation 9693* for the preceding year.  *See Proclamation 10101*, 85 Fed. Reg. at 65,640; *Proclamation 9693*, 83 Fed. Reg. at 3,542 ¶ 8, Annex I (text at ¶¶ (f) and (h)).[9]

The trial court's error in this regard is two-fold.  First, beyond inaccurately treating the President's actions as "increases" to the safeguard measure, the trial court overlooked that the term "modification" should at least be interpreted to accommodate neutral changes to subsidiary aspects of the safeguard measure.  The modifications here are at least neutral in the sense of restoring the *status quo ante,* without expanding the measure that the President originally proclaimed.  Because

---

[9]  In other contexts, the Supreme Court similarly has distinguished between altering something from its current level and preventing a planned change from taking effect.  *See United States* v. *Will*, 449 U.S. 200, 228-29 (1980) (holding that legislation preventing planned increase in judicial salaries from taking effect was constitutionally valid because it did not "diminish" compensation of Federal judges in violation of Compensation Clause).

*Proclamation 10101* is neutral—and, in actuality, the slower decrease in the phase-down remains trade-liberalizing because the duty rate still decreased—it does not violate any principle that would prohibit the President from instituting additional measures "without complying with the statutory requirements necessary to initially impose those safeguards." *SEIA*, 553 F. Supp. 3d at 1342.

Indeed, the trial court's treatment of the President's rescission of the bifacial exclusion as an "increase" to the safeguard measure is inconsistent with its concurrent holding that USTR's original exclusion grant *did not* constitute a "termination" of the safeguard measure with respect to bifacial panels. *See SEIA*, 553 F. Supp. 3d at 1336-38. If bifacial panels were never terminated from the safeguard measure, then they were never outside its scope, such that withdrawing the exclusion would "increase" the measure. Likewise, consistent with section 2253(e)(5)'s requirement that duties imposed under the safeguard measure phase down over time, the revision of the duty rate in the measure's fourth year to be 18 percent rather than 15 percent (compared to a third year rate of 20 percent) remains a net *reduction* in the duty rate between years three and four—not an increase.

Second, to the extent the trial court's interpretation of section 2254(b) based on the "broader statutory scheme" derives from section 2253(e)(5)'s phase-down requirement (which the court did not explicitly cite), the provision's language stating that the President's "action [under 19 U.S.C. § 2253(a)(3)(A), (B), or (C)]

shall be phased down at regular intervals" while it is in effect contradicts that approach. 19 U.S.C. § 2253(e)(5). The "action" that section 2253(e)(5) references is the overall safeguard action that the President instituted, not subsidiary matters, such as granting or withdrawing an exclusion. *See id.* § 2253(a)(3) (describing "action" in terms connoting the overall safeguard measure, rather than subsidiary matters such as exclusions). Nothing in section 2253(e)(5) prohibits subsidiary modifications to existing safeguard measures such as those in this case. *Cf. Transpacific*, 4 F.4th at 1321-22 (holding that Section 232 timing requirements applied to proclamation of overall plan of action, not "each individual discrete imposition on imports"). Indeed, *Proclamation 9693* stated explicitly that the President intended to make necessary modifications under section 2254(b)(1) as part of his "action." *Proclamation 9693*, 83 Fed. Reg. at 3,542; *cf. Transpacific*, 4 F.4th at 1318-19 (holding that President, in exercising statutory authority to act to alleviate national security threats from imports, could announce continuing course of action and modify initial implementing steps in line with that plan).

Consequently, even if the statute limits the scope of Presidential action as the trial court held, the President's subsidiary, neutral modifications in *Proclamation 10101* should be sustained as lawful.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court reverse the

judgment and direct the trial court to enter judgment in favor of defendants.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:                              /s/ Joshua E. Kurland
MICHAEL T. GAGAIN                JOSHUA E. KURLAND
Assistant General Counsel          Trial Attorney
Office of the United States Trade    U.S. Department of Justice
  Representative                            Civil Division
Washington, D.C.  20508            Commercial Litigation Branch
                                                    P.O. Box 480, Ben Franklin Station
                                                    Washington, D.C.  20044
                                                    Tel: (202) 616-0477
                                                    Fax: (202) 353-0461

                                                    Email: Joshua.E.Kurland@usdoj.gov

May 11, 2022                              *Attorneys for Defendants-Appellants*

# Addendum

## UNITED STATES COURT OF INTERNATIONAL TRADE

SOLAR ENERGY INDUSTRIES
ASSOCIATION, NEXTERA ENERGY,
INC., INVENERGY RENEWABLES LLC,
and EDF RENEWABLES, INC.,

        **Plaintiffs,**

    v.

UNITED STATES, UNITED STATES
CUSTOMS AND BORDER
PROTECTION, AND TROY A. MILLER,
IN HIS OFFICIAL CAPACITY AS
ACTING COMMISSIONER OF UNITED
STATES CUSTOMS AND BORDER
PROTECTION,

        **Defendants.**

Before:  Gary S. Katzmann, Judge
Court No. 20-03941

### <u>JUDGMENT</u>

This case having been submitted for decision, and the court, after due deliberation, having

rendered an opinion; now, in conformity with that opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED** that Defendants' Motion to Dismiss is **DENIED**; and it is further

**ORDERED** that <u>Proclamation 10101: To Further Facilitate Positive Adjustment to</u>

<u>Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not</u>

<u>Partially or Fully Assembled into Other Products)</u>, 85 Fed. Reg. 65,639 (Oct. 16, 2020)

("<u>Proclamation 10101</u>") is **SET ASIDE** as null and void; and it is further

**ORDERED** that Customs and Border Protection shall refund with interest all increased

safeguard duties heretofore collected from Plaintiffs under <u>Proclamation 10101</u>; and it is further

Court No. 20-003941                                                      Page 2

     **ORDERED** that Defendants and their agents are enjoined from taking any further action to effectuate or enforce <u>Proclamation 10101</u>.

     **SO ORDERED.**

<div align="right">

<u>/s/  Gary S. Katzmann</u>
Gary S. Katzmann, Judge

</div>

Dated: <u>November 16, 2021</u>
       New York, New York

Slip Op. 21-154

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, and EDF RENEWABLES, INC.,**<br><br>         **Plaintiffs,**<br><br>     **v.**<br><br>**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, AND TROY A. MILLER, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF UNITED STATES CUSTOMS AND BORDER PROTECTION,**<br><br>         **Defendants.** | **Before: Gary S. Katzmann, Judge**<br>**Court No. 20-03941** |

## <u>OPINION</u>

[The court denies Defendants' motion to dismiss and grants Plaintiffs' motion for summary judgment.]

Date: <u>November 16, 2021</u>

<u>Matthew R. Nicely</u> and <u>Daniel M. Witkowski</u>, Akin, Gump, Strauss, Hauer & Feld LLP, of Washington, D.C., argued for Plaintiffs Solar Energy Industries Association and NextEra Energy, Inc. With them on the briefs were <u>James E. Tysse, Devin S. Sikes</u> and <u>Julia K. Eppard</u>.

<u>Amanda Shafer Berman</u>, and <u>John Brew</u>, Crowell & Moring LLP, of Washington, D.C. and New York, N.Y., argued for Plaintiff Invenergy Renewables LLC. With them on the briefs were <u>Larry F. Eisenstat</u> and <u>Frances Hadfield</u>.

<u>Christine M. Streatfeild</u> and <u>Kevin M. O'Brien</u>, Baker & McKenzie LLP, of Washington, D.C., argued for Plaintiff EDF Renewables, Inc.

<u>Stephen C. Tosini</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S.

Department of Justice, of Washington, D.C., argued for Defendants United States, United States Customs and Border Protection, and Troy A. Miller, in his Official Capacity as Acting Commissioner of United States Customs and Border Protection. With him on the briefs were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director, and Joshua E. Kurland, Trial Attorney.

