2022-1392

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,
*Plaintiffs-Appellees,*

v.

UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, CHRISTOPHER MAGNUS, Commissioner of U.S. Customs and Border Protection,
*Defendants-Appellants.*

Appeal from the United States Court of International Trade
Case No. 1:20-cv-03941, Judge Gary S. Katzmann

# RESPONSE BRIEF OF APPELLEES INVENERGY RENEWABLES LLC AND EDF RENEWABLES, INC.

Christine M. Streatfeild
Baker & McKenzie LLP
815 Connecticut Ave, NW
Washington, DC 20006
Tel: (202) 835-6111
Christine.streatfeild@bakermckenzie.com

John Brew
Larry F. Eisenstat
Amanda Shafer Berman
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004-2595
Tel: (202) 688-3451
Fax: (202) 628-5116
aberman@crowell.com

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1392

**Short Case Caption** Solar Energy Industries Association v. US

**Filing Party/Entity** Invenergy Renewables LLC

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/07/2022

Signature: /s/ John Brew

Name: John Brew

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Invenergy Renewables LLC | | Invenergy Renewables Holdings LLC, Invenergy IRH Holdings LLC, IIC Renewables Holdings LLC, and Invenergy Investment Company LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Amanda Shafer Berman | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1392

**Short Case Caption** Solar Energy Industries Association v. US

**Filing Party/Entity** EDF RENEWABLES, INC.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/07/2022

Signature: /s/ Christine M. Streatfeild

Name: Christine M. Streatfeild

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| EDF RENEWABLES, INC. | N/A | EDF S.A. is the parent company and has a greater than 10% ownership interest. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Christine M. Streatfeild (Baker McKenzie LLP) | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATES OF INTEREST ........ i

TABLE OF AUTHORITIES ........ ix

STATEMENT OF RELATED CASES ........ 1

INTRODUCTION ........ 1

STATEMENT OF THE ISSUE ........ 3

STATEMENT OF THE CASE ........ 3

I. The safeguard statute ........ 4

II. Proclamation 9693 ........ 6

III. The bifacial panel exclusion and government's attempts to withdraw it ........ 7

IV. Proclamation 10101 ........ 10

V. Proclamation 10339 ........ 11

SUMMARY OF THE ARGUMENT ........ 12

ARGUMENT ........ 15

I. This Court reviews the decision below de novo, and must set aside Presidential action where it fails to fulfill statutory requirements. ........ 16

II. The safeguard statute required the President to determine, in Proclamation 10101, that the economic and social benefits of re-imposing the safeguard measure on bifacial panels outweighed the costs. ........ 17

A. The statutory text, context, and purpose confirm that the President must weigh economic and social benefits versus costs before taking any safeguard action, including a modification. ........ 18

B. The cost/benefit determination made in Proclamation 9693 did not fulfill the President's obligation to again consider the benefits versus costs of his action when issuing Proclamation 10101. .......... 21

C. The argument that no cost/benefit determination is required for action under Section 204 is inconsistent with the text of that provision and could obviate Section 201 and 203's mandate. .......... 23

III. The President failed to meet the statutory requirement to determine that the economic and social benefits of his action outweighed the costs. .......... 26

A. The President's statement that the bifacial panel exclusion "impaired" the safeguard measure does not fulfill the statutory mandate to determine that the economic and social benefits of withdrawing the exclusion outweigh its costs. .......... 27

1. The President's statement about "impairment" does not indicate that he weighed the benefits versus costs of his action. .......... 27

2. The President did not "determine" that the benefits of his action outweighed its costs. .......... 30

B. The President's costs/benefits determination in Proclamation 9693 cannot substitute for the determination the CIT found was required before issuance of Proclamation 10101. .......... 31

CONCLUSION .......... 34

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States*,
573 U.S. 169 (2014)....................25

*Corus Grp. PLC v. Int'l Trade Comm'n*,
352 F.3d 1351 (Fed. Cir. 2003) ....................16, 33

*Demko v. United States*,
216 F.3d 1049 (Fed. Cir. 2000) ....................25

*Gilda Industries, Inc. v. United States*,
622 F.3d 1358 (Fed. Cir. 2010) ....................16

*Gilda Industries v. United States*,
446 F.3d 1271 (Fed. Cir. 2006) ....................17

*GPX Int'l Tire Corp. v. United States*,
780 F.3d 1136 (Fed. Cir. 2015) ....................16

*Invenergy Renewables LLC v. United States*,
422 F. Supp. 3d 1255 (2019) ....................8

*Invenergy Renewables LLC v. United States*,
553 F.Supp. 3d 1382 (C.I.T. Nov. 17, 2021)....................8, 9, 10, 23

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985) ....................33

*Michigan v. EPA*,
576 U.S. 743 (2015)....................20

*Motion Sys. Corp. v. Bush*,
437 F.3d 1356 (Fed. Cir. 2006) (en banc) ....................17, 26, 31

*Nautilus Grp., Inc. v. Icon Health & Fitness, Inc.*,
437 F.3d 1376 (Fed. Cir. 2006) ....................15

*Schwegmann Bros. v. Calvery Distillers Corp.*,
341 U.S. 384 (1951)....................25

*Shinyei Corp. of Am. v. United States*,
524 F.3d 1274 (Fed. Cir. 2008) ....................................................................16

*Silfab Solar, Inc. v. United States*,
892 F.3d 1340 (Fed. Cir. 2018) ..............................................................17, 33

*Sioux Honey Ass'n v. Hartford Fire Ins. Co.*,
672 F.3d 1041 (Fed. Cir. 2012) ....................................................................25

*Solar Energy Industries Ass'n v. U.S.*,
553 F.Supp. 3d 1322 (C.I.T. 2021)........................... 3, 17, 19, 25, 27, 28, 30, 31

*Transpacific Steel LLC v. United States*,
4 F.3d 1306 (Fed. Cir. 2021) ...................................................................16, 20

*Utility Air Regulatory Group v. EPA*,
134 S. Ct. 2437 (2014)..................................................................................20

