**No. 2022-1392**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, CHRISTOPHER MAGNUS, Commissioner of U.S. Customs and Border Protection,**
*Defendants-Appellants*

---

Appeal from the United States Court of International Trade in
No. 1:20-cv-03941-GSK, Judge Gary S. Katzmann

---

**RESPONSE BRIEF OF PLAINTIFFS-APPELLEES SOLAR ENERGY INDUSTRIES ASSOCIATION AND NEXTERA ENERGY, INC.**

---

Matthew R. Nicely
mnicely@akingump.com
James E. Tysse
jtysse@akingump.com
Daniel M. Witkowski
dwitkowski@akingump.com
Devin S. Sikes
dsikes@akingump.com
Julia K. Eppard
jeppard@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4000

July 5, 2022

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-1392

**Short Case Caption** Solar Energy Industries Association v. US

**Filing Party/Entity** Solar Energy Industries Association; NextEra Energy, Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/05/2022

Signature: /s/ Matthew R. Nicely

Name: Matthew R. Nicely

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Solar Energy Industries Association | | |
| NextEra Energy, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF THE ISSUES ........ 2

INTRODUCTION ........ 3

STATEMENT OF THE CASE AND FACTS ........ 5

I. LEGAL FRAMEWORK ........ 5

II. FACTUAL BACKGROUND ........ 7

A. Issuance of the Solar Safeguard Measure and Exclusion of Bifacial Panels ........ 7

B. The Trump Administration's First Attempt to Withdraw the Exclusion ........ 9

C. The Trump Administration's Second Attempt to Withdraw the Exclusion ........ 9

D. The Trump Administration's Third Attempt to Withdraw the Exclusion ........ 10

III. PROCEDURAL HISTORY ........ 11

SUMMARY OF THE ARGUMENT ........ 12

ARGUMENT ........ 14

I. STANDARD OF REVIEW ........ 14

II. PROCLAMATION 10101 VIOLATED SECTION 204(b)(1)(B) OF THE TRADE ACT BY INCREASING TRADE RESTRICTIONS ........ 15

A. Section 204(b)(1)(B) Does Not Allow The President To Further Restrict Trade. ........ 16

1. All the Tools of Statutory Construction Show that Section 204(b)(1)(B) Does Not Authorize Further Restrictions of Trade. ........ 16

a. The Text and Context of Section 204(b)(1)(B) Demonstrate an Intent to Liberalize Trade. ........ 16

b. The Broader Structure and the Purpose of the Safeguard Statute Confirm that Section 204(b)(1)(B) Does Not Permit Trade-Restrictive Modifications. ........ 18

c. History Supports the CIT's Interpretation. ........ 26

2. The Government Fails to Show that Section 204(b)(1)(B) Authorizes Further Restrictions on Trade. ........ 27

a. The Government's Arguments Regarding the Word "Modification" Lack Merit. ........ 28

b. The Government's Policy Arguments Lack Merit. ........ 34

c. The Legislative History Does Not Support the Government's Interpretation. ........ 37

B. PROCLAMATION 10101 INCREASED TRADE RESTRICTIONS. ........ 41

III. THE JUDGMENT THAT PROCLAMATION 10101 VIOLATES SECTION 204(b)(1)(B) OF THE TRADE ACT CAN BE AFFIRMED ON ALTERNATIVE GROUNDS. ....................46
A. The President Did Not Receive the Petition Required by Section 204(b)(1)(B). ....................47
B. The President Did Not Make the Finding Required by Section 204(b)(1)(B). ....................58
CONCLUSION....................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlantic Cleaners & Dyers v. United States*,
286 U.S. 427 (1932)....30

*Barrett v. United States*,
423 U.S. 212 (1976)....59, 60, 61

*Bostock v. Clayton Cty., Georgia*,
140 S. Ct. 1731 (2020)....38

*Carr v. United States*,
560 U.S. 438 (2010)....59

*Corus Grp. PLC v. Int'l Trade Comm'n*,
352 F.3d 1351 (Fed. Cir. 2003) ....*passim*

*Env't Def. v. Duke Energy Corp.*,
549 U.S. 561 (2007)....30

*Est. of Cowart v. Nickols Drilling Co.*,
505 U.S. 469 (1992)....59

*Garcia v. United States*,
469 U.S. 70 (1984)....49

*Gen. Dynamics Land Sys., Inc. v. Cline*,
540 U.S. 581 (2004)....30

*Gilda Indus., Inc. v. United States*,
622 F.3d 1358 (Fed. Cir. 2010) ....14

*GPX Int'l Tire Corp. v. United States*,
780 F.3d 1136 (Fed. Cir. 2015) ....15

*Invenergy Renewables LLC v. United States*,
422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ....9

*Invenergy Renewables LLC v. United States*,
476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ....................9, 10

*Invenergy Renewables LLC v. United States*,
552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) ....................10

*Jarecki v. G. D. Searle & Co.*,
367 U.S. 303 (1961)....................17

*Keene Corp. v. United States*,
508 U.S. 200 (1993)....................23, 52, 61

*King v. Burwell*,
576 U.S. 473 (2015)....................19, 29, 30

*King v. St. Vincent's Hosp.*,
502 U.S. 215 (1991)....................51

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985) ....................14

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
512 U.S. 218 (1994)....................17

*Michael Simon Design, Inc. v. United States*,
609 F.3d 1335 (Fed. Cir. 2010) ....................57

*Microsoft Corp. v. i4i Ltd. Partnership*,
564 U.S. 91 (2011)....................34

*Nautilus Grp., Inc. v. Icon Health & Fitness, Inc.*,
437 F.3d 1376 (Fed. Cir. 2006) ....................46

*Rush Prudential HMO v. Moran*,
536 U.S. 355 (2002)....................18

*Russello v. United States*,
464 U.S. 16 (1983)....................23

*Schlumberger Tech. Corp. v. United States*,
845 F.3d 1158 (Fed. Cir. 2017) ....................42

*Shinyei Corp. of Am. v. United States*,
524 F.3d 1274 (Fed. Cir. 2008) ....................................................................14

*Shoshone Indian Tribe v. United States*,
364 F.3d 1339 (Fed. Cir. 2004) ....................................................................22

*Silfab Solar, Inc. v. United States*,
892 F.3d 1340 (Fed. Cir. 2018) ..........................................................15, 56, 57

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
566 U.S. 560 (2012).........................................................................................30

*Transpacific Steel LLC v. United States*,
4 F.4th 1306 (Fed. Cir. 2021) ...............................................................14, 16, 26

*U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439 (1993).........................................................................................47

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365 (1988)...................................................................................19, 30

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989).........................................................................................47

*United States v. Wilson*,
503 U.S. 329 (1992)...................................................................................59, 60

*USP Holdings, Inc. v. United States*,
No. 2021-1726, slip op. (Fed. Cir. June 9, 2022) .......................................14, 57

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014).........................................................................................18

*Young v. UPS*,
575 U.S. 206 (2015).........................................................................................44

**Statutes**

19 U.S.C. § 2133(a)(1)(A) ..................................................................................31

19 U.S.C. § 2133(a)(2)(B) ..................................................................................31

19 U.S.C. § 2251(a) ..............................................................5, 6, 19, 20, 35

19 U.S.C. § 2251(b)(1)........................................................................59
19 U.S.C. § 2251(b)(1)(A)....................................................................20
19 U.S.C. § 2252.............................................................................6, 24
19 U.S.C. § 2253(a)(1)(A)..................................................5, 6, 24, 55
19 U.S.C. § 2253(a)(2)...................................................................6, 25
19 U.S.C. § 2253(a)(2)(E)........................................................................6
19 U.S.C. § 2253(a)(3)(A)............................................................23, 32
19 U.S.C. § 2253(a)(3)(C)....................................................................31
19 U.S.C. § 2253(a)(3)(D)....................................................................32
19 U.S.C. § 2253(a)(4)..........................................................................43
19 U.S.C. § 2253(b)(2)..........................................................................35
19 U.S.C. § 2253(c)..............................................................................43
19 U.S.C. § 2253(e)............................................................................5, 6
19 U.S.C. § 2253(e)(1)..........................................................................35
19 U.S.C. § 2253(e)(1)(B)....................................................................24
19 U.S.C. § 2253(e)(1)(B)(i).................................................................23
19 U.S.C. § 2253(e)(1)(B)(i)(II)............................................................61
19 U.S.C. § 2253(e)(3)..........................................................................35
19 U.S.C. § 2253(e)(5)....................................................................35, 36
19 U.S.C. § 2253(e)(7)..........................................................................35
19 U.S.C. § 2254(b)(1).....................................................................6, 43
19 U.S.C. § 2254(b)(1)(A).....................................................21, 25, 37, 52
19 U.S.C. § 2254(b)(1)(B)...........................................................*passim*

19 U.S.C. § 2254(b)(2) ........ 22, 23

19 U.S.C. § 2254(b)(3) ........ 22

19 U.S.C. § 2254(c) ........ 24

19 U.S.C. § 2254(c)(1) ........ 23, 61

19 U.S.C. § 2481(6) ........ 17, 34, 39

19 U.S.C. § 3004(c)(1) ........ 42

19 U.S.C. § 3512(d) ........ 40

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988) ........ 40

**Presidential Proclamations and Regulations**

*Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21,497 (Apr. 17, 2020) ........ 9

*Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27,684 (June 13, 2019) ........ 8, 9

*Procedures To Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670 (Feb. 14, 2018) ........ 8

Proclamation 10339, *To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products),* 87 Fed. Reg. 7,357 (Feb. 4, 2022) ........ 12

Proclamation 5727, *Termination of Import Relief on Certain Heavyweight Motorcycles*, 52 Fed. Reg. 38,075 (Oct. 9, 1987) ........ 27

Proclamation 7314, *To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*, 65 Fed. Reg. 34,899 (May 26, 2000) ........ 26

Proclamation 7529, *To Facilitate Positive Adjustment to Competition From Imports of Certain Steel Products*, 67 Fed. Reg. 10,551 (Mar. 7, 2002) ........ 44

Proclamation 9693, *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541 (Jan. 25, 2018) ........................................7, 8, 44

Proclamation 9694, *To Facilitate Positive Adjustment to Competition from Imports of Large Residential Washers*, 83 Fed. Reg. 3553 (Jan. 25, 2018).......44

*To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products)*, 85 Fed. Reg. 65,639 (Oct. 16, 2020) (Proclamation 10101) ........................................................*passim*

*Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54,244 (Oct. 9, 2019)..................................9

**Other Authorities**

134 Cong. Rec. 7197 (1988) ...........................................................49, 52

H.R. Rep. No. 100-576 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 1547 .......38, 49

H.R. Rep. No. 103-316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 .......40, 41

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*, Inv. No. TA-201-75, USITC Pub. 5266 (Dec. 2021) ..................................24, 62

*Heavyweight Motorcycles*, Inv. No. TA-203-17, USITC Pub. 1988 (June 1987) .....................................................................................27

Robert A. Katzmann, *Judging Statutes* (2014).........................................49

Merriam-Webster Dictionary...........................................................17, 53

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...........................................................................48

Webster's Unabridged Third New International Dictionary (1965) .......................17

**STATEMENT OF RELATED CASES**

Counsel for the Solar Energy Industries Association ("SEIA") and NextEra Energy, Inc. ("NextEra") know of no other appeal in or from the same civil action before this or any other appellate court.

## STATEMENT OF THE ISSUES

This appeal arises from a judgment of the Court of International Trade ("CIT") setting aside Proclamation 10101, *To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products)*, 85 Fed. Reg. 65,639 (Oct. 16, 2020) ("Proclamation 10101"). Proclamation 10101 modified the safeguard measure on certain crystalline silicon photovoltaic ("CSPV") products, commonly referred to as solar products, by imposing tariffs on bifacial panels and increasing the tariff burden on all products (including bifacial panels) covered by the Proclamation. The issues presented in this brief are:

1. Whether Proclamation 10101 violated section 204(b)(1)(B) of the Trade Act of 1974 because that provision bars the President from modifying a safeguard measure to increase trade restrictions in response to a domestic industry's successful response to import competition.

2. Whether, in the alternative, Proclamation 10101 violated section 204(b)(1)(B) in either of two additional ways: (1) President Trump issued Proclamation 10101 without having received a petition requesting modification on the basis that the domestic industry had made a positive adjustment to import competition, as mandated by section 204(b)(1)(B); and (2) President Trump issued Proclamation 10101 without having determined "that the domestic industry has made a positive adjustment to import competition," as also mandated by section 204(b)(1)(B).

## INTRODUCTION

In the Trade Act of 1974, Congress delegated to the President the power to impose emergency, temporary "safeguard" measures that can restrict imports from all sources in order to "safeguard" a domestic industry. It also gave the President, in section 204(b)(1)(B), the power to "modify" an existing measure—but only after the domestic industry "has made" a positive adjustment to import competition. The Parties agree that the modification provision allows the President to *taper* trade restrictions in response to the domestic industry's success in responding to foreign competition. The primary question presented is whether the President may respond to the industry's success by *increasing* trade restrictions as well.

The answer is plainly no. As the Court of International Trade held, the text of the statute, its purpose and history, and common sense are all in accord: Congress did not grant the power to restrict foreign trade in a provision explicitly designed to respond to an industry's successful adjustment to import competition. That is particularly true in light of the extraordinary nature of the safeguard statute, which, in order to protect the domestic industry, uniquely permits the President to restrict even indisputably *fair* trade. The statute thus places numerous procedural and substantive limitations on imposing and modifying safeguard measures in order to avoid obvious potential harm to consumers, U.S. trading relationships, and other important interests. Flouting those limits, President Trump tried to fit a square peg

in a round hole, by relying on a provision that was simply not designed to increase trade restrictions. Indeed, Proclamation 10101 was actually the Trump Administration's *third* unlawful attempt to impose the same restriction (the Government wisely elected not to appeal the CIT's judgments setting aside the first two attempts).

President Trump's faulty reliance on section 204(b)(1)(B) to restrict trade is alone sufficient to affirm the CIT's judgment. But if more were needed, Proclamation 10101 violated the modification provision in at least two other respects, and the Court can independently affirm the judgment on either ground. First, the President acted without having received the statutorily mandated petition from the domestic industry seeking a modification on the "basis" that it had made a positive adjustment to import competition. In fact, it is undisputed that no such petition existed. Second, despite being statutorily required to find that the industry "has made" a positive adjustment before modifying the measure, the President undisputedly found instead that the industry only "has *begun to make*" such an adjustment.

For any and all of these reasons, the Court should affirm the judgment of the CIT setting aside the President's modifications of the safeguard measure as unlawful.

## STATEMENT OF THE CASE AND FACTS

Plaintiffs brought this action to challenge the legality of Presidential Proclamation 10101, which modified the safeguard measure that applies to CSPV products by restricting trade in multiple respects.

### I. LEGAL FRAMEWORK

Under section 201 of the Trade Act, Congress delegated to the President the power to impose a "safeguard" measure—*i.e.*, an emergency, temporary restriction on imports—if the International Trade Commission ("ITC") finds that "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article." 19 U.S.C. § 2251(a). Unlike antidumping and countervailing duty measures, which impose tariffs to address *unfair* trade, safeguards seek to address the effects of presumptively *fair* trade, in order to "facilitate efforts by the domestic industry to make a positive adjustment to import competition." 19 U.S.C. § 2251(a). Given the potential for harm to downstream industries, consumers, and U.S. trading relations, Congress imposed a number of procedural requirements before the President can take action pursuant to the safeguard statute. It also required that any action taken be temporary in nature, decrease over time, and "provide greater economic and social benefits than costs." 19 U.S.C. §§ 2251(a), 2253(a)(1)(A), (e).

Specifically, before a safeguard action is imposed, the ITC must conduct an investigation in which interested parties can participate. *See* 19 U.S.C. § 2252. Only if the ITC finds that increased imports are a substantial cause of serious injury (or threat thereof) to the domestic industry can the President impose a safeguard measure. 19 U.S.C. § 2253(a)(1)(A). Then, in deciding whether to take action, and what that action should be, the President must weigh the economic and social costs and benefits of the potential action as well as consider a list of enumerated factors, which include the potential negative impacts of trade relief. 19 U.S.C. § 2253(a)(1)(A), (a)(2). The President's action is then subject to numerous limitations, such as a cap on the rate of any additional duties, and a requirement that safeguard actions in the form of trade barriers (duties, quotas, and tariff-rate quotas) be phased down over time. 19 U.S.C. § 2253(e). And before taking any action, the President must balance the costs against the economic and social benefits. 19 U.S.C. §§ 2251(a), 2253(a)(1)(A), 2253(a)(2)(E).

The primary provision at issue in this case, section 204(b)(1), governs reductions, modifications, and terminations of safeguard measures, which may be taken after the President receives a monitoring report from the ITC. 19 U.S.C. § 2254(b)(1). The provision authorizes the President to reduce, modify, or terminate the safeguard measure only if the President "determines, after a majority of the representatives of the domestic industry submits to the President a petition

requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1)(B).

## II. FACTUAL BACKGROUND

### A. Issuance of the Solar Safeguard Measure and Exclusion of Bifacial Panels

In early 2018, following an investigation and injury finding by the ITC, President Trump issued a safeguard measure on CSPV products. Proclamation 9693, *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541, 3541-51 (Jan. 25, 2018) ("Proclamation 9693"). Consistent with the statutory requirement that safeguard measures be temporary and phase down over time, President Trump imposed a tariff rate quota on CSPV cells and an additional duty on CSPV modules at the following rates:

| If entered during the period from: | Rate |
|---|---|
| February 7, 2018 through February 6, 2019 | 30% |
| February 7, 2019 through February 6, 2020 | 25% |
| February 7, 2020 through February 6, 2021 | 20% |
| February 7, 2021 through February 6, 2022 | 15% |

*Id.* at 3548.

Proclamation 9693 authorized the U.S. Trade Representative ("USTR") to establish a process to exclude certain products from the safeguard measure. *Id.* at 3543-44. USTR's notice, which set out the procedures to request an exclusion, stated that USTR would "evaluate each request on a case-by-case basis" and "grant only those exclusions that do not undermine the objectives of the safeguard measures." *Procedures To Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670, 6671 (Feb. 14, 2018). The notice did not state that USTR would or could withdraw a granted exclusion at a later date. *Id.* Various parties filed exclusion requests.

In June 2019, having considered the factors laid out in the February 14, 2018 notice, USTR granted a prospective exclusion for "bifacial solar panels that absorb light and generate electricity on each side of the panel and that consist of only bifacial solar cells that absorb light and generate electricity on each side of the cells" ("the Exclusion"). *Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27,684, 27,685 (June 13, 2019). USTR's June

2019 notice did not set forth an expiration date for the Exclusion and did not indicate that USTR might revisit or withdraw the Exclusion in the future. *Id.* at 27,684-85.

### B. The Trump Administration's First Attempt to Withdraw the Exclusion

Roughly four months after granting the Exclusion, USTR announced that it would withdraw the Exclusion effective October 28, 2019. *Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54,244 (Oct. 9, 2019). Several parties, including SEIA, filed an action at the CIT challenging USTR's attempt to withdraw the Exclusion, and the CIT issued a preliminary injunction prohibiting the withdrawal of the Exclusion. *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1295 (Ct. Int'l Trade 2019). The CIT concluded that USTR had likely violated the Administrative Procedure Act ("APA") in withdrawing the Exclusion, *id.* at 1287, and the CIT eventually vacated USTR's October 2019 notice on that basis, *see Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1340 (Ct. Int'l Trade 2020). The Government did not appeal.

### C. The Trump Administration's Second Attempt to Withdraw the Exclusion

In April 2020, USTR again attempted to withdraw the Exclusion. *See Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21,497 (Apr. 17, 2020). The CIT

concluded that the April 2020 notice also likely violated the APA and modified its original preliminary injunction to cover the April 2020 notice. *Invenergy Renewables*, 476 F. Supp. 3d at 1352. The CIT eventually held that USTR violated the APA in issuing the April 2020 withdrawal determination and that USTR lacked authority to withdraw the Exclusion. *Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382, 1394-95 (Ct. Int'l Trade 2021). Again, the Government did not appeal.

### D. The Trump Administration's Third Attempt to Withdraw the Exclusion

After the Trump Administration was twice frustrated in withdrawing the Exclusion administratively, President Trump tried a third tack by issuing Proclamation 10101 on October 10, 2020 (with an effective date of October 25). 85 Fed. Reg. 65,639. Proclamation 10101 had three primary effects. First, it imposed safeguard duties on bifacial panels, taking the action that USTR had been enjoined from taking (and that was later found unlawful). *Id.* at 65,640, 65,642. Second, it increased the originally announced safeguard duty rate on imported CSPV products, including bifacial panels, for the fourth year of the solar safeguard measure (February 7, 2021 through February 6, 2022) from 15 percent to 18 percent. *Id.* at 65,642. Third, it modified the Harmonized Tariff Schedule of the United States ("HTSUS") to reflect the two substantive changes to the safeguard measure. *Id.* at 65,640-42.

As authority for these actions, President Trump relied on section 204(b)(1)(B) of the Trade Act, 19 U.S.C. § 2254(b)(1)(B), which permits the President to reduce, modify, or terminate safeguard measures if the President "determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification or termination on such basis, that the domestic industry has made a positive adjustment to import competition." The President asserted that he had received a petition from the domestic industry requesting the modifications to the safeguard measure, but he did not assert that the request was made on the basis of the domestic industry having made a positive adjustment to import competition. 85 Fed. Reg. at 65,640. Nor did President Trump determine that the domestic industry "has made" a positive adjustment to import competition; instead, he found only that the "domestic industry *has begun to make*" such an adjustment. *Id.* (emphasis added).

## III. PROCEDURAL HISTORY

SEIA, NextEra, and other parties filed suit at the CIT to contest the legality of Proclamation 10101. Before the CIT, the Government produced three letters, joined by a total of six companies, that it relied on as the "petition" that led to Proclamation 10101. Appx47-52, Appx85-86. None of the documents (read alone or together) asserted that the domestic industry "has made" a positive adjustment to import

competition, much less requested modifications to the safeguard measure on that "basis." 19 U.S.C. § 2254(b)(1)(B); *see* Appx47-52, Appx200-201.

The CIT granted summary judgment in favor of Plaintiffs and set aside Proclamation 10101 as unlawful. The CIT agreed with Plaintiffs that Proclamation 10101 violated section 204(b)(1)(B) by increasing trade restrictions. Appx28-34. But the CIT disagreed with Plaintiffs on certain other arguments, including as to whether the domestic industry petition or the President's determinations satisfied section 204(b)(1)(B)'s requirements. Appx12-28.

In February 2022, President Biden extended the safeguard measure pursuant to section 203(e)(1)(B)(i), but specifically excluded bifacial panels and set the duty rates for the extension period below 15 percent. Proclamation 10339, *To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products),* 87 Fed. Reg. 7,357 (Feb. 4, 2022). Plaintiffs thus agree with the Government (Gov't Br. 18) that this appeal affects only the tariff treatment of certain entries of CSPV products that were made before President Biden extended the safeguard measure in February 2022.

## SUMMARY OF THE ARGUMENT

The CIT's judgment setting aside Proclamation 10101 should be affirmed either on the ground relied upon by the CIT or on other independent grounds.

**I.** As the CIT correctly held, all the tools of statutory construction—text, context, structure, purpose, and history—show that section 204(b)(1)(B) unambiguously precludes trade-restrictive changes to safeguard measures. Indeed, because section 204(b)(1)(B) permits modifications only after the domestic industry "has made" a positive adjustment to competition, it logically follows that this provision cannot be grounds to *further restrict* trade. Because the modifications to the safeguard made by Proclamation 10101 resulted in a greater tariff burden on imported CSPV products than would have existed absent the modifications, the CIT rightly set the Proclamation aside.

**II.** Proclamation 10101 is independently unlawful for two additional reasons. First, the President did not receive the petition required by section 204(b)(1)(B) to modify a safeguard measure. The statute requires that the President receive a petition from the domestic industry requesting changes to the safeguard measure on the "basis" that the domestic industry has made a positive adjustment to import competition. But it is undisputed that none of the three letters that the President treated collectively as the mandatory "petition" requested changes to the safeguard measure on that "basis."

Second, the President did not find that "the domestic industry *has made* a positive adjustment to import competition," as required by section 204(b)(1)(B). Instead, the President stated only that the domestic industry "*has begun*" to make

that positive adjustment. The rules of grammar, the statutory structure, and the ITC's own guidance confirm the President's determination is quite different from—and cannot satisfy—the statutory requirement.

## ARGUMENT

### I. STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *See, e.g.*, *Shinyei Corp. of Am. v. United States*, 524 F.3d 1274, 1282 (Fed. Cir. 2008). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a).

This Court generally reviews presidential action for a "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *USP Holdings, Inc. v. United States*, No. 2021-1726, slip op., at *9 n.3 (Fed. Cir. June 9, 2022) (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)). But the judiciary, rather than the Executive Branch, "is the final authority on issues of statutory construction." *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010). This Court thus decides pure "legal issues"—even those implicating the President's proffered statutory interpretations—"de novo," based on "text and context, including purpose and history." *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1319 (Fed. Cir.

2021); *see GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1140 (Fed. Cir. 2015) ("[This Court] review[s] questions of constitutional or statutory interpretation de novo."). Such review includes the authority to determine whether the President failed to meet statutory prerequisites for presidential action. *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (courts may set aside presidential action if President "acts beyond his statutory authority"); *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1359-61 (Fed. Cir. 2003) (reviewing whether statutory prerequisites for presidential action under safeguard statute were satisfied).

## II. PROCLAMATION 10101 VIOLATED SECTION 204(b)(1)(B) OF THE TRADE ACT BY INCREASING TRADE RESTRICTIONS

As the CIT recognized, section 204(b)(1)(B) of the Trade Act does not allow trade-restrictive changes to safeguard measures—but Proclamation 10101 further restricted trade in multiple ways. Appx28-33. Because those changes violated the statute, this Court should affirm the CIT's judgment setting aside Proclamation 10101. Appx33-34.

### A. Section 204(b)(1)(B) Does Not Allow The President To Further Restrict Trade.

#### 1. *All the Tools of Statutory Construction Show that Section 204(b)(1)(B) Does Not Authorize Further Restrictions of Trade.*

The basic tools of statutory construction—"text and context, including purpose and history," *Transpacific*, 4 F.4th at 1319—show that section 204(b)(1)(B) gives the President a tool to liberalize trade, not restrict it.

##### a. The Text and Context of Section 204(b)(1)(B) Demonstrate an Intent to Liberalize Trade.

The unambiguous text of this provision gives the President the power to "modif[y]" a safeguard action only after the President determines that "the domestic industry has made a positive adjustment to import competition." As relevant here, a safeguard action

> may be reduced, modified, or terminated by the President (but not before the President receives [a required report from the ITC]) if the President—
>
> ***
>
> (B) determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b)(1)(B).

The relevant question is whether Congress intended the word "modification" in section 204(b)(1)(B) to encompass both trade-liberalizing and trade-restrictive measures. The Trade Act defines the term "modification" as follows: "The term 'modification', as applied to any duty or other import restriction, includes the elimination of any duty or other import restriction." 19 U.S.C. § 2481(6). Although this definition fails to specify what "modification" does *not* include, it makes clear that it includes, at a minimum, actions that moderate or taper an existing restriction, up to full "elimination."

Similarly, common dictionary definitions indicate that the word "modify" means to "moderate" or make "less extreme." *See, e.g.*, "Modify," Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/modify ("1: to make less extreme: MODERATE "); "Modify," Webster's Unabridged Third New International Dictionary (1965) ("1: to make more temperate and less extreme: lessen the severity of: MODERATE); *see MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 241-42 & n.5 (1994) (Stevens, J. dissenting) (citing dictionary definitions for the "long-established meaning" of "modify" as "to limit or reduce in extent or degree"). To be sure, "modify" can *also* mean "to change moderately or in minor fashion." *Id.* at 218 (internal quotation marks omitted); *see* Appx30 (discussing definitions). Given these competing definitions, the specific definition Congress intended necessarily depends on context. *See Jarecki v. G. D. Searle &*

*Co*., 367 U.S. 303, 307 (1961) (explaining that a statutory term, though "usable in many contexts, and with various shades of meaning," "does not stand alone, but gathers meaning from the words around it").

Here, the surrounding context shows that Congress used "modification" in the sense of "to moderate." Congress intentionally predicated "modification" of a safeguard measure on a finding "that the domestic industry *has made* a positive adjustment to import competition," after the domestic industry requested such modification "on such basis." 19 U.S.C. § 2254(b)(1)(B) (emphasis added). It would make no sense for Congress to authorize further trade *restrictions* after the domestic industry already "has made" a positive adjustment—and the Government offers no plausible explanation otherwise. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (statutory term must be given a "reasonable, context-appropriate meaning"); *Rush Prudential HMO v. Moran*, 536 U.S. 355, 366 (2002) (courts take "commonsense" approach when construing a term in a particular statutory context). To the contrary, once the industry "has made" a positive adjustment, the goal of section 201(a) has been achieved, making further restrictions unnecessary.

#### b. The Broader Structure and the Purpose of the Safeguard Statute Confirm that Section 204(b)(1)(B) Does Not Permit Trade-Restrictive Modifications.

The broader structure and stated purpose of the statute support the interpretation of section 204(b)(1)(B) as prohibiting trade-restrictive changes to

safeguard measures. *See King v. Burwell*, 576 U.S. 473, 492-98 (2015) (declining to adopt interpretation of statutory provision that would undermine broader statutory scheme). That is "because only one of the permissible meanings" of section 204(b)(1)(B) "produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

Section 201 of the Trade Act allows the President to impose a safeguard measure if the ITC finds that imported articles are causing (or threatening to cause) serious injury to the domestic industry. 19 U.S.C. § 2251(a). It thus constitutes "an 'escape clause' provision, which allows the President to provide temporary relief to domestic industries from the lowering of trade barriers as the result of such trade agreements, so that the industry will have sufficient time to adjust to the freer international competition." *Corus*, 352 F.3d at 1353 (internal quotation marks omitted)). Unlike antidumping and countervailing duty measures, the purpose of the safeguard statute is not to remedy *unfair* trade (as no finding of unfair trade is required), but rather to "facilitate efforts by the domestic industry to make a positive adjustment to import competition." 19 U.S.C. § 2251(a). That occurs when the domestic industry is "able to compete successfully with imports" without the protections provided by the safeguard measure, or when the industry or dislocated

workers experience an orderly transition to other "productive pursuits." 19 U.S.C. § 2251(b)(1)(A).

Importantly, section 201 also evidences congressional intent to strike a balance between facilitating the domestic industry's efforts to adjust to import competition, on one hand, and addressing the negative ramifications of trade restrictions on downstream users of the imported product, consumers, and U.S. trading partners, on the other. It thus explicitly requires that any action "provide greater economic and social benefits than costs." 19 U.S.C. § 2251(a).[1] Given Congress's explicit desire to ensure that safeguard measures impose no undue social or economic costs, it surely did not invite the President in section 204(b)(1)(B) to further restrict trade *after* the industry succeeds in positively adjusting. To the contrary, as the CIT observed, "there is every indication that [section 204(b)(1)(B)] was intended to provide an escape hatch from those safeguards where [the] domestic industry has adequately adapted to import competition." Appx32.

Section 204(b)(1)(B)'s neighboring provisions reinforce the conclusion that it precludes trade-restrictive modifications. For example, section 204(b)(1)(A) allows the President to reduce or terminate a safeguard measure:

if the President—

[1] The requirement that the President consider the costs and benefits of action taken under the safeguard statute is discussed further in the response brief of Appellees Invenergy Renewables LLC and EDF Renewables LLC.

> (A) after taking into account any report or advice submitted by the Commission under subsection (a) [requiring the ITC to produce a monitoring report] and after seeking the advice of the Secretary of Commerce and the Secretary of Labor, determines, on the basis that either—
>
> > (i) the domestic industry has not made adequate efforts to make a positive adjustment to import competition, or
> >
> > (ii) the effectiveness of the action taken under section 2253 of this title has been impaired by changed economic circumstances,
>
> that changed circumstances warrant such reduction, or termination[.]

19 U.S.C. § 2254(b)(1)(A). The Government admits that this provision, which refers only to "reduction" and "termination," has the "evident purpose to permit loosening of a safeguard measure" in the enumerated circumstances. Gov't Br. 30; *see id.* at 28 ("Section 2254(b)(1)(A) *solely* permits" reduction or termination.). That being so, the Government fails to explain why Congress would deny the President authority to further restrict trade to assist the domestic industry due to "changed economic circumstances" or inadequate industry efforts, while simultaneously authorizing the President to further restrict trade after the industry already "has made" a positive adjustment.

Other nearby provisions are in accord. Section 204(b)(2) authorizes the President to take "additional action" to "eliminate any circumvention of any action previously taken under such section," while section 204(b)(3) authorizes the

President to "reduce, modify, or terminate" a measure following an ITC determination responding to World Trade Organization ("WTO") dispute settlement findings. *See* Gov't Br. 6, 33 (citing 19 U.S.C. § 2254(b)(2)-(3)). Although the Government relies on these provisions, it consistently neglects to mention that both allow the President to take action "*notwithstanding* [section 204(b)(1)]." 19 U.S.C. § 2254(b)(2)-(3) (emphasis added). The word "notwithstanding" ordinarily reflects "a legislative intent to displace any other provision of law that is contrary to" its requirements. *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1346 (Fed. Cir. 2004). Congress's language thus supports *Plaintiffs'* interpretation: even assuming subsections (b)(2) and (b)(3) permit trade-restrictive actions, they do so "notwithstanding" the prohibition on such actions in subsection (b)(1)(A) and (b)(1)(B). Otherwise, both provisions would mean the same thing even without the "notwithstanding" clauses (as the Government's repeated failure to quote those clauses confirms).

At a minimum, those provisions show that, even if Congress authorized the President to restrict trade in *other* provisions—provisions he failed to invoke in Proclamation 10101—Congress did not do so *in section 204(b)(1)(B)*. Indeed, it is notable that in section 204(b)(2), which is the only provision in section 204 in which Congress clearly contemplated an increase in trade restrictions (to combat circumvention), Congress used a different phrase—the President may take

"additional action," 19 U.S.C. § 2254(b)(2))—instead of the "reduce, modify, or terminate" formulation Congress used in both sections 204(b)(1)(B) and 204(b)(3). Similarly, section 203(a)(3)(A) authorizes the President to "proclaim an increase in" duties when imposing a safeguard measure, 19 U.S.C. § 2253(a)(3)(A), but Congress gave the President no similar power to "increase" an action in section 204(b)(1)(B). These provisions show that when Congress wanted to grant the power to further *restrict* trade, it knew how to say so—and it did not grant that authority in section 204(b)(1)(B). *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).

The provision regarding extensions of safeguard measures, section 204(c), further supports the CIT's interpretation. A safeguard measure can be extended only if the ITC—the expert body tasked with conducting safeguard investigations, overseeing safeguard measures, and advising the President regarding the same—finds that the measure "continues to be necessary to prevent or remedy serious injury," and that "there is evidence that the industry *is making* a positive adjustment to import competition." 19 U.S.C. § 2254(c)(1); 19 U.S.C. § 2253(e)(1)(B)(i) (emphasis added). As the ITC has observed, "the 'necessity' criterion suggests that

the domestic industry may not yet have completed its positive adjustment to import competition; *in fact, a fully-adjusted industry would no longer need relief*." *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*, Inv. No. TA-201-75, USITC Pub. 5266 (Dec. 2021) at 32 (emphasis added). In other words, the fact that an extension under section 204(c)(1) is not "necessary" after the domestic industry has fully adjusted to import competition is further proof that Congress could not have intended the President to further restrict trade in section 204(b)(1)(B) after the domestic industry has already "made" such adjustment.

Finally, interpreting section 204(b)(1)(B) as prohibiting trade-restrictive modifications is necessary to maintain vital statutory protections for parties adversely affected by safeguard measures. All parties agree that the President can impose or extend a safeguard only after the ITC conducts an investigation that provides for interested party participation, including by those who would be adversely affected by the safeguard, and after the ITC makes certain findings. 19 U.S.C. §§ 2252, 2253(a)(1)(A), 2253(e)(1)(B), 2254(c). The statute also requires the President to consider a host of enumerated factors before imposing a safeguard measure, including the report of the ITC, the probable effectiveness of the action, the short- and long-term economic and social costs of the action, the effect of action on consumers and on competition in domestic markets for articles, and the impact

on U.S. industries and firms as a result of international obligations regarding compensation to trading partners for imposing a safeguard action. 19 U.S.C. § 2253(a)(2). Thus, before increasing trade restrictions, the President is required to consider multiple viewpoints and issues, including the interests of parties that might be harmed by a safeguard measure.

When acting under section 204(b)(1)(B), however, the President may act based solely upon a petition from the domestic industry. *Compare* 19 U.S.C. § 2254(b)(1)(A) (explicitly requiring President to take ITC's report into account), *with* § 2254(b)(1)(B) (omitting any requirement that President consider ITC's report). Interpreting section 204(b)(1)(B) to allow the President to further restrict trade, when the President is required to consider nothing but the views of the (presumptively self-interested) domestic industry, would be entirely at odds with the provisions in the safeguard statute that require a consideration of the interests and views of other parties before trade restrictions can be imposed or extended. As the CIT observed, "[t]here is no indication in the statute that Congress intended Section 204 to provide a loophole for the institution of harsher safeguards without the standard procedural restrictions." Appx32. The only interpretation of section 204(b)(1)(B) that maintains the balance that Congress struck between facilitating the domestic industry's positive adjustment and avoiding measures that do more social

and economic harm than good is one that permits only trade-liberalizing or trade-neutral actions.

**c. History Supports the CIT's Interpretation.**

The total lack of historical usage of section 204(b)(1)(B) to restrict trade is further evidence weighing in favor of the CIT's interpretation. *See Transpacific*, 4 F.4th at 1326 (reviewing history and practice under statutory provision in aid of statutory interpretation). Indeed, the Government fails to point to a single instance where the President relied on section 204(b)(1) to make a trade-restrictive change to a safeguard measure. Gov't Br. 39-40. The Government's only example involves President Clinton's reliance on a *different* provision—section 204(b)(1)(A)—as the authority for that modification. *Id.* (citing Proclamation 7314, *To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*, 65 Fed. Reg. 34,899 (May 26, 2000)). But the Government now acknowledges that section 204(b)(1)(A) cannot be used to increase trade restrictions. *See* Gov't Br. 28, 30. The Government thus not only fails to cite a single instance of section 204(b)(1)(B) being used to increase trade restrictions in the 30-plus years since that provision was added, but relies on a presidential action, taken under a different provision, that the Government now acknowledges was unlawful. The fact that no prior President has

used section 204(b)(1)(B) to increase trade restrictions supports the CIT's interpretation that section 204(b)(1)(B) was not intended to be used for that purpose.[2]

For the foregoing reasons, section 204(b)(1)(B) must be read as prohibiting trade-restrictive modifications to safeguard measures—meaning that Proclamation 10101's reinstatement of tariffs on bifacial panels, and its increase in the tariff rate from 15 percent to 18 percent in the measure's fourth year, violated the Trade Act.

#### 2. *The Government Fails to Show that Section 204(b)(1)(B) Authorizes Further Restrictions on Trade.*

None of the Government's arguments show that the CIT erred in its interpretation of section 204(b)(1)(B).

[2] While Congress was considering the bill that eventually included section 204(b)(1), Harley-Davidson sought early termination of the safeguard measure on motorcyles. That safeguard measure was scheduled to expire in April 1988, but Harley-Davidson filed a letter in March 1987, requesting early termination of the measure because it had achieved a positive adjustment to import competition. *Heavyweight Motorcycles*, Inv. No. TA-203-17, USITC Pub. 1988 at 3-4, A-1 (June 1987). Based on that request, the ITC recommended termination of the measure, *id.* at 4-5, and the measure was terminated early. Proclamation 5727, *Termination of Import Relief on Certain Heavyweight Motorcycles*, 52 Fed. Reg. 38,075 (Oct. 9, 1987). Although this occurred prior to the addition of section 204(b)(1)(B), given that section 204(b)(1)(B) describes the situation that had just occurred in the *Motorcycles* case, it is reasonable to assume that Congress understood and intended that section 204(b)(1)(B) would be used to liberalize trade, not further restrict it.

#### a. The Government's Arguments Regarding the Word "Modification" Lack Merit.

Largely ignoring the requirement permitting modifications only after the domestic industry "has made" a positive adjustment, the Government makes several arguments based on the text and structure of the Trade Act. None has merit.

*First*, the Government argues that there is no explicit prohibition in section 204(b)(1)(B) on making trade-restrictive modifications, and the words "modify" and "modification" can mean the making of a limited change up *or* down. Gov't Br. 23-25.

As an initial matter, the Government does not contend that the word "modification" gives it the power to increase a trade restriction in a way that would "exceed the original measure's scope." Gov't Br. 41; *see also id.* (President may not "us[e] section 2254(b)(1)(B) to raise the duties beyond the previous year's level"). Thus, the Government's argument over the meaning of "modification" is narrow—it does not argue that the word authorizes the President to further restrict trade generally, but rather only to do so if the *adjustment is still less restrictive than the initial action* (*e.g.*, to grant, then later withdraw, an exclusion). Even if Congress intended to grant such unusual and modest authority to the President somewhere, the Government offers no explanation for why it would have granted it in a provision explicitly addressing the circumstance where a domestic industry already "has made" a successful adjustment to competition.

Regardless, as noted *supra* (p.17), common dictionary definitions of "modify" include to "moderate" or "make less extreme." Thus, the only question is which definition Congress intended—and, as the CIT held, the traditional tools of statutory construction confirm that Congress necessarily intended "modify" to mean "make less extreme." The Government contends that the CIT read an "unstated limitation" into section 204(b)(1)(B), contrasting that provision to section 203(e)(5), which requires that relief be phased down over time. Gov't Br. 31-32. But section 203(e)(5), which sets forth a general rule for safeguard measures rather than the President's modification authority, has a completely different structure, and uses entirely different language (it does not even use the word "modification"). It thus offers no insight into which of the common definitions of "modify" Congress intended in section 204(b)(1)(B).

*Second*, the Government highlights the CIT's statement that "the terminology of the statute is ambiguous" and suggests that such ambiguity precludes a finding that the President violated the law. Gov't Br. 25-26 (quoting Appx31). But, as the CIT explained, Appx31-32, the fact that a particular *word* is susceptible to different dictionary definitions does not render *the statute* ambiguous. As the Supreme Court emphasized in *King v. Burwell*,

> If the statutory language is plain, we must enforce it according to its terms. But oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their

> context and with a view to their place in the overall statutory scheme. Our duty, after all, is to construe statutes, not isolated provisions.

576 U.S. at 486 (internal citations and quotation marks omitted). It is well established that "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme," *United Sav. Ass'n of Tex.*, 484 U.S. at 371, and for reasons already explained, the safeguard scheme confirms that Congress intended the moderating connotation of "modification" in section 204(b)(1)(B).

*Third*, the Government asserts that "modification" is used in other provisions of the Trade Act that logically permit an increase in trade restrictions, and Congress must have intended those words to have the same meaning. Gov't Br. 35 (citing *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 571 (2012)). But the interpretive principle the Government relies on is far from a rigid "rule." Rather, it is only a "presumption" that yields when statutory context suggests that different meanings were intended, which may include differences in the subject matter to which the words refer, different conditions, or differences in scope of the authority exercised. *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932); *see also Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) ("A given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies," "even when the terms share a common statutory definition[.]"); *Gen. Dynamics Land Sys., Inc. v.*

*Cline*, 540 U.S. 581, 595-96 (2004) (presumption of uniform usage relents when word "has several commonly understood meanings among which a speaker can alternate in the course of an ordinary conversation").

Although the Government contends that the Trade Act sometimes uses "modification" in a way that permits trade-restrictive measures, the opposite is also true, *i.e.*, the Trade Act also uses "modification" in a manner that unequivocally connotes the President taking exclusively trade-liberalizing action. For example, section 123 provides that when the President imposes a safeguard measure, the President is authorized to enter into trade agreements "for the purpose of granting new [trade] concessions as compensation in order to maintain the general level of reciprocal and mutually advantageous concessions." 19 U.S.C. § 2133(a)(1)(A). In offering trade concessions to countries pursuant to this provision, the President "may proclaim such modification or continuance of any existing duty . . . as he determines to be required or appropriate to carry out any such agreement." 19 U.S.C. § 2133(a)(2)(B). Logically, if the purpose of this provision is to provide compensation to trading partners, Congress meant "modification" in this context to mean *only a decrease* in trade restrictions, and it would be a misuse of that provision to increase trade restrictions. Thus, the Government's reliance on 19 U.S.C. § 2253(a)(3)(C) to show that "modification" exclusively refers to an increase in trade restrictions *in that section* proves Plaintiffs' point: it is critical to consider the

specific context in which the word "modification" is used, as Congress clearly did not give the word "modification" the same connotation throughout the Trade Act.

*Finally*, the Government argues that the CIT's interpretation of section 204(b)(1)(B) renders the word "modification" superfluous to the word "reduction." Gov't Br. 28-30. But that is not true. The President has many ways to "modify" an action in a manner that is not trade-restrictive, yet without "reducing" or "terminating" the action. When initially imposing a safeguard measure, section 203(a)(3) lists several kinds of "action" that the President can take, one of which is "an increase in . . . any duty" (*i.e.*, imposing safeguard duties). 19 U.S.C. § 2253(a)(3)(A). A "reduction" of that particular kind of action would be lowering the safeguard duty rate. But, the President could "modify" the action by changing its form, such as from a duty to a tariff rate quota, whereby a certain amount of imports would enter duty free before the additional rate of duty is applied. This would decrease trade barriers, but the original "action"—*i.e.*, the safeguard duty rate—is not "reduced," nor would the action be "terminated." Another example would be if the President changed the form of the action from duties to trade adjustment assistance. *See* 19 U.S.C. § 2253(a)(3)(D) (authorizing provision of trade adjustment assistance). That modification would not be trade-restrictive, but given that financial assistance would be provided directly to the industry or workers,

one could not readily say that the safeguard action was "reduced" or "terminated," either.

In fact, the possibility that the form of the action could be changed highlights why Congress reasonably included the word "modification" in section 204(b)(1)(B), but not in section 204(b)(1)(A). *See* Gov't Br. 30 (noting distinction between provisions). Presidential action under section 204(b)(1)(A) requires a consideration of the ITC's report and consultation with the Secretaries of Commerce and Labor before the President takes action adverse to the domestic industry based on a finding that the safeguard measure is not working as intended. Under those circumstances, Congress evidently preferred only certain types of changes—namely, the reduction or termination of the specific type of action under section 203 that the President originally proclaimed. Section 204(b)(1)(B), in contrast, is triggered by a request from the domestic industry to change the safeguard measure based on a representation that the industry "has made" a positive adjustment to import competition. In that scenario, it makes sense for the President to be given more flexibility in making trade-liberalizing changes to the safeguard measure, because the domestic industry has requested and consented to the change.

In any event, the Government's interpretation does not solve the supposed "superfluity" problem. The Government asserts that "modification" merely means a modest change (whether up or down). Gov't Br. 23-24. But as the Government

elsewhere notes, the Trade Act defines "modification . . . [to] include[] the *elimination* of any duty or other import restriction." *See, e.g.*, Gov't Br. 7 (quoting 19 U.S.C. § 2481(6)). Moreover, and particularly in light of that definition, the word "modification" encompasses any "reduction" or "termination" (*i.e.*, "elimination") as well. In other words, under the Government's proffered interpretation, the words "reduction" and "termination" are equally superfluous, as the provision would have meant the exact same thing if "modification" stood alone. "[T]he canon against superfluity assists only where a competing interpretation gives effect to every clause and word of a statute." *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 106 (2011) (internal quotation marks omitted). Thus, the unexceptional fact that Congress chose a belt-and-suspenders approach by including words with arguable overlap under both sides' interpretations in no way undermines the CIT's proper interpretation of section 204(b)(1)(B).

**b. The Government's Policy Arguments Lack Merit.**

The Government also makes various policy arguments about why the CIT's interpretation conflicts with the purpose of the safeguard statute. Gov't Br. 37-40. The Government's arguments are again devoid of merit.

*First*, the Government focuses on section 201's directive to "take all appropriate and feasible action within his power" to facilitate the domestic industry's positive adjustment, but ignores the rest of the sentence: that any action taken

"provide greater economic and social benefits than costs." 19 U.S.C. § 2251(a). As explained above, numerous provisions of the safeguard statute impose limits on presidential action that reflect a careful balancing between assisting a domestic industry and limiting the negative externalities of trade restrictions. For example, the Government acknowledges that safeguard duty rates are capped and trade restrictions that extend beyond a year must be phased down at regular intervals—limits that evidence Congress's intent for safeguard measures to be progressively trade liberalizing. 19 U.S.C. § 2253(e)(3), (5). Safeguard actions are also limited in duration, and they cannot be re-imposed on the same product for a certain period after the action terminates. 19 U.S.C. § 2253(e)(1), (7). All of these limitations could inhibit the domestic industry's ability to make a positive adjustment.

Indeed, the safeguard statute does not require the President to take *any action at all* in response to the ITC's finding that an industry has been seriously injured. 19 U.S.C. § 2253(b)(2) (describing circumstances in which President decides not to take action). The fact that the President need not take action whenever the costs outweigh the benefits completely undercuts the Government's contention that the CIT's interpretation led to an "absurd" result by preventing the President from taking trade-restrictive action here. Gov't Br. 39. As the CIT found, interpreting section 204(b)(1)(B) as a trade-liberalizing provision supports the balance that Congress struck in the safeguard statute as a whole. Appx31-32.

*Second*, the Government concedes that any authority to increase trade restrictions in section 204(b)(1)(B) is very limited in any event. Because 19 U.S.C. § 2253(e)(5) "ensures that any duty rate modification will not exceed the original measure's scope," Gov't Br. 41, all parties agree the President's powers would be limited to merely undoing the liberalization of trade that has previously occurred, or is scheduled to occur, under the original measure. If the initial level of relief was not sufficient to facilitate the domestic industry's positive adjustment, the President would be powerless to do anything about it. The limited nature of the President's authority even under the Government's theory belies its suggestion that the ability to further restrict trade was a critical power Congress necessarily gave the President in order to ensure the effectiveness of the safeguard statute.

*Third*, even if facilitating the domestic industry's positive adjustment to import competition was the only concern reflected in the statute, barring trade-restrictive modifications in section 204(b)(1)(B) would not undermine that objective. Authority under section 204(b)(1)(B) is triggered by a statement from the domestic industry and a finding by the President that "the domestic industry has made a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1)(B). Given that finding, additional trade restrictions would not be needed to facilitate the domestic industry's positive adjustment.

The facts here show why increasing trade restrictions is *not* appropriate under section 204(b)(1)(B). The Government emphasizes that President Trump found, consistent with the ITC, that the bifacial panel exclusion "impaired the effectiveness" of the safeguard. Gov't Br. 14, 27. That finding falls precisely within the ambit of section 204(b)(1)(A), which addresses situations where "the effectiveness of the [safeguard] action . . . has been impaired by changed economic circumstances." 19 U.S.C. § 2254(b)(1)(A). But as the Government concedes, section 204(b)(1)(A) does *not* allow for an increase in trade restrictions. Gov't Br. 5, 28. Given that the statutory provision specifically dealing with the concerns that President Trump identified prohibits an increase in trade restrictions, it is illogical to assume that Congress nonetheless intended for the President to be able to address those same concerns by increasing trade restrictions pursuant to a finding that "the domestic industry *has made* a positive adjustment to import competition." President Trump tried to take action specifically denied to him by section 204(b)(1)(A) by misconstruing section 204(b)(1)(B). The Court should not condone the President's end-run around Congress's limitations.

**c. The Legislative History Does Not Support the Government's Interpretation.**

The Government argues that the legislative history of section 204(b)(1)(B) supports an interpretation allowing increased trade restrictions. Gov't Br. 36-37. But as the CIT concluded, there is no need to resort to legislative history, because

section 204(b)(1)(B) is susceptible to only one reasonable interpretation based on the text, structure, and purpose of the statute. *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1749 (2020) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." (internal quotation marks omitted)).

In any event, the legislative history relied upon by the Government does not evidence any intent to give the President the authority to increase trade restrictions under section 204(b)(1)(B). *See* Appx32-33 & n.9. When the provision authorizing a reduction, modification, or termination of the safeguard measure on the basis of a petition from the domestic industry was originally proposed in the Senate, it was accompanied by a specific limitation that modification would not include the ability to "increase" the measure, which reflects how Congress originally understood that this provision would be used. *See* H.R. Rep. No. 100-576, at 687 (1988) (Conf. Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1720 (noting that "modify" in Senate version of bill originally containing this provision did not allow an "increase" of the action). The text of the Senate version of the bill changed after it emerged from conference to resolve disagreements between the House and Senate versions of the bill, but context is key. After conference, the final text combined the Senate version described above with provisions in the House bill that allowed modifications, terminations, and reductions on the basis of changed economic circumstances, resulting in a significantly rewritten provision. H.R. Rep. No. 100-

576, at 688, 1988 U.S.C.C.A.N. at 1721. Given that the conference report does not explain why the conferees deleted the text, Appx33 n.9, the Government cannot point to anything in the legislative history suggesting that Congress intended to give the President the power to *increase trade restrictions* via section 204(b)(1)(B).

Similarly, the legislative history regarding 19 U.S.C. § 2481(6) that the Government cites (for the first time on appeal) fails to show that Congress intended for the President to use section 204(b)(1)(B) to increase trade restrictions. *See* Gov't Br. 7-8, 35-36. The actual text of § 2481(6) does not use the word "increase," and in fact states that "modification" would include the "elimination" of a duty, which is obviously a trade-liberalizing connotation. The Senate committee report the Government quotes similarly lacks a specific statement that "increases" in trade restrictions were contemplated for purposes of § 2481(6). There is therefore no basis to conclude that both houses of Congress understood that "modification" in § 2481(6) would include "increase." Regardless, as already explained, the word "modification" has several different connotations in the various provisions of the Trade Act, which depend on context, and both the text and legislative history of this separate provision are consistent with the CIT's interpretation of section 204(b)(1)(B).

If anything, the legislative history regarding the safeguard statute supports Plaintiffs' interpretation, as the CIT recognized. Appx33 n.9. In particular, the

Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA")[3] confirms that modifications to a safeguard measure are to be trade liberalizing. The SAA explains that, in negotiating the Uruguay Round Agreement on Safeguards, "the United States sought to ensure that when WTO members apply safeguards measures they are transparent, temporary, 'degressive' and subject to review and termination when no longer needed." H.R. Rep. No. 103-316, at 956 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4262. These negotiating objectives had previously been set by Congress in section 1101(12) of the Omnibus Trade and Competitiveness Act of 1988, which is the same act that added section 204(b)(1)(B). *See* Pub. L. No. 100-418, 102 Stat. 1107, 1124 (1988). It would make little sense for Congress to have instructed trade negotiators to create an international obligation that safeguard measures be degressive (*i.e.*, trade-liberalizing) while simultaneously authorizing an increase in trade restrictions after an industry has *already made* a positive adjustment to import competition.

The SAA further explains that "[t]he Uruguay Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from section 201," including "'degressivity' (progressive liberalization of safeguards

[3] The SAA is to be "regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements Act] in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

restrictions)." H.R. Rep. No. 103-316, at 956, 1994 U.S.C.C.A.N. at 4262. Among those provisions that the United States successfully negotiated into the WTO Agreement on Safeguards is Article 7.4, which provides that "the Member applying the measure shall progressively liberalize it at regular intervals during the period of application." That Article also provides that if the measure is in place for longer than three years, "the Member applying such a measure *shall review the situation not later than the mid-term of the measure and*, if appropriate, withdraw it or *increase the pace of liberalization*." *Id.* (emphases added). This provision does not allow for an increase in trade restrictions following mid-term reviews. The Agreement on Safeguards that the United States successfully negotiated *to reflect U.S. law*, and the SAA's discussion regarding that Agreement, constitute further evidence that Congress understood and intended for any modification to a safeguard measure to be trade-liberalizing.

### B. PROCLAMATION 10101 INCREASED TRADE RESTRICTIONS.

The Government argues in the alternative that Proclamation 10101 did not violate section 204(b)(1)(B) because it did not increase trade restrictions, in that the scope of the original safeguard measure was not increased. Gov't Br. 42-45. But there is no dispute that the effect—and indeed, the point—of Proclamation 10101 was to restrict trade in two distinct ways. Specifically, before Proclamation 10101, (1) bifacial panels were not subject to the safeguard measure by reason of the

Exclusion, and (2) the duty rate for the fourth year of the measure was set at 15 percent. Proclamation 10101 explicitly "modif[ied]" the safeguard measure by withdrawing the Exclusion and changing the duty rate. 85 Fed. Reg. at 65,640, 65,642. And in order to effectuate those changes, the President had to amend the HTSUS, which amounted to a statutory change governing how future imports of CSPV products would be treated.[4] *Id.* at 65,640-42. Thus, bifacial panels would not have been subject to safeguard duties between October 25, 2020 and the end of the safeguard measure if not for Proclamation 10101. Similarly, the fourth-year duty rate would have been 15 percent (not 18 percent) if not for Proclamation 10101.

Rather than deny any of those facts, the Government argues from a fundamentally flawed premise: That there was no "increase" in the safeguard because the as-modified safeguard was not more trade-restrictive than the safeguard measure as it was first applied. Gov't Br. 42-43. But that is not the relevant comparison. The issue is whether the "modification" changes the safeguard in a manner that makes it more trade-restrictive than it otherwise would have been absent the modification. Safeguard measures last a set period of years, with built-in changes that are announced at the outset so that market participants understand how the measure will operate over time and can plan accordingly. The third or fourth year

[4] The HTSUS is considered be "statutory provisions of law" and thus is equivalent to an act of Congress. 19 U.S.C. § 3004(c)(1); *accord Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1163 (Fed. Cir. 2017) (same).

of a safeguard measure is just as much a part of the safeguard measure as the first or second. An increase in the scope, which places duties on products that had been excluded pursuant to a process authorized by the President's safeguard proclamation, and an increase in the duty rate in the latter part of the measure, indisputably render the measure *as a whole* more trade-restrictive than the pre-modification version of the measure.

The structure and history of the safeguard statute make clear that the President is to announce how the safeguard will operate throughout its duration at the beginning of the measure. The statute requires the President to take action within a set period from receipt of the ITC's report, normally within 60 days. 19 U.S.C. § 2253(a)(4). The statute then gives Congress the ability to override the President's action, but only within 90 days of being notified of the action that the President has chosen. 19 U.S.C. § 2253(c). The statute then contains specific provisions regarding the modification of safeguards, and normally precludes the modification of safeguards for at least the first two years of the measure. 19 U.S.C. § 2254(b)(1). If the President could merely announce a level of relief that applies at the outset of the measure and then modify that relief up or down whenever the President sees fit, then there would be no point in requiring the President to announce the action promptly, Congress would have no firm idea how the safeguard would operate in considering whether to exercise its override authority, and the procedures for modifying

safeguard actions would never need to be followed. But that is not how Congress designed the statute to operate. *See, e.g.*, *Young v. UPS*, 575 U.S. 206, 226 (2015) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause is rendered superfluous, void, or insignificant." (internal quotation marks omitted)). Instead, the President is required to lay out, when the measure is announced, how the measure will operate several years later. In fact, in every single safeguard measure imposed since at least the 1988 amendments that added section 204(b)(1), the President has set forth the applicable rates of duties and details regarding the operation of the safeguard for the entire duration of the safeguard when he originally proclaimed relief.[5]

The Government also incorrectly characterizes the modifications as "neutral." Gov't Br. 43-45. As an initial matter, this argument is a concession that the word "modification" poses no superfluity problem (*cf.* Gov't Br 28-30), given that the Government itself interprets the statute to allow neutral "modifications" that neither reduce nor terminate a safeguard action. In any event, Proclamation 10101's changes to the safeguard measure were far from neutral.

---

[5] *See, e.g.*, Proclamation 9693, 83 Fed. Reg. 3541; Proclamation 9694, *To Facilitate Positive Adjustment to Competition from Imports of Large Residential Washers*, 83 Fed. Reg. 3553 (Jan. 25, 2018); Proclamation 7529, *To Facilitate Positive Adjustment to Competition From Imports of Certain Steel Products*, 67 Fed. Reg. 10,551 (Mar. 7, 2002).

In considering one of Plaintiffs' arguments below, the CIT held that section 203(e)(7) is triggered only when the safeguard measure completely terminates as to all products that were originally subject to relief. *See* Appx22-25. Under the CIT's reasoning, because the safeguard measure on CSPV products was still in effect, section 203(e)(7) did not apply. *See* Appx24-25. The Government seizes on this reasoning to argue that bifacial panels "were never outside [the] scope" of the measure, meaning that withdrawing the Exclusion could not increase the measure. Gov't Br. 44. The fact that the *safeguard measure* continued to exist does not mean, however, that bifacial panels remained within the scope of that measure after the Exclusion. If they were, there would have been no reason for the President to proclaim a "modification" of the safeguard measure and to amend the HTSUS to cover bifacial panels. The withdrawal of the Exclusion imposed tariffs on panels that, prior to Proclamation 10101, were not subject to tariffs. That "modification" of the measure constituted a very real increase in trade restrictions for the parties that import and rely on those panels.

The Government also notes that the modified fourth-year duty rate of 18 percent was still lower than the third-year duty rate of 20 percent. Gov't Br. 43. True, but irrelevant. Under the safeguard measure as originally proclaimed (and the HTSUS amendments made pursuant to that original proclamation), the duty rate in the fourth year was 15 percent. The fourth-year duty rate of 18 percent applicable

under the modified safeguard measure was thus higher than—*i.e.*, increased—the rate applicable under the original safeguard measure.

In sum, because Proclamation 10101 made the operation of the safeguard measure more trade-restrictive in two separate respects, it violated section 204(b)(1)(B).

## III. THE JUDGMENT THAT PROCLAMATION 10101 VIOLATES SECTION 204(b)(1)(B) OF THE TRADE ACT CAN BE AFFIRMED ON ALTERNATIVE GROUNDS.

If the Court agrees that section 204(b)(1)(B) does not authorize trade-restrictive modifications, it may affirm on that basis without further inquiry. But Proclamation 10101 is independently unlawful, and this Court may alternatively affirm, on either of two additional grounds: (1) the President never received a domestic industry petition seeking a modification on the "basis" that the industry had made a positive adjustment to import competition, as section 204(b)(1)(B) requires; and (2) the President failed to make the requisite finding under section 204(b)(1)(B) that the domestic industry has made a positive adjustment to import competition. *See Nautilus Grp., Inc. v. Icon Health & Fitness, Inc.*, 437 F.3d 1376, 1377 (Fed. Cir. 2006) ("[A]n appellee can present in this court all arguments supported by the record and advanced in the trial court in support of the judgment as an appellee, even if those particular arguments were rejected or ignored by the trial court." (internal quotation marks omitted)).

### A. The President Did Not Receive the Petition Required by Section 204(b)(1)(B).

#### 1. *The President Undisputedly Did Not Receive a Petition Requesting Modification on the Basis that the Industry Has Made a Positive Adjustment to Import Competition.*

President Trump did not have authority to act under section 204(b)(1)(B), because he did not receive the petition that serves as the statutory prerequisite to presidential action. By the statute's plain terms, the President may take action under this provision only if the President "determines, after a majority of the representatives of the domestic industry submits to the President a *petition requesting such reduction, modification, or termination on such basis,* that the domestic industry has made a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1)(B) (emphasis added).

The plain-language interpretation—that the President may act only after receiving a petition that requests a modification on the "basis" that the domestic industry has positively adjusted to import competition—is supported by the placement of the commas in section 204(b)(1)(B). *U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993) ("[T]he meaning of a statute will typically heed the commands of its punctuation."); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241-42 (1989) ("grammatical structure of the statute," specifically the placement of commas to set aside phrase, mandated a specific construction). The critical language ("after a majority of the representatives of the

domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis") is a single clause offset by commas from the remainder of the sentence ("if the President determines that the domestic industry has made a positive adjustment to import competition"). The words "on such basis" most naturally refer to the nearest noun, *i.e.*, the petition described seven words earlier within that same clause. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012) (noting that "a prepositive or postpositive modifier normally applies only to the nearest reasonable referent"). And the only logical interpretation of "on such basis" as it pertains to the petition is that the domestic industry's request must be based on the domestic industry's positive adjustment to import competition.

Although the language is clear enough to make resort to the legislative history unnecessary, that history removes any doubt over Congress's intent. The final text of section 204(b)(1) was agreed to in conference and differed from both the preceding House and Senate versions. The Conference Report, which was relied upon by both chambers, describes the provision as follows:

> [S]ubsequent to receiving the first ITC monitoring report (or ITC advice thereafter), the President may reduce, modify or terminate any action taken if either:
>
> (1) [the President finds changed circumstances] or
>
> (2) a majority of representatives of the domestic industry requests such reduction, modification or termination *on the*

> *basis that the domestic industry has made a positive adjustment to import competition*.

H.R. Rep. 100-576, at 688, 1988 U.S.C.C.A.N. at 1721 (1988) (emphasis added); *see also Garcia v. United States*, 469 U.S. 70, 76 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." (internal quotation marks and alterations omitted)); Robert A. Katzmann, *Judging Statutes* 54 (2014) ("Conference committee reports . . . should sit at the top of authority."). The Conference Report confirms that the phrase "on such basis" refers to the domestic industry's request for a "reduction, modification, or termination on the basis that the domestic industry has made a positive adjustment to import competition."

Similarly, the bill summary in the Congressional Record explains that this provision "[a]uthorizes the President, after 2 years have lapsed, to reduce, modify, or terminate action if either (1) *the domestic industry requests it on the basis that it has made a positive adjustment*, or (2) [an inapplicable reason]." 134 Cong. Rec. 7197 (1988) (emphasis added). The Congressional Record thus also confirms that the words "on such basis" in section 204(b)(1)(B) meant that the domestic industry would request the reduction, modification, or termination of the safeguard action on the basis that it has made a positive adjustment.

Here, however, it is undisputed that *none* of the three letters from various producers, which the Government claims collectively constitute a "petition," requested modification of the safeguard measure based on the domestic industry having "made" a positive adjustment to import competition (quite the opposite, in that they requested additional restrictions, and two of the letters cited the industry's *inability to compete* with excluded bifacial panels). Appx47-52. In fact, the Government conceded the point below. Appx176-177; Appx200-201 (describing as "uncontroverted" the that domestic industry letters did not state industry has made positive adjustment). Because there was no petition that satisfied the statutory criteria, President Trump lacked authority under section 204(b)(1)(B) to issue Proclamation 10101. Proclamation 10101 therefore should be set aside as action outside of delegated authority.

#### 2. *The Government's Theory—That "Such" Refers to the President's Reliance on an ITC Report—Is Wrong.*

Despite conceding that the domestic industry never requested a modification based on having "made" a positive adjustment to import competition, the Government argued—and the CIT accepted—that the statute requires the President only to make a determination that the domestic industry has made a positive adjustment based on the *ITC's monitoring report* mentioned in the introductory clause to section 204(b)(1). *See* Appx176-177. That was error, for several reasons.

First, the Government's interpretation would require the Court to rewrite section 204(b)(1)(B). As explained, the words "on such basis" are part of a clause describing the industry petition that is set off by commas, while the separate clause outside of the commas reads "determines, . . . , that the domestic industry has made a positive adjustment." If the Government were correct that the ITC's midterm report is the "basis" for the President's "determin[ation]," it would require "on such basis" to be placed *outside* the commas—*i.e.,* "determines, . . . , [on such basis] that the domestic industry has made a positive adjustment to import competition." But that is not how section 204(b)(1)(B) is written. The comma placement makes "on such basis" part of the middle clause describing the industry petition, not the clauses referencing the President's determination or the ITC's midterm report (which is mentioned only in an introductory clause to section (b)(1)).

Second, in addition to violating the provision's grammar, the Government's interpretation is contrary to section 204(b)(1)(B)'s structure. *See, e.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("[A] statute is to be read as a whole . . . since the meaning of statutory language, plain or not, depends on context."). It is true that any action under section 204(b)(1), whether under subparagraph (A) or (B), cannot be taken "before the President receives the report required under subsection (a)(2)(A)," *i.e.*, the ITC's monitoring report. But that language merely prohibits action before a certain point in time. This is confirmed by the summary of the bill

in the Congressional Record, which does not refer to the ITC's report but instead explains that action can be taken "after 2 years have lapsed." 134 Cong. Rec. 7197. When the President acts pursuant to subparagraph (A), the statute separately requires the President to "tak[e] into account any report or advice submitted by the Commission under section (a)." 19 U.S.C. § 2254(b)(1)(A). Section 204(b)(1)(B), on the other hand, contains no such requirement. The fact that Congress specifically included additional language in section 204(b)(1)(A) requiring the President to take into account the ITC's report, but *omitted* that language from section 204(b)(1)(B), indicates that Congress did *not* intend to require the President to consider the ITC's report when acting under section 204(b)(1)(B). *See, e.g.*, *Keene*, 508 U.S. at 208. It makes no sense for "on such basis" to refer to the President making a determination based on the ITC's report—as the Government contends—when the statute plainly requires consideration of the ITC's report only under section 204(b)(1)(A), not (b)(1)(B).

Third, the Government's interpretation is completely at odds with the legislative history described above. In fact, the relevant portions of the Conference Report and Congressional Record summary do not contain any mention of a presidential determination regarding the industry's positive adjustment, and the Congressional Record summary further omits any reference to the ITC's report.

Finally, the Government failed to offer any persuasive response to Plaintiffs' interpretation. The Government argued, and the CIT accepted, that "'such' is typically read to 'refer[] back to something indicated earlier in the text,' which disfavors Plaintiffs' view that the basis referred to is the industry's positive adjustment." Appx20 (alteration in original) (quoting Government's Reply at 21-22, Appx176-177). The definition of "such," however, also encompasses "something stated, implied, or exemplified." "Such," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/such. The definition of "such" is broad enough to cover language referenced later in the text. As demonstrated above, the placement of the commas, the broader structure of section 204(b)(1), and the legislative history all make clear that "on such basis" is a requirement that applies to the request to modify the safeguard, and the intended "basis" is the industry's positive adjustment to import competition. The Government's contention regarding how the word "such" is typically applied is not reason to adopt an interpretation that is contrary to the grammar, structure, and legislative history of the provision at issue.

The Government also argued below that Plaintiffs' reading of the statute "would require individual producers to make determinations regarding the entire industry." Appx177; *see also* Appx20. Not so: the individual producers would make a *request* based on their perception of the industry's adjustment, but it is the President who must make the "determination," as a factual matter, whether the

industry actually adjusted. Nor would it be unreasonable for Congress to believe that "a majority of the representatives of the domestic industry" would be knowledgeable about the overall industry and could speak authoritatively on the industry's behalf when submitting a petition. Regardless, the Government's views on the wisdom of Congress's policy does not change the fact that Plaintiffs' argument accords with the intent that Congress clearly expressed in the text, structure, and legislative history of section 204(b)(1).

### 3. *The President's Noncompliance with the Petition Requirement Renders Proclamation 10101 Unlawful.*

Because no petition requested modifications to the safeguard on the "basis" that the domestic industry has made a positive adjustment to import competition—which was Congress's prerequisite to presidential action under section 204(b)(1)(B)—the President lacked statutory authority to issue Proclamation 10101.

This Court's cases stand for a clear rule: presidential action is lawful only if the statutory prerequisites for presidential action are met. In *Corus Group PLC v. ITC*, a plaintiff challenged presidential safeguard action taken pursuant to section 203 of the Trade Act. *Corus*, 352 F.3d at 1358. Section 203(a)(1)(A) provides:

> *After receiving a report . . . containing an affirmative finding regarding serious injury*, or the threat thereof, to a domestic industry, the President shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.

19 U.S.C. § 2253(a)(1)(A) (emphasis added). The plaintiff in *Corus* argued that the Commission had failed to make an affirmative injury finding. This Court agreed that the President can act under section 203(a)(1)(A) only if the President received a report from the ITC containing an affirmative injury determination; it was not enough for the President just to have received a report. *Corus*, 352 F.3d at 1359. The Court in *Corus* then conducted an independent examination of the underlying ITC decision to confirm that such an affirmative decision had been reached. *Id.* at 1359-61. Had the ITC misconstrued what constituted an affirmative injury determination, the requirements in section 203(a)(1)(A) would not have been met, and the President would not have been authorized to impose a safeguard measure. *Id.* at 1359.[6]

[6] Before the CIT, the Government argued that judicial review of whether the President received the petition required under section 204(b)(1)(B) was wholly unavailable, framing compliance with the statute as unreviewable presidential fact-finding. Appx13. The CIT rightly rejected that argument as contrary to this Court's precedent, including *Corus*, which allows courts to inquire as to whether statutory prerequisites for presidential action were met and whether action falls within the proper ambit of the authority delegated by Congress. *See* Appx14; *Corus*, 352 F.3d at 1359-61. If the Government's position were accepted, the President could shield his actions from judicial review by simply "finding" that his action was lawful. Plaintiffs further note that the President did not make any finding regarding whether the letters he relied upon as the "petition" requested modifications to the safeguard on the basis that the domestic industry has made a positive adjustment to import competition. Plaintiffs' claim therefore does not second-guess a finding made by the President in any event.

Just as section 203(a)(1)(A) predicates presidential action on the President's receipt of a document meeting certain substantive requirements (*i.e.*, containing an affirmative injury finding), section 204(b)(1)(B) predicates presidential action on receipt of a petition meeting certain substantive requirements (*i.e.*, containing a request that is based on the domestic industry's positive adjustment to import competition). Under the latter provision, the President can reduce, modify, or terminate a safeguard action only "*after* a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on [the] basis" of the domestic industry's positive adjustment to import competition. 19 U.S.C. § 2254(b)(1)(B) (emphasis added). The petition is thus the key prerequisite to presidential action.

The CIT, without considering *Corus*, instead analogized noncompliance with section 204(b)(1)(B) to the ITC's alleged failures to follow certain procedures in *Silfab*. Appx21 (citing *Silfab*, 892 F.3d at 1347). *Silfab* also involved a challenged to presidential action under section 203(a), but the basis of the challenge was the alleged failure of the ITC to provide a proper remedy recommendation to the President. The Court reiterated its conclusion in *Corus* "that the President lacks authority under Section [203] to act, unless the ITC makes a determination of serious injury or threat thereof," but it concluded that "nothing in the statute or in *Corus* suggests that the existence of an ITC recommendation as to *remedy* is a condition of

the President's power to act." *Silfab*, 892 F.3d at 1346 (emphasis added). Indeed, section 203(a)(1)(A), the provision authorizing presidential action, says nothing about the ITC's remedy recommendations. As this Court recently stated, the distinction *Silfab* drew was between the ITC's affirmative finding of *injury*, which was a statutory predicate to presidential action in section 203(a), and its recommendation as to *remedy*, which was not a statutory predicate in section 203(a). *See UPS Holdings, Inc. v. United States*, No. 2021-1726, slip op. at 14-15.

Here, unlike in *Silfab*, Plaintiffs are not trying to shoehorn requirements found elsewhere in the statute into the provision authorizing presidential action.[7] Instead, as in *Corus*, Plaintiffs are merely seeking to enforce the clear prerequisites found in the specific provision that authorizes presidential action. Compliance with the petition requirements is also essential for the statute to work properly. As explained, under section 204(b)(1)(B), the President only needs to consider the petition and is not required to consider the ITC's monitoring report. Without a representation in the petition that the domestic industry has made a positive adjustment to import

[7] *Silfab* relied on *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335 (Fed. Cir. 2010), which rejected an argument that presidential action modifying the HTSUS was unlawful because the ITC had violated certain procedures before issuing recommendations to the President. Like the plaintiffs in *Silfab*, the plaintiffs in *Michael Simon Design* sought to predicate presidential action on the ITC's compliance with statutory requirements found in provisions other than the one actually authorizing presidential action. *See id.* at 1341. *Michael Simon Design* is therefore distinguishable for the same reason as *Silfab*.

competition, there would be no basis at all for the President to make the required determination that the domestic industry has made such an adjustment. Compliance with the requirement is therefore necessary to facilitate the fact-finding by the President that is also required for action under section 204(b)(1)(B). The Court should not excuse the President's reliance on a petition that does not meet the criteria specifically set forth in section 204(b)(1)(B).

### B. The President Did Not Make the Finding Required by Section 204(b)(1)(B).

Section 204(b)(1)(B) authorizes the President to reduce, modify, or terminate a safeguard action only "if the President . . . determines . . . that the domestic industry *has made* a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1)(B) (emphasis added). The President, however, determined in Proclamation 10101 only that "the domestic industry *has begun to make* positive adjustment to import competition." 85 Fed. Reg. at 65,640 (emphasis added); *see also* Gov't Br. 20 (acknowledging that President relied on ITC's finding that the "safeguard had helped the domestic industry to *start adapting*" to import competition (emphasis added)). "Has made" and "has begun to make" do not mean the same thing. Because the President failed to make the finding necessary for action to be taken under section 204(b)(1)(B), that failure provides yet another ground for concluding that President Trump issued Proclamation 10101 without statutory

authority. *See Corus*, 352 F.3d at 1358-59 (courts may examine whether President complied with independent predicate to presidential action).

Section 201(b) of the safeguard statute defines a "positive adjustment to import competition" as when (a) the domestic industry "is able to compete successfully with imports" absent safeguard relief or "experiences an orderly transfer of resources to other productive pursuits" and (b) "dislocated workers in the industry experience an orderly transition to productive pursuits." 19 U.S.C. § 2251(b)(1). Although not an inviolable rule, because the phrase "positive adjustment" appears in both sections 201(b)(1) and 204(b)(1)(B), it is generally presumed to have the same meaning in each. *See Est. of Cowart v. Nickols Drilling Co.*, 505 U.S. 469, 479 (1992) ("[I]dentical terms within an Act bear the same meaning."). Indeed, section 201(b)(1) defines "positive adjustment to import competition" for purposes of the entire safeguard statute, and nothing in section 204(b)(1)(B) suggests that the use of the identical term there carries a different meaning.

Moreover, "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992). Section 204(b)(1)(B) uses the present perfect "has made," and Congress employs "the present perfect tense" of a verb to "denot[e] an act that has been completed." *Barrett v. United States*, 423 U.S. 212, 216 (1976); *accord Carr v. United States*, 560 U.S. 438, 448 (2010). Yet it is

undisputed that President Trump never found that the domestic industry "has made" a positive adjustment, but rather only that the domestic industry has "begun to make" the adjustment. The President's findings in paragraph 9 of Proclamation 10101 that the Exclusion "has impaired and is likely to continue to impair the effectiveness" of the safeguard measure confirm that he did *not* conclude that the industry "is able to compete successfully with imports" absent safeguard relief, or that dislocated workers had "transition[ed] to productive pursuits." *See* 85 Fed. Reg. at 65,640.

Despite the plain text, the CIT concluded that there was no significant difference between "has made" and "has begun to make." Specifically, the CIT held that "[t]he phrase 'has made a positive adjustment' in the statute is broad enough to include the finding that the domestic industry 'has begun to make a positive adjustment' contained in the proclamation," and that "the distinction between 'has made' and 'has begun to make' is too narrow to rise to the level of a clear misconstruction." Appx22. But that conclusion ignores Congress's specific choice to use a specific term "denoting an act that has been *completed*." *Barrett*, 423 U.S. at 216 (emphasis added). Congress's verb choice is presumed to be intentional, *see Wilson*, 503 U.S. at 333, and the CIT should not have disregarded it.

Proving the point, Congress used the formulation "is making"—which far more readily overlaps with "has begun to make"—in two other places in the statute, but not in section 204(b)(1). Specifically, in section 204(c)(1), for purposes of

deciding whether to extend the duration of a safeguard, Congress instructed the ITC to consider "whether there is evidence that the [domestic] industry *is making* a positive adjustment to import competition." 19 U.S.C. § 2254(c)(1) (emphasis added). Separately, in section 203, Congress authorized the President to extend a safeguard if the President determines, *inter alia*, that "there is evidence that the domestic industry *is making* a positive adjustment to import competition." 19 U.S.C. § 2253(e)(1)(B)(i)(II) (emphasis added). But Congress employed different language for purposes of section 204(b)(1)(B), which shows that Congress did not consider a finding that the domestic industry "is making" a positive adjustment to be sufficient. *See Keene*, 508 U.S. at 208; *see also Barrett*, 423 U.S. at 216-17 (finding no ambiguity in statute when Congress used present perfect tense in certain provisions and present tense in others, showing that "Congress knew the significance and meaning of the language it employed"). Were it sufficient that the domestic industry merely had "*begun to make* a positive adjustment," Congress knew how to say so.

The ITC in fact has observed and relied on the very same distinction between "is making" and "has made" in its administration of the safeguard statute as it pertains to CSPV products. As noted, a safeguard action can be extended only if the ITC and President find "evidence that the industry *is making* a positive adjustment to import competition." 19 U.S.C. §§ 2253(e)(1)(B)(i)(II), 2254(c)(1) (emphasis added). In rejecting arguments that the extension standard had not been met, the

ITC emphasized that "the statutory standard is whether there is 'evidence' that the domestic industry *'is making'* a positive adjustment to import competition, *not that it 'has made' a positive adjustment*." USITC Pub. 5266 at 32 (emphases added). The ITC continued: "Thus, the existence of evidence of aspects in which the domestic industry has not as yet 'made' a full positive adjustment to import competition does not negate the ample evidence in this investigation of the domestic industry's progress in making a positive adjustment, and does not warrant a negative extension determination[.]" *Id.* As the ITC's analysis shows, "is making" and "has made" are different standards under the statute, and that difference is important for purposes of the statute's operation. Because President Trump failed to find that the domestic industry "has made" a positive adjustment to import competition, he failed to make the predicate finding necessary for action under section 204(b)(1)(B), and Proclamation 10101 should be set aside on this basis as well.

## CONCLUSION

For the foregoing reasons and those set forth in the response briefs of the other Appellees, we respectfully request that the Court affirm the CIT's judgment.

Respectfully submitted,

/s/ *Matthew R. Nicely*
Matthew R. Nicely
mnicely@akingump.com
James E. Tysse
jtysse@akingump.com
Daniel M. Witkowski
dwitkowski@akingump.com
Devin S. Sikes
dsikes@akingump.com
Julia K. Eppard
jeppard@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4000

*Counsel to Plaintiffs-Appellees SEIA and NextEra Energy, Inc.*

July 5, 2022

# ADDENDUM

## TABLE OF CONTENTS

19 U.S.C. § 2251 .......... Add. 1

19 U.S.C. § 2252 .......... Add. 2

19 U.S.C. § 2253 .......... Add. 16

19 U.S.C. § 2254 .......... Add. 24

**United States Code**

**Title 19. Customs Duties**

**Chapter 12. Trade Act of 1974**

**Subchapter II. Relief from Injury Caused by Import Competition**

**Part 1. Positive Adjustment by Industries Injured by Imports**

**Section 2251. Action to facilitate positive adjustment to import competition**

**(a) Presidential action**

If the United States International Trade Commission (hereinafter referred to in this part as the "Commission") determines under section 2252(b) of this title that an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article, the President, in accordance with this part, shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.

**(b) Positive adjustment to import competition**

(1) For purposes of this part, a positive adjustment to import competition occurs when-

(A) the domestic industry-

(i) is able to compete successfully with imports after actions taken under section 2254 of this title terminate, or

(ii) the domestic industry experiences an orderly transfer of resources to other productive pursuits; and

(B) dislocated workers in the industry experience an orderly transition to productive pursuits.

(2) The domestic industry may be considered to have made a positive adjustment to import competition even though the industry is not of the same size and composition as the industry at the time the investigation was initiated under section 2252(b) of this title.

**United States Code**

**Title 19. Customs Duties**

**Chapter 12. Trade Act of 1974**

**Subchapter II. Relief from Injury Caused by Import Competition**

**Part 1. Positive Adjustment by Industries Injured by Imports**

**Section 2252. Investigations, determinations, and recommendations by Commission**

**(a) Petitions and adjustment plans**

(1) A petition requesting action under this part for the purpose of facilitating positive adjustment to import competition may be filed with the Commission by an entity, including a trade association, firm, certified or recognized union, or group of workers, which is representative of an industry.

(2) A petition under paragraph (1)-

(A) shall include a statement describing the specific purposes for which action is being sought, which may include facilitating the orderly transfer of resources to more productive pursuits, enhancing competitiveness, or other means of adjustment to new conditions of competition; and

(B) may-

(i) subject to subsection (d)(1)(C)(i), request provisional relief under subsection (d)(1); or

(ii) request provisional relief under subsection (d)(2).

(3) Whenever a petition is filed under paragraph (1), the Commission shall promptly transmit copies of the petition to the Office of the United States Trade Representative and other Federal agencies directly concerned.

(4) A petitioner under paragraph (1) may submit to the Commission and the United States Trade Representative (hereafter in this part referred to as the "Trade Representative"), either with the petition, or at any time within 120 days after the date of filing of the petition, a plan to facilitate positive adjustment to import competition.

(5)(A) Before submitting an adjustment plan under paragraph (4), the petitioner and other entities referred to in paragraph (1) that wish to participate may consult with the Trade Representative and the officers and employees of any Federal agency that is considered appropriate by the Trade Representative, for purposes of evaluating the adequacy of the proposals being considered for inclusion in the plan in relation to specific actions that may be taken under this part.

(B) A request for any consultation under subparagraph (A) must be made to the Trade Representative. Upon receiving such a request, the Trade Representative shall confer with the petitioner and provide such assistance, including publication of appropriate notice in the Federal Register, as may be practicable in obtaining other participants in the consultation. No consultation may occur under subparagraph (A) unless the Trade Representative, or his delegate, is in attendance.

(6)(A) In the course of any investigation under subsection (b) of this section, the Commission shall seek information (on a confidential basis, to the extent appropriate) on actions being taken, or planned to be taken, or both, by firms and workers in the industry to make a positive adjustment to import competition.

(B) Regardless whether an adjustment plan is submitted under paragraph (4) by the petitioner, if the Commission makes an affirmative determination under subsection (b), any-

(i) firm in the domestic industry;

(ii) certified or recognized union or group of workers in the domestic industry;

(iii) State or local community;

(iv) trade association representing the domestic industry; or

(v) any other person or group of persons,

may, individually, submit to the Commission commitments regarding actions such persons and entities intend to take to facilitate positive adjustment to import competition.

(7) Nothing in paragraphs (5) and (6) may be construed to provide immunity under the antitrust laws.

(8) The procedures concerning the release of confidential business information set forth in section 332(g) of the Tariff Act of 1930 [19 U.S.C. 1332(g)] shall apply with respect to information received by the Commission in the course of

investigations conducted under this part, part 1 of title III of the North American Free Trade Agreement Implementation Act, title II of the United States-Jordan Free Trade Area Implementation Act, title III of the United States-Chile Free Trade Agreement Implementation Act, title III of the United States-Singapore Free Trade Agreement Implementation Act, title III of the United States-Australia Free Trade Agreement Implementation Act, title III of the United States-Morocco Free Trade Agreement Implementation Act, title III of the Dominican Republic-Central America-United States Free Trade Agreement Implementation Act [19 U.S.C. 4051 et seq.], title III of the United States-Bahrain Free Trade Agreement Implementation Act, title III of the United States-Oman Free Trade Agreement Implementation Act, title III of the United States-Peru Trade Promotion Agreement Implementation Act, title III of the United States–Korea Free Trade Agreement Implementation Act, title III of the United States–Colombia Trade Promotion Agreement Implementation Act,,[1] title III of the United States-Panama Trade Promotion Agreement Implementation Act, and subtitle C of title III of the United States-Mexico-Canada Agreement Implementation Act [19 U.S.C. 4571 et seq.]. The Commission may request that parties providing confidential business information furnish nonconfidential summaries thereof or, if such parties indicate that the information in the submission cannot be summarized, the reasons why a summary cannot be provided. If the Commission finds that a request for confidentiality is not warranted and if the party concerned is either unwilling to make the information public or to authorize its disclosure in generalized or summarized form, the Commission may disregard the submission.

**(b) Investigations and determinations by Commission**

(1)(A) Upon the filing of a petition under subsection (a), the request of the President or the Trade Representative, the resolution of either the Committee on Ways and Means of the House of Representatives or the Committee on Finance of the Senate, or on its own motion, the Commission shall promptly make an investigation to determine whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.

(B) For purposes of this section, the term "substantial cause" means a cause which is important and not less than any other cause.

(2)(A) Except as provided in subparagraph (B), the Commission shall make the determination under paragraph (1) within 120 days (180 days if the petition alleges

that critical circumstances exist) after the date on which the petition is filed, the request or resolution is received, or the motion is adopted, as the case may be.

(B) If before the 100th day after a petition is filed under subsection (a)(1) the Commission determines that the investigation is extraordinarily complicated, the Commission shall make the determination under paragraph (1) within 150 days (210 days if the petition alleges that critical circumstances exist) after the date referred to in subparagraph (A).

(3) The Commission shall publish notice of the commencement of any proceeding under this subsection in the Federal Register and shall, within a reasonable time thereafter, hold public hearings at which the Commission shall afford interested parties and consumers an opportunity to be present, to present evidence, to comment on the adjustment plan, if any, submitted under subsection (a), to respond to the presentations of other parties and consumers, and otherwise to be heard.

**(c) Factors applied in making determinations**

(1) In making determinations under subsection (b), the Commission shall take into account all economic factors which it considers relevant, including (but not limited to)-

(A) with respect to serious injury-

(i) the significant idling of productive facilities in the domestic industry,

(ii) the inability of a significant number of firms to carry out domestic production operations at a reasonable level of profit, and

(iii) significant unemployment or underemployment within the domestic industry;

(B) with respect to threat of serious injury-

(i) a decline in sales or market share, a higher and growing inventory (whether maintained by domestic producers, importers, wholesalers, or retailers), and a downward trend in production, profits, wages, productivity, or employment (or increasing underemployment) in the domestic industry,

(ii) the extent to which firms in the domestic industry are unable to generate adequate capital to finance the modernization of their domestic plants and

equipment, or are unable to maintain existing levels of expenditures for research and development,

(iii) the extent to which the United States market is the focal point for the diversion of exports of the article concerned by reason of restraints on exports of such article to, or on imports of such article into, third country markets; and

(C) with respect to substantial cause, an increase in imports (either actual or relative to domestic production) and a decline in the proportion of the domestic market supplied by domestic producers.

(2) In making determinations under subsection (b), the Commission shall-

(A) consider the condition of the domestic industry over the course of the relevant business cycle, but may not aggregate the causes of declining demand associated with a recession or economic downturn in the United States economy into a single cause of serious injury or threat of injury; and

(B) examine factors other than imports which may be a cause of serious injury, or threat of serious injury, to the domestic industry.

The Commission shall include the results of its examination under subparagraph (B) in the report submitted by the Commission to the President under subsection (e).

(3) The presence or absence of any factor which the Commission is required to evaluate in subparagraphs (A) and (B) of paragraph (1) is not necessarily dispositive of whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry.

(4) For purposes of subsection (b), in determining the domestic industry producing an article like or directly competitive with an imported article, the Commission-

(A) to the extent information is available, shall, in the case of a domestic producer which also imports, treat as part of such domestic industry only its domestic production;

(B) may, in the case of a domestic producer which produces more than one article, treat as part of such domestic industry only that portion or subdivision of the producer which produces the like or directly competitive article; and

(C) may, in the case of one or more domestic producers which produce a like or directly competitive article in a major geographic area of the United States and whose production facilities in such area for such article constitute a substantial portion of the domestic industry in the United States and primarily serve the market in such area, and where the imports are concentrated in such area, treat as such domestic industry only that segment of the production located in such area.

(5) In the course of any proceeding under this subsection, the Commission shall investigate any factor which in its judgment may be contributing to increased imports of the article under investigation. Whenever in the course of its investigation the Commission has reason to believe that the increased imports are attributable in part to circumstances which come within the purview of subtitles A and B of title VII [19 U.S.C. 1671 et seq., 1673 et seq.] or section 337 [19 U.S.C. 1337] of the Tariff Act of 1930, or other remedial provisions of law, the Commission shall promptly notify the appropriate agency so that such action may be taken as is otherwise authorized by such provisions of law.

(6) For purposes of this section:

(A)(i) The term "domestic industry" means, with respect to an article, the producers as a whole of the like or directly competitive article or those producers whose collective production of the like or directly competitive article constitutes a major proportion of the total domestic production of such article.

(ii) The term "domestic industry" includes producers located in the United States insular possessions.

(B) The term "significant idling of productive facilities" includes the closing of plants or the underutilization of production capacity.

(C) The term "serious injury" means a significant overall impairment in the position of a domestic industry.

(D) The term "threat of serious injury" means serious injury that is clearly imminent.

**(d) Provisional relief**

(1)(A) An entity representing a domestic industry that produces a perishable agricultural product or citrus product that is like or directly competitive with an imported perishable agricultural product or citrus product may file a request with

the Trade Representative for the monitoring of imports of that product under subparagraph (B). Within 21 days after receiving the request, the Trade Representative shall determine if-

(i) the imported product is a perishable agricultural product or citrus product; and

(ii) there is a reasonable indication that such product is being imported into the United States in such increased quantities as to be, or likely to be, a substantial cause of serious injury, or the threat thereof, to such domestic industry.

(B) If the determinations under subparagraph (A)(i) and (ii) are affirmative, the Trade Representative shall request, under section 332(g) of the Tariff Act of 1930 [19 U.S.C. 1332(g)], the Commission to monitor and investigate the imports concerned for a period not to exceed 2 years. The monitoring and investigation may include the collection and analysis of information that would expedite an investigation under subsection (b).

(C) If a petition filed under subsection (a)-

(i) alleges injury from imports of a perishable agricultural product or citrus product that has been, on the date the allegation is included in the petition, subject to monitoring by the Commission under subparagraph (B) for not less than 90 days; and

(ii) requests that provisional relief be provided under this subsection with respect to such imports;

the Commission shall, not later than the 21st day after the day on which the request was filed, make a determination, on the basis of available information, whether increased imports (either actual or relative to domestic production) of the perishable agricultural product or citrus product are a substantial cause of serious injury, or the threat thereof, to the domestic industry producing a like or directly competitive perishable product or citrus product, and whether either-

(I) the serious injury is likely to be difficult to repair by reason of perishability of the like or directly competitive agricultural product; or

(II) the serious injury cannot be timely prevented through investigation under subsection (b) and action under section 2253 of this title.

(D) At the request of the Commission, the Secretary of Agriculture shall promptly provide to the Commission any relevant information that the Department of Agriculture may have for purposes of making determinations and findings under this subsection.

(E) Whenever the Commission makes an affirmative preliminary determination under subparagraph (C), the Commission shall find the amount or extent of provisional relief that is necessary to prevent or remedy the serious injury. In carrying out this subparagraph, the Commission shall give preference to increasing or imposing a duty on imports, if such form of relief is feasible and would prevent or remedy the serious injury.

(F) The Commission shall immediately report to the President its determination under subparagraph (C) and, if the determination is affirmative, the finding under subparagraph (E).

(G) Within 7 days after receiving a report from the Commission under subparagraph (F) containing an affirmative determination, the President, if he considers provisional relief to be warranted and after taking into account the finding of the Commission under subparagraph (E), shall proclaim such provisional relief that the President considers necessary to prevent or remedy the serious injury.

(2)(A) When a petition filed under subsection (a) alleges that critical circumstances exist and requests that provisional relief be provided under this subsection with respect to imports of the article identified in the petition, the Commission shall, not later than 60 days after the petition containing the request was filed, determine, on the basis of available information, whether-

(i) there is clear evidence that increased imports (either actual or relative to domestic production) of the article are a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article; and

(ii) delay in taking action under this part would cause damage to that industry that would be difficult to repair.

(B) If the determinations under subparagraph (A)(i) and (ii) are affirmative, the Commission shall find the amount or extent of provisional relief that is necessary to prevent or remedy the serious injury. In carrying out this subparagraph, the Commission shall give preference to increasing or imposing a duty on imports, if such form of relief is feasible and would prevent or remedy the serious injury.

(C) The Commission shall immediately report to the President its determinations under subparagraph (A)(i) and (ii) and, if the determinations are affirmative, the finding under subparagraph (B).

(D) Within 30 days after receiving a report from the Commission under subparagraph (C) containing an affirmative determination under subparagraph (A)(i) and (ii), the President, if he considers provisional relief to be warranted and after taking into account the finding of the Commission under subparagraph (B), shall proclaim, for a period not to exceed 200 days, such provisional relief that the President considers necessary to prevent or remedy the serious injury. Such relief shall take the form of an increase in, or the imposition of, a duty on imports, if such form of relief is feasible and would prevent or remedy the serious injury.

(3) If provisional relief is proclaimed under paragraph (1)(G) or (2)(D) in the form of an increase, or the imposition of, a duty, the President shall order the suspension of liquidation of all imported articles subject to the affirmative determination under paragraph (1)(C) or paragraph (2)(A), as the case may be, that are entered, or withdrawn from warehouse for consumption, on or after the date of the determination.

(4)(A) Any provisional relief implemented under this subsection with respect to an imported article shall terminate on the day on which-

(i) if such relief was proclaimed under paragraph (1)(G) or (2)(D), the Commission makes a negative determination under subsection (b) regarding injury or the threat thereof by imports of such article;

(ii) action described in section 2253(a)(3)(A) or (C) of this title takes effect under section 2253 of this title with respect to such article;

(iii) a decision by the President not to take any action under section 2253(a) of this title with respect to such article becomes final; or

(iv) whenever the President determines that, because of changed circumstances, such relief is no longer warranted.

(B) Any suspension of liquidation ordered under paragraph (3) with respect to an imported article shall terminate on the day on which provisional relief is terminated under subparagraph (A) with respect to the article.

(C) If an increase in, or the imposition of, a duty that is proclaimed under section 2253 of this title on an imported article is different from a duty increase or

imposition that was proclaimed for such an article under this section, then the entry of any such article for which liquidation was suspended under paragraph (3) shall be liquidated at whichever of such rates of duty is lower.

(D) If provisional relief in the form of an increase in, or the imposition of, a duty is proclaimed under this section with respect to an imported article and neither a duty increase nor a duty imposition is proclaimed under section 2253 of this title regarding such article, the entry of any such article for which liquidation was suspended under paragraph (3) may be liquidated at the rate of duty that applied before provisional relief was provided.

(5) For purposes of this subsection:

(A) The term "citrus product" means any processed oranges or grapefruit, or any orange or grapefruit juice, including concentrate.

(B) A perishable agricultural product is any agricultural article, including livestock, regarding which the Trade Representative considers action under this section to be appropriate after taking into account-

(i) whether the article has-

(I) a short shelf life,

(II) a short growing season, or

(III) a short marketing period,

(ii) whether the article is treated as a perishable product under any other Federal law or regulation; and

(iii) any other factor considered appropriate by the Trade Representative.

The presence or absence of any factor which the Trade Representative is required to take into account under clause (i), (ii), or (iii) is not necessarily dispositive of whether an article is a perishable agricultural product.

(C) The term "provisional relief" means-

(i) any increase in, or imposition of, any duty;

(ii) any modification or imposition of any quantitative restriction on the importation of an article into the United States; or

(iii) any combination of actions under clauses (i) and (ii).

**(e) Commission recommendations**

(1) If the Commission makes an affirmative determination under subsection (b)(1), the Commission shall also recommend the action that would address the serious injury, or threat thereof, to the domestic industry and be most effective in facilitating the efforts of the domestic industry to make a positive adjustment to import competition.

(2) The Commission is authorized to recommend under paragraph (1)-

(A) an increase in, or the imposition of, any duty on the imported article;

(B) a tariff-rate quota on the article;

(C) a modification or imposition of any quantitative restriction on the importation of the article into the United States;

(D) one or more appropriate adjustment measures, including the provision of trade adjustment assistance under part 2 of this subchapter; or

(E) any combination of the actions described in subparagraphs (A) through (D).

(3) The Commission shall specify the type, amount, and duration of the action recommended by it under paragraph (1). The limitations set forth in section 2253(e) of this title are applicable to the action recommended by the Commission.

(4) In addition to the recommendation made under paragraph (1), the Commission may also recommend that the President-

(A) initiate international negotiations to address the underlying cause of the increase in imports of the article or otherwise to alleviate the injury or threat; or

(B) implement any other action authorized under law that is likely to facilitate positive adjustment to import competition.

(5) For purposes of making its recommendation under this subsection, the Commission shall-

(A) after reasonable notice, hold a public hearing at which all interested parties shall be provided an opportunity to present testimony and evidence; and

(B) take into account-

(i) the form and amount of action described in paragraph (2)(A), (B), and (C) that would prevent or remedy the injury or threat thereof,

(ii) the objectives and actions specified in the adjustment plan, if any, submitted under subsection (a)(4),

(iii) any individual commitment that was submitted to the Commission under subsection (a)(6),

(iv) any information available to the Commission concerning the conditions of competition in domestic and world markets, and likely developments affecting such conditions during the period for which action is being requested, and

(v) whether international negotiations may be constructive to address the injury or threat thereof or to facilitate adjustment.

(6) Only those members of the Commission who agreed to the affirmative determination under subsection (b) are eligible to vote on the recommendation required to be made under paragraph (1) or that may be made under paragraph (3). Members of the Commission who did not agree to the affirmative determination may submit, in the report required under subsection (f), separate views regarding what action, if any, should be taken under section 2253 of this title.

**(f) Report by Commission**

(1) The Commission shall submit to the President a report on each investigation undertaken under subsection (b). The report shall be submitted at the earliest practicable time, but not later than 180 days (240 days if the petition alleges that critical circumstances exist) after the date on which the petition is filed, the request or resolution is received, or the motion is adopted, as the case may be.

(2) The Commission shall include in the report required under paragraph (1) the following:

(A) The determination made under subsection (b) and an explanation of the basis for the determination.

(B) If the determination under subsection (b) is affirmative, the recommendations for action made under subsection (e) and an explanation of the basis for each recommendation.

(C) Any dissenting or separate views by members of the Commission regarding the determination and any recommendation referred to in subparagraphs (A) and (B).

(D) The findings required to be included in the report under subsection (c)(2).

(E) A copy of the adjustment plan, if any, submitted under section 2251(b)(4) of this title.

(F) Commitments submitted, and information obtained, by the Commission regarding steps that firms and workers in the domestic industry are taking, or plan to take, to facilitate positive adjustment to import competition.

(G) A description of-

(i) the short- and long-term effects that implementation of the action recommended under subection [2] (e) is likely to have on the petitioning domestic industry, on other domestic industries, and on consumers, and

(ii) the short- and long-term effects of not taking the recommended action on the petitioning domestic industry, its workers and the communities where production facilities of such industry are located, and on other domestic industries.

(3) The Commission, after submitting a report to the President under paragraph (1), shall promptly make it available to the public (with the exception of the confidential information obtained under subsection (a)(6)(B) and any other information which the Commission determines to be confidential) and cause a summary thereof to be published in the Federal Register.

**(g) Expedited consideration of adjustment assistance petitions**

If the Commission makes an affirmative determination under subsection (b)(1), the Commission shall promptly notify the Secretary of Labor and the Secretary of Commerce of the determination. After receiving such notification-

(1) the Secretary of Labor shall give expedited consideration to petitions by workers in the domestic industry for certification for eligibility to apply for adjustment assistance under part 2 of this subchapter; and

(2) the Secretary of Commerce shall give expedited consideration to petitions by firms in the domestic industry for certification of eligibility to apply for adjustment assistance under part 3 of this subchapter.

**(h) Limitations on investigations**

(1) Except for good cause determined by the Commission to exist, no investigation for the purposes of this section shall be made with respect to the same subject matter as a previous investigation under this part, unless 1 year has elapsed since the Commission made its report to the President of the results of such previous investigation.

(2) No new investigation shall be conducted with respect to an article that is or has been the subject of an action under section 2253(a)(3)(A), (B), (C), or (E) of this title if the last day on which the President could take action under section 2253 of this title in the new investigation is a date earlier than that permitted under section 2253(e)(7) of this title.

(3)(A) Not later than the date on which the Textiles Agreement enters into force with respect to the United States, the Secretary of Commerce shall publish in the Federal Register a list of all articles that are subject to the Textiles Agreement. An investigation may be conducted under this section concerning imports of any article that is subject to the Textiles Agreement only if the United States has integrated that article into GATT 1994 pursuant to the Textiles Agreement, as set forth in notices published in the Federal Register by the Secretary of Commerce, including the notice published under section 3591 of this title.

(B) For purposes of this paragraph:

(i) The term "Textiles Agreement" means the Agreement on Textiles and Clothing referred to in section 3511(d)(4) of this title.

(ii) The term "GATT 1994" has the meaning given that term in section 3501(1)(B) of this title.

**(i) Limited disclosure of confidential business information under protective order**

The Commission shall promulgate regulations to provide access to confidential business information under protective order to authorized representatives of interested parties who are parties to an investigation under this section.

**United States Code**

**Title 19. Customs Duties**

**Chapter 12. Trade Act of 1974**

**Subchapter II. Relief from Injury Caused by Import Competition**

**Part 1. Positive Adjustment by Industries Injured by Imports**

**Section 2253. Action by President after determination of import injury**

**(a) In general**

(1)(A) After receiving a report under section 2252(f) of this title containing an affirmative finding regarding serious injury, or the threat thereof, to a domestic industry, the President shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.

(B) The action taken by the President under subparagraph (A) shall be to such extent, and for such duration, subject to subsection (e)(1), that the President determines to be appropriate and feasible under such subparagraph.

(C) The interagency trade organization established under section 1872(a) of this title shall, with respect to each affirmative determination reported under section 2252(f) of this title, make a recommendation to the President as to what action the President should take under subparagraph (A).

(2) In determining what action to take under paragraph (1), the President shall take into account-

(A) the recommendation and report of the Commission;

(B) the extent to which workers and firms in the domestic industry are-

(i) benefitting from adjustment assistance and other manpower programs, and

(ii) engaged in worker retraining efforts;

(C) the efforts being made, or to be implemented, by the domestic industry (including the efforts included in any adjustment plan or commitment submitted

to the Commission under section 2252(a) of this title) to make a positive adjustment to import competition;

(D) the probable effectiveness of the actions authorized under paragraph (3) to facilitate positive adjustment to import competition;

(E) the short- and long-term economic and social costs of the actions authorized under paragraph (3) relative to their short- and long-term economic and social benefits and other considerations relative to the position of the domestic industry in the United States economy;

(F) other factors related to the national economic interest of the United States, including, but not limited to-

(i) the economic and social costs which would be incurred by taxpayers, communities, and workers if import relief were not provided under this part,

(ii) the effect of the implementation of actions under this section on consumers and on competition in domestic markets for articles, and

(iii) the impact on United States industries and firms as a result of international obligations regarding compensation;

(G) the extent to which there is diversion of foreign exports to the United States market by reason of foreign restraints;

(H) the potential for circumvention of any action taken under this section;

(I) the national security interests of the United States; and

(J) the factors required to be considered by the Commission under section 2252(e)(5) of this title.

(3) The President may, for purposes of taking action under paragraph (1)-

(A) proclaim an increase in, or the imposition of, any duty on the imported article;

(B) proclaim a tariff-rate quota on the article;

(C) proclaim a modification or imposition of any quantitative restriction on the importation of the article into the United States;

(D) implement one or more appropriate adjustment measures, including the provision of trade adjustment assistance under part 2 of this subchapter;

(E) negotiate, conclude, and carry out agreements with foreign countries limiting the export from foreign countries and the import into the United States of such article;

(F) proclaim procedures necessary to allocate among importers by the auction of import licenses quantities of the article that are permitted to be imported into the United States;

(G) initiate international negotiations to address the underlying cause of the increase in imports of the article or otherwise to alleviate the injury or threat thereof;

(H) submit to Congress legislative proposals to facilitate the efforts of the domestic industry to make a positive adjustment to import competition;

(I) take any other action which may be taken by the President under the authority of law and which the President considers appropriate and feasible for purposes of paragraph (1); and

(J) take any combination of actions listed in subparagraphs (A) through (I).

(4)(A) Subject to subparagraph (B), the President shall take action under paragraph (1) within 60 days (50 days if the President has proclaimed provisional relief under section 2252(d)(2)(D) of this title with respect to the article concerned) after receiving a report from the Commission containing an affirmative determination under section 2252(b)(1) of this title (or a determination under such section which he considers to be an affirmative determination by reason of section 1330(d) of this title).

(B) If a supplemental report is requested under paragraph (5), the President shall take action under paragraph (1) within 30 days after the supplemental report is received, except that, in a case in which the President has proclaimed provisional relief under section 2252(d)(2)(D) of this title with respect to the article concerned, action by the President under paragraph (1) may not be taken later than the 200th day after the provisional relief was proclaimed.

(5) The President may, within 15 days after the date on which he receives a report from the Commission containing an affirmative determination under section 2252(b)(1) of this title, request additional information from the Commission. The

Commission shall, as soon as practicable but in no event more than 30 days after the date on which it receives the President's request, furnish additional information with respect to the industry in a supplemental report.

**(b) Reports to Congress**

(1) On the day the President takes action under subsection (a)(1), the President shall transmit to Congress a document describing the action and the reasons for taking the action. If the action taken by the President differs from the action required to be recommended by the Commission under section 2252(e)(1) of this title, the President shall state in detail the reasons for the difference.

(2) On the day on which the President decides that there is no appropriate and feasible action to take under subsection (a)(1) with respect to a domestic industry, the President shall transmit to Congress a document that sets forth in detail the reasons for the decision.

(3) On the day on which the President takes any action under subsection (a)(1) that is not reported under paragraph (1), the President shall transmit to Congress a document setting forth the action being taken and the reasons therefor.

**(c) Implementation of action recommended by Commission**

If the President reports under subsection (b)(1) or (2) that-

(1) the action taken under subsection (a)(1) differs from the action recommended by the Commission under section 2252(e)(1) of this title; or

(2) no action will be taken under subsection (a)(1) with respect to the domestic industry;

the action recommended by the Commission shall take effect (as provided in subsection (d)(2)) upon the enactment of a joint resolution described in section 2192(a)(1)(A) of this title within the 90-day period beginning on the date on which the document referred to in subsection (b)(1) or (2) is transmitted to the Congress.

**(d) Time for taking effect of certain relief**

(1) Except as provided in paragraph (2), any action described in subsection (a)(3)(A), (B), or (C), that is taken under subsection (a)(1) shall take effect within 15 days after the day on which the President proclaims the action, unless the President announces, on the date he decides to take such action, his intention to negotiate one or more agreements described in subsection (a)(3)(E) in which case

the action under subsection (a)(3)(A), (B), or (C) shall be proclaimed and take effect within 90 days after the date of such decision.

(2) If the contingency set forth in subsection (c) occurs, the President shall, within 30 days after the date of the enactment of the joint resolution referred to in such subsection, proclaim the action recommended by the Commission under section 2252(e)(1) of this title.

**(e) Limitations on actions**

(1)(A) Subject to subparagraph (B), the duration of the period in which an action taken under this section may be in effect shall not exceed 4 years. Such period shall include the period, if any, in which provisional relief under section 2252(d) of this title was in effect.

(B)(i) Subject to clause (ii), the President, after receiving an affirmative determination from the Commission under section 2254(c) of this title (or, if the Commission is equally divided in its determination, a determination which the President considers to be an affirmative determination of the Commission), may extend the effective period of any action under this section if the President determines that-

(I) the action continues to be necessary to prevent or remedy the serious injury; and

(II) there is evidence that the domestic industry is making a positive adjustment to import competition.

(ii) The effective period of any action under this section, including any extensions thereof, may not, in the aggregate, exceed 8 years.

(2) Action of a type described in subsection (a)(3)(A), (B), or (C) may be taken under subsection (a)(1), under section 2252(d)(1)(G) of this title, or under section 2252(d)(2)(D) of this title only to the extent the cumulative impact of such action does not exceed the amount necessary to prevent or remedy the serious injury.

(3) No action may be taken under this section which would increase a rate of duty to (or impose a rate) which is more than 50 percent ad valorem above the rate (if any) existing at the time the action is taken.

(4) Any action taken under this section proclaiming a quantitative restriction shall permit the importation of a quantity or value of the article which is not less

than the average quantity or value of such article entered into the United States in the most recent 3 years that are representative of imports of such article and for which data are available, unless the President finds that the importation of a different quantity or value is clearly justified in order to prevent or remedy the serious injury.

(5) An action described in subsection (a)(3)(A), (B), or (C) that has an effective period of more than 1 year shall be phased down at regular intervals during the period in which the action is in effect.

(6)(A) The suspension, pursuant to any action taken under this section, of-

(i) subheadings 9802.00.60 or 9802.00.80 of the Harmonized Tariff Schedule of the United States with respect to an article; and

(ii) the designation of any article as an eligible article for purposes of subchapter V;

shall be treated as an increase in duty.

(B) No proclamation providing for a suspension referred to in subparagraph (A) with respect to any article may be made by the President, nor may any such suspension be recommended by the Commission under section 2252(e) of this title, unless the Commission, in addition to making an affirmative determination under section 2252(b)(1) of this title, determines in the course of its investigation under section 2252(b) of this title that the serious injury, or threat thereof, substantially caused by imports to the domestic industry producing a like or directly competitive article results from, as the case may be-

(i) the application of subheading 9802.00.60 or subheading 9802.00.80 of the Harmonized Tariff Schedule of the United States; or

(ii) the designation of the article as an eligible article for the purposes of subchapter V.

(7)(A) If an article was the subject of an action under subparagraph (A), (B), (C), or (E) of subsection (a)(3), no new action may be taken under any of those subparagraphs with respect to such article for-

(i) a period beginning on the date on which the previous action terminates that is equal to the period in which the previous action was in effect, or

(ii) a period of 2 years beginning on the date on which the previous action terminates,

whichever is greater.

(B) Notwithstanding subparagraph (A), if the previous action under subparagraph (A), (B), (C), or (E) of subsection (a)(3) with respect to an article was in effect for a period of 180 days or less, the President may take a new action under any of those subparagraphs with respect to such article if-

(i) at least 1 year has elapsed since the previous action went into effect; and

(ii) an action described in any of those subparagraphs has not been taken with respect to such article more than twice in the 5-year period immediately preceding the date on which the new action with respect to such article first becomes effective.

**(f) Certain agreements**

(1) If the President takes action under this section other than the implemention [1] of agreements of the type described in subsection (a)(3)(E), the President may, after such action takes effect, negotiate agreements of the type described in subsection (a)(3)(E), and may, after such agreements take effect, suspend or terminate, in whole or in part, any action previously taken.

(2) If an agreement implemented under subsection (a)(3)(E) is not effective, the President may, consistent with the limitations contained in subsection (e), take additional action under subsection (a).

**(g) Regulations**

(1) The President shall by regulation provide for the efficient and fair administration of all actions taken for the purpose of providing import relief under this part.

(2) In order to carry out an international agreement concluded under this part, the President may prescribe regulations governing the entry or withdrawal from warehouse of articles covered by such agreement. In addition, in order to carry out any agreement of the type described in subsection (a)(3)(E) that is concluded under this part with one or more countries accounting for a major part of United States imports of the article covered by such agreement, including imports into a major geographic area of the United States, the President may issue regulations

governing the entry or withdrawal from warehouse of like articles which are the product of countries not parties to such agreement.

(3) Regulations prescribed under this subsection shall, to the extent practicable and consistent with efficient and fair administration, insure against inequitable sharing of imports by a relatively small number of the larger importers.

**United States Code**

**Title 19. Customs Duties**

**Chapter 12. Trade Act of 1974**

**Subchapter II. Relief from Injury Caused by Import Competition**

**Part 1. Positive Adjustment by Industries Injured by Imports**

**Section 2254. Monitoring, modification, and termination of action**

**(a) Monitoring**

(1) So long as any action taken under section 2253 of this title remains in effect, the Commission shall monitor developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition.

(2) If the initial period during which the action taken under section 2253 of this title is in effect exceeds 3 years, or if an extension of such action exceeds 3 years, the Commission shall submit a report on the results of the monitoring under paragraph (1) to the President and to the Congress not later than the date that is the mid-point of the initial period, and of each such extension, during which the action is in effect.

(3) In the course of preparing each report under paragraph (2), the Commission shall hold a hearing at which interested persons shall be given a reasonable opportunity to be present, to produce evidence, and to be heard.

(4) Upon request of the President, the Commission shall advise the President of its judgment as to the probable economic effect on the industry concerned of any reduction, modification, or termination of the action taken under section 2253 of this title which is under consideration.

**(b) Reduction, modification, and termination of action**

(1) Action taken under section 2253 of this title may be reduced, modified, or terminated by the President (but not before the President receives the report required under subsection (a)(2)(A)) if the President-

(A) after taking into account any report or advice submitted by the Commission under subsection (a) and after seeking the advice of the Secretary of Commerce and the Secretary of Labor, determines, on the basis that either-

(i) the domestic industry has not made adequate efforts to make a positive adjustment to import competition, or

(ii) the effectiveness of the action taken under section 2253 of this title has been impaired by changed economic circumstances,

that changed circumstances warrant such reduction, or termination; or

(B) determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition.

(2) Notwithstanding paragraph (1), the President is authorized to take such additional action under section 2253 of this title as may be necessary to eliminate any circumvention of any action previously taken under such section.

(3) Notwithstanding paragraph (1), the President may, after receipt of a Commission determination under section 3538(a)(4) of this title and consulting with the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate, reduce, modify, or terminate action taken under section 2253 of this title.

**(c) Extension of action**

(1) Upon request of the President, or upon petition on behalf of the industry concerned filed with the Commission not earlier than the date which is 9 months, and not later than the date which is 6 months, before the date any action taken under section 2253 of this title is to terminate, the Commission shall investigate to determine whether action under section 2253 of this title continues to be necessary to prevent or remedy serious injury and whether there is evidence that the industry is making a positive adjustment to import competition.

(2) The Commission shall publish notice of the commencement of any proceeding under this subsection in the Federal Register and shall, within a reasonable time thereafter, hold a public hearing at which the Commission shall afford interested parties and consumers an opportunity to be present, to present

evidence, and to respond to the presentations of other parties and consumers, and otherwise to be heard.

(3) The Commission shall transmit to the President a report on its investigation and determination under this subsection not later than 60 days before the action under section 2253 of this title is to terminate, unless the President specifies a different date.

**(d) Evaluation of effectiveness of action**

(1) After any action taken under section 2253 of this title has terminated, the Commission shall evaluate the effectiveness of the actions in facilitating positive adjustment by the domestic industry to import competition, consistent with the reasons set out by the President in the report submitted to the Congress under section 2253(b) of this title.

(2) During the course of the evaluation conducted under paragraph (1), the Commission shall, after reasonable public notice, hold a hearing on the effectiveness of the action. All interested persons shall have the opportunity to attend such hearing and to present evidence or testimony at such hearing.

(3) A report on the evaluation made under paragraph (1) and the hearings held under paragraph (2) shall be submitted by the Commission to the President and to the Congress by no later than the 180th day after the day on which the actions taken under section 2253 of this title terminated.

**(e) Other provisions**

(1) Action by the President under this part may be taken without regard to the provisions of section 2136(a) of this title but only after consideration of the relation of such actions to the international obligations of the United States.

(2) If the Commission treats as the domestic industry production located in a major geographic area of the United States under section 2252(c)(4)(C) of this title, then the President shall take into account the geographic concentration of domestic production and of imports in that area in taking any action authorized under paragraph (1).

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(a). The brief contains 13,994 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type style.

July 5, 2022

*/s/ Matthew R. Nicely*
Matthew R. Nicely

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court of the United States Court of the Federal Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

July 5, 2022

*/s/ Matthew R. Nicely*
Matthew R. Nicely