**No. 2022-1392**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, CHRISTOPHER MAGNUS, Commissioner of U.S. Customs and Border Protection,**
*Defendants-Appellants*

---

Appeal from the United States Court of International Trade in
No. 1:20-cv-03941-GSK, Judge Gary S. Katzmann

---

# BRIEF *AMICI CURIAE* OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE AMERICAN CLEAN POWER ASSOCIATION IN SUPPORT OF APPELLEES

---

Tara S. Morrissey
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5668
tmorrissey@uschamber.com

*Counsel for Amicus Curiae Chamber of Commerce of the United States of America*

Jonathan T. Stoel
Michael G. Jacobson
Katherine B. Wellington
Molly B. Newell
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel for Amici Curiae*

July 12, 2022

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-1392

**Short Case Caption** Solar Energy Industries Association v. U.S.

**Filing Party/Entity** Chamber of Commerce of the United States of America; American Clean Power Association

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/12/2022

Signature: /s/ Jonathan T. Stoel

Name: Jonathan T. Stoel

**FORM 9. Certificate of Interest** **Form 9 (p. 2)**
**July 2020**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Chamber of Commerce of the United States of America | | |
| American Clean Power Association | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |



Save for Filing

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..... i

TABLE OF AUTHORITIES ..... vi

STATEMENT OF INTEREST ..... 1

BACKGROUND ..... 2

A. U.S. Solar Industry ..... 2

B. The Legal Basis for Safeguard Measures ..... 6

C. The Safeguard Measure, Exclusion for Bifacial Modules, and Subsequent Government Actions ..... 10

1. Safeguard on Crystalline Silicon Photovoltaic Solar Products ..... 10

2. The Safeguard Exclusion for Bifacial Modules ..... 11

3. Proclamation 10101 ..... 14

4. Extension of Safeguard Measure and Exclusion for Bifacial Modules ..... 15

D. Procedural History ..... 16

SUMMARY OF ARGUMENT ..... 17

ARGUMENT ..... 19

I. THE SAFEGUARD LAW SHOULD BE APPLIED IN A PREDICTABLE MANNER THAT ENABLES CAREFUL BUSINESS PLANNING ..... 19

II. THE GOVERNMENT KNOWS HOW TO TAILOR AND IMPLEMENT REASONABLE EXCLUSIONS FROM TARIFF MEASURES ..... 23

CONCLUSION ..... 26

**TABLE OF CONTENTS—Continued**

Page

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Invenergy Renewables LLC v. United States*,
476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ........ 12

*Invenergy Renewables LLC v. United States*,
552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) ........ 14, 15

*Marshall Field & Co. v. Clark*,
143 U.S. 649 (1892) ........ 6

*Solar Energy Indus. Ass'n v. United States*,
553 F. Supp. 3d 1322 (Ct. Int'l Trade 2021) ........ 17

*U.S. Cane Sugar Refiners' Ass'n v. Block*,
683 F.2d 399 (C.C.P.A. 1982) ........ 7

**STATUTES:**

19 U.S.C. § 1862 ........ 24

19 U.S.C. § 2251(a) ........ 7

19 U.S.C. § 2253(a)(3)(C) ........ 16

19 U.S.C. § 2253(a)(3)(D) ........ 16

19 U.S.C. § 2253(a)(3)(F) ........ 16

19 U.S.C. § 2253(a)(3)(H) ........ 16

19 U.S.C. § 2254(b)(1)(B) ........ 15

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-
418, tit. I, § 1401(a), 102 Stat. 1107, 1225, 1238-39 ........ 22

**ADMINISTRATIVE AND EXECUTIVE MATERIALS:**

15 C.F.R. pt. 705 (Supp. 1 2020) ........ 24

## TABLE OF AUTHORITIES—Continued

Page(s)

*Action Under Section 203 of the Trade Act of 1974 Concerning Line Pipe*, 65 Fed. Reg. 9197 (Feb. 18, 2000) ........................................22

*Action Under Section 203 of the Trade Act of 1974 Concerning Steel Wire Rod*, 65 Fed. Reg. 8629 (Feb. 16, 2000) ........................................22

*Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21,497 (Apr. 17, 2020) ........................................12

*Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27,684 (June 13, 2019) ........................................12

*Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (June 20, 2018) ........................................25

*Procedures to Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670 (Feb. 14, 2018) ........................................11, 12

*Procedures to Consider Requests for Exclusion of Particular Products From the Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 32,181 (July 11, 2018) ........................................25

Proclamation 6961, *To Facilitate Positive Adjustment to Competition From Imports of Broom Corn Brooms*, 61 Fed. Reg. 64,431 (Nov. 28, 1996) ........................................22

Proclamation 7103, *To Facilitate Positive Adjustment to Competition From Imports of Wheat Gluten*, 63 Fed. Reg. 30,359 (May 30, 1998) ........................................22

Proclamation 7208, *To Facilitate Positive Adjustment to Competition From Imports of Lamb Meat*, 64 Fed. Reg. 37,389 (July 7, 1999) ....................22

**TABLE OF AUTHORITIES—Continued**

Page(s)

Proclamation 7529, *To Facilitate Positive Adjustment to Competition From Imports of Certain Steel Products*, 67 Fed. Reg. 10,553 (Mar. 5, 2002) ....................9, 22

Proclamation 9693, *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541 (Jan. 23, 2018) ....................10, 11, 22

Proclamation 9694, *To Facilitate Positive Adjustment to Competition from Imports of Large Residential Washers*, 83 Fed. Reg. 3553 (Jan. 23, 2018)....................22

Proclamation 9705, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 8, 2018)....................24

Proclamation 10101, *To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 85 Fed. Reg. 65,639 (Oct. 10, 2020)....................14, 15

Proclamation 10339, *To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicone Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 87 Fed. Reg. 7357 (Feb. 4, 2022) ....................15

Proclamation 10414, *Declaration of Emergency and Authorization for Temporary Extension of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067 (June 6, 2022) ....................4, 5, 21

*Withdrawal of Bifacial Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54,244 (Oct. 9, 2019)....................12

**LEGISLATIVE MATERIAL:**

H.R. Rep. No. 103-316, at 286 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 ....................8

## TABLE OF AUTHORITIES—Continued

Page(s)

**OTHER AUTHORITIES:**

*Agreement on Safeguards*, World Trade Org., https://www.wto.org/english/tratop_e/safeg_e/safeint.htm (last visited July 12, 2022) .......... 7, 8

Cong. Rsrch. Serv., *In Focus—Safeguards: Section 201 of the Trade Act of 1974* (updated Jan. 13, 2021) .......... 9

*Development Timeline for Utility-Scale Solar Power Plant*, Solar Energy Indus. Ass'n, https://www.seia.org/research-resources/development-timeline-utility-scale-solar-power-plant (last visited July 12, 2022) .......... 6, 21

David Feldman et al., Nat'l Renewable Energy Laboratory, U.S. Solar Photovoltaic System and Energy Storage Cost Benchmark: Q1 2020 (Jan. 2021), *available at* https://www.nrel.gov/docs/fy21osti/77324.pdf .......... 21

GATT, Ministerial Declaration of 29 November 1982, GATT Doc. W.38/4 (1982), *available at* https://docs.wto.org/gattdocs/q/GG/W/38-4.PDF .......... 8

GATT Secretariat, *Work Already Undertaken in the GATT on Safeguards*, GATT Doc. MTN.GNG/NG9/W/1 (Apr. 7, 1987), *available at* https://docs.wto.org/gattdocs/q/UR/GNGNG09/W1.PDF .......... 8

Press Release, U.S. Dep't of Energy, DOE Releases Solar Futures Study Providing the Blueprint for a Zero-Carbon Grid (Sept. 8, 2021), https://www.energy.gov/articles/doe-releases-solar-futures-study-providing-blueprint-zero-carbon-grid .......... 4

*Solar Energy In the United States*, Office of Energy Efficiency & Renewable Energy, U.S. Dep't of Energy, https://www.energy.gov/eere/solar/solar-energy-united-states (last visited July 12, 2022) .......... 3

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Solar Futures Study*, Office of Energy Efficiency & Renewable Energy, U.S. Dep't of Energy, https://www.energy.gov/eere/solar/solar-futures-study (last visited July 12, 2022)....................5

*Solar Industry Research Data*, Solar Energy Indus. Ass'n, https://www.seia.org/solar-industry-research-data (last visited July 12, 2022) ....................3, 4

Alan O. Sykes, *The Safeguards Mess; A Critique of WTO Jurisprudence* (Univ. of Chi. Law Sch., John M. Olin Prog. in Law & Econ. Working Paper, Paper No. 187, 2003), *available at* https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1570&context=law_and_economics....................8

*Understanding Safeguard Investigations*, U.S. Int'l Trade Comm., https://www.usitc.gov/press_room/us_safeguard.htm (last visited July 12, 2022)....................8

U.S. Customs & Border Prot., U.S. Dep't of Homeland Sec., Antidumping and Countervailing Duty Enforcement Actions and Compliance Initiatives: FY 2020; Fiscal Year 2021 Report to Congress (Public Version) (Aug. 11, 2021), *available at* https://www.dhs.gov/sites/default/files/2021-12/antidumping_and_countervailing_duty_enforcement.pdf ....................9

U.S. Dep't of Energy, *Investing in a Clean Energy Future: Solar Energy Research, Deployment, and Workforce Priorities* (Aug. 2021), *available at* https://www.energy.gov/sites/default/files/2021-08/investing-in-a-clean-energy-future-solar-energy.pdf ....................5, 6

*Utility-Scale Solar Power Facts*, Am. Clean Power, https://cleanpower.org/facts/solar-power/ (last visited July 12, 2022) ....................4

## STATEMENT OF INTEREST[1]

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The American Clean Power Association ("ACP") is a non-profit national trade association representing a broad range of entities with the common purpose of encouraging the expansion and facilitation of clean energy resources in the United States, particularly with respect to the wind, solar, energy storage, and transmission industries. ACP represents the interests of clean energy manufacturers, component suppliers, project developers, project owners and operators, financiers, researchers, renewable energy supporters, utilities, marketers, customers, and their advocates. Through actions such as participation as *amicus curiae* in state and federal courts,

---

[1] All parties have consented to the filing of this *amicus* brief. No person other than the Chamber, ACP, their members, or their counsel authored this brief in whole or in part or contributed money intended for the funding of this brief.

ACP seeks to promote clean energy and transmission to provide affordable, reliable, and non-polluting electricity for consumers.

The Chamber and ACP regularly appear before the federal courts as *amicus curiae* in cases involving issues of importance to their members. *See, e.g.*, *Ford Motor Co. v. United States*, 926 F.3d 741 (Fed. Cir. 2019) (brief in support of rehearing *en banc*) (Chamber as *amicus*); *Ideker Farms, Inc. v. United States*, Nos. 21-1849, 21-1875 (Fed. Cir. Dec. 23, 2021) (Chamber as *amicus*); *Nat'l Wildlife Refuge Ass'n v. Am. Transmission Co.*, No. 22-1347 (7th Cir. Apr. 27, 2022), 2022 WL 1416287 (ACP as *amicus*). This is just such a case. *Amici's* members operate in the global economy and depend on the predictability of U.S. trade measures impacting their supply chains, including their ability to manufacture innovative downstream products or to undertake complex energy projects here in the United States. The U.S. Court of International Trade's ("CIT") decision upheld these principles by invalidating an unexpected change in the application of the safeguard measure on solar products.

## BACKGROUND

### A. U.S. Solar Industry

This case involves tariffs on solar panels. The U.S. solar industry plays an important role in the U.S. economy and an increasingly crucial role in meeting U.S. energy needs, including fulfilling the demand for renewable energy. Composed of

three sub-segments—utility-scale, commercial, and residential—the U.S. solar market has grown from a mere 0.34 gigawatts of solar capacity in 2008 to roughly 97.2 gigawatts today.[2] This is enough capacity to power 18 million American homes.[3]

Solar energy's growing role in the U.S. energy marketplace has been due, in large part, to technological innovation and federal incentives that have reduced the costs of solar power, making it more accessible. One such recent innovation is the bifacial solar panels, a solar panel capable of generating electricity on both sides. This feature greatly improves power generation in comparison with monofacial solar panels, and decreases the amount of space necessary for solar power generation. Bifacial solar panels are typically used by utility-scale solar projects powering thousands of American homes, whereas monofacial solar panels have a variety of applications, including for consumer home power generation.

In 2020, the U.S. solar sector employed more than 230,000 American workers at over 10,000 companies across every U.S. state.[4] In 2021, the solar industry

---

[2] *Solar Energy In the United States*, Office of Energy Efficiency & Renewable Energy, U.S. Dep't of Energy, https://www.energy.gov/eere/solar/solar-energy-united-states (last visited July 12, 2022).

[3] *Id*.

[4] *Solar Industry Research Data*, Solar Energy Indus. Ass'n, https://www.seia.org/solar-industry-research-data (last visited July 12, 2022).

generated over $33 billion of private investment in the U.S. economy.[5] The solar industry's growth has been primarily driven by utilities' increasing demands for solar power generation, thereby requiring the deployment of enormous quantities of bifacial solar panels.[6]

The solar industry is also essential to the ongoing U.S. pivot towards a more diverse electric grid with a lower carbon footprint. For example, in September 2021, the U.S. Department of Energy released its *Solar Futures Study*, in which Secretary Granholm explained: "[S]olar, our cheapest and fastest-growing source of clean energy, could produce enough electricity to power *all of the homes in the U.S. by 2035 and employ as many as 1.5 million people in the process*."[7]

On June 6, 2022, President Biden issued Proclamation 10414, *Declaration of Emergency and Authorization for Temporary Extension of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067 (June 6, 2022) ("Proclamation 10414"). Recognizing that U.S. trade policy must both support domestic manufacturing and promote reliable supply chains to enable

---

[5] *Id.*

[6] *See Utility-Scale Solar Power Facts*, Am. Clean Power, https://cleanpower.org/facts/solar-power/ (last visited July 12, 2022).

[7] Press Release, U.S. Dep't of Energy, DOE Releases Solar Futures Study Providing the Blueprint for a Zero-Carbon Grid (Sept. 8, 2021), https://www.energy.gov/articles/doe-releases-solar-futures-study-providing-blueprint-zero-carbon-grid (emphasis added).

downstream manufacturing and service, Proclamation 10414 both authorizes the use of the Defense Production Act to support U.S. manufacturing and recognizes that "[i]mmediate action is needed to ensure . . . that the United States has access to a sufficient supply of solar modules to assist in meeting our electricity generation needs." *Id.* at 35,068. The U.S. Department of Energy's *Solar Futures Study* found that, by 2035, solar energy could power as much as 40% of the U.S. electricity.[8] This dramatic shift in the sourcing of America's electricity needs will require a major increase in solar deployment and, consequently, substantial additional quantities of solar panels will be needed. For example, the *Solar Futures Study* found that, in order to meet the current Administration's goals, solar deployment would need to increase by an average of 30 gigawatts each year between 2021 and 2025, and that deployment will then need to grow even faster, by as much as 60 gigawatts per year, between 2025 and 2030.[9]

The technological innovations that have led to the solar industry's expanding role in the U.S. economy would not be possible without significant investments.[10]

---

[8] *Solar Futures Study*, Office of Energy Efficiency & Renewable Energy, U.S. Dep't of Energy, https://www.energy.gov/eere/solar/solar-futures-study (last visited July 12, 2022).

[9] *Id.*

[10] *See, e.g.*, U.S. Dep't of Energy, *Investing in a Clean Energy Future: Solar Energy Research, Deployment, and Workforce Priorities* (Aug. 2021), *available at* https://www.energy.gov/sites/default/files/2021-08/investing-in-a-clean-energy-

Such investments require predictability. Companies across the solar supply chain, including manufacturers, project developers, and financial institutions, often enter into project contracts years in advance of the consummation of actual construction of those projects. For example, the long-term contracts employed by utility-scale project developers to produce solar energy for American businesses and homes provide for the manufacture and sourcing of solar panels and other essential components years in advance.[11] Business certainty is crucial for these long-term projects. Any disruptions to anticipated plans—such as unexpected changes in tariffs—can result in unrecoverable financial harm and lost business opportunities, negatively impacting the U.S. economy, American jobs, and the reliability of our electric grid.

### B. The Legal Basis for Safeguard Measures

The President is not permitted to implement measures that restrict trade, such as tariffs, without a specific statutory delegation from Congress. *See, e g.*, *Marshall Field & Co. v. Clark*, 143 U.S. 649, 680, 692-693 (1892) (holding that the President could reimpose certain reciprocal tariffs only because Congress had already detailed

future-solar-energy.pdf (emphasizing the importance of investments to lower both the hardware and soft administrative costs of solar).

[11] *See Development Timeline for Utility-Scale Solar Power Plant*, Solar Energy Indus. Ass'n, https://www.seia.org/research-resources/development-timeline-utility-scale-solar-power-plant (last visited July 12, 2022) (showing ideal development timeline over 6 years).

the specific goods and tariff rates that would apply); *U.S. Cane Sugar Refiners' Ass'n v. Block*, 683 F.2d 399, 404 (C.C.P.A. 1982) (establishing that the President could impose quotas on imports of sugar under Section 201 as long as the action was authorized by statute).

Congress's delegations of authority to the President to impose safeguard measures and to change existing safeguard measures are detailed in Sections 201 through 204 of the Trade Act of 1974 (the "Trade Act"). Pursuant to Section 201, the President may impose a safeguard measure if the U.S. International Trade Commission ("ITC") finds that "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article." 19 U.S.C. § 2251(a). Any safeguard measure imposed by the President should "facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs." *Id.* The U.S. safeguard statute is guided by U.S. commitments in treaties and other international agreements, in particular the World Trade Organization Agreement on Safeguards, which entered into effect on January 1, 1995, to create more predictability and clarity in the implementation of safeguard measures.[12] The

[12] *See Agreement on Safeguards*, World Trade Org., https://www.wto.org/english/tratop_e/safeg_e/safeint.htm (last visited July 12,

World Trade Organization Agreement on Safeguards was modeled largely after the pre-existing U.S. safeguard law.[13]

The safeguard law is not meant to punish importers or remedy unfair trade practices. A safeguard merely provides short-term relief for a domestic industry that needs assistance, irrespective of whether foreign producers or importers are trading goods on fair or unfair terms.[14] Safeguard measures are thus different than other,

---

2022) (recognizing the need to "clarify and reinforce" Article XIX of the General Agreement on Tariffs and Trade); *see also* GATT, Ministerial Declaration of 29 November 1982, GATT Doc. W.38/4 (1982), *available at* https://docs.wto.org/gattdocs/q/GG/W/38-4.PDF [hereinafter "1982 Ministerial Declaration"] ("having regard to the objectives and disciplines of the General Agreement, there is need for an improved and more efficient safeguard system which provides for greater predictability and clarity and also greater security and equity for both importing and exporting countries, so as to preserve the results of trade liberalization and avoid the proliferation of restrictive measures"); GATT Secretariat, *Work Already Undertaken in the GATT on Safeguards*, ¶ 23, GATT Doc. MTN.GNG/NG9/W/1 (Apr. 7, 1987), *available at* https://docs.wto.org/gattdocs/q/UR/GNGNG09/W1.PDF (citing 1982 Ministerial Declaration).

[13] The Statement of Administrative Action of the Uruguay Round Agreements Act, which implemented the World Trade Organization Agreement on Safeguards into U.S. law, explains that "[t]he Uruguay Round Agreement on Safeguards . . . incorporates many concepts taken directly from section 201." H.R. Rep. No. 103-316, at 286 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4262; *see also* Alan O. Sykes, *The Safeguards Mess; A Critique of WTO Jurisprudence* 13 (Univ. of Chi. Law Sch., John M. Olin Prog. in Law & Econ. Working Paper, Paper No. 187, 2003), *available at* https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1570&context=law_and_economics ("the Agreement [on Safeguards] largely parrots U.S. law" in certain aspects).

[14] *See Understanding Safeguard Investigations*, U.S. Int'l Trade Comm., https://www.usitc.gov/press_room/us_safeguard.htm (last visited July 12, 2022).

more frequently engaged types of trade measures, such as ordinary customs tariffs, antidumping duties, and countervailing duties. Ordinary customs tariffs are primarily designed to secure revenue for the Government's coffers. Antidumping duties are used to remedy the unfair sale of a product below normal value or below cost. Countervailing duties are used to remedy trade-distorting foreign subsidies. In contrast, the Government makes no finding of unfair trade practices when imposing safeguard measures.

In practice, safeguard measures are infrequently used. Prior to President Trump's Administration, the United States had not imposed safeguard measures under Sections 201 through 204 of the Trade Act since 2002.[15] In contrast, the United States has initiated hundreds of antidumping and countervailing duty investigations in recent years, including 104 new investigations initiated in 2020 alone, imposing duties on imports of particular products from specified countries after finding unfair trade practices.[16]

---

[15] *See* Proclamation 7529, *To Facilitate Positive Adjustment to Competition From Imports of Certain Steel Products*, 67 Fed. Reg. 10,553 (Mar. 5, 2002); Cong. Rsrch. Serv., *In Focus—Safeguards: Section 201 of the Trade Act of 1974* (updated Jan. 13, 2021).

[16] *See* U.S. Customs & Border Prot., U.S. Dep't of Homeland Sec., Antidumping and Countervailing Duty Enforcement Actions and Compliance Initiatives: FY 2020; Fiscal Year 2021 Report to Congress (Public Version), at iv (Aug. 11, 2021), *available at* https://www.dhs.gov/sites/default/files/2021-12/antidumping_and_countervailing_duty_enforcement.pdf ("As of September 30, 2020, CBP was enforcing 540 AD/CV orders. During FY 2020, Commerce issued

### C. The Safeguard Measure, Exclusion for Bifacial Modules, and Subsequent Government Actions

#### 1. Safeguard on Crystalline Silicon Photovoltaic Solar Products

In 2017, the ITC conducted a detailed investigation into whether imports of crystalline silicon photovoltaic ("CSPV") solar products were causing serious injury to the domestic industry manufacturing those products. The ITC rendered an affirmative determination, concluding that the importation of those products was causing serious injury to domestic manufacturers, and recommended that the President impose safeguard measures on all imports of CSPV solar products, with the exception of imports from Canada and certain developing countries.

On January 23, 2018, President Trump issued Proclamation 9693, *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541 (Jan. 23, 2018) ("Proclamation 9693"). This proclamation imposed a safeguard measure for four years, beginning on February 7, 2018.

Proclamation 9693 imposed higher tariffs on CSPV modules, phasing them down over a four-year period, based on when the modules entered the United States:

---

45 new AD/CVD orders . . . . Commerce also initiated 104 new AD/CVD investigations and completed 56 investigations.").

If entered during the period from
February 7, 2018 through February 6, 2019 . . . . . . . . . 30%

If entered during the period from
February 7, 2019 through February 6, 2020 . . . . . . . . . 25%

If entered during the period from
February 7, 2020 through February 6, 2021 . . . . . . . . . 20%

If entered during the period from
February 7, 2021 through February 6, 2022 . . . . . . . . . 15%

*Id*. at 3548. The President exempted imports from certain developing countries from the safeguard measure. *Id*. at 3543.

**2. The Safeguard Exclusion for Bifacial Modules**

Proclamation 9693 authorized the U.S. Trade Representative ("USTR") to issue "procedures for requests for exclusion of a particular product from the safeguard" duties and further authorized USTR to grant such exclusions. *Id*. at 3543-44. In other words, USTR could designate specific products that would not be subject to the safeguard measure, and thus would not pay the higher tariffs imposed under Proclamation 9693.

Pursuant to this process, parties requested an exclusion from the safeguard measure for bifacial solar panels. USTR agreed, and on June 13, 2019, issued an exclusion for bifacial panels. *Procedures to Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83

Fed. Reg. 6670 (Feb. 14, 2018); *Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27,684 (June 13, 2019).

USTR's procedures for requesting an exclusion and USTR's subsequent guidance nowhere indicated that an exclusion from the safeguard measure—once granted—could be withdrawn or expire early. Nevertheless, USTR attempted to withdraw the exclusion for bifacial modules *just four months later* on October 9, 2019. *Withdrawal of Bifacial Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54,244 (Oct. 9, 2019). USTR's withdrawal of the exclusion was challenged by Invenergy, EDF Renewables, Inc., the Solar Energy Industries Association, and other parties at the CIT, which issued a preliminary injunction prohibiting the withdrawal from taking effect. The CIT ultimately vacated the withdrawal, concluding that it violated the Administrative Procedure Act. *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1340 (Ct. Int'l Trade 2020).

USTR attempted again to withdraw the bifacial exclusion on April 17, 2020. *Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21,497 (Apr. 17, 2020). The CIT again enjoined USTR's withdrawal of the exclusion pending the court's ruling on the merits. *Invenergy Renewables*, 476 F. Supp. 3d at 1352.

In proceedings before the CIT, USTR stated that if the CIT were to uphold its withdrawal of the exclusion, USTR would seek to retroactively collect the safeguard

duties on bifacial modules dating back to May 18, 2020. *See, e.g.*, Hr'g Tr. at 45, *Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) (No. 19-00192), ECF No. 284 ("CBP would exert maximal efforts to recover all duties that were not deposited at the time of entry because of the Court's preliminary injunction."); Defs.' Resp. to Pls.' Mot. for J. on the Administrative R. at 52, *Invenergy Renewables*, 552 F. Supp. 3d 1382 (No. 19-00192), ECF No. 307 ("Enforcement would entail . . . [the] collection of deposits of estimated section 201 duties as of the effective date of the *April Withdrawal*."); Defs.' Resp. to the Court's Questions of June 2, 2021, at 10-11, *Invenergy Renewables*, 552 F. Supp. 3d 1382 (No. 19-00192), ECF No. 318 ("There is nothing 'unfair' about . . . the Government's retrospective duty collection regime."); Defs.' Suppl. Br. at 5, *Invenergy Renewables*, 552 F. Supp. 3d 1382 (No. 19-00192), ECF No. 327 ("[A]s explained in our brief, both the *April Withdrawal* and the preliminary injunction envision the collection of these duties."). The plaintiffs and intervenors before the CIT disputed USTR's authority to retroactively collect tariffs, explaining that:

> The Court's goal of protecting Plaintiffs from harms caused by business uncertainty while this suit was pending would be completely undermined if the safeguard measures were permitted to be applied retroactively to bifacial panel imports that occurred during that same period. . . . Indeed, Plaintiffs would face even more dramatic harm if they and their importers were suddenly required to pay millions of dollars in duties for bifacial panels that were imported relying on the continued

> application of the [bifacial] Exclusion pursuant to the Court's PI.

Pls.' Mot. for J. on the Administrative R. at 82, *Invenergy Renewables*, 552 F. Supp. 3d 1382 (No. 19-00192), ECF No. 303.

In November 2021, the CIT issued its decision on the merits, vacating USTR's second withdrawal of the exclusion as arbitrary and capricious under the Administrative Procedure Act. The CIT held that "the statute does not allow such yo-yoing of duties within a scheme that is tightly limited by Congress in terms of the substance and duration of safeguard actions that can be taken by the President," and that "importers had no notice that an exclusion once granted would—or even could—be subject to being withdrawn." *Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382, 1397-98 (Ct. Int'l Trade 2021). The CIT explained that "[n]otice is a fundamental fairness requirement [and] is a limit identified by the Federal Circuit on an agency's ability to reconsider its decision." *Id*. at 1398. Moreover, the CIT found that "the statute does not provide the President the authority to withdraw exclusions from safeguard measures." *Id*. at 1398 n.9. The Government did not appeal the CIT's judgment in *Invenergy*.

### 3. Proclamation 10101

On October 10, 2020, President Trump issued Proclamation 10101, *To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled*

*Into Other Products)*, 85 Fed. Reg. 65,639 (Oct. 10, 2020) ("Proclamation 10101") pursuant to Section 204(b)(1)(B) of the Trade Act. That provision permits the President to make certain changes to safeguard measures after receiving a midterm report from the ITC. Specifically, the President may authorize the "reduction, modification, or termination" of a safeguard measure. 19 U.S.C. § 2254(b)(1)(B). Proclamation 10101 reimposed safeguard duties on bifacial modules, and it *increased* the safeguard tariff from 15% to 18% for 2021 in contravention of the President's earlier direction. 85 Fed. Reg. at 65,639-40, 65,642. In sum, these changes expanded the product coverage of the safeguard measure and increased the cost of imported CSPV products for U.S. business.

#### 4. Extension of Safeguard Measure and Exclusion for Bifacial Modules

President Biden decided in February 2022 to extend the safeguard measure for an additional four years. The President's extension action includes a new step-down schedule and a continued exclusion for bifacial panels. Proclamation 10339, *To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicone Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 87 Fed. Reg. 7357 (Feb. 4, 2022) ("Proclamation 10339").

### D. Procedural History

The Solar Energy Industry Association, NextEra Energy, EDF Renewables, and Invenergy Renewables filed suit at the CIT to challenge the legality of Proclamation 10101, which reimposed safeguard duties on bifacial modules and increased the safeguard tariff for 2021. The CIT ultimately declared Proclamation 10101 null and void, concluding that the word "modification" in Section 204 was limited to trade-liberalizing modifications and that Proclamation 10101 was restrictive rather than trade-liberalizing.[17] As the CIT explained, "Proclamation 10101's withdrawal of the exclusion of bifacial solar panels and increase of the

[17] Trade measures may be changed to be more trade restrictive, more trade liberalizing, or in a neutral manner. There are many examples of neutral modifications that could be made to safeguard measures. For instance, if a country is excluded from a safeguard measure, but that country's borders change (such as has been the case in recent years for Sudan and for Ukraine), the safeguard measure could be changed to clarify whether goods from a particular region are eligible for a country-based exclusion. Similarly, a quota potentially could be administered differently without increasing trade restrictions, such as a quarterly administration instead of a yearly administration. *See* Section 203(a)(3)(C) of the Trade Act (19 U.S.C. § 2253(a)(3)(C)). The President could change the procedures for allocating import licenses in a manner that allows the same amount of imports, but adjusting the sources of imports based on intervening events, such as a country's decision to stop producing a particular good. *See* Section 203(a)(3)(F) (19 U.S.C. § 2253(a)(3)(F)). In addition, trade adjustment assistance that was part of the original safeguard measure could be changed in a manner that is neither more nor less trade restrictive, such as adjusting thresholds for eligibility for trade adjustment assistance based on inflation, or reducing paperwork or other red tape that slows down access to the program. *See* Section 203(a)(3)(D) (19 U.S.C. § 2253(a)(3)(D)). The President could also submit revised legislative proposals, which do not change the trade restrictiveness of the safeguard measure without congressional action. *See* Section 203(a)(3)(H) (19 U.S.C. § 2253(a)(3)(H)).

safeguard duties on CSPV modules constituted both a clear misconstruction of the statute and action outside the President's delegated authority." *Solar Energy Indus. Ass'n v. United States*, 553 F. Supp. 3d 1322, 1327 (Ct. Int'l Trade 2021).

The Government appealed. No domestic producers, or any other party, has attempted to intervene in defense of Proclamation 10101 or to participate as *amicus curiae* in support of the Government.

## SUMMARY OF ARGUMENT

The CIT's judgment setting aside Proclamation 10101 should be affirmed. Safeguard measures should be applied in a manner that is predictable, circumscribed, and allows for reasonable business planning. Exclusions from safeguards are intended to provide certainty to firms by designating particular products, or products from particular countries, as exempt from a safeguard measure. Under the circumstances here, Proclamation 10101 undermines that certainty, casting into doubt the longstanding reliance of businesses on the scope of a safeguard measure and any exclusions from the safeguard.

In this case, the business community reasonably relied on the scheduled tariff step-down that was imposed in the original safeguard measure. The business community also reasonably relied on non-time-limited exclusions issued by USTR through the authority delegated by the President in the original safeguard measure,

leading to an exclusion for bifacial solar panels. Proclamation 10101 unreasonably changed these important rules of commerce mid-stream.

The business community must be given a reasonable opportunity to plan ahead for the administrative and financial burden caused by safeguard measures. Such planning is made impossible if the President and the agencies acting pursuant to delegated authority are allowed to change tariff step-down schedules and product exclusions in an unpredictable and unreasonable manner. It is particularly pernicious to businesses to threaten retroactive application of millions of dollars of tariffs, as was done here by the Government.

The predictability of government-imposed measures such as tariffs is an important systemic issue. Uncertainty harms American manufacturing, which depends on reliable, timely supply chains (including imported products) to be able to manufacture goods efficiently and cost-effectively here in America. Unplanned-for tariffs and other unreasonable trade measures chill commerce. They also harm American consumers, who ultimately pay higher prices as a result of business uncertainty. As the President recently recognized in Proclamation 10414, these consumers include commercial and residential customers of electricity who will be forced to pay higher electricity bills if the development, installation, and operation of solar energy generation projects are delayed due to an unstable supply of solar

panels. Finally, increasing certainty around tariffs is particularly good public policy today due to high U.S. inflation and the meaningful impact of tariffs on rising costs.

## ARGUMENT

### I. THE SAFEGUARD LAW SHOULD BE APPLIED IN A PREDICTABLE MANNER THAT ENABLES CAREFUL BUSINESS PLANNING.

*Amici's* members have a strong interest in promoting reasonable and predictable legal standards. Businesses need predictability for medium- and long-term planning. Predictability around tariffs, which may constitute a significant portion of the cost of the generation of solar energy, for example, is a crucial component of this planning.

The Government's actions here were anything but predictable. First, the Government thrice sought to revoke the bifacial exclusion. Second, the prior Administration repeatedly threatened retroactive tariffs on bifacial panels as discussed above. Finally, Proclamation 10101 was employed to bypass USTR's regulatory process, reimpose tariffs on bifacial solar panels, and increase tariffs above the scheduled step-down rate. All of these actions threatened the imposition of unreasonable and unexpected tariffs for which the business community could not plan and had the effect of stunting commerce.

When the Government grants an exclusion to a tariff, it should make the application of that exclusion predictable to permit reasonable reliance by businesses

on that exclusion. The Government can accomplish this by being precise as to the product(s) to be covered—and the tariff should be established for a specific period identified by the Government. This is essential so that businesses can adjust for the financial and compliance costs of those tariffs. Firms make business decisions based on exclusions, exemptions, and scheduled tariff step-downs to decide which goods to import into the United States—impacting companies' ability to manufacture and the timing and financial returns on development projects in the United States. If the Government imposes a trade-restrictive measure, *Amici's* members depend on having upfront clarity about the measure, including the scope and length of any exclusions and exemptions.

Unpredictable trade measures, which suddenly impose higher costs on particular goods, also create ripple effects throughout the broader economy. If businesses are unable to anticipate reliably the price of an imported good due to a potential tariff—and whether they will face the additional compliance burdens associated with any such tariff—they may be delayed in their decision-making, put their business plans on hold, or even cancel them altogether, thereby chilling commerce. These higher costs, delays, and/or cancellations adversely impact downstream manufacturers and consumers alike, exacerbating supply chain problems and contributing to inflationary pressures.

This lack of predictability is particularly harmful to industries, such as the solar industry, that require lengthy time horizons for large-scale development projects. Importers of solar panels and end users—often large solar developers that add green energy to the grid—plan years in advance for the importation of sophisticated solar products.[18] Utility-grade solar development projects often cost hundreds of millions of dollars, and sourcing solar panels is a key aspect of the multi-year budgeting required to complete these projects.[19] The solar industry relied on the tariff step-down and exclusions to the safeguard measure announced by the President and implemented by USTR to plan and price solar projects many years into the future. The scope and financial viability of those projects are predicated on, among other factors, the ability to forecast the cost of importing solar panels into the United States.[20]

---

[18] *See* Development Timeline, *supra* note 11 (showing ideal development timeline over 6 years).

[19] *See id*; David Feldman et al., Nat'l Renewable Energy Laboratory, U.S. Solar Photovoltaic System and Energy Storage Cost Benchmark: Q1 2020, at iv-v, 86 (Jan. 2021), *available at* https://www.nrel.gov/docs/fy21osti/77324.pdf (benchmarking "$171 million–$173 million for a 100-MW PV system colocated with 60 MW/240 MWh of storage" and showing solar panels as a major portion of those costs).

[20] *See* Proclamation 10414, 87 Fed. Reg. at 35,067 ("Utilities and grid operators are increasingly relying on new solar installations to ensure that there are sufficient resources on the grid to maintain reliable service. Additions of solar capacity and batteries were expected to account for over half of new electric sector capacity in 2022 and 2023. The unavailability of solar cells and modules jeopardizes those planned additions, which in turn threatens the availability of sufficient electricity

The modern history of safeguard measures is consistent with *Amici's* views presented here. Every safeguard measure imposed since at least 1988[21] set forth the applicable rates of duties and the details of the safeguard measure for the entire duration of that measure, providing predictability to business.[22] The efforts by both the President and USTR to revoke the bifacial module exclusion, including by issuance of Proclamation 10101, could not have been anticipated by the business community based on the history of the Government's application of the safeguard law. This Court should not endorse a Presidential action that contributes to the uncertainties already confronting U.S. supply chains and further burdens U.S. firms making their best efforts to adhere to the rules.

generation capacity to serve expected customer demand. Electricity produced through solar energy is also critical to reducing our dependence on electricity produced by the burning of fossil fuels, which drives climate change. The Department of Defense has recognized climate change as a threat to our national security.").

[21] Section 204(b)(1) was added in 1988. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, tit. I, § 1401(a), 102 Stat. 1107, 1225, 1238-39.

[22] *See* Proclamation 9693, 83 Fed. Reg. 3541; Proclamation 9694, *To Facilitate Positive Adjustment to Competition from Imports of Large Residential Washers*, 83 Fed. Reg. 3553 (Jan. 23, 2018); Proclamation 7529, 67 Fed. Reg. 10,553; *Action Under Section 203 of the Trade Act of 1974 Concerning Line Pipe*, 65 Fed. Reg. 9197 (Feb. 18, 2000); *Action Under Section 203 of the Trade Act of 1974 Concerning Steel Wire Rod*, 65 Fed. Reg. 8629 (Feb. 16, 2000); Proclamation 7208, *To Facilitate Positive Adjustment to Competition From Imports of Lamb Meat*, 64 Fed. Reg. 37,389 (July 7, 1999); Proclamation 7103, *To Facilitate Positive Adjustment to Competition From Imports of Wheat Gluten*, 63 Fed. Reg. 30,359 (May 30, 1998); Proclamation 6961, *To Facilitate Positive Adjustment to Competition From Imports of Broom Corn Brooms*, 61 Fed. Reg. 64,431 (Nov. 28, 1996).

This remains a live issue today. In February 2022, President Biden extended the safeguard on solar panels for four additional years, until February 2026, but excluded bifacial panels and imposed a new tariff step-down schedule. The Government has conceded that only customs entries of bifacial panels between October 2020 and February 2022 remain at issue at this point, and yet reversal of the CIT's decision vacating Proclamation 10101 would introduce even more uncertainty over a set of tariffs whose frequent policy reversals are already whipsawing businesses in all segments of the domestic solar industry. This Court should thus affirm the CIT's decision and support the ability of business to conduct its supply chain planning.

## II. THE GOVERNMENT KNOWS HOW TO TAILOR AND IMPLEMENT REASONABLE EXCLUSIONS FROM TARIFF MEASURES.

The purpose of an exclusion from a trade measure is to allow U.S. businesses to import particular products from specific countries. This relief is meaningful only if U.S. businesses are able to plan their supply chains in reliance on the specific terms of any exclusion established by the Government. On the other hand, as explained above, business planning is harmed by uncertainty over the duration and scope of trade measures. This need for predictability is heightened in today's economy due to high inflation and rising prices. Businesses should not be left guessing by their own Government about future legal and financial obligations.

A tariff exclusion granted without qualification or termination date is presumptively in effect for the duration of the measure. The bifacial module exclusion from the solar safeguard measure had no defined end date. Specifically, USTR's exclusion procedures and subsequent guidance did not indicate that the bifacial module exclusion could be withdrawn, nor was there a timeline for expiry. Consequently, businesses expected the bifacial exclusion to remain in force for the duration of the safeguard measure.

The Government here sought unreasonably to overcome this presumption. This is particularly evident when its actions seeking to revoke the safeguard exclusion for bifacial modules are compared with other recent examples of tariff exclusions around which the Government has erected reasonable guardrails. For example, pursuant to Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862), President Trump issued Proclamation 9705, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 8, 2018) and applied 25% and 10% tariffs, respectively, on certain steel and aluminum imports. The Commerce Department subsequently initiated an exclusions process and clearly informed the public that any granted exclusions from the Section 232 measures would be valid for one year unless otherwise provided. 15 C.F.R. pt. 705 (Supp. 1 2020). This clear guidance enabled U.S. companies to make multi-million-dollar business decisions in reliance on granted exclusions.

Similarly, pursuant to Section 301 of the Trade Act, USTR imposed 25% tariffs on an initial tranche of imports from China. *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (June 20, 2018). USTR set clear expectations that the initial exclusions would be effective for only one year after the publication of the exclusion determination. *Procedures to Consider Requests for Exclusion of Particular Products From the Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 32,181 (July 11, 2018). This predictability has been critical to importers' reliance on the exclusions that were granted and long-term business planning.

The need for carefully tailored exclusions remains important. President Biden extended the safeguard on solar panels for four additional years, until February 2026, excluding bifacial modules without qualification. Upholding the CIT is important to ensure that the Executive and USTR will not again unreasonably change the rules of the road and subject business to the yo-yoing effects of tariffs. This Court should thus affirm the CIT's decision and preserve the ability of businesses to rely on the rules of the road in their supply chain planning.

## CONCLUSION

For these reasons, this Court should affirm the CIT's decision.

Respectfully submitted,

/s/ Jonathan T. Stoel

Jonathan T. Stoel
Michael G. Jacobson
Katherine B. Wellington
Molly B. Newell
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jonathan.stoel@hoganlovells.com

*Counsel for Amici Curiae*

Tara S. Morrissey
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5668
tmorrissey@uschamber.com

*Counsel for Amicus Curiae Chamber of Commerce of the United States of America*

July 12, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2022, I caused a copy of the foregoing to be served by electronic means via the Court's CM/ECF system on all counsel registered to receive electronic notices.

July 12, 2022

/s/ Jonathan T. Stoel

Jonathan T. Stoel

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Circuit Rule 35(g) because it contains 5,889 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

July 12, 2022

/s/ Jonathan T. Stoel
Jonathan T. Stoel

*Counsel for Amici Curiae*