Katzmann, Judge: Solar modules consist of cells that convert sunlight into electricity on both the front and the back of the cells.[1] The court has on five occasions addressed ongoing litigation involving efforts by the President to withdraw an exclusion from safeguard duties on imported solar modules, duties which the President had imposed by proclamation to protect the domestic industry from serious injury suffered due to increased imports.[2] Flowing from a new complaint, the case now before the court principally involves the most recent effort by the President in 2020, invoking Section 204 of the Trade Act of 1974 ("Trade Act") -- a separate track not adjudicated in the previous litigation -- to withdraw an exclusion from safeguard duties on imported solar modules. That section provides that if certain conditions are met, the President is authorized to "reduce, modify, or terminate" previously instituted safeguard measures. Plaintiffs Solar Energy Industries Association ("SEIA"), NextEra Energy, Inc. ("NextEra"), Invenergy Renewables LLC ("Invenergy"), and EDF Renewables, Inc. ("EDF-R")[3] have initiated this suit to

---

[1] For purposes of this opinion, the terms "solar modules" and "solar panels" are used interchangeably.

[2] Prelim. Inj. Order and Op., Invenergy Renewables LLC v. United States, 43 CIT __, 422 F. Supp. 3d 1255 (2019) ("Invenergy I"); Order and Op. Den. Mot. to Show Cause, id., 44 CIT __, 427 F. Supp. 3d 1402 (2020) ("Invenergy II"); Order and Op. Den. Mot. to Dissolve Prelim Inj., Mots. to Dismiss and Granting Mot. to Suppl. Compl., id., 44 CIT __, 450 F. Supp. 3d 1347 (2020) ("Invenergy III"); Order and Op. Den. Mot. to Dissolve Prelim Inj., Mot. to Stay, Granting Mot. to Modify Prelim. Inj., Mot. to Complete Administrative R., and Vacating USTR Decision, id., 44 CIT __, 476 F. Supp. 3d 1323 (2020) ("Invenergy IV"); Order and Op. Den. Mot. to Modify Prelim. Inj., id., 44 CIT __, 482 F. Supp. 3d 1344 (2020) ("Invenergy V").

[3] Per the complaint, SEIA "is the national trade association for the U.S. solar industry, with hundreds of member companies . . . throughout the solar value chain, including importers, manufacturers, distributors, installers, and project developers[;]" "NextEra is one of the largest

challenge Presidential Proclamation 10101, which withdrew the exclusion of bifacial solar panels

from Section 201 safeguards on imported crystalline silicon photovoltaic ("CSPV") solar panels.

Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of

Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into

Other Products), 85 Fed. Reg. 65,639 (Oct. 16, 2020) ("Proclamation 10101"); Complaint at 1,

Dec. 29, 2020, ECF No. 2 ("Compl."). Named as Defendants are the United States, United States

Customs and Border Protection ("CPB"), and Troy A. Miller, in his Official Capacity as Acting

CBP Commissioner (collectively "the Government.")

This case raises a number of questions regarding the interface of Proclamation 10101 with

Sections 201–204 of the Trade Act.  For example: (1) Do three letters (reflecting a majority of the

domestic industry production) which seek the modification of safeguards constitute a petition as

required by statute?  (2) Is the requirement that a petition be submitted to the President satisfied

by submission to the United States Trade Representative ("USTR")?  (3) Does the Proclamation's

withdrawal of the exclusion for bifacial modules violate the statutory temporal restrictions which

must be met before new presidential action may be taken?  (4) Was Proclamation 10101 issued in

violation of the requirement that the President determine that an action will "provide greater

economic and social benefits than costs"?  (5) Can the word "modify" in Section 204(b)(1)(B) be

read to permit increased restrictions on trade?  The court concludes that with respect to the first

four questions, the answer is "Yes."  With respect to the fifth question, the answer is "No."

---

electric power and energy infrastructure companies in North America and a leader in the renewable
energy industry[;]" Invenergy Renewables, LLC, "is the world's leading independent and
privately-held renewable energy company" [and] "develops, owns and operates large-scale
renewable and other clean energy generation facilities around the world[;]" and EDF Renewables,
Inc. "has more than 30 years of expertise in the renewable energy industry," with a focus on "wind,
solar, energy storage and offshore wind."  Compl., ¶¶ 7-9.

Plaintiffs allege that <u>Proclamation 10101</u> violates Sections 201, 203 and 204 of the Trade Act and seek both a declaratory judgment that the proclamation is unlawful and the injunction of its enforcement. Compl. at 16–21. The Government has moved to dismiss Plaintiffs' complaint; Plaintiffs oppose this motion and have moved separately for summary judgment. The Government in turn opposes Plaintiffs' motion. The court concludes that the various procedural challenges posed by Plaintiffs to <u>Proclamation 10101</u> are unpersuasive. However, the court also concludes that because Section 204(b)(1)(B) permits only trade-liberalizing modifications to existing safeguard measures, <u>Proclamation 10101</u>'s withdrawal of the exclusion of bifacial solar panels and increase of the safeguard duties on CSPV modules constituted both a clear misconstruction of the statute and action outside the President's delegated authority. The court now grants Plaintiffs' motion for summary judgment and denies the Government's motion to dismiss.

## BACKGROUND

### I.    *Legal & Regulatory Framework*

Section 201 of the Trade Act of 1974 authorizes the executive branch to implement discretionary protective measures ("safeguards") to protect a domestic industry from the harm associated with an increase in imports from foreign competitors, and Sections 202 through 204 lay out the procedures for issuing such safeguards. 19 U.S.C. §§ 2251–54. Relevant here, Section 202 provides that upon petition from domestic entities or industries, the International Trade Commission ("ITC") may make an affirmative determination that imports have seriously injured, or threaten serious injury to, domestic industry. 19 U.S.C. § 2252. Once such a determination has been made, Section 203 permits the President to authorize safeguard measures to temporarily

protect domestic industry from the identified harm.  19 U.S.C. § 2253.

For the duration of any safeguard measure, Section 204 provides that the ITC shall monitor "developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition."  19 U.S.C § 2254(a)(1).  If a safeguard duty is imposed for longer than three years, the ITC "shall submit a report on the results of the monitoring . . . to the President and to the Congress not later than the date that is the mid-point of the initial period, and of each such extension, during which the action is in effect."  19 U.S.C § 2254(a)(2).

Upon receipt of this report, the President is authorized to reduce, modify, or terminate the safeguard measures according to either 19 U.S.C. § 2254(b)(1)(A) or 19 U.S.C. § 2254(b)(1)(B).  The statute specifically provides that:

> (1)  Action taken under [Section 203] may be reduced, modified, or terminated by the President (but not before the President receives the report required under subsection (a)(2)(A)) if the President—
>
>> (A)  after taking into account any report or advice submitted by the Commission under subsection (a) and after seeking the advice of the Secretary of Commerce and the Secretary of Labor, determines, on the basis that either—
>>
>>> (i)  the domestic industry has not made adequate efforts to make a positive adjustment to import competition, or
>>>
>>> (ii)  the effectiveness of the action taken under [Section 203] of this title has been impaired by changed economic circumstances, that changed circumstances warrant such reduction, or termination;
>>
>> (B)  determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b)(1).

Safeguard measures have a maximum duration of four years, unless extended for another maximum of four years based upon a new determination by the ITC.  19 U.S.C. § 2253(e)(1).  In addition, measures resulting in the increase or imposition of duties on an article, the institution of a tariff-rate quota with respect to an article, the imposition or modification of qualitative import restrictions on an article, or limitations on the import of an article subject to international agreements face a two-year "cooling-off period," during which further action is restricted.  19 U.S.C. § 2253(e)(7)(A).  Once terminated, such safeguard measures may not be re-imposed, nor may additional such measures be enacted on the same article, for at least two years following the date of termination.  Id.

## II.    *Factual Background & Procedural History*

On January 23, 2018, President Trump issued Presidential Proclamation 9693, which imposed a safeguard measure under Section 203(a)(3) of the Trade Act on certain CSPV products. Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes, 83 Fed. Reg. 3,541 (Jan. 23, 2018) ("Proclamation 9693"). Proclamation 9693 imposed a duty on CSPV modules for a four-year period beginning on February 7, 2018.  Id.

On February 14, 2018, USTR published a notice detailing the procedures to request a product exclusion.  Procedures to Consider Additional Requests for Exclusion of Particular Products from the Solar Products Safeguard Measure, 83 Fed. Reg. 6,670 (USTR Feb. 14, 2018). Pursuant to these procedures, on June 13, 2019, USTR granted a number of requested exclusions from the safeguard measures declared by Proclamation 9693, including an exclusion for bifacial

solar panels.  Exclusion of Particular Products from the Solar Products Safeguard Measure, 84

Fed. Reg. 27,684 (USTR Jun. 13, 2019).

USTR attempted to withdraw the exclusion of bifacial solar panels on October 9, 2019 and

again on April 17, 2020.  Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products

Safeguard Measure, 84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) ("First Withdrawal");

Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar

Products, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) ("Second Withdrawal").  Each withdrawal

was issued on the basis that "[s]ince publication of [the exclusion] notice, the U.S. Trade

Representative has evaluated this exclusion further and . . . determined it will undermine the

objectives of the safeguard measure," First Withdrawal, 84 Fed. Reg. at 54,244; with the Second

Withdrawal noting that bifacial solar panel imports are directly substitutable for domestically-

produced monofacial solar panels, and concluding that because "[c]ompetition from low-priced

imports prevented domestic producers from selling significant quantities of solar panels in the

utility segment during the ITC's original investigation period . . . low-priced imports of bifacial

solar panels due to the exclusion are likely to have a similar effect under current market

conditions," 85 Fed. Reg. at 21,498.

Both attempted withdrawals were challenged before the court in Invenergy Renewables

LLC v. United States, with consumers, purchasers, and importers of utility-grade bifacial solar

panels "argu[ing] that the importation of bifacial solar panels does not harm domestic producers

because domestic producers do not produce utility-scale bifacial solar panels; [and] thus

oppos[ing] safeguard duties that they contend increase the cost of these bifacial solar panels."

Invenergy I, 422 F. Supp. 3d at 1264.  Both withdrawals were ultimately enjoined.  See id. at 1294;

Invenergy IV, 476 F. Supp. 3d at 1356–57.  Following the court's expansion of its preliminary

injunction to include the <u>Second Withdrawal</u> in <u>Invenergy IV</u>, President Trump issued

<u>Proclamation 10101</u> on October 16, 2020.  <u>Proclamation 10101</u> again withdrew the exclusion,

thereby re-imposing safeguard duties on bifacial modules, and further increased the safeguard

duties on CSPV modules declared under <u>Proclamation 9693</u> from 15% to 18%.[4]  85 Fed. Reg. at

65,640–42.

      Plaintiffs sought to incorporate <u>Proclamation 10101</u> into the ongoing <u>Invenergy</u> litigation,

and into the court's previously issued PI enjoining USTR from withdrawing the exclusion.  <u>See</u>

<u>Invenergy V</u>, 482 F. Supp. 3d at 1351.  The court denied both leave to amend and expansion of

the PI, finding that Plaintiffs' <u>Proclamation 10101</u> claims "involve actions undertaken by the

President, a party not implicated in Plaintiffs' complaints or supplemental complaints [in the

<u>Invenergy</u> litigation] and seek relief against the President not contemplated by Plaintiffs' prior

pleadings" -- in other words, that "the core issues are different."  <u>Id.</u> at 1353.  In the wake of the

court's denial, this action was filed in a separate complaint on December 29, 2020.  Compl.

      The Government filed a motion to dismiss the action on March 1, 2021.  Defs.' Mot. to

Dismiss, March 1, 2021, ECF No. 17 ("Defs.' Br.").  Plaintiffs filed a cross-motion for summary

judgment and a response to the Government's motion to dismiss on May 7, 2021.  Pls.' Resp. to

Defs.' Mot. to Dismiss and Cross-Mot. for Summ. J., ECF No. 28 ("Pls.' Resp.").  The Government

filed its reply to Plaintiffs' motion for summary judgment on June 11, 2021.  Defs.' Reply in Supp.

of Mot. to Dismiss and Resp. to Pls.' Mot. for Summ. J., ECF No. 30 ("Defs.' Reply"). On June

25, 2021, Plaintiffs filed their own reply in support of their cross-motion for summary judgment.

Pls.' Reply in Support of Cross-Mot. for Summ. J., ECF No. 32 ("Pls.' Reply").  In response to a

---

[4]  The parties agree that this is the first instance of the President employing 19 U.S.C.
§ 2254(b)(1)(B) to withdraw an exclusion. <u>See</u> Oral Argument, July 13, 2021, ECF No. 38; Pls.'
Resp. to Oral Arg. Questions at 7, Jul. 9, 2021, ECF No. 36.

request by the court, the parties filed written responses prior to argument. Defs.' Resp. to the Ct.'s Questions, Jul. 9, 2021, ECF No. 35; Pls.' Resp. to Oral Arg. Questions. Oral argument was held July 13, 2021 and the parties filed supplemental briefs on the issues discussed at oral argument thereafter. Oral Arg., ECF No. 38; Defs.' Suppl. Br., Jul. 20, 2021, ECF No. 39; Defs.' Transpacific Br., Jul. 20, 2021, ECF No. 40; Pls.' Transpacific Br., Jul. 20, 2021, ECF No. 41; Pls.' Suppl. Br., Jul. 20, 2021, ECF No. 42.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(i), which provides that the court "shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of the law of the United States providing for . . . [the] administration and enforcement" of tariffs and duties. The court may review Presidential action pursuant to Section 201, insofar as it gives rise to a controversy involving international trade and foreign affairs, for a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." See Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985).

## DISCUSSION

Plaintiffs raise four overarching claims. First, Plaintiffs argue that Proclamation 10101 violates the procedural requirements of Section 204(b)(1)(B) of the Trade Act with respect to the nature and contents of the petition the President must receive prior to taking action. Second, Plaintiffs claim that Proclamation 10101 violates the requirements of Section 203(e)(7) of the Trade Act by imposing a new safeguard measure on bifacial modules less than two years after the previous measure -- namely, the duties imposed by Proclamation 9693 -- expired. Third, Plaintiffs argue that Proclamation 10101 violates the requirements of Section 201 of the Trade Act because

the President failed to weigh the social and economic costs and benefits of the modifications prior

to issuing the proclamation.  Finally, Plaintiffs argue that <u>Proclamation 10101</u> violates the

substantive requirements of Section 204(b)(1)(B) of the Trade Act by increasing safeguard

measures under the aegis of that provision.

The court addresses each of these arguments in turn and concludes that while the

Government prevails on the questions of procedural compliance -- the form, contents, and timing

of the petition, as well as the President's assessment of costs and benefits -- <u>Proclamation 10101</u>

<u>ultimately</u> fails to comply with the substantive requirements of Section 204(b)(1)(B) of the Trade

Act.  Accordingly, the court grants Plaintiffs' motion for summary judgment and denies the

Government's motion to dismiss.

I.    <u>***Proclamation 10101* Does Not Violate the Procedural Requirements of
      § 204(b)(1)(B) of the Trade Act***</u>

Plaintiffs identify five procedural requirements within Section 204(b)(1)(B).  Four of these

requirements pertain to features of the petition submitted by the domestic industry: first, "the

petition must be submitted by 'a majority of the representatives of the domestic industry'"; second,

it must be submitted to the President; third, "by the use of the language '*such* reduction,

modification, or termination,' the petition must request the reduction, modification, or termination

that the President ultimately adopts" and fourth, "by the use of the language 'on *such* basis,' the

petition must request the reduction, modification or termination on the basis that 'the domestic

industry has made a positive adjustment to import competition.'"  Pls.' Resp. at 13–14 (quoting

19 U.S.C. § 2254(b)(1)(B)).  The final requirement Plaintiffs identify is that the President must

find that the industry "has made a positive adjustment to import competition."  <u>Id.</u>; 19 U.S.C.

§ 2254(b)(1)(B).

Plaintiffs' arguments that Proclamation 10101 significantly violated the procedural requirements of Section 204 are unpersuasive. The court concludes that: (1) the letters submitted to the Trade Representative are, taken collectively, sufficient to constitute a petition to the President; (2) submission to USTR was sufficient to satisfy the requirements of the statute; (3) the petition adequately complied with the statute's requirement that "such reduction, modification, or termination" be requested by the "majority of the representatives of the domestic industry"; (4) the petition in this case did not significantly violate 204(b)(1)(B)'s "on such basis" requirement; and (5) the President's finding that the domestic industry "has begun to make" a positive adjustment to import competition again does not significantly violate the statutory requirement that the President find the domestic industry "has made," a positive adjustment to import competition. 19 U.S.C. § 204(b)(1)(B).

As a preliminary matter, the parties dispute the jurisdiction of the court over the above questions. Plaintiffs contend that they are requesting judicial inquiry into whether the President satisfied the statutory predicates for action under the safeguard statute, and that the challenge to Proclamation 10101 is therefore within the authority of the court. Pls.' Resp. at 17–21; see Silfab Solar, Inc. v. United States, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (holding that courts may set aside Presidential action if the President "acts beyond his statutory authority"). The Government, meanwhile, frames the inquiry as a requested review of Presidential fact-finding, which would be outside the scope of judicial review. Defs.' Reply at 10–12; see Florsheim Shoe Co., Div. of Interco, Inc. v. United States, 744 F.2d 787, 796 (Fed. Cir. 1985) ("After it is decided that the President has congressional authority for his action, 'his motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny.'" (quoting United States Cane Sugar Refiners' Ass'n v. Block, 683 F.2d 399, 404 (C.C.P.A. 1982))).

Plaintiffs' view prevails.  It has been established by the Federal Circuit that courts may consider whether "the President has violated an explicit statutory mandate."  Motion Sys. Corp. v. Bush, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc).  Such analysis has been undertaken where the disputed Presidential action constitutes an exercise of delegated authority without complete discretion, including where the President has acted to institute safeguard measures under the Trade Act.  See, e.g., Maple Leaf Fish Co., 762 F.2d at 89; see also, e.g. Corus Group PLC v. Int'l Trade Com'n, 352 F.3d 1351, 1358–59 (Fed. Cir. 2003).  Here as well, the court may consider whether the President's action constituted a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."  Silfab, 892 F.3d at 1346 (citing Maple Leaf Fish Co., 762 F.2d at 89).

Even so, the law is clear that claims alleging violation of the President's statutory mandate face an extraordinarily high bar for success.  The court in Silfab Solar, Inc. v. United States, for example, determined that even where procedural violations are alleged with respect to the agency recommendations underlying Presidential action, the President may nevertheless act to approve those recommendations without judicial intrusion.  Silfab, 892 F.3d at 1347 (rejecting challenge to Presidential action under Section 201 following alleged procedural violations by the ITC under Section 202).  Silfab also made clear that the failure of the President to comply with statutory requirements generally, so long as those requirements are not conditions precedent to the action challenged before the court, provides no basis for overturning the challenged action.  Id.  Similarly, in Maple Leaf Fish Co. v. United States, the court determined that reliance on an allegedly flawed ITC report nevertheless did not invalidate the resultant Presidential action.  These cases illustrate that more is required for a successful challenge to Presidential safeguards than simple noncompliance, and Plaintiffs' challenges must be weighed against that benchmark here.

### A.    The Petition

With respect to the petition, Plaintiffs allege that the three letters which constitute the purported petition do not satisfy the requirements of Section 204(b)(1)(B) because (1) they were not a petition to the President within the meaning of the statute; (2) they only contained requests from three companies for a change in the duty rate and from five companies for the withdrawal of the exclusion, and thus were not a petition by a majority of the representatives of the domestic industry for the same modification instituted by the President; and (3) they failed to allege that the domestic industry has made a positive adjustment to import competition, "much less [to] identify such positive adjustment as the basis for their request to modify the safeguard measure."  Pls.' Resp. at 16.  The Government responds that (1) the statute does not define "petition," and the President therefore "lawfully accepted the domestic industry's communications as 'a petition' under the statute;" (2) the petition constituted a request from the majority of the industry by production volume and collectively requested the relief granted by the President; and (3) the statute does not require petitioners to assert that the industry has made a positive adjustment to import competition.  Defs.' Reply at 8, 14–21.  The court addresses each of these arguments in turn.

### 1.    The Letters Submitted to USTR Constituted a Petition

With respect to the requirement that a petition be submitted to the President, Plaintiffs' overarching argument is that "an amalgamation of three letters submitted to USTR" by Auxin Solar, SolarTech Universal, Mission Solar Energy, LG Electronics USA, Inc., and Hanwha Q CELLS cannot constitute a petition.  Pls.' Resp. at 14.  Plaintiffs object to both the form and timing of the alleged petition.

First, Plaintiffs argue that that the earliest of the three letters, submitted to USTR in July 2019, cannot serve as the basis for Presidential action in any case because it was submitted prior

to the issuance of the ITC's midterm report.  Pls.' Resp. at 15.  This argument is without merit, as

19 U.S.C. § 2254(b)(1) requires only that the President must receive the ITC report before taking

action and does not require any particular timing with respect to industry petitions.  The court

therefore rejects Plaintiffs' timing argument.

Next, Plaintiffs argue that "multiple documents" do not constitute "'a petition' in the

singular," and therefore the three letters comprising the alleged petition fail to satisfy the text of

the statute.  Pls.' Resp. at 14.  However, as the Government notes, the statute provides no

requirement for the form a petition must take.  Defs.' Reply at 12.  Furthermore, the United States

Code provides that "[i]n determining the meaning of any Act of Congress, unless the context

indicates otherwise -- words importing the singular include and apply to several persons, parties,

or things."  1 U.S.C. § 1; Defs.' Reply at 13.  There is no indication in the statute that a petition

must constitute a single document.  The court therefore determines that the letters submitted in this

case were reasonably construed as a petition under the meaning of Section 204(b)(1)(B).

### 2. *Submission of the Letters to USTR was Not a Procedural Violation*

In addition to disputing that the letters in this case constitute a petition, Plaintiffs argue that

any petition in fact submitted fails to satisfy Section 204(b)(1)(B) because it was submitted to

USTR and not to the President.  Pls.' Resp. at 14.  The court rejects this argument for two reasons.

First, the statute does not require, or even suggest, that the President may not exercise discretion

in determining the appropriate method of submission.  By contrast, where Congress has intended

strict requirements with respect to petitions under the safeguard statute, those requirements have

generally been explicit.  For example, Section 202 of the Trade Act requires that a petition under

that section be "filed with the Commission" and additional documents "submit[ted] to the

Commission and the [USTR]" within a set period, and further prescribes specific language that

must be included in the petition.  19 U.S.C. § 2252(a)(1), (3)–(4).  No such detailed requirements are found under Section 204(b)(1)(B).  Accordingly, the court declines to read such inflexibility into the statute.  See Jama v. Immigration and Customs Enf't, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Furthermore, the petitions were submitted to USTR, and USTR  is the agency which "act[s] as the principal spokesperson of the President on international trade."[5]  19 U.S.C. § 2171(c)(1)(E). With respect to safeguard duties specifically, the statute contemplates the close relationship between the President and USTR; requiring that "the interagency trade organization established under 1872(a)," of which USTR is chair, "make a recommendation to the President as to what action the President should take" prior to the institution of any safeguards.  19 U.S.C. § 2253(a)(1)(C); 19 U.S.C. § 1872(a)(3)(A).  Given the close relationship of USTR and the President in the context of trade regulation and of safeguards specifically, the court finds that filing the petitions with USTR reasonably satisfied Section 204(b)(1)(B)'s requirement that the petitions be submitted to the President.

### 3.       The Petition Constituted a Request from the Majority of the Representatives of the Domestic Industry for the Relief Granted by the President

Plaintiffs next argue that even if the three letters submitted to USTR constitute a valid petition, the withdrawal was requested by at most six out of twenty of the "representatives of the domestic industry," which is less than a majority and therefore in violation of the statute.  Pls.'

---

[5] See About Us, Office of the U.S. Trade Representative, https://ustr.gov/about-us (last visited Nov. 9, 2021).

Resp. at 16–17.  The Government counters that it is appropriate to look to production volume to

determine if a majority of domestic industry representatives have submitted a petition, and that by

this measure a majority of the domestic industry has requested both the withdrawal of the exclusion

and the increased duty rate imposed by Proclamation 10101.  Defs.' Reply at 15–18.  Plaintiffs, in

turn, respond that this conflates "a majority of the representatives" -- the language of the statute -

- with "representatives of the majority."  Pls.' Reply at 7.  The latter language, according to

Plaintiffs, might permit measuring the majority by production volume, but "'majority of the

representatives' reflects a majority of particular individuals."  Id.

 The language of the statute belies Plaintiffs' interpretation.  Section 202(c)(6)(A)(i) defines

"domestic industry" with respect to a specific article as "the producers as a whole of the like or

directly competitive article or those producers whose collective production of the like or directly

competitive article constitutes a major proportion of the total domestic production of such article."

19 U.S.C. § 2252(c)(6)(A)(i).  Clearly, the statute permits definition of domestic industry on the

basis of production volume.  Id.  Section 204(b)(1)(B) may accordingly be read to require (prior

to any safeguard adjustments) a petition by "a majority of the representatives of" the producers

who are responsible for a "major proportion" of domestic production, and a finding by the

President that the same producers have positively adjusted to import competition.  19 U.S.C. §

2254(b)(1)(B).  In short, Section 204(b)(1)(B) implicitly contemplates the submission of a petition

by those producers responsible for the majority of production volume.  Id.

 Nor does context support a reading of 204(b)(1)(B) that focuses on a numerical majority

of representatives, rather than a proportional majority of manufacturers.  First, the statute requires

that a "majority . . . submits" a petition, not that a majority of the representatives submit a petition.

Id.  Second, it is clear from the statute's follow-on requirement that the President determine that

the domestic industry as a whole has positively adjusted to competition that 204(b)(1)(B) is intended to permit changes to a safeguard measure where a specific domestic industry has <u>overall</u> adapted to competition -- not when a certain number of producers have requested modification. <u>Id.</u>   Requiring that a <u>numerical</u> majority of industry representatives petition for modification, regardless of the associated production volume, would therefore not support the ultimate aim of 204(b)(1)(B) as there is no indication that such a numerical majority would reflect industry-wide adaptation.  Accordingly, the court concludes that the statute should not be read to exclusively require petition by a majority of representatives.

Having thus determined that production volume is an appropriate metric for the assessment of a petition, the court concludes that a majority of the domestic industry requested the modifications.  Auxin, Hanwha Q CELLS, and LG requested the modification of the tariff rate in the fourth year of the solar safeguard measure, and according to the confidential filings submitted to the court, these representatives constitute a majority of the domestic industry by production volume.  <u>See</u> ITC Pub. 5021 at III-14 III-15 (Table III-4).  Similarly, Auxin, Hanwha Q CELLS, Heliene, Mission, and Solar Tech requested withdrawal of the bifacial exclusion, and these domestic producers, too, constitute a majority of production during the relevant period.  <u>Id.</u>  Thus, the court finds no basis to conclude that a majority of the domestic industry representatives failed to request the relief granted by the President.

### 4.   <u>*Proclamation 10101*</u> *Did Not Clearly Misconstrue the Language of Section 204(b)(1)(B)*

Finally, the parties dispute whether the petition submitted by the domestic industry must request relief on the basis that the domestic industry has made a positive adjustment to import competition.  Plaintiffs' argument hinges on the statute's inclusion of "on such basis," which they contend should be read to require that petitioners must request reduction, modification, or

termination of the safeguard measure on the basis that the domestic industry has made a positive adjustment to competition. Pls.' Resp. at 14–15. The Government argues that the statute must instead be interpreted to require the President to determine the domestic industry has made a positive adjustment to competition on the basis of either the petition or the ITC midterm review report referenced earlier in Section 204. Defs.' Suppl. Br. at 7. As the President in fact relied on the ITC report, the Government contends that the court must defer to his reasonable interpretation of the statute and accept that "on such basis" refers to the ITC report. Id.

The question before the court is not merely one of statutory interpretation. Rather, as noted above, the court may only set aside Presidential action where such action constitutes a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." Maple Leaf Fish Co., 762 F.2d at 89. Accordingly, the appropriate inquiry is not how the court would interpret the statute, but whether the President's interpretation of the statute was a "clear misconstruction" warranting judicial intervention.

The court concludes that it was not. As the Government notes, the President's determination of positive adjustment on the basis of the ITC report is at least plausibly supported by the statutes as a whole. First, "such" is typically read to "refer[] back to something indicated earlier in the text," which disfavors Plaintiffs' view that the basis referred to is the industry's positive adjustment. Defs.' Reply at 21–22. Second, a determination made on the basis of the ITC report would reflect "the views of an independent body based on information and argument provided by all market participants," and would therefore align with the Section 204(b)(1)(B)'s overall aim of permitting the adjustment of safeguard measures when the industry as a whole begins to adapt to competition. Defs.' Suppl. Br. at 7. The President's reading of the statute is not

the only possible interpretation of "on such basis."  Nevertheless, neither is it so implausible as to amount to a clear misconstruction.

Even in the event that the correct referent of "such basis" under Section 204(b)(1)(B) is, as Plaintiffs contend, "that the domestic industry has made a positive adjustment to import competition," there is likely no basis to set aside <u>Proclamation 10101</u>.  Plaintiffs argue that the correct interpretation of "such basis" requires that the petition submitted to the president include a request for modification on the basis of positive adjustment.  Pls.' Resp. at 16.  Failure to satisfy such a requirement would therefore be an interpretive error by the representatives of domestic industry, rather than the President -- and would result in a flawed petition.  As discussed above, the Federal Circuit has previously recognized that, where there is nothing in the statute that "prohibit[s] the President from approving recommendations that are procedurally flawed," procedural inadequacies in recommendations provided to the President do not provide a basis for rejecting the resultant Presidential action.  <u>See</u> <u>Silfab</u>, 892 F.3d at 1347 (<u>quoting</u> <u>Dalton v. Specter</u>, 511 U.S. 462, 476).  Indeed, "a recommendation does not cease to be made 'under' [the relevant] section . . . simply because the recommendation is assertedly contrary to the substantive requirements of that provision."  <u>Id.</u> (quoting <u>Michael Simon Design, Inc. v. United States</u>, 609 F.3d 1335, 1341 (Fed. Cir. 2010)).  Even under Plaintiffs' interpretation of the statute, as in <u>Silfab</u>, there is no requirement in Section 204 precluding the President's acceptance of a flawed petition.  Accordingly, even if the appropriate referent of "on such basis" under Section 204(b)(1)(B) were "the domestic industry has made a positive adjustment to import competition," the failure of petitioners to comply with this requirement would not render <u>Proclamation 10101</u> unlawful.

### B.      The President's Determination.

Finally, Plaintiffs allege that the President failed to comply with the procedural requirements of Section 204(b)(1)(B) by determining in <u>Proclamation 10101</u> that the domestic industry "has begun to make" a positive adjustment to import competition, rather than "has made" such a positive adjustment.  Pls.' Resp. at 21–23.  The Government rejects Plaintiffs' argument that there is a meaningful distinction between "has made" and "has begun to make" which would invalidate the President's action under Section 204.  Defs.' Reply at 22–24.

The court agrees with the Government.  The phrase "has made a positive adjustment" in the statute is broad enough to include the finding that the domestic industry "has begun to make a positive adjustment" contained in the proclamation.  For their argument to succeed, Plaintiffs must demonstrate a "clear misconstruction of the governing statute," <u>Silfab</u>, 892 F.3d at 1346, and the distinction between "has made" and "has begun to make" is too narrow to rise to the level of a clear misconstruction.  Accordingly, the court rejects Plaintiffs' arguments with respect to the President's procedural compliance with the statute.

### II.      <u>Proclamation 10101</u> Does Not Violate Section 203(e)(7) of the Trade Act

Plaintiffs next argue that <u>Proclamation 10101</u> violates the timing provisions of Section 203(e)(7) of the Trade Act.  Section 203(e)(7) prohibits new safeguard duties from being imposed on an article for at least "a period of 2 years beginning on the date on which the previous action terminates" imposed on that article was terminated. 19 U.S.C. § 2253(e)(7)(A)(ii).[6]  Plaintiffs

---

[6] 19 U.S.C. § 2253(e)(7) provides:

> (A)  If an article was the subject of an action under subparagraph (A), (B), (C), or (E) of subsection (a)(3), no new action may be taken under any of those subparagraphs with respect to such article for—

contend that <u>Proclamation 10101</u> violates this section because (1) bifacial solar panels are "articles" for the purposes of Section 203, and (2) the exclusion granted by USTR constitutes the termination of a safeguard duty such that any re-imposition of duties on bifacial solar panels through withdrawal of that exclusion would violate the prohibition on new safeguard measures. Pls.' Resp. at 35. The Government argues that CSPV products generally are the "article" at issue in Section 203, and that the exclusion "did not 'terminate' the safeguard measure as to bifacial products'" but rather "modif[ied] the HTS provisions" created by <u>Proclamation 9693</u> to exclude a specific product from the safeguard measure. Defs.' Resp. to the Court's Questions at 8.

The court concludes that the relevant article for purposes of Section 203's cooling-off period is CSPV products generally, and not bifacial solar panels specifically. The word "article" in this section refers back to its use in Section 201, which establishes the President's authority to impose safeguard duties "[i]f the [ITC] determines . . . that an article is being imported in the United States in such increased quantities as to be a substantial cause of serious injury." 19 U.S.C. § 2251(a). Here, the ITC determined that "crystalline silicon photovoltaic cells . . . are being

---

       (i)  a period beginning on the date on which the previous action terminates that is equal to the period in which the previous action was in effect, or

      (ii)  a period of 2 years beginning on the date on which the previous action terminates, whichever is greater.

(B)  Notwithstanding subparagraph (A), if the previous action under subparagraph (A), (B), (C), or (E) of subsection (a)(3) with respect to an article was in effect for a period of 180 days or less, the President may take a new action under any of those subparagraphs with respect to such article if—

      (i)  at least 1 year has elapsed since the previous action went into effect; and

      (ii)  an action described in any of those subparagraphs has not been taken with respect to such article more than twice in the 5-year period immediately preceding the date on which the new action with respect to such article first becomes effective.

imported into the United States in such increased quantities as to be a substantial cause of injury to the domestic industry producing an article like or directly competitive with the imported article." Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products), Investigation No. TA-201-75, USITC Pub. 4739 (Nov. 2017) at 1. It is clear that the ITC considered the imported "article" at issue here to be all CSPV products, and not bifacial products specifically. Accordingly, the court finds that Section 203(c)(7)'s cooling-off period does not apply to bifacial panels specifically, but rather to CSPV products as a whole.[7]

The court further concludes that the exclusion of bifacial solar panels is not a "termination" for the purposes of Section 203(e)(7). The President in Proclamation 9693 authorized USTR to "exclude . . . particular product[s] from the safeguard measure" and to "modify or terminate any such determination." Proclamation 9693, 83 Fed. Reg. at 3,544. The President did not, however, delegate the authority to terminate the safeguard measure, which is the action that would trigger the limitations of Section 203(e)(7). Accordingly, no action that would trigger Section 203(e)(7)'s cooling-off period -- i.e., a termination of a safeguard measure -- was undertaken through the issuance of the exclusion. Furthermore, interpreting the exclusion of bifacial panels as a termination of the safeguard measure with respect to a specific "article" would run counter to

---

[7] Plaintiffs further argue that bifacial solar panels constitute an article for the purposes of 203(e)(7), and that failing to consider bifacial panels (rather than CSPV panels generally) a qualifying article would "allow safeguard duties to be immediately re-imposed on products following the termination of a safeguard measure as long as the domestic industry slightly modifies the definition of the article for which relief is sought." Pls.' Resp. at 35. Such a loophole, Plaintiffs contend, runs counter to the purpose of the statute. Pls.' Br. at 36. However, as Defendants expressly acknowledge in their responses to the court's questions before oral argument, "imposition of a safeguard measure against any subsequent entry of an overlapping product before the cooling-off period has passed would result [in] a 'new action . . . taken . . . with respect to such article'" and accordingly would be in violation of Section 203. Defs.' Resp. to the Court's Questions at 7–8 (quoting 19 U.S.C. § 2253(e)(7)(A)). As Plaintiffs' basis for deeming bifacial solar panels an article for purposes of the cooling-off period has therefore been mooted, the court declines to further address Plaintiffs' argument here.

Congressional intent.  First, as set out above, bifacial solar panels are not an article for purposes

of Section 203.  Second, as the Government notes, viewing a withdrawn exclusion as a termination

subject to Section 203's two-year limitation on new safeguards would require a separate cooling-

off period with respect to every excluded "article," which would in turn give rise to repeated "mini-

ITC investigations into separate subsets of the original 'article'" as each excluded product became

eligible for the re-imposition of safeguards.  Defs.' Br. at 22.  The Government asserts that

"Congress did not intend such a piecemeal approach to the protections of the safeguard statute,"

and the court agrees.  Id.   For the reasons set forth above, the court therefore concludes that

Proclamation 10101's withdrawal of the exclusion was not in violation of Section 203(7)(e).

### III.   *Proclamation 10101 Does Not Violate Section 201 of the Trade Act*

The parties also dispute whether action taken under Section 201 of the Trade Act requires

the President to weigh the economic and social benefits of the alterations in Proclamation 10101

against the costs.  Section 201(a) imposes a requirement that the President weigh the costs and

benefits of a safeguard measure before imposing it:

> If the United States International Trade Commission (hereinafter referred to in this
> part as the "Commission") determines under [Section 202(b)] of this title that an
> article is being imported into the United States in such increased quantities as to
> be a substantial cause of serious injury, or the threat thereof, to the domestic
> industry producing an article like or directly competitive with the imported article,
> the President, in accordance with this part, shall take all appropriate and feasible
> action within his power which the President determines will facilitate efforts by
> the domestic industry to make a positive adjustment to import competition and
> provide greater economic and social benefits than costs.

19 U.S.C. § 2251(a).  The Government argues that the President's initial explicit weighing of the

economic and social costs in Proclamation 9693 is sufficient to comply with the requirements of

the statute,[8] and maintains that the weighing of economic and social costs is only expressly required under Section 201(a) and Section 203(a)(2) -- which govern the initial implementation of safeguard duties -- and not under Section 204, which governs the alterations at issue here. Defs.' Br. at 22–24. Therefore, according to the Government, "there is no statutory basis for appending additional requirements onto Section 204 determinations." Defs.' Reply at 33.

Plaintiffs, however, contend that this determination must be made for Proclamation 10101 as well. First, Plaintiffs argue that Proclamation 9693 weighed the costs and benefits of a different tariff rate: 15% in the fourth year, rather than 18%. Pls.' Resp. at 39–42. Second, Plaintiffs argue that all changes to safeguard duties require the President to weigh social and economic costs and benefits. Id. at 40. They maintain that the President acknowledged as much in Proclamation 9693, which read in part that changes could be made "to facilitate efforts by the domestic industry to make a positive adjustment to import competition and to provide greater economic and social benefits than costs." Id. at 40–41 (quoting Proclamation 9693, 83 Fed. Reg. at 3,542). Furthermore, Plaintiffs argue that Section 201 of the Trade Act, which contains the requirement to weigh social and economic costs and benefits, provides "the overarching rule for safeguard duties," and therefore "sets the parameters for all actions taken pursuant to the entire safeguard statute," including the amendment of safeguard measures. Pls.' Reply at 21. They claim that the Government's interpretation of Section 204 "would create an exception . . . that would swallow the rule," and therefore should be rejected. Id. (citing Schwegmann Bros. v. Calvert Distillers

---

[8] The relevant portion of the proclamation reads, "I have determined that this safeguard measure will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs." Proclamation 9693, 83 Fed. Reg. at 3,542.

Corp., 341 U.S. 384, 389 (1951) (rejecting statutory interpretation under which "the exception

swallows the proviso and destroys its practical effectiveness)).

      The court concludes that the President was required to weigh the costs and benefits of his

alterations to the safeguards imposed by Proclamation 9693, and further concludes that the

President met this requirement. On the first issue, the court agrees with Plaintiffs that failing to

apply Section 201's requirement to weigh costs and benefits throughout the safeguard statute risks

permitting absurd results, wherein "the President could impose a safeguard duty of one percent on

certain CSPV products under Section 201 (after concluding that the costs of doing so did not

outweigh the benefits), but then use Section 204 to increase the safeguard duty to 50 percent . . .

without ever considering whether the benefits of doing so exceed the costs." Pls.' Resp. at 41.

Such a scenario would allow any Section 204 exception to swallow the Section 201 rule and would

thus "destroy its practical effectiveness." Schwegmann 341 U.S. at 389. Accordingly, it is

appropriate to read a baseline requirement to weigh social and economic costs and benefits into

the statute as a whole.

      With respect to the second issue, the court finds that the President considered, in

compliance with the statute, the costs and benefits of his alterations to the safeguards imposed by

Proclamation 9693. In Proclamation 10101 the President determined that "that the exclusion of

bifacial panels from application of the safeguard tariff has impaired and is likely to continue to

impair the effectiveness of the action I proclaimed in Proclamation 9693," and that "the exclusion

of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-

year action I proclaimed in Proclamation 9693, and that to achieve the full remedial effect

envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth

year of the safeguard measure to 18 percent." 85 Fed. Reg. at 65,640. By determining that the

bifacial exclusion "impaired" the action taken under <u>Proclamation 9693</u>, which was itself deemed

necessary to "facilitate efforts by the domestic industry to make a positive adjustment to import

competition and provide greater economic and social benefits than costs," the President weighed

the necessity of <u>Proclamation 10101</u>'s alterations.  <u>Id.</u>; <u>see</u> <u>Proclamation 9693</u>, 83 Fed. Reg. at

3,542.  Furthermore, by referring back to the purpose of the safeguards issued by <u>Proclamation</u>

<u>9693</u> and thus to that proclamation's express consideration of the economic and social costs and

benefits of the safeguard measures, the President evinced his general consideration of the costs

and benefits of the changes.  As there is no requirement in either Section 201(a) or Section

204(b)(1)(B) that the President set forth his analysis in specific detail, the court concludes that the

assessment of costs and benefits apparent here satisfies the statutory requirement.

**IV.**     <u>**Proclamation 10101** Violates the Substantive Requirements of § 204(b)(1)(B) of
           the Trade Act</u>

Finally, Plaintiffs argue that <u>Proclamation 10101</u> fails to comply substantively with Section

204(b)(1)(B) because it restricts, rather than liberalizes, trade.  As set out above, Section 204(b)

provides for the "reduction, modification, and termination" of a safeguard action, and specifically

states that:

> (1)     Action taken under [Section 203] may be reduced, modified, or terminated by
>          the President . . . if the President—
>
>              [ . . . ]
>
> (B)     determines, after a majority of the representatives of the domestic industry
>          submits to the President a petition requesting such reduction, modification, or
>          termination on such basis, that the domestic industry has made a positive
>          adjustment to import competition.

19 U.S.C. § 2254(b)(1).  The court concludes that, by interpreting "modification" to permit the

expansion or upward adjustment of safeguard measures, <u>Proclamation 10101</u> clearly misconstrues

the meaning of the statute.  Accordingly, <u>Proclamation 10101</u>'s withdrawal of the exclusion must

Case 1:21-cv-00081-GSK Document 43 Filed 05/11/2022 Page 85 of 91
Case 22-1392 Document 30 Page: 511 Filed: 05/11/2022 1 of 32

Court No. 20-03941                                                              Page 27

be set aside as a "clear misconstruction of the governing statute," resulting in "action outside

delegated authority." Silfab, 892 F.3d at 1346 (quoting Maple Leaf Fish Co., 762 F.2d at 89).

   Plaintiffs contend that only trade-liberalizing modifications are permitted under

204(b)(1)(B) because "[i]t runs counter to logic and congressional intent to increase trade

restrictions when 'the domestic industry has made a positive adjustment to import competition.'"

Pls.' Resp. at 25 (emphasis in original). Plaintiffs further contend that in the Uruguay Round

Agreement on Safeguards, Congress sought to implement existing United States law, and the fact

that the resultant agreement only permits trade liberalizing modifications reflects the congressional

intent that Section 204(b)(1)(B) also only permit trade liberalizing modifications. Id. at 27–28.

Plaintiffs note that "[t]he [Statement of Administrative Action] further explains that '[t]he Uruguay

Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from

section 201. These include criteria regarding . . . degressivity (progressive liberalization of

safeguard restrictions).'" Id. (citing H.R. Rep. No. 103-316, 286, as reprinted in 1994

U.S.C.C.A.N. 4040, 4262). Accordingly, Plaintiffs argue, Proclamation 10101 should be set aside.

   The Government claims that Section 204(b)(1)(B) is not limited to trade liberalizing

measures, and in fact permits the President to increase safeguard duties. In support of their position

they argue that, because safeguards may be reduced, modified, or terminated by the President

under Section 204, reading modification to permit only "actions that reduce safeguard protections

would make 'modification' coterminous with . . . 'reduction', and therefore render 'modification'

superfluous." Defs.' Br. at 13. The Government also cites to legislative history in support of their

argument, noting that "an earlier Senate amendment stated that, upon receipt of the 'ITC

monitoring report, the President may reduce, modify (but not increase), or terminate any action . .

. .'" Id. at 14–15. The Government argues that the omission of the parenthetical "but not increase"

in the final version of the act indicates that Congress intended to permit increases because "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." Russello v. United States, 464 U.S. 16, 23–24 (1983); see id. Accordingly, the Government argues, Proclamation 10101 is lawful under 204(b)(1)(B).

The question underlying this dispute is the meaning of "modify" as used in 204(b)(1)(B). How that question is resolved is informed by basic principles of statutory interpretation. See generally, Robert A. Katzmann, JUDGING STATUTES (2014). The court begins with the principle that statutory language should be interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment." Bostock v. Clayton County, 140 S. Ct. 1731, 1738 (2020). An appeal to the dictionary is therefore illustrative. In its verb form -- as it is used in 204(b)(1) -- "modify" is defined as "to make less extreme." See "Modify," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modify (last visited Nov. 9, 2021) Similarly, in its noun form -- as it is used in the section title, and in 204(b)(1)(B) -- "modification" is defined as "the limiting of a statement." See "Modification," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modification (last visited Nov. 9, 2021). Secondarily, "modification" is defined as "the making of a limited change in something." Id. The definition of the verb (as well as the first definition of the noun) favors Plaintiffs' interpretation: that the statute's provision for modification permits only changes that limit or moderate the existing safeguard measures. On the other hand, the second definition of "modification" favors the Government's interpretation: that both trade-liberalizing and trade-restricting changes to existing safeguard duties are authorized by the statute. Defs.' Resp. to the Court's Questions at 3.

Accordingly, the court turns next to the statute as a whole.  Courts may look "to the broader structure of the [statute] to determine the meaning" of specific language.  King v. Burwell, 576 U.S. 473, 492 (2015).  Where, as here, the terminology of the statute is ambiguous, it is all the more important to read disputed provisions "in their context and with a view to their place in the overall statutory scheme."  Utility Air Reg. Grp. v. EPA, 573 U.S. 302, 311 (2014) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)).

Safeguard measures are intended to "facilitate efforts by the domestic industry to make a positive adjustment to import competition" while providing "greater economic and social benefits than costs."  19 U.S.C. § 2251(a).  As Plaintiffs correctly note, "to strike that balance, the statute contains an intricate framework of investigations, consultations, reports, [and] weighing of factors."  Pls.' Resp. at 26.  This framework includes specific instructions for the investigation of alleged harms by the ITC, including the assessment of enumerated factors favoring a finding of serious injury and the holding of public hearings on both the risk of injury and proposed adjustment plans.  19 U.S.C. § 2252(b), (e).  In order to ultimately authorize any safeguard measures, the President must also comply with a variety of interpretive and substantive requirements, as well as specific deadlines for both further investigation and the proclamation of relief.  See generally, 19 U.S.C. § 2253.  The measures implemented go on to face both ongoing review and strict time limitations.  19 U.S.C. § 2253(e)(7); 2253(a).

Interpreting Section 204(b)(1)(B) to permit both trade-restricting and trade-liberalizing modifications would run counter to this detailed statutory scheme.  Under such a view of the statute, the President would be permitted to increase safeguard measures without complying with the statutory requirements necessary to initially impose those safeguards.  Adjustment of safeguard measures under 204(b)(1)(B) requires only that the President consider a midterm report by the ITC

on the "developments with respect to the domestic industry, including the progress and specific

efforts . . . to make a positive adjustment to import competition." U.S.C. § 2254(a)(1)–(3), (b).

There is no indication in the statute that Congress intended Section 204 to provide a loophole for

the institution of harsher safeguards without the standard procedural restrictions. Conversely,

there is every indication that the section was intended to provide an escape hatch from those

safeguards where domestic industry has adequately adapted to import competition. Section

204(b)(1)(A), for example, contemplates that safeguards might be reduced or terminated where

"the domestic industry has not made adequate efforts" to adjust to competition, or where "the

effectiveness of the action . . . has been impaired by changed economic circumstances" which

"warrant . . . reduction, or termination." 19 U.S.C. § 2254(b)(1)(A)(i)–(ii). The court therefore

concludes that 204(b)(1)(B) must be read to authorize only trade-liberalizing modifications to

safeguard measures, because interpreting the statute to permit trade-restricting modifications

would undermine the broader statutory scheme. See United Sav. Ass'n of Tex. v. Timbers of

Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous

in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the

permissible meanings produces a substantive effect that is compatible with the rest of the law.")

(citations omitted).

       In light of the above, the court need not consider the legislative history arguments advanced

by either side. See Bostock, 140 S. Ct. at 1749 ("Legislative history, for those who take it into

account, is meant to clear up ambiguity, not create it.") (quoting Milner v. Department of Navy,

562 U.S. 562, 574 (2011)). Even in the event, however, that the court did proceed to consideration

of the legislative history Plaintiffs still prevail, as that history is not decisive. For example, it is

easy to imagine a scenario where a trade-liberalizing modification would require an "increase" of

sorts (the President might increase a previously instituted quota) and the Government's arguments

to the contrary are not dispositive.[9]

Because Section 204(b)(1)(B) permits only trade-liberalizing modifications to existing

safeguard measures, the court concludes that <u>Proclamation 10101</u>'s withdrawal of the exclusion

of bifacial solar panels and increase of the safeguard duties on CSPV modules constituted both a

clear misconstruction the statute and action outside the President's delegated authority.  85 Fed.

Reg. at 65,640–42; <u>Maple Leaf Fish Co.</u>, 762 F.2d at 89.  This conclusion is rooted in the statutory

---

[9] In support of its legislative history argument, the Government points primarily to the fact that "(but not increase)" was included in an earlier version of the statute in support of their position. Defs.' Reply at 28–29. And indeed, as already noted earlier in this opinion, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." <u>Russello</u>, 464 U.S. at 23–24 (citations omitted). This presumption, however, is not irrebuttable, and Plaintiffs offer convincing alternative explanations.

Procedurally, Plaintiffs suggest the "but not increase" language was dropped as "a byproduct of combining different provisions addressing different situations using different language into a single provision." Pls.' Resp. to Oral Arg. Questions at 1–2. The "but not increase" language did not disappear during deliberations within a single house of Congress, but rather as a result of combining a similar provision from the Senate with one from the House. <u>See</u> H.R. Rep. No. 100-576, 687–88 (1988), <u>as reprinted in</u> 1988 U.S.C.C.A.N. 1547, 1720–21. This indicates that the deleted language may not carry the presumptive meaning argued for by the Government.

Practically, moreover, the "but not increase" language may have been deleted from the final version of the statute in order to give the President flexibility to make trade-liberalizing increases to existing safeguard duties. An increase in a quota, for example, would be a trade-liberalizing modification permitted under the operative language of Section 204(b)(1)(B) that would perhaps have been barred had the "but not increase" language not been deleted.

Furthermore, there is legislative history supporting Plaintiffs' view that "modify" should be read to permit only trade-liberalizing changes. In particular, the Uruguay Round Agreement on Safeguards, a multilateral treaty negotiated in the 1980s which only permits trade liberalizing modifications, was explicitly negotiated to reflect existing United States law. <u>See</u> H.R. Rep. No. 103–316, 286 (1994), <u>as reprinted in</u> 1994 U.S.C.C.A.N. at 4262 ("The Uruguay Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from section 201. These include criteria regarding . . . degressivity (progressive liberalization of safeguard restrictions).") As such, the limitations on trade-restricting action incorporated in the Uruguay Round Agreement seem to reflect Congress's intent that the originating statute, including Section 204(b)(1)(B), also only permit trade-liberalizing modifications. Accordingly, even the legislative history supports Plaintiffs' view that "modify" only permits trade-liberalizing changes to safeguard measures.

scheme. That is not to say that, in another context, in a different statute, "modify" could not be read differently, or indeed as the Government argues. To be sure, Congress is free to revise the statute now before the court to permit upward modifications. Nevertheless, in this context, and without such revision of the law, the Government's argument cannot succeed. Accordingly, the court grants Plaintiffs' motion for summary judgment and finds that the proclamation must be set aside.

## CONCLUSION

Ultimately, while Proclamation 10101 complied with the procedural requirements of the safeguard statute, it nevertheless clearly misconstrued the reach of Section 204(b)(1)(B) of the Trade Act, and thus constituted an action outside the President's delegated authority. Neither the statute nor the statutory scheme supports interpreting Section 204(b)(1)(B) to permit increased restrictions on trade. Accordingly, the court grants Plaintiff's motion for summary judgment, and sets aside Proclamation 10101 on the basis that trade-restricting modifications are not permitted under the authority granted to the President by Section 204(b)(1)(B). The Government is enjoined from enforcing Proclamation 10101, including by modifying the Harmonized Tariff Schedule of the United States, and Plaintiff shall be refunded all safeguard duties collected pursuant to Proclamation 10101, with interest.

SO ORDERED.

/s/  Gary S. Katzmann
Gary S. Katzmann, Judge

Dated:  November 16, 2021
New York, New York

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b), the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 10,344 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.


<u>/s/ Joshua E. Kurland</u>