**Statutes**

19 U.S.C. § 204(b)(1)(B) ........................................................................1, 2, 11

19 U.S.C. § 2102(1) ...........................................................................................20

19 U.S.C. § 2251....................................................... 2, 4, 6, 13, 14, 19, 20, 23, 25

19 U.S.C. § 2251(a) .................................................. 2, 4, 5, 18, 19, 26, 27, 30, 33

19 U.S.C. § 2252(b) ...........................................................................................18

19 U.S.C. § 2253.......................................................... 2, 10, 14, 19, 20, 23, 24, 25

19 U.S.C. § 2253(a)(1)(A) ........................................ 5, 7, 18, 19, 24, 26, 27, 30, 33

19 U.S.C. § 2253(a)(2)(E)..........................................................6, 9, 18, 19, 24, 28

19 U.S.C. § 2253(e)(1)(B)(i)..............................................................................11

19 U.S.C. § 2254.......................................................................... 13, 20, 21, 23, 24, 25

19 U.S.C. § 2254(b) ...........................................................................................23

19 U.S.C. § 2254(b)(1)...................................................................................15, 23

19 U.S.C. § 2254(b)(2).........................................................................................23

**Other Authorities**

83 Fed. Reg. 3,541 (Jan. 25, 2018) ........................................................................ 2, 6, 7, 21, 22, 26, 27, 28, 31, 32

83 Fed. Reg. 6,670 (Feb. 14, 2018) ....................................................................8

84 Fed. Reg. 27,684 (June 13, 2019) ....................................................................7

84 Fed. Reg. 54,244 (Oct. 9, 2019)......................................................................8

85 Fed. Reg. 4,756 (Jan. 27, 2020) ..................................................................8, 10

85 Fed. Reg. 21,497 (Apr. 17, 2020) ................................................................9, 10

85 Fed. Reg. 65,639 (Oct. 25, 2020)...........................................2, 10, 11, 27, 29, 32

87 Fed. Reg. 7,357 (Feb. 9, 2022) .......................................................11, 12, 22, 31

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellees is not aware of any other appeal in or from this action previously before this or any other appellate court. Appellees' counsel is unaware of any case pending in this or any other court that may directly affect or be affected by this Court's decision in this appeal.

## INTRODUCTION

Appellees Invenergy Renewables ("Invenergy"), LLC, and EDF Renewables, LLC ("EDF") agree with and refer the Court to the brief submitted by Appellees Solar Energy Industries Association and NextEra Energy, Inc. ("SEIA Br."), which identifies several reasons why this Court should affirm the Court of International Trade's ("CIT's") judgment holding Presidential Proclamation 10101 unlawful. Invenergy and EDF submit this brief to inform the Court of an alternative reason to uphold the CIT's decision: The President failed to follow the statutory directive to determine that the economic and social benefits of imposing tariffs on bifacial solar panels and increasing the safeguard duty rate for the fourth year of the measure outweighed the economic and social costs of taking such action.[1]

[1] The Court does not need to reach this issue if it agrees with the CIT's holding that the President may not increase trade restrictions under Section 204(b)(1)(B), or any of the alternative arguments set forth in SEIA and NextEra's brief. But if the Court is not inclined to uphold the decision below on one of those grounds, then it should consider whether the President met his statutory obligation to determine that the benefits of his action outweighed the costs—which he did not.

Sections 201 and 203 of the 1974 Trade Act require the President to weigh the economic and social benefits versus costs of any safeguard action, and "determine" that the action will have greater benefits than costs. *See* 19 U.S.C. § 2251(a), 2253. This is a statutory prerequisite to any safeguard action—including any increase in or re-imposition of a prior safeguard measure, if the Court were to conclude that such action is permitted under Section 204(b)(1)(B) of the Trade Act.

Indeed, President Trump explicitly recognized, when he first imposed safeguard tariffs on solar goods in Proclamation 9763, that any modifications to the safeguard measure must be preceded by *another* cost/benefit analysis. 83 Fed. Reg. 3,541, 3,542 (Jan. 25, 2018). Yet, in Proclamation 10101, the President ignored that requirement and imposed safeguard tariffs on bifacial solar panels, which the United States Trade Representative ("USTR") had excluded pursuant to the original safeguard measure, without determining that the benefits of such action to domestic solar panel manufacturers outweigh the social and economic costs to the broader solar development industry and economy. *See* 85 Fed. Reg. 65,639 (Oct. 25, 2020). The President also increased the duty rate for all covered solar products from what was originally announced for the fourth year of the safeguard measure—again without determining that the benefits of doing so outweighed the costs. *Id*. Given the significant economic and policy interests at issue, the President's failure to consider the economic and social benefits versus costs of his actions is significant.

The CIT rightly recognized that before re-imposing safeguard tariffs on bifacial solar panels and increasing the fourth-year duty rate, the President "was required to weigh the costs and benefits of his alterations to" the safeguard measure. *Solar Energy Industries Ass'n v. U.S.*, 553 F.Supp. 3d 1322, 1339 (C.I.T. 2021) ("*SEIA*"). But the court should have gone further and found that the President failed to fulfill that obligation in Proclamation 10101, which contained no discussion of the benefits and costs of that action, and included no determination that the former outweighed the latter. Both the statutory obligation and the President's failure to fulfill it are clear, and so this Court should uphold the judgment below on that alternative basis if it is not convinced that Proclamation 10101 fails for other reasons.

## STATEMENT OF THE ISSUE

When enacting Proclamation 10101, did the President fulfill his statutory obligation to determine that the social and economic benefits of re-imposing safeguard tariffs on bifacial solar panels and increasing the fourth-year duty rate outweighed the social and economic costs of doing so?

## STATEMENT OF THE CASE

The statutory and factual background giving rise to this appeal is set out at length in SEIA and NextEra's brief. Invenergy and EDF will not repeat that material. We highlight below the statutory provisions and facts most relevant to the issue presented in this brief: the President's failure to fulfill the statutory requirement to

consider and determine whether the economic and social benefits of imposing safeguard tariffs on bifacial panels and increasing the fourth-year duty rate outweigh the economic and social costs of those tariffs.

## I. The safeguard statute

Section 201 and its companion provisions set forth a unique trade program. Unlike other programs that authorize the government to impose tariffs to address unfair trade, the "safeguard statute" seeks to address the effects of presumptively *fair* trade, giving the President power to impose *temporary* restrictions on imports if the International Trade Commission ("ITC") finds that "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article." 19 U.S.C. § 2251(a).

Given the unique and extreme nature of safeguard measures, it is not surprising that Congress imposed a number of limitations on the President's authority to implement such measures, several of which are discussed in SEIA and NextEra's brief (Statement of the Case, § I ("Legal Framework")). Relevant here, Congress instructed the President to determine whether the economic and social costs of taking a safeguard action outweighed the benefits—and it did so not just once, but *three* different times.

First, Section 201(a) authorizes the President to take a safeguard action only if "the President determines" that such action "will [1] facilitate efforts by the domestic industry to make a positive adjustment to import competition and [2] provide greater economic and social benefits than costs." 19 U.S.C. § 2251(a), 2253 (a)(1)(A). Congress thus identified two key factors that the President is required to assess before taking any action pursuant to the safeguard statute—one of which is whether the action "provide[s] greater economic and social benefits than costs." *Id*.

Second, Section 203(a)(1)(A) states that, after receiving a serious injury finding from the International Trade Commission ("ITC") (another prerequisite to the imposition of safeguard tariffs), he "shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition *and* provide greater economic and social benefits than costs." 19 U.S.C. § 2253(a)(1)(A). Again, Congress made clear that the President must consider *both* the impact of the measure on the domestic industry's ability to adjust to import competition, *and* the relative costs and benefits of imposing safeguard tariffs, which requires a wider lens of analysis, extending beyond the particular domestic industry allegedly in need of assistance to compete with imports.

Third, in Section 203(a)(2)(E), the President is given more explicit instructions about how to weigh the economic and social costs and benefits of a potential safeguard action. That provision states:

> [T]he President shall take into account . . . the short- and long-term economic and social costs of the actions authorized . . . relative to their short- and long-term economic and social benefits and other considerations relative to the position of the domestic industry in the United States economy

19 U.S.C. § 2253(a)(2)(E). This subsection not only reiterates Congress's intent for the President to meaningfully consider the economic and social costs of imposing a safeguard measure and determine that they do not outweigh the benefits before taking any such action, but also conveys Congress's intent for the President to consider how that analysis relates to the impacts on the domestic industry and its ability to adjust to trade (the other core statutory factor identified in Section 201).

## II. Proclamation 9693

On January 23, 2018, President Trump issued Proclamation 9693, which imposed a safeguard measure on certain crystalline silicon photovoltaic ("CSPV") solar products, including bifacial solar panels. 83 Fed. Reg. at 3,541-51. In addition to imposing a tariff rate quota on CSPV cells, the President imposed duties on CSPV modules, set to reduce annually from a rate of 30% in the first year, to 15% in the fourth year. *Id.* at 3,548.

In Proclamation 9693, the President confirmed that had considered the economic and social benefits versus costs of his action, stating:

> Pursuant to section 203(a)(1)(A) of the Trade Act (19 U.S.C. 2253(a)(1)(A)), I have determined that this safeguard measure will facilitate efforts by the domestic industry to make a positive adjustment to import competition *and provide greater economic and social benefits than costs*.

*Id*. at 3,542 (emphasis added). The President then further stated:

> If I determine that further action is appropriate and feasible to facilitate efforts by the domestic industry to make a positive adjustment to import competition *and to provide greater economic and social benefits than costs* . . . I shall reduce, modify, or terminate the action established in this proclamation accordingly.

*Id.* The President recognized his obligation to determine that the economic and social benefits of his action are greater than the economic and social costs before *modifying* a safeguard action—not just before its initial imposition.

In Proclamation 9693, the President also instructed USTR to publish "procedures for requests for exclusion of a particular product" from the safeguard duties in the Federal Register and authorized USTR to make such exclusions after consultation with the Secretaries of Commerce and Energy and publishing a notice in the Federal Register. *Id*. at 3,543-44.

## III. The bifacial panel exclusion and government's attempts to withdraw it

Based on requests from three solar companies, USTR excluded bifacial solar panels from the safeguard measure in June 2019, after a sixteen-month notice-and-comment process. *See* 84 Fed. Reg. 27,684 (USTR June 13, 2019) ("Exclusion").

As the CIT explained when vacating one of the USTR's subsequent attempts to withdraw the exclusion (discussed further below), the "facts underlying the Exclusion" included USTR's finding that "that the economic and social benefits outweigh its costs." *Invenergy Renewables LLC v. United States*, 553 F.Supp. 3d 1382, 1402 (C.I.T. Nov. 17, 2021).[2]

Four months after issuing the Exclusion, the government tried to withdraw it. *See* 84 Fed. Reg. 54,244 (Oct. 9, 2019) ("October Withdrawal"). But the CIT entered a preliminary injunction barring USTR's October Withdrawal from entering into effect. *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255 (2019). The court found that the October Withdrawal was likely unlawful both because USTR had not followed notice-and-comment rulemaking procedures and because USTR's decision was arbitrary and capricious. *See id.* at 1286-88.

USTR initiated another action to withdraw the bifacial panel exclusion in early 2020, this time publishing notice and asking for comment—including on the costs and benefits of withdrawing the exclusion. 85 Fed. Reg. 4,756–58 (Jan. 27, 2020). Invenergy, EDF, and many others filed comments arguing against withdrawal of the Exclusion—including on the ground that it would cause economic and social

---

[2] *See also Procedures To Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670, 6671 (Feb. 14, 2018) (stating that USTR would "grant only those exclusions that do not undermine the objectives of the safeguard measures[,]" including to provide greater economic and social benefits than costs).

harm well outweighing any benefits to U.S. manufacturers. *See* 553 F.Supp.3d at 1401 (describing comments on "job losses, . . . planned solar projects and the communities where those projects are located, . . . and overall solar industry impacts," as well as comments explaining that the domestic solar manufacturing industry does not produce enough bifacial products to meet the broader U.S. solar development industry's needs). These comments reflected input from a broad cross section of interested parties beyond the domestic industry—precisely the input contemplated by the statute for purposes of a cost/benefit analysis. *See* 19 U.S.C. § 2253(a)(2)(E) (instructing President to consider "the short- and long-term economic and social costs of the actions authorized" and "other considerations relative to the position of the domestic industry in the United States economy").

USTR nonetheless again attempted to withdraw the bifacial panel exclusion in April 2020. 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) ("April Withdrawal"). The CIT again found that USTR had failed to act lawfully, both because the action exceeded USTR's authority under the safeguard statute, and because the April Withdrawal was arbitrary and capricious. 553 F.Supp. 3d at 1394-95.

Importantly here, one of the key reasons that the CIT held that the April Withdrawal was arbitrary and capricious was that USTR had failed to respond to comments addressing the economic and social costs and benefits of eliminating the bifacial exclusion. *See* 553 F.Supp. 3d at 1401. The court confirmed:

> This issue was plainly significant in that the statute itself identifies it as a central consideration to the imposition of safeguard measures. See 19 U.S.C. § 2253 ("the President shall take into account . . . the short- and long-term economic and social costs . . . relative to their short- and long-term economic and social benefits and other considerations relative to the position of the domestic industry in the United States economy").

*Id*.

USTR itself had recognized the importance of comparing the broader costs versus benefits of withdrawing the Exclusion by asking for comment, in its January 2020 notice proposing to again withdraw the bifacial panel exclusion, on "[t]he potential impact, if any, on the domestic workforce and economy in general should the exclusion be withdrawn." 85 Fed. Reg. 4,756, 4757 (Jan. 27, 2020).

Having found the government's second attempt to withdraw the bifacial panel exclusion to be beyond USTR's statutory or delegated authority as well as arbitrary and capricious, the CIT vacated the April Withdrawal. *Invenergy Renewables*, 553 F.Supp.3d at 1404. The government chose not to appeal that decision.

## IV. Proclamation 10101

Having twice failed to follow its own procedural and substantive process to lawfully withdraw the bifacial panel exclusion through USTR action, the government tried a different tack: presidential action. Proclamation 10101, issued in October 2020, again withdrew the bifacial exclusion, and also raised the tariff rate for the fourth year of the safeguard measure. 85 Fed. Reg. at 65,639-40.

As justification for withdrawal of the bifacial panel exclusion, the President pointed to ITC reports addressing the status of the domestic solar CPSV cell and module manufacturing industry and the alleged impact of imports on its growth, as well as the so-called "petition" from a majority of that industry supposedly requesting relief in accordance with the requirements of section 204(b)(1)(B) (which, as explained in SEIA and NextEra's brief, was in fact no such thing). *Id*. The President then asserted:

> [T]he exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in Proclamation 9693 in light of the increased imports of competing products such exclusion entails, and that it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels.

85 Fed. Reg. at 65,640. However, the President did not discuss, or even reference, the economic or social benefits or costs of his further action, and he made no determination that the former outweighed the latter.

## V. Proclamation 10339

In February 2022, President Biden extended the safeguard measure pursuant to section 203(e)(1)(B)(i), setting the safeguard duty rate for the extension period below 15 percent. Proclamation 10339, *To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products),* 87 Fed. Reg. 7,357 (published Feb. 9, 2022).

However, President Biden *excluded* bifacial panels from the extended safeguard measure. *See id*. Thus, as the government recognized in its brief (at 18), this appeal affects only bifacial panels imported *after* October 25, 2020, but *before* February 7, 2022, as well as the duty rate for covered products from February 7, 2021 through February 6, 2022 (the fourth year of the safeguard measure).

Furthermore, in Proclamation 10339 President Biden did what President Trump failed to do in Proclamation 10101. He "determine[d]" that his action extending the safeguard measure—but excluding bifacial solar panels from the extended safeguard measure—"will provide greater economic and social benefits than costs." 87 Fed. Reg. at 7,359.

## SUMMARY OF THE ARGUMENT

I. This Court may set aside Presidential action that does not comply with statutory requirements**.** This Court has repeatedly confirmed that it has a meaningful role in reviewing Presidential action where the President is acting pursuant to a statutory delegation of authority. If the President has failed to fulfill a statutory requirement, the Court can and should set aside his action.

II. When enacting Proclamation 10101, the President had to determine that the economic and social benefits of his action outweighed the costs. The CIT correctly concluded that President must weigh social and economic benefits versus costs and determine that the former outweigh the latter before taking any safeguard

action—including to re-impose tariffs on an article previously excluded from a safeguard measure. The safeguard statute so instructs three times, including at the outset in Section 201, making it clear that this requirement applies to any safeguard action, including modifying a prior safeguard action pursuant to Section 204. The CIT was also right to find that the President's determination in Proclamation 9693 that the original solar safeguard measure would have greater benefits than costs did not fulfill his obligation to consider the benefits versus costs of re-imposing the safeguard measure on bifacial panels three years later and increasing the fourth-year duty rate in Proclamation 10101.

III. The President did not meet his statutory obligation to determine that the benefits of his action outweigh the costs. Proclamation 10101 contains no determination that the action the President took therein would have greater economic and social benefits than costs, as required by the safeguard statute. The President stated only that the bifacial exclusion had "impaired" the safeguard measure, which does not show that that he considered the broader economic and social costs and benefits of his action, as opposed to the domestic industry's ability to adjust to import competition. If the President's cursory reference to "impairment" of the safeguard measure were sufficient, it would render Congress's repeated mandate to determine that a safeguard action have collectively greater benefits than costs meaningless.

Nor did the President meet the statutory cost/benefit determination requirement by referring back to Proclamation 9693's statements regarding the "purpose" of the safeguard measure. Proclamation 10101 does not mention the purpose of the safeguard measure. And Proclamation 9693 identified *two* core purposes behind the imposition of safeguard tariffs: (1) assisting the domestic manufacturing industry in adjusting to import competition, and (2) ensuring greater economic and social benefits than costs. Even if the President had referenced those purposes in Proclamation 10101 (which he did not), such a statement would not demonstrate that he had considered the latter in addition to the former. Here, the text and context of Proclamation 10101 make clear that the President was focused entirely on the domestic manufacturing industry. In any event, a simple reference to the goals of the original safeguard measure would fall well short of the explicit *determination* that the safeguard action will have greater economic and social benefits than costs required by Sections 201 and 203.

Thus, if the Court does not uphold the CIT's decision for the reasons in SEIA's and NextEra's brief, it should do so because the President failed to fulfill the statutory requirement to determine the benefits of his action outweighed the costs.

## ARGUMENT

As the CIT decision and SEIA and NextEra's brief both explain, Section 204(b)(1) of the Trade Act does not authorize the President to increase the stringency of an existing safeguard measure, including by re-imposing that measure on a product (here, bifacial panels) excluded pursuant to the original measure or by raising the tariff rate. But if the Court does not agree with that CIT holding or SEIA and NextEra's alternative arguments, it should uphold the decision below on the alternative ground that the President failed to determine in Proclamation 10101 that the economic and social benefits of his modification of the safeguard measure outweighed the costs. *See Nautilus Grp., Inc. v. Icon Health & Fitness, Inc.*, 437 F.3d 1376, 1377 (Fed. Cir. 2006) ("[A]n appellee can present in this court all arguments supported by the record and advanced in the trial court in support of the judgment as an appellee, even if those particular arguments were rejected or ignored by the trial court." (internal quotation marks omitted)).

The statutory requirement to make a costs/benefits determination is clear. It is not only set forth at the outset of the safeguard statute as a guiding purpose and principle, but repeated twice thereafter. And it is equally clear that the President made no such determination in Proclamation 10101, which says nothing about the costs or benefits of that action. The President ignored a statutory prerequisite, and

this Court should overturn his action on that basis if it does not overturn his action on one of the other bases discussed in SEIA and Next-Era's brief.

## I. This Court reviews the decision below *de novo*, and must set aside Presidential action where it fails to fulfill statutory requirements.

As explained in SEIA and NextEra's brief (at 14), this Court reviews a grant of summary judgment *de novo*, assessing for itself whether the movant was entitled to judgment as a matter of law. USCIT R. 56(a); *Shinyei Corp. of Am. v. United States*, 524 F.3d 1274, 1282 (Fed. Cir. 2008). And contrary to the government's suggestion, the Court's review of Presidential action is meaningful, with two core obligations relevant here.

First, the Court must review the President's construction of his statutory authority "de novo," assessing for itself what is required under the "text and context" of the statute. *Transpacific Steel LLC v. United States*, 4 F.3d 1306, 1319 (Fed. Cir. 2021); *see also GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1140 (Fed. Cir. 2015) (This Court "review[s] questions of constitutional or statutory interpretation de novo."). After all, the Court, not the President, is the "final authority on issues of statutory construction." *Gilda Industries, Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010); *see also Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1356 (Fed. Cir. 2003) (courts will assess whether the President "misconstru[ed]" his statutory authority).

Second, having determined the scope and bounds of the authority granted to the President by Congress, the Court must determine whether the President's action complied with the statute. The Court will set aside Presidential action where the President "acts beyond his statutory authority," *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018), or has "violated an explicit statutory mandate." *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc). As explained in *Gilda Industries v. United States*, 446 F.3d 1271, 1282 (Fed. Cir. 2006), it is within the Court's purview to determine whether the Executive Branch "has actually made a determination required by the statute, or whether, instead . . . has wholly ignored the statute's commands."

Thus, as the CIT did, this Court can and should consider whether, in issuing Proclamation 10101, the President fulfilled all statutory requirements—including the requirement that the President determine, before taking any safeguard action, that the social and economic benefits of doing so outweigh the costs.

## II. The safeguard statute required the President to determine, in Proclamation 10101, that the economic and social benefits of re-imposing the safeguard measure on bifacial panels outweighed the costs.

The CIT rightly concluded that the President was required to weigh the economic and social costs and benefits of his alterations to the safeguard tariffs imposed by Proclamation 9693 before issuing Proclamation 10101. *SEIA*, 553

F.Supp.3d at 1339. That holding flows directly from the text of the safeguard statute, and is reinforced by the statutory context and purpose.

The government's contrary arguments, if accepted, would subvert the statutory scheme and allow the President to avoid Congress's intent that all safeguard actions have greater economic and social benefits that costs.

### A. The statutory text, context, and purpose confirm that the President must weigh economic and social benefits versus costs before taking *any* safeguard action, including a modification.

The CIT's conclusion that, before modifying a safeguard measure, the President must weigh the benefits versus costs of doing so and determine that the former outweigh the latter is mandated by the plain text of the safeguard statute, which states that mandate at its outset, and then twice thereafter. See 19 U.S.C. §§ 2251(a), 2253(a)(1)(A) & 2253(a)(2)(E).

Section 201(a) mandates that the President weigh the costs and benefits of a safeguard measure and affirmatively find that it "provides greater economic and social benefits than costs" before imposing it:

> If the [ITC] determines under [Section 202(b)] that an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article, the President, in accordance with this chapter, shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition *and provide greater economic and social benefits than costs*.

19 U.S.C. § 2251(a) (emphasis added).

Section 203(a)(1)(A) repeats this mandate, again instructing the President to determine, before taking a safeguard action pursuant to a finding that imports are harming or threatening a domestic industry, whether that action will "provide greater economic and social benefits than costs. 19 U.S.C. § 2253(a)(1)(A). And Section 203(a)(2)(E) reiterates that obligation and expands upon it by explaining that the President must consider both long- and short-term benefits and costs. 19 U.S.C. § 2253(a)(2)(E). Congress's repetition of its mandate to determine the relative social and economic benefits versus costs of imposing safeguard measures demonstrates that Congress wanted to strike a balance between facilitating the efforts by a domestic industry to adjust to import competition, and the negative ramifications of trade restrictions on a wider group of interests, including downstream users of the imported product. Thus, when the President adopts a safeguard action, he cannot ignore one of the two core statutory factors (*e.g.*, whether economic and social costs outweigh benefits) in favor of the other (*e.g.*, impacts on the domestic industry).

The CIT properly interpreted Congress's mandate that the President determine that the economic and social benefits of safeguard action outweigh the costs as applying to all actions taken "in accordance with this chapter," *i.e.* pursuant to the entire safeguard statutory scheme. 553 F.Supp. 3d at 1339. That is, the cost/benefit analysis mandated at the outset of Section 201 and reiterated twice in Section 203

applies equally to actions taken pursuant to Section 204—at least to the extent that Section 204 is construed to allow upward modifications of safeguard measures.

The articulation of the benefits/costs determination requirement in the very first provision of the safeguard statute, Section 201, describing the statute's purpose, goals, and core requirements, establish that Congress intended it to apply across the board as an overarching rule for all safeguard actions. *See Transpacific Steel,* 4 F.3d at 1319 (statutory requirements must be interpreted in light of "text and context, including purpose and history"). Congress's repetition of the mandate twice in Section 203 only reinforces the primacy and general applicability of that obligation. *See Michigan v. EPA,* 576 U.S. 743, 751-58 (2015) (holding that EPA unlawfully failed to consider costs where the Clean Air Act instructed it to regulate power plants if doing so was "appropriate and necessary" and a companion provision directed the agency to study the costs of regulation); *see also Utility Air Regulatory Group v. EPA,* 134 S. Ct. 2437, 2442 (2014) (a "reasonable statutory interpretation must account for … the broader context of the statute as a whole").

That is also the only interpretation of the requirement that is consistent with Congress's stated purpose in enacting the safeguard statute: "to foster economic growth of and full employment in the United States." 19 U.S.C. § 2102(1); *see also Transpacific Steel*, 4 F.3d at 1319 (looking to statute's "purpose" to construe scope of requirements). By requiring the President to make a cost/benefit determination

before taking any safeguard action, Congress ensured that every safeguard action would not only assist some discrete domestic industry segment in adjusting to import competition, but also "safeguard" the broader domestic industry and economy.

The CIT was thus right to conclude the safeguard statute required the President to determine that the economic and social benefits of withdrawing the bifacial panel exclusion and raising the fourth-year tariff rate outweighed the costs of doing so before issuing Proclamation 10101 pursuant to Section 204.

### B. The cost/benefit determination made in Proclamation 9693 did not fulfill the President's obligation to again consider the benefits versus costs of his action when issuing Proclamation 10101.

Below, the government argued that the cost/benefit determination made by the President when imposing safeguard measures in Proclamation 9693—issued two and a half years prior to Proclamation 10101 and before a global pandemic significantly restricted trade—was a sufficient basis for the later withdrawal, in Proclamation 10101, of the bifacial panel exclusion and the increase in the year-four duty rate from 15 percent to 18 percent. But the cost/benefit analysis conducted for the implementation of safeguard measures in Proclamation 9693 was fundamentally different from the one needed to modify it in Proclamation 10101.

Proclamation 9693 weighed the costs and benefits of imposing safeguard measures on the basis that the safeguard duty rate during the fourth year of the measure would be 15 percent. *See* 83 Fed. Reg. at 3,548. The President never

considered whether the economic and social benefits of a safeguard measure with a duty rate of 18 percent during its fourth year would outweigh the measure's costs. And the cost/benefit determination underlying Proclamation 9693 did not assess the comparative costs and benefits of a bifacial panel exclusion at all. Rather, that was first assessed by USTR in the course of its subsequent rulemaking considering exclusion requests, with USTR concluding that the benefits of the exclusion outweighed the costs. Thus, the only existent determination regarding the comparative benefits and costs of excluding bifacial solar panels from the safeguard measure is contrary to the President's action in 10101.

Furthermore, the President explicitly recognized in Proclamation 9693 that he could only thereafter reduce, modify, or terminate the safeguard measure if he determined that doing so was necessary "to facilitate efforts by the domestic industry to make a positive adjustment to import competition *and* to provide greater economic and social benefits than costs." 83 Fed. Reg. at 3,542. President Biden similarly recognized that he was required to make a new costs/benefits determination in Proclamation 10339, when he extended the safeguard measure (but excluded bifacial panels), stating: "I have determined that an extension of this safeguard measure will provide greater economic and social benefits than costs." 87 Fed. Reg. at 7,359. And, as the CIT recognized, the bifacial panel exclusion itself was predicated on USTR's analysis of the economic and social benefits and costs of excluding bifacial

panels from the safeguard measure, and USTR's conclusion that the benefits of the exclusion outweighed the costs. *See Invenergy Renewables*, 553 F.Supp. 3d at 1402.

Thus, both the statutory text and the government's practice make clear that an assessment of comparative economic and social benefits versus costs was required before the government re-imposed safeguard tariffs on bifacial panels and increased the fourth-year tariff rate in Proclamation 10101.

### C. The argument that no cost/benefit determination is required for action under Section 204 is inconsistent with the text of that provision and could obviate Section 201 and 203's mandate.

The government also argued below that the safeguard statute does not require a benefits/costs determination for a modification of a safeguard measures pursuant to Section 204, only for the measure's initial imposition. This argument also fails.

First, this argument ignores that the only part of Section 204(b) that explicitly contemplates an increase in stringency of a prior safeguard measure—Section 204(b)(2), authorizing the President to take further action to "eliminate any circumvention" of a prior safeguard action[3]—directs the President to "take such additional action under [Section 203]." 19 U.S.C. § 2254(b)(2). This demonstrates

[3] The government has not invoked this "circumvention" subsection to justify the actions taken in Proclamation 10101. But if the Court finds that the President has authority to increase the stringency of a prior safeguard measure under Section 204(b)(1), then subsection 204(b)(2)'s direction that modifications must conform to the requirements of Section 203 is a clear signal that Congress did not intend action under Section 204 to escape those cross-cutting requirements—such as to consider the economic and social benefits versus costs of the action.

that, to the extent Congress allowed the President to increase the stringency of a safeguard measure already in effect, any such action must be consistent with the requirements of Section 203—including its instruction that the President determine the long- and short-term economic and social benefits versus costs of his action. *See* 19 U.S.C. § 2253(a)(1)(A) and (a)(2)(E).

Furthermore, the government's expansive view of the President's modification authority under Section 204 subverts the statutory scheme. Under that view, the President could conduct a limited cost/benefit analysis to impose a modest safeguard measure, but then modify that measure under Section 204 (whether by increasing the tariff rate, imposing the measure on more products, or taking some other action[4]) with no further consideration of the costs and benefits of his action—even if the result is a safeguard measure that has greater economic and social costs than benefits. The CIT correctly characterized this narrow view of the cost/benefit

[4] Before this Court, the government for the first time argues that its modification authority under Section 204 is limited in that it cannot increase the stringency of a safeguard measure beyond the level at which it was initially imposed. Not only is this an argument raised only in litigation, as opposed to a firm Presidential commitment, it is inconsistent with the President's actions in Proclamation 10101. There the President increased the duty rate for the fourth year of safeguard tariffs from 15% to 18%–even though the original safeguard measure set the fourth-year rate at 15%–and re-imposed an exclusion issued directly under the original safeguard measure, and thus part of it. As explained in SEIA and NextEra's brief (Arg. § II(B)), Proclamation 10101 increased the stringency of the safeguard measure beyond that set forth in Proclamation 9693. If the President is going to be permitted to take such action, he must logically then be required to again fulfill the statutory benefits/costs determination requirement—or that requirement ceases to have meaning.

determination requirement as "permitting absurd results," and "destroy[ing] its practical effectiveness." *SEIA*, 553 F.Supp. 3d at 1339 (citing *Schwegmann Bros. v. Calvery Distillers Corp.*, 341 U.S. 384, 389 (1951) (rejecting statutory interpretation under which "the exception swallows the proviso and destroys its practical effectiveness"). This Court should similarly decline to adopt an interpretation of Section 204 that could obviate, as a practical matter, the core requirement of Sections 201 and 203. *See Abramski v. United States*, 573 U.S. 169, 179-80 (2014) (rejecting a statutory interpretation that would create an exception that would "virtually repeal" the law's core provisions); *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1052 (Fed. Cir. 2012) ("a statutory interpretation that would render another provision "meaningless" should be rejected); *Demko v. United States*, 216 F.3d 1049, 1052-1053 (Fed. Cir. 2000) (rejecting statutory interpretation that would lead to an "incongruous effect").

Rather, if this Court holds that the President was permitted to increase the stringency of the solar safeguard measures pursuant to Section 204 (which the CIT, SEIA, and NextEra have explained is an incorrect interpretation of the statute), then it should also hold that the President was required to determine that the economic and social benefits of such action outweighed the costs.

## III. The President failed to meet the statutory requirement to determine that the economic and social benefits of his action outweighed the costs.

President Trump failed to meet the statutory requirement that he determine that the economic and social benefits of re-imposing the safeguard measure on bifacial solar panels and increasing the fourth-year duty rate outweighed the costs when he issued Proclamation 10101. Proclamation 10101 contains no mention of economic or social costs or benefits. Unlike in Proclamation 9693, the President did not purport to "determine" that his action would "provide greater economic and social benefits than costs." 19 U.S.C. §§ 2251(a), 2253(a)(1)(A). Rather, he entirely—and unlawfully—ignored that statutory criterion. And the President did so even though he had committed in Proclamation 9693 to ensuring that any future modification of the safeguard measure would have greater economic and social benefits than costs. 83 Fed. Reg. at 3,542.

Neither Proclamation 10101's simple assertion that the bifacial solar exclusion had impaired the safeguard measure, nor a theoretical reference back to the safeguard measure's purposes, was sufficient to fulfill the explicit statutory requirement that the President "determine" that the economic and social benefits of that action outweighed the costs. 19 U.S.C. §§ 2251(a), 2253(a)(1)(A). This is a situation where the President has "violated an explicit statutory mandate." *Motion Sys. Corp.*, 437 F.3d at 1361. His action therefore should be overturned.

### A. The President's statement that the bifacial panel exclusion "impaired" the safeguard measure does not fulfill the statutory mandate to determine that the economic and social benefits of withdrawing the exclusion outweigh its costs.

The President's mere assertion in Proclamation 10101 that the bifacial panel exclusion "has impaired . . . the effectiveness of" the safeguard measure (85 Fed. Reg. at 65,640) does not fulfill his statutory obligation to determine that the economic and social benefits of withdrawing the exclusion and increasing the fourth-year tariff rate outweigh the costs of such action. That statement makes no mention of costs nor benefits, and nothing about it indicates that the President conducted any cost/benefit analysis—let alone "determined" that the economic and social benefits of Proclamation 10101 outweighed its costs. 19 U.S.C. § 2251(a), 2253(a)(1)(A).

#### 1. <u>The President's statement about "impairment" does not indicate that he weighed the benefits versus costs of his action.</u>

The CIT opined that "[b]y determining that the bifacial exclusion 'impaired' the action taken under Proclamation 9693, which was itself deemed necessary to 'facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs,' the President weighed the necessity of Proclamation 10101's alterations." 553 F.Supp. 3d at 1339 (quoting 83 Fed. Reg. at 3,542). But weighing the "necessity" (*id.*) of Proclamation 10101 is not the same as weighing the comparative *economic and social costs and benefits* of that action. The statutory requirement is specific, as

shown by Congress's instruction that the President weigh "economic and social" costs and benefits specifically as well as weigh "the short- and long-term economic and social costs of the actions authorized . . . relative to their short- and long-term economic and social benefits and other considerations relative to the position of the domestic industry in the United States economy." 19 U.S.C. § 2253(a)(2)(E). If this statutory text is to have meaning, the President's assertion that the bifacial exclusion "impaired" the safeguard measure cannot be sufficient to fulfill Congress's mandate.

The President's assertion that the bifacial panel exclusion impaired the effectiveness the original safeguard measure also cannot reasonably be said to "evince" that he weighed the economic and social costs versus benefits of withdrawing that exclusion. 553 F.Supp. 3d at 1340. In enacting the safeguard measure, the President stated that it was intended to serve two distinct goals: (1) to "facilitate efforts by the domestic industry to make a positive adjustment to import competition", and (2) to "provide greater economic and social benefits than costs." 83 Fed. Reg. at 3,542. A statement that the bifacial exclusion is impairing the safeguard measure accordingly could be based solely on the President's belief that the measure was impairing the domestic industry's ability to adjust to import competition, with no consideration of the second, separate goal of providing greater economic and social benefits than costs.

Indeed, everything about Proclamation 10101 and its history indicates that the President was focused entirely and exclusively on the claimed harms to domestic CPSV cell and module manufacturers from imports. As discussed in SEIA and NextEra's brief, Proclamation 10101 was ostensibly the result of three letters sent by members of the domestic CSPV product manufacturing industry, not one of which discusses the broader economic and social costs versus benefits of withdrawing the exclusion and re-imposing safeguard tariffs on bifacial panels. *See* Appx47-52. In turn, Proclamation 10101 focused solely on the status of the domestic CPSV product manufacturing industry. At the outset, the President pointed to the ITC findings that "multiple CSPV module producers opened production facilities in the United States" in 2019; that imports of CPSV modules had increased in 2019; and that continuing to "exempt[] imports of bifacial modules from the safeguard tariff would apply significant downward pressure on prices of domestically produced CSPV modules." 85 Fed. Reg. at 65,639-40. The President then "determined that the domestic industry has begun to make positive adjustment to import competition, shown by the increases in domestic module production capacity, production, and market share," followed immediately by his "further" determination that the bifacial exclusion has "impair[ed] the effectiveness" of the safeguard measure. *Id*. at 65,640. Thus, leading up to his statement regarding "impairment," the President focused entirely on the domestic solar manufacturing industry and the effects of the bifacial

exclusion on that subset of the broader U.S. solar industry. In that context, the assertion that the bifacial exclusion had impaired the safeguard measure cannot reasonably be read as implying that the President had also considered the separate statutory factor of comparative economic and social costs and benefits.

2. The President did not "determine" that the benefits of his action outweighed its costs.

Even if the President's statement regarding "impairment" of the safeguard measure could be read as implying that he considered the economic and social benefits versus costs of withdrawing the exclusion, the President still did not "determine" that doing so would "provide greater economic and social benefits than costs." 19 U.S.C. §§ 2251(a), 2253(a)(1)(A).

The safeguard statute calls for a *determination* that this particular statutory criterion has been met, not just some vague indication that the President has considered costs and benefits. While there may be "no requirement . . . that the President set forth his [cost/benefit] analysis in specific detail," 553 F.Supp. 3d at 1340, here the President failed to even make a bare statement that he had determined that the benefits of his action outweighed the costs. Some other case may present the harder question of whether a conclusory statement to that end is sufficient to fulfill the safeguard statute's requirements without some further discussion of the costs and benefits considered, but this case presents the narrow question of whether an action

that contains *no statement regarding benefits and costs at all* meets the statutory requirement to make a costs/benefits determination. It plainly does not.

The President has previously and since recognized the need to at least state in his determination that the benefits of taking a safeguard action outweighed the costs. In Proclamation 9693, President Trump stated: "I have determined that this safeguard measure will . . . provide greater economic and social benefits than costs." 83 Fed. Reg. at 3,542. President Biden made an explicit benefits/costs determination in Proclamation 10339, stating that his action "will provide greater economic and social benefits than costs." 87 Fed. Reg. at 7,359. By failing to include any such language in Proclamation 10101, the President "violated an explicit statutory mandate," *Motion Sys. Corp.*, 437 F.3d at 1361, and his action should be set aside for that reason as well as those discussed in SEIA and NextEra's brief.

**B. The President's costs/benefits determination in Proclamation 9693 cannot substitute for the determination the CIT found was required before issuance of Proclamation 10101.**

Finally, the President did not fulfill the statutory mandate to determine that the economic and social benefits of Proclamation 10101 outweighed its costs "by referring back to the purpose of the safeguards issued by Proclamation 9693 and thus to that proclamation's express consideration of the economic and social costs and benefits of the safeguard measures." *SEIA*, 553 F.Supp. 3d at 1340. Like his opaque reference to "impairment" of the safeguard measure, the President's

reference to the original safeguard measure does not convey that he considered the social and economic benefits versus costs of re-imposing tariffs on bifacial panels and raising the tariff rate almost three years later.

To begin, contrary to the CIT's suggestion, Proclamation 10101 does not refer to the "purpose" of the original safeguard measure at all. It simply states that the President issued Proclamation 9693 imposing safeguard tariffs on certain CPSV products. *See* 85 Fed. Reg. at 65,639. This is not even thin gruel from which to infer consideration of the comparative economic and social costs versus benefits of Proclamation 10101. It is no gruel at all.

Furthermore, Proclamation 9693 identified *two* purposes for the safeguard measure: helping the domestic solar industry "make a positive adjustment to import competition" *and* "provid[ing] greater economic and social benefits than costs." 83 Fed. Reg. at 3,542. A general reference in Proclamation 10101 to the original "purpose" of the safeguard measure (had the President actually made one, which he did not) does not demonstrate that the President considered the latter as opposed to only the former—and as discussed above, the text and context of Proclamation 10101 indicate that the President was narrowly focused on the claimed needs of domestic CPSV manufacturers. In any event, even if a bare reference to the purpose of the original safeguard measure might somehow be read as suggesting some consideration of costs and benefits, it does not show that the President

"determine[d]" that re-imposing safeguard tariffs on bifacial panels and raising the fourth-year tariff rate would in fact "provide greater economic and social benefits than costs." 19 U.S.C. § 2251(a), 2253(a)(1)(A).

This Court has repeatedly confirmed that the President must fulfill statutory requirements, and will review his actions to ensure that he did so. *See Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) (court may "interpose" where the President commits "a significant procedural violation"); *Silfab Solar*, 892 F.3d at 1347 (finding that the President fulfilled his statutory obligation to consider the ITC's report before taking action because "[t]he Proclamation states that the President considered the report"); *cf. Corus*, 352 F.3d at 1359 ("The statute only gives the President authority to impose a duty if the [ITC] makes 'an affirmative finding regarding serious injury.' . . . If the [ITC's] determination was negative . . . then the President acted beyond his delegated authority"). By failing to determine, in Proclamation 10101, that the economic and social benefits of re-imposing safeguard tariffs on bifacial solar panels and increasing the tariff rate outweighed the costs of doing so, the President failed to fulfill a statutory obligation, and his action should therefore be overturned.

## CONCLUSION

For these reasons and those set forth in SEIA and NextEra's brief, the Court should affirm the CIT's judgment setting aside Proclamation 10101 as unlawful.

July 5, 2022

/s/ John Brew
John Brew
Larry F. Eisenstat
Amanda Shafer Berman
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004-2595
Tel: (202) 688-3451
aberman@crowell.com

Christine M. Streatfeild
Baker & McKenzie LLP
815 Connecticut Ave, NW
Washington, DC 20006
Tel: (202) 835-6111
Christine.streatfeild@bakermckenzie.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ John Brew
John Brew

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Federal Circuit Rule 32(b)(1). The brief contains 7,954 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2).

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared using Microsoft Word in Times New Roman, a proportionally spaced typeface, in 14-point size font.

In preparing this certificate of compliance, I have relied upon the word count function of Microsoft Word.

Dated: July 5, 2022

/s/ John Brew
John Brew