No. 2022-1392

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,

Plaintiffs-Appellees,

v.

UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, CHRISTOPHER MAGNUS, Commissioner of U.S. Customs and Border Protection,

Defendants-Appellants

---

Appeal from the United States Court of International Trade
Case No. 1:20-cv-03941, Judge Gary S. Katzmann

---

# REPLY BRIEF OF DEFENDANTS-APPELLANTS

---

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
MICHAEL T. GAGAIN
Assistant General Counsel
Office of the United States Trade
Representative
Washington, D.C. 20508

JOSHUA E. KURLAND
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Fax: (202) 353-0461
Email: Joshua.E.Kurland@usdoj.gov

October 17, 2022

*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

ARGUMENT ........................................................................................ 2

I. Appellees' Core Claims Attempting To Overcome The Statute's Silence On The Restriction They Advocate Lack Merit ........................................ 2

II. Appellees' Responses Regarding The Statute's Structure, Purpose, And History Lack Merit ........................................................................ 7

A. Appellees' Cited Statutory Provisions Do Not Limit The Meaning Of "Modification" In Section 2254(b)(1)(B) ........................ 8

B. Appellees' Interpretation Of "Modification" In Section 2254(b)(1) Renders The Term Superfluous ........................................ 15

C. The President's Past Trade-Restrictive Modification Of A Safeguard Measure Contradicts Appellees' Interpretation ................ 17

D. Appellees Cannot Reconcile Their Interpretation With The Statute's Evident Purpose ........................................................ 18

E. Appellees' Legislative History Arguments Lack Merit ...................... 21

III. The President's Actions Did Not "Increase" The Safeguard Measure ......... 24

IV. Appellees' Alternative Arguments For Affirmance Alleging That The Domestic Industry Petition And The President's Determination Were Procedurally Defective Lack Merit ........................................................ 27

A. The President Acted Lawfully Following His Receipt Of The Domestic Industry Petition ........................................................ 27

B. The President Made The Requisite Factual Finding Concerning The Domestic Industry's Positive Adjustment .................................. 33

V. *Proclamation 10101* Satisfied Any Applicable Cost/Benefit Requirement....39

A. Section 2254(b)(1) Does Not Require A New Cost/Benefit Analysis....40

B. Alternatively, The Trial Court Correctly Held That *Proclamation 10101* Evidenced The President's Cost/Benefit Determination....44

CONCLUSION....47

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Barrett v. United States*,
423 U.S. 212 (1976) ... 36-37

*Bates v. United States*,
522 U.S. 23 (1997) ... 8-9, 14, 25, 43

*Corus Group PLC v. International Trade Commission*,
352 F.3d 1351 (Fed. Cir. 2003) ... 31

*Corus Staal BV v. Dep't of Comm.*,
395 F.3d 1343 (Fed. Cir. 2005) ... 24

*Dalton v. Specter*,
511 U.S. 462 (1994) ... 30, 32

*Intercargo Ins. Co. v. United States*,
83 F.3d 391 (Fed. Cir. 1996) ... 33

*Jama v. Immigr. & Customs Enf't*,
543 U.S. 335 (2005) ... 14, 25, 42

*MCI Telecomm. Corp. v. AT&T Co.*,
512 U.S. 218 (1994) ... 17, 19

*Michael Simon Designs, Inc. v. United States*,
609 F.3d 1335 (Fed. Cir. 2010) ... 32

*Motion Sys. Corp. v. Bush*,
437 F.3d 1356 (Fed. Cir. 2006) ... 7

*Patel v. Garland*,
142 S. Ct. 1614 (2022) ... 20

*Russello v. United States*,
464 U.S. 16 (1983) ... 21

*Silfab Solar, Inc. v. United States*,
892 F.3d 1340 (Fed. Cir. 2018) ........................................................ *passim*

*Solar Energy Industries Association v. United States*,
553 F. Supp. 3d 1322 (Ct. Int'l Trade 2021) ........................................................1

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
566 U.S. 560 (2012)........................................................................... 10, 15

*Transpacific Steel LLC v. United States*,
4 F.4th 1306 (Fed. Cir. 2021) ........................................................ *passim*

*United States v. George S. Bush & Co.*,
310 U.S. 371 (1940)........................................................................... 7, 25

*United States* v. *Will*,
449 U.S. 200 (1980)...............................................................................25

*USP Holdings, Inc. v. United States*,
36 F.4th 1359 (Fed. Cir. 2022) ........................................................ 7, 31

**Statutes**

18 U.S.C. § 922(h) ...............................................................................36

19 U.S.C. § 1862 ...............................................................................4

19 U.S.C. § 2133(a) ...............................................................................14

19 U.S.C. § 2251(b) ...............................................................................35

19 U.S.C. § 2252(d) ...............................................................................14

19 U.S.C. § 2252(e) ...............................................................................14

19 U.S.C. § 2253(a) ........................................................................ *passim*

19 U.S.C. § 2253(e) ........................................................................ *passim*

19 U.S.C. § 2254(a) ........................................................................ 6, 12, 30, 34

19 U.S.C. § 2254(b) ........................................................................ *passim*

19 U.S.C. § 2254(c) ........................................................................ 11, 38, 39

19 U.S.C. § 2481(6) ........................................................................ 14, 15, 22

19 U.S.C. § 3512(a) ........................................................................24

**Presidential Proclamations**

*Proclamation 7314: To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*, 65 Fed. Reg. 34,899 (May 26, 2000)........................17

*Proclamation 9693: To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541 (January 23, 2018)...................................................... *passim*

*Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products)*, 85 Fed. Reg. 65,639 (Oct. 16, 2020) ...................................................... *passim*

*Proclamation 10339*, *To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 87 Fed. Reg. 7,357 (Feb. 4, 2022) ......................................................44

**Legislative History**

H.R. Conf. Rep. 100-576 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547.... 4, 21, 22

H.R. Rep. No. 93-571 (1973)........................................................................22

S. Rep. No. 93-1298 (1974)........................................................................22

**International Trade Commission Determinations**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*,
Inv. No. TA-201-075, USITC Pub. 5021 (Feb. 2020) ................. 5, 12-13, 20, 36

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure*,
Inv. No. TA-201-075, USITC Pub. 5032 (Mar. 2020).......................5, 20, 36, 45

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*,
Inv. No. TA-201-075 (Extension), USITC Pub. 5266 (Dec. 2021) .............38, 39

**Miscellaneous**

*Black's Law Dictionary* (11th ed. 2019)...........................................................11, 29

Kenneth G. Wilson, The Columbia Guide to Standard American English (Columbia Univ. Press 1993).........................................................................36

## INTRODUCTION

Defendants-appellants respectfully submit this reply in support of our appeal of *Solar Energy Industries Association v. United States*, 553 F. Supp. 3d 1322 (Ct. Int'l Trade 2021) (Appx3-34), which set aside the President's modifications to an international trade safeguard measure set forth in *Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products),* 85 Fed. Reg. 65,639 (Oct. 10, 2020) (*Proclamation 10101*).

We demonstrate in our opening brief that the text, structure, purpose, and history of 19 U.S.C. § 2254(b)(1)(B) indicate that Congress afforded the President flexibility to modify safeguard measures to meet existing circumstances following the International Trade Commission's (ITC's) midterm report, without inserting a "trade-liberalizing" requirement into that authority. Appellees' response depends greatly on their strained argument that section 2254(b)(1)(B)'s use of "has made" (rather than "has begun to make") to describe a domestic industry's adjustment to import competition precludes the President from making modifications to support ongoing adjustment—a distinction even the trial court rejected. Appellees also present various counterarguments concerning the statute's text, structure, purpose, and history, but they do not withstand scrutiny. Likewise, appellees fail to refute the fact that the President's actions are not "increases" to the safeguard.

Finally, none of the procedural arguments that appellees raise as alternate grounds for affirmance has merit. Specifically, appellees argue that: (1) the petition that the President received from the domestic industry was procedurally defective; (2) the President, in stating that the domestic industry "has begun to make" a positive adjustment to import competition failed to make the requisite finding that the domestic industry "has made" a positive adjustment; and (3) the President failed to perform a required cost/benefit analysis in issuing *Proclamation 10101*. The trial court correctly rejected each of these arguments.

## ARGUMENT

### I. Appellees' Core Claims Attempting To Overcome The Statute's Silence On The Restriction They Advocate Lack Merit

Appellees do not dispute that section 2254(b)(1)(B) lacks language explicitly restricting the President to "trade-liberalizing" modifications. SEIA Br. 17 (conceding that statutory and dictionary definitions of "modification" do not preclude trade-restrictive modifications).[1] Their contention that the statute nonetheless implicitly restricts the President to "trade-liberalizing" action depends on a strained reading of statutory context, by placing great (and undue) emphasis

[1] Indeed, notwithstanding their focus elsewhere, appellees' interpretation is *contrary* to the primary legal definition of "modification," to the Supreme Court's treatment of the term, and to legislative history showing that Congress understood the Trade Act of 1974's open-ended definition of the term to include both modest increases and decreases. Gov't Br. 23-24, 35-36.

on the fact that section 2254(b)(1)(B) refers to the President determining that the domestic industry "has made" a positive adjustment to import competition. *See*, *e.g.*, SEIA Br. 3, 13, 18, 20, 21, 24, 28, 36, 40. According to appellees, this phrase mandates that the President act under section 2254(b)(1)(B) only if a domestic industry's adjustment to import competition has been completed, such that solely "trade-liberalizing" action is needed. *See id.* at 18, 20, 36, 59-60.

This position, as the trial court held, relies on an illusory distinction between complete and ongoing adjustment; section 2254(b)(1)(B)'s language is sufficiently broad to include circumstances in which a domestic industry "has made" progress, but further adjustment remains necessary. Appx22. Congress did not evince an intent, in allowing "reduction, *modification*, or termination" of a safeguard action, to restrict use of section 2254(b)(1)(B) to cases in which the domestic industry's adjustment is complete.

Appellees' claim that section 2254(b)(1)(B) permits only "trade-liberalizing" modifications is also predicated on a false narrative. According to appellees, the generally degressive nature of safeguard measures and the procedural requirements for imposing them create a regime so strict that it limits the type of modifications the President can make solely to "trade-liberalizing" ones, precluding the President from adjusting a measure to ensure it accomplishes its purpose. SEIA Br. 3-4.

This narrative is not borne out by the statute's history. Congress overtly *declined* to limit the President's authority by removing restrictive language from the Senate version of the legislation. *See* H.R. Conf. Rep. 100-576, at 687 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1720. Conversely—and directly contrary to appellees' narrative—the House version of the legislation authorized modifications specifically "to ensure the effectiveness of the import relief in providing adequate opportunity for adjustment." *Id.* This Court has also rejected such an approach in *Transpacific Steel LLC v. United States*, ruling that procedural requirements to impose national security tariffs under 19 U.S.C. § 1862 do not bar the President from making certain adjustments. 4 F.4th 1306, 1323 (Fed. Cir. 2021) ("It is enough to say that the Trade Court's categorical narrow reading of § 1862(c)(1)—precluding *all* impositions adopted after the 15-day period in implementation of a plan announced within the period—obstructs the statutory purpose.").[2]

Moreover, despite appellees' assertions that the President's authority is "unusual and modest" and that the President's interpretation "make[s] no sense" (SEIA Br. 18, 28), the circumstances here illustrate why Congress declined to limit the President's discretion. In its midterm reports, the ITC found that the domestic

[2] As in *Transpacific*, the President's proclamation imposing the solar safeguard stated that the President intended to make modifications under section 2254(b)(1) as part of his "action." *Compare Proclamation 9693*, 83 Fed. Reg. 3,541, 3,542 ¶ 12 (Jan. 23, 2018) *with Transpacific*, 4 F.4th at 1318-19.

industry *had made* a positive adjustment. *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*, Inv. No. TA-201-075, USITC Pub. 5021, at 6 (Feb. 2020) (*ITC Feb. 2020 Report*), *available at* https://www.usitc.gov/publications/other/pub5021.pdf ("The safeguard measure resulted in positive industry adjustments . . . ."). But the ITC *also* indicated that this adjustment was hindered by the United States Trade Representative's (USTR's) decision to grant an exclusion for bifacial panels. *See*, *e.g., id.* at 7, VI-4–5 (reporting exclusion was "major factor" influencing prices); *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure*, Inv. No. TA-201-075, USITC Pub. 5032, at ES-3, III-4–5 (Mar. 2020) (*ITC Mar. 2020 Report*), *available at* https://www.usitc.gov/publications/other/pub5032.pdf (continued "exclusion for imports of bifacial modules . . . is likely to have significant effects on prices and trade in both modules and cells").

It is illogical to conclude that Congress foreclosed the President from addressing an after-the-fact exclusion that was undermining the safeguard measure. In providing the President authority to "modify" (not just "reduce" or "terminate") a safeguard measure, Congress authorized the President to deal with the range of issues arising during the measure's term. 19 U.S.C. § 2254(b)(1)(B). That the

President may only act upon receiving the ITC's midterm report indicates that Congress anticipated that the President might need to address developments. *See id.* § 2254(a) (requiring ITC to monitor developments, reporting to President and Congress). Those issues include situations like this one, where the domestic industry is achieving progress, but the President needs to adjust the measure to achieve its purpose. Congress recognized that it could not anticipate every circumstance and did not try to do so.

Further undermining appellees' narrative is the fact that context "always includes evident purpose" and "evident purpose always includes effectiveness." *Transpacific*, 4 F.4th at 1323 (citation omitted). Here, the safeguard statute's evident purpose—repeated twice—is for the President to "take all appropriate and feasible action within his power" to facilitate domestic industry efforts to adjust to import competition, while providing greater economic and social benefits than costs. 19 U.S.C. §§ 2251(a), 2253(a)(1). Despite this context, under appellees' interpretation, the President cannot close an after-the-fact loophole that is preventing the measure from fully accomplishing that purpose.

Appellees' core context arguments also contravene the deferential standard under which Courts review Presidential action for "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *E.g.*, *Silfab Solar, Inc. v. United States,* 892 F.3d 1340, 1346 (Fed. Cir.

2018) (citation omitted). Applying that standard, this Court examines whether "the President has violated an explicit statutory mandate." *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc); *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1365-66 (Fed. Cir. 2022). Although appellees argue that ambiguous statutory language can be clarified by context, SEIA Br. 29-30, numerous contrary indicators undermine their context arguments. Appellees identify no "explicit statutory mandate" that the President violated, and their narrative should not trump Congress's silence. *See Motion Sys.*, 437 F.3d at 1361; *United States v. George S. Bush & Co.*, 310 U.S. 371, 378-79 (1940) ("To imply [this limitation] would be to add what Congress has omitted[.]").

Finally, even if one were to accept appellees' narrative, the President's actions are consistent with the generally degressive nature of safeguards and the procedural requirements for instituting a safeguard measure. Hence, the President did not "clearly misconstru[e]" his statutory authority by revoking an improvident exclusion and slowing the decrease in the measure's fourth year.

## II. Appellees' Responses Regarding The Statute's Structure, Purpose, And History Lack Merit

The safeguard statute's structure, purpose, and history all indicate that the President may make appropriate modifications to a safeguard measure following the ITC midterm report. Gov't Br. 28-42. Appellees' counterarguments do not withstand scrutiny.

### A. Appellees' Cited Statutory Provisions Do Not Limit The Meaning Of "Modification" In Section 2254(b)(1)(B)

Notwithstanding our demonstration that adjacent provisions of the safeguard statute indicate that Congress did not restrict the President's authority as appellees assert, appellees argue that these and other provisions support their claims. Gov't Br. 31-37; SEIA Br. 21-26, 29-32. We address each of their arguments in turn.

Appellees first highlight the more limited actions the President may take under 19 U.S.C. § 2254(b)(1)(A) when a safeguard measure *is not working*, to claim that a similar limitation applies to the broader set of actions the President may take under section 2254(b)(1)(B). SEIA Br. 20-21. This makes no sense. The contrast between these sections *supports* the understanding that Congress in section 2254(b)(1)(B) gave the President flexibility to address the range of issues that may arise if a safeguard is succeeding. Gov't Br. 28-30, 33-34. Because the President may only "reduc[e]" or "terminat[e]" a failing measure under section 2254(b)(1)(A), but may also "modif[y]" one that is succeeding under section 2254(b)(1)(B), the President's authority is broader in the latter scenario.

To hold otherwise renders section 2254(b)(1)(B)'s use of "modification" superfluous, while violating the principle that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Bates v. United States*, 522 U.S. 23, 29-30

(1997) (citations omitted). The contrast between sections 2254(b)(1)(A) and (B) strongly supports the President's actions.

Similarly, appellees' characterization of 19 U.S.C. § 2254(b)(2) and (3) is unavailing. SEIA Br. 21-23. These provisions, which allow the President to make modifications to stop circumvention or to comply with a World Trade Organization (WTO) decision, demonstrate both that "modifications" under section 2254(b) may be trade-restrictive and that the procedural requirements for initially imposing a safeguard do not preclude such modifications. Gov't Br. 6, 32-33. Appellees nonetheless contend that the provisions' inclusion of the phrase "[n]otwithstanding paragraph (1)" signifies that section 2254(b)(1)(B), unlike sections 2254(b)(2) and (3), prohibits trade-restrictive actions. SEIA Br. 22.

There are two key flaws in this argument. First, it is clear from the statute that trade-restrictive actions authorized by sections 2254(b)(2) and (3) must be "modifications" akin to those authorized by section 2254(b)(1)(B). Section 2254(b)(2)—which expressly authorizes trade-restrictive actions—appears alongside section 2254(b)(1)(B) under the heading "(b) Reduction, modification, and termination of action." 19 U.S.C. § 2254(b). Although section 2254(b)(2)'s and 2254(b)(1)(B)'s language differs (SEIA Br. 22-23), among the three types of actions listed in that heading, trade-restrictive actions under section 2254(b)(2) can *only* be "modifications." Further, section 2254(b)(3) specifically uses "modify" to

describe changes that may be either liberalizing or restrictive. Gov't Br. 33 & n.6. This confirms that, irrespective of the "[n]otwithstanding paragraph (1)" phrase, "modification" in section 2254(b)(1)(B) does not mean solely "trade-liberalizing."

Second, consistent with the fact that any trade-restrictive actions under sections 2254(b)(2) and (3) must be "modifications" (since they cannot be "reductions" or "terminations"), use of the phrase "[n]otwithstanding paragraph (1)" is best understood to refer to the fact that modifications under either of those sections do not require any of the procedural prerequisites that Congress set forth in section 2254(b)(1). In other words, *notwithstanding* the requirements set forth in section (b)(1), such as receipt of an ITC midterm report or a domestic industry petition, the President may act to eliminate circumvention or to comply with a WTO decision.[3] This is especially so because section 2254(b)(3) uses the same "reduce, modify, or terminate" language as section 2254(b)(1), making it unlikely that Congress intended "modify" to have different meanings in the two adjacent paragraphs. *See Taniguchi v. Kan Pac. Saipan, Ltd.,* 566 U.S. 560, 571 (2012) ("it is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" (cleaned up)).

[3] The fact that section 2254(b)(1) entails procedural perquisites that sections 2254(b)(2) and (3) do not, as well as potentially different circumstances, refutes appellees' suggestion that the provisions would be redundant unless section 2254(b)(1)(B) is restricted to "trade-liberalizing" changes. SEIA Br. 22.

Appellees next argue that section 2254(b)(1)(B) restricts the President because it uses the generic term "modification" rather than the word "increase" or the phrase "additional action" that appear in sections referring solely to increasing duties. SEIA Br. 23. The provisions, however, are plainly different in nature and "modification" commonly connotes changes of varying kinds. *See Modification*, *Black's Law Dictionary* (11th ed. 2019) ("1. A change to something; an alteration or amendment <a contract modification>").

Appellees' argument based on the statute's extension provision, 19 U.S.C. § 2254(c), is equally unavailing. SEIA Br. 23-24. They claim that the extension provision's reference to the ITC investigating whether (1) an extension is "necessary" and (2) the domestic industry "is making" a positive adjustment to import competition indicates that the President may not adopt trade-restrictive modifications when the domestic industry "has made" an adjustment. *Id.* Again, even the trial court rejected this distinction because "has made" may encompass situations (like this one) in which some adjustment has been made, but more remains necessary. Appx22. If anything, the extension provision supports the President's interpretation because it shows that it may be appropriate to make a supportive "modification" when the domestic industry "has made" a positive adjustment but further adjustment is necessary.

Additionally, appellees marry their claims about other statutory provisions with their broader narrative that the safeguard regime is *so inherently restrictive* that the President cannot fix a loophole caused by an exclusion or slow a measure's rate of decrease in a future year (while remaining degressive overall). SEIA Br. 24-26. That narrative is particularly inapt here because the President's actions fall within the ambit of the original safeguard action, such that one would not expect an all-new investigation. *See* Appx22-25 (USTR's bifacial exclusion was not "termination" of safeguard for bifacial panels).

This argument is also flawed because appellees' claim that section 2254(b)(1)(B) lacks procedural prerequisites is inaccurate. Gov't Br. 40-41. The President may only make a section 2254(b)(1)(B) modification after receiving *both* the ITC midterm report and a domestic industry petition, and after determining that the domestic industry has made a positive adjustment. 19 U.S.C. § 2254(b)(1).[4] Appellees likewise incorrectly suggest that this process wholly lacks views from opposing parties. SEIA Br. 25. Domestic producers, importers, and others may all submit briefing and testimony to the ITC. 19 U.S.C. § 2254(a)(3); *see*, *e.g.*, *ITC*

[4] It is logical, moreover, for section 2254(b)(1)(A) to explicitly require the President to take the ITC's report into account when section 2254(b)(1)(B) does not. SEIA Br. 25. Under section 2254(b)(1)(A), the President is reducing or terminating the measure likely over the domestic industry's objection, whereas under section 2254(b)(1)(B) the President is acting following the ITC's report *at the domestic industry's behest*.

*Feb. 2020 Report*, USITC Pub. 5021, at VII-33 (summarizing SEIA brief); VII-30 (summarizing parties' position that "the bifacial exclusion is effectively a loophole for Chinese-owned companies in China and South East Asia to ship bifacial solar modules to the United States free of duties"); App'x B (hearing witness list).

More fundamentally, that Congress enacted procedural requirements to institute a safeguard measure does not speak to whether section 2254(b)(1)(B)'s "modification" language allows the President to make limited adjustments to ensure that the measure meets the statutory purpose. *Cf. Transpacific*, 4 F.4th at 1323-24 (rejecting similar argument "that the President's authority to act outside the 15-day period without securing a new report from the Secretary is limited to relaxing impositions imposed initially within that period").

Next, appellees dispute the contrast between section 2254(b)(1)(B) and the general limitation in section 2253(e)(5) requiring safeguard measures to phase down over time. Gov't Br. 31-32; SEIA Br. 29. But this underscores our point: section 2253(e)(5) does not address exclusions, while section 2254(b)(1)(B) does not contain a "liberalizing" requirement. Because courts are reluctant to "assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply"—especially "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest"—the contrast between sections 2253(e)(5) and 2254(b)(1)(B) highlights the trial court's error in

reading an unstated limitation into section 2254(b)(1)(B). *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005); *see also Bates*, 522 U.S. at 29.

Finally, appellees sidestep the safeguard statute's repeated use of the term "modification" to connote trade-restrictive action, which is consistent with the Trade Act's open-ended definition of "modification" in 19 U.S.C. § 2481(6). Gov't Br. 34-35; 19 U.S.C. §§ 2252(e)(2)(C), 2252(d)(5)(C), 2253(a)(3). Instead, they cite a separate provision of the Trade Act, 19 U.S.C. § 2133(a)(2)(B), which uses "modification" in a context where one would expect the modifications to be "trade-liberalizing." SEIA Br. 30-32. That provision authorizes the President to modify duty treatment to carry out concessions to which the President agrees as compensation for other trade actions, including safeguard measures.

By contrast, section 2254(b)(1)(B)'s context *does not* exclusively require liberalizing "modifications." The provision contains no suggestion that Congress departed either from the safeguard statute's repeated use of the term to connote trade-restricting actions, or the Trade Act's open-ended definition of the term. Rather, notwithstanding appellees' arguments, Congress did not foreclose the President from making modifications to support an industry that "has made" an adjustment but still requires assistance. Section 2254(b)(1)(B)'s context thus does not displace the "normal rule of statutory construction that identical words used in

different parts of the same act are intended to have the same meaning." *Taniguchi*, 566 U.S. at 571 (cleaned up).

Equally importantly, appellees' contention stemming from section 2133 does not address the fact that the term "modification" in the heading and body of section 2254(b) must include both restrictive and liberalizing adjustments to accommodate the potentially restrictive modifications authorized by sections 2254(b)(2) and (3). It also does not address the history of the Trade Act's open-ended definition of "modification" in 19 U.S.C. § 2481(6), which indicates that Congress understood the term to connote minor changes generally. Gov't Br. 7-8, 35-36. Consequently, it is more appropriate—and in any event not a "clear misconstruction" of the statute—for the President to have interpreted his "modification" authority under section 2254(b)(1)(B) consistent with the general definition of that term and its repeated use to include trade-restrictive actions throughout the safeguard statute.

### B. Appellees' Interpretation Of "Modification" In Section 2254(b)(1) Renders The Term Superfluous

Addressing our argument that the trial court's interpretation of section 2254(b)(1)(B) renders the term "modification" superfluous, appellees offer "trade-liberalizing" actions that they claim would solely be "modifications" rather than "reductions" or "terminations." SEIA Br. 32-34. Both examples, however, constitute "reductions" to a safeguard measure. In one case, the President would be *reducing* the portion of imports subject to duties by converting the tariff into a

tariff-rate quota, and in the other the President would be *reducing* (indeed, terminating) the duties by eliminating them and instead supporting the domestic industry through trade adjustment assistance. Appellees thus offer no interpretation that gives meaning to Congress's deliberate decision to include *additional* authority to modify safeguard measures in section 2254(b)(1)(B), rather than just permitting "reduction" and "termination."[5]

Indeed, as appellees appear to concede, if these actions were uniquely considered "modifications" (as opposed to "reductions" or "terminations"), then the President would *lack* authority under section 2254(b)(1)(A) to take them when the safeguard measure is not working as intended because that provision does not authorize "modifications." Gov't Br. 29-30; SEIA Br. 33. That makes no sense in light of section 2254(b)(1)(A)'s evident purpose to permit loosening of a safeguard measure when the domestic industry's inadequate efforts or changed economic circumstances warrant doing so. 19 U.S.C. § 2254(b)(1)(A).

Finally, appellees attempt to stand our argument on its head by claiming that an interpretation of "modification" as including limited upward and downward adjustments would render the terms "reduction" and "termination" in section 2254(b)(1)(B) surplusage. SEIA Br. 33-34. But that is clearly not the case.

---

[5] Appellees' *amici* similarly posit several highly-contrived examples that would not constitute changes to the safeguard action itself, and thus do not appear to fit within the ambit of section 2254(b)(1)(B). Amici Br. 16 n.17.

Section 2254(b)(1)(B) permits the President to make a substantial reduction to the measure or to eliminate it altogether, whereas "modification" commonly connotes a moderate or minor change. *See MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 225 (1994). Section 2254(b)(1)(B) gives the President discretion to make changes appropriate to the circumstances following the ITC's midterm report (within the overall phase-down requirement). Had Congress intended the President to make only liberalizing changes, there would have been no need to authorize "modifications" apart from "reductions" and "terminations."

### C. The President's Past Trade-Restrictive Modification Of A Safeguard Measure Contradicts Appellees' Interpretation

We previously showed that the President's interpretation of his authority is supported by past practice because President Clinton modified a safeguard measure in a trade-restrictive manner following the ITC's midterm report. Gov't Br. 39-40; *Proclamation 7314: To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*, 65 Fed. Reg. 34,899 (May 26, 2000). Appellees seize upon President Clinton's incorrect reference to section 2254(b)(1)(A)—which could not provide the basis for trade-restrictive action—to claim that there is a "total lack of historical usage of section 204(b)(1)(B) to restrict trade." SEIA Br. 26-27.

Clearly, however, the President's invocation of "modification" authority under section 2254(b)(1) to take trade-restrictive action following the ITC midterm report is supportive of the President's similar action in this case. *See Transpacific*,

4 F.4th at 1326 ("We think history and practice give the edge to this latter position." (citation omitted)). Even if that were not so, given the infrequency of safeguards, any lack of prior use would not demonstrate that Congress sought to restrict the President's "modification" authority in the way appellees assert.

### D. Appellees Cannot Reconcile Their Interpretation With The Statute's Evident Purpose

Responding to our demonstration that their interpretation conflicts with the safeguard statute's purpose, appellees argue that the corollary requirement that the President balance costs and benefits when imposing a safeguard measure supports their reading. SEIA Br. 34-35. Again, appellees' argument is predicated on their narrative that limitations associated with initially imposing a safeguard limit the President's section 2254(b)(1)(B) authority to "trade-liberalizing" action. *Id.* The President's actions here, however, fit within the procedural requirements they cite. *Id.* at 35 (citing cap on duties and phase-down requirement). And although a cost/benefit determination is required to impose a safeguard, to the extent such a requirement also applies to section 2254(b)(1)(B) modifications, the President's actions in *Proclamation 10101* met that requirement. *See* Appx27-28.

More generally, appellees do not dispute that the safeguard statute twice directs the President to "take all appropriate and feasible action within his power" to facilitate adjustment efforts, while providing greater benefits than costs. 19 U.S.C. §§ 2251(a), 2253(a)(1)(A). Because "context always includes evident

purpose" and "evident purpose always includes effectiveness," *Transpacific*, 4 F.4th at 1323 (citation omitted), the statute's purpose contradicts appellees' claims. The procedural requirements appellees highlight do not change the absurd result that flows from their interpretation, under which the President is prohibited from making limited changes to an existing safeguard to vindicate the statute's purpose.

Appellees' other policy arguments are also weak. They claim that the President's modification authority under our interpretation would be too limited to be realistic, SEIA Br. 36, when the Supreme Court recognizes that a modification is generally defined as a moderate or minor change to something (without dictating the direction). *See MCI*, 512 U.S. at 225. Of course, section 2254(b)(1)(B) does not *prohibit* the President from making "trade-liberalizing" modifications; the authority is simply not confined only to those types of changes.

Next, again relying on the phrase "has made," appellees claim that there is no need to modify a safeguard measure when the domestic industry already "has made" an adjustment. SEIA Br. 36. The facts of this case illustrate that there may be instances when the domestic industry "has made" an adjustment, but further adjustment remains necessary and can be supported by modification (such as closing a loophole or slowing a decrease in a future year).

Appellees relatedly suggest that the facts here fall under the more limited actions allowed under section 2254(b)(1)(A) because the bifacial exclusion's

impairment of the solar safeguard constitutes "changed economic circumstances." SEIA Br. 37. They recognize elsewhere, however, that section 2254(b)(1)(A) concerns situations in which a safeguard measure is not succeeding, a situation contrary to what the ITC found when it indicated that the domestic industry had made a positive adjustment that was hampered by the bifacial exclusion. SEIA Br. 33; *see also*, *e.g.*, *ITC Feb. 2020 Report*, USITC Pub. 5021, at 6, 7, VI-4–5; *ITC Mar. 2020 Report*, USITC Pub. 5032, at ES-3, III-4–5. Regardless, even if another provision could apply, that does not change the President's valid invocation of section 2254(b)(1)(B) to address the circumstances that the ITC reported.

Citing a business need for certainty, appellees' *amici* urge that safeguards and their exclusions should be applied predictably for business planning. Amici Br. 17-25. These policy arguments are divorced from the statute, which neither refers explicitly to exclusions or business planning, nor makes "predictability" the touchstone of safeguard relief. Amici Br. 19-21. Policy arguments do not trump the statutory language. *Patel v. Garland*, 142 S. Ct. 1614, 1627 (2022).[6]

---

[6] A*mici* are also wrong that businesses could not anticipate *Proclamation 10101*. Amici Br. 21. The President: (a) stated in proclaiming the safeguard that he might make section 2254(b)(1) modifications; (b) delegated USTR authority both to grant *and to modify or terminate* exclusions; and (c) acted after extensive advocacy regarding the exclusion. *Proclamation 9693*, 83 Fed. Reg. at 3,542 ¶ 12, Annex I (text at (d)); *ITC Feb. 2020 Report*, USITC Pub. 5021, at VII-30, VII-33. Likewise, *amici* are wrong to characterize the President's actions as "retroactive" when *Proclamation 10101* applied solely to future imports. Amici Br. 18.

Finally, appellees' focus on the boundaries to the President's modification authority formed by other provisions of the safeguard statute, such as the section 2253(e)(5) phase-down requirement, underscore that the trial court was incorrect to view the President's section 2254(b)(1)(B) modification authority as a potentially significant "loophole" for the President to institute harsher safeguards without procedural protections. Gov't Br. 40-42. Given these boundaries, it is unlikely that "interpreting the statute to permit trade-restricting modifications" would "undermine the broader statutory scheme." Appx32.

### E. Appellees' Legislative History Arguments Lack Merit

Appellees cannot dispute that Congress specifically removed language from the legislation enacting section 2254(b)(1)(B) that would have incorporated the limitation that appellees seek to insert into the statute. H.R. Conf. Rep. 100-576, at 687, *reprinted in* 1988 U.S.C.C.A.N. 1547, 1720 (showing removed language); *Russello v. United States*, 464 U.S. 16, 23-24 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.").

Appellees try to sidestep this history by highlighting Congress' removal of the restrictive language from the Senate version of the legislation when the provision was rewritten as part of the House-Senate conference, and arguing that Congress in doing so did not specifically indicate that it intended to give the

President authority to take restrictive action in section 2254(b)(1)(B). SEIA Br. 38-39. This omits that the House version of the legislation specifically authorized modifications "to ensure the effectiveness of the import relief in providing adequate opportunity for adjustment." H.R. Conf. Rep. 100-576, at 687, *reprinted in* 1988 U.S.C.C.A.N. 1547, 1720. Even so, the flaw in the argument is two-fold.

First, that the language was deleted at conference, a common occurrence, does not provide an exception to the presumption (or the underlying logic) that Congress's deletions are intentional. Indeed, the purpose of a conference is for the House and Senate to reconcile differences in legislation passing both chambers. Second, the Trade Act's default definition of "modification" is the open-ended definition set forth in 19 U.S.C. § 2481(6), which entails its own legislative history indicating that Congress understood the term to connote minor changes generally. Gov't Br. 7-8, 35-36 (discussing H.R. Rep. No. 93-571, at 89 (1973) and S. Rep. No. 93-1298, at 230 (1974)).[7] Congress enacted section 2254(b)(1)(B) against this

[7] The House report explains that "[t]he term 'modification,' as applied to any duty or other import restriction, includes the elimination, *or imposition*, of any duty or other import restriction, *as well as changes or increases and decreases in the existing duty or import restriction*." H.R. Rep. No. 93-571, at 89 (emphasis added). The Senate report similarly explains that "[t]he term 'modification,' as applied to any duty or other import restriction, would include the elimination of any duty or other import restriction, *as well as changes in the existing duty or import restriction*." S. Rep. No. 93-1298, at 230 (emphasis added). Appellees argue that the Senate report does not specifically use the word "increase," but the report's similarity to the House Report and general reference to "changes in the existing duty or import restriction" indicate that the Senate likewise contemplated changes in the general sense, without dictating a direction. SEIA Br. 39.

backdrop treating "modification" as connoting both increases and decreases to import restrictions. Gov't Br. 36. Thus, by declining to alter the definition and removing the contrary language in the Senate bill, Congress intentionally left section 2254(b)(1)(B) neutral regarding the President's modification authority.

Appellees also cite legislative history pertaining to the later Uruguay Round Agreements Act, the negotiating objectives for which were set contemporaneously with enactment of section 2254(b)(1)(B), for the broad proposition that safeguards are intended to be "digressive" in nature. SEIA Br. 39-41. This ignores that: (a) the "degressivity" principle is embodied in the section 2253(e)(5) phase-down requirement (which does not address exclusions), and (b) the President's actions here are consistent with that principle because, as appellees no longer dispute, the bifacial exclusion *was not* a termination of the safeguard for bifacial panels, while the slower decrease in duties for the measure's fourth year continued its degressive trajectory. *See* Appx22-25 (rejecting termination claim).

Thus, the fact that safeguards are intended to be broadly degressive does not prohibit the President from making modifications to carry out a measure's intended purpose within that framework. *See* Gov't Br. 44-45. Indeed, if the degressivity principle were that strict, it would conflict with section 2254(b)(2), which plainly authorizes the President to take non-degressive actions to eliminate circumvention. *See* 19 U.S.C. § 2254(b)(2).

Likewise, the provisions of the WTO Agreement on Safeguards reflecting the degressivity principle do not support appellees' contention that, at the same time it *removed* any restriction on the President's modification authority, Congress nonetheless intended the restriction. *Cf.* 19 U.S.C. § 3512(a) ("No provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect."); *Corus Staal BV v. Dep't of Comm.*, 395 F.3d 1343, 1348 (Fed. Cir. 2005) ("Neither the GATT nor any enabling international agreement outlining compliance therewith . . . trumps domestic legislation[.]").

## III. The President's Actions Did Not "Increase" The Safeguard Measure

Appellees concede that the President may take "trade-neutral" actions pursuant to section 2254(b)(1)(B). SEIA Br. 26. This concession alone should prompt the Court to sustain *Proclamation 10101* as lawful because the President's actions are at least neutral in nature. Gov't Br. 42-45. Specifically, *Proclamation 10101* merely restores the *status quo ante* regarding the measure's coverage of bifacial panels, while slowing the pace at which the duty rate would phase down in the measure's fourth year to 18 percent (still constituting a reduction from the 20 percent rate applicable at that time). Neither action increased the duty rate.

Moreover, appellees have no answer for the fact that the Supreme Court similarly has distinguished between altering something from its current level and

preventing a future change from taking effect. *United States v. Will*, 449 U.S. 200, 228-29 (1980) (legislation preventing future statutory increase in judicial salaries from taking effect was constitutionally valid because it did not "diminish" compensation of Federal judges in violation of Compensation Clause).

Nonetheless, appellees argue that the "relevant inquiry" "is whether the 'modification' changes the safeguard in a manner that makes it more trade-restrictive than it otherwise would have been absent the modification." SEIA Br. 42. That is not appropriate. Appellees' characterization of the "relevant inquiry" is contrary to the Supreme Court's approach to analogous circumstances in *United States v. Will* because the Court ruled that modifying a *future* salary increase prior to its effective date did not constitute an impermissible change compared to what salaries otherwise would have been. 449 U.S. at 228-29. Appellees are defining parameters to a requirement of their own creation, reading a requirement that Congress itself did not impose into the statute. *See George S. Bush*, 310 U.S. at 378-79; *Jama*, 543 U.S. at 341; *Bates*, 522 U.S. at 29 (disfavoring that approach).

Appellees' attendant appeal to business planning based on the way safeguards are announced is both legally irrelevant and fails to account for other provisions, like sections 2254(b)(2) and (3), which authorize the President to make changes based on further developments involving circumvention or WTO rulings. SEIA Br. 42. The argument also ignores the fact that bifacial panels *were included*

in the original safeguard measure. It similarly ignores the President's stated intention to make needed modifications under section 2254(b)(1) and delegation of authority to USTR to modify or terminate granted exclusions. *See Proclamation 9693*, 83 Fed. Reg. at 3,542 ¶ 12, Annex I (text at (d)).

Appellees further suggest that requirements pertaining to the President's announcement of a safeguard measure effectively lock the President into the duty rates for future years, so that any upward deviation is an "increase." SEIA Br. 43-44, 45-46; Amici Br. 22. This suffers from the same flaws discussed above.

Appellees finally claim, in line with the trial court's concern that section 2254(b)(1)(B) could constitute a "loophole" for the President to institute harsher safeguard measures after-the-fact, that "the President could merely announce a level of relief that applies at the outset of the measure and then modify that relief up or down whenever the President sees fit." SEIA Br. 43. But that concern is unwarranted because the President remains constrained by the overall section 2253(e)(5) phase-down requirement. The President's actions in this case merely restored the *status quo ante* with respect to bifacial panels while maintaining a net *reduction* of the duty rate in the safeguard measure's fourth year. Both actions are consistent with the relief the President announced "at the outset." Consequently, these facts are hardly "irrelevant" to whether *Proclamation 10101* constituted an "increase" to the safeguard. SEIA Br. 45.

## IV. Appellees' Alternative Arguments For Affirmance Alleging That The Domestic Industry Petition And The President's Determination Were Procedurally Defective Lack Merit

Appellees SEIA and NextEra Energy, Inc. argue alternatively that *Proclamation 10101* is invalid because: (1) the President lacked authority to act when the domestic industry petition did not state that the domestic industry had made a positive adjustment to import competition and (2) the President, in finding that the domestic industry "has begun to make" a positive adjustment to import competition, did not make the finding that the domestic industry "has made" such a positive adjustment. SEIA Br. 46-62. Neither argument—both of which the trial court rejected—demonstrates a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority" by the President. *Silfab*, 892 F.3d at 1346.

### A. The President Acted Lawfully Following His Receipt Of The Domestic Industry Petition

Contrary to appellees' claims, the President acted lawfully in finding that the domestic industry had begun to make a positive adjustment to import competition following receipt of the ITC midterm report and domestic industry petition.

There are three prerequisites to action under section 2254(b)(1)(B): (1) the President's receipt of the ITC's midterm report; (2) the petition by a majority of the representatives of the domestic industry; and (3) the President's factual determination that the domestic industry has made a positive adjustment to import

competition. Here, as the trial court correctly held, the statutory requirements for the petition and the President's determination were met. Appx15-22.

There is no dispute that the President issued *Proclamation 10101* after the ITC issued its midterm report. The trial court concluded that the three letters submitted by domestic manufacturers "were reasonably construed as a petition." Appx16. The court also concluded that a majority of the domestic industry, by production volume, requested the modifications. Appx19. Appellees do not challenge these findings on appeal.

Appellees argue that the petition is fatally deficient because the domestic manufacturers did not request relief on the "basis" "that the domestic industry has made a positive adjustment to import competition." SEIA Br. 47-58. And because the domestic manufacturers did not use those precise words in requesting relief, appellees argue, the President lacked authority to act under section 2254(b)(1)(B). *Id.* at 47, 50, 54. Appellees' hyper-grammatical arguments offer no reason to set aside *Proclamation 10101*.

Section 2254(b)(1)(B) authorizes the President to reduce, modify, or terminate a safeguard action "*if the President determines*, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, *that the domestic industry has made a positive adjustment to import competition*." 19

U.S.C. § 2254(b)(1)(B) (emphasis added). The President alone determines whether "the domestic industry has made a positive adjustment to import competition" after receiving the petition, as SEIA concedes. SEIA Br. 53-54.

The adjective "such" refers back to something indicated earlier in the text. *See Such*, *Black's Law Dictionary* (11th ed. 2019) ("1. Of this or that kind <she collects a variety of such things>. 2. That or those; having just been mentioned <a newly discovered Fabergé egg will be on auction next week; such egg is expected to sell for more than $500,000>."). Because the phrase "positive adjustment to import competition" comes at the end of section 2254(b)(1)(B), the preceding phrase "on such basis" does not refer to it. Moreover, section 2254(b)(1)(B) provides that the President alone determines whether "the domestic industry has made a positive adjustment to import competition." The phrase "on such basis" is best understood as referencing the ITC midterm report discussed earlier in 19 U.S.C. § 2254(b)(1). And as the trial court concluded, even if one were to credit appellees' contrary interpretation, it would not render the President's actions a "clear misconstruction" of the statute. Appx20-21.

Indeed, whether the petition asserts the domestic industry's positive adjustment does not expand or limit the requirement that the *President* make this determination. Equally, subjective allegations regarding the domestic industry's adjustment would be redundant when the President may act only after receiving the

ITC's midterm report explicitly addressing the issue. 19 U.S.C. § 2254(a)(1)-(2). At that point, the relevant consideration is not whether it is the domestic industry's "perception" that it has made a positive adjustment, SEIA Br. 53, but whether the report from an independent body, the ITC, shows that it has. *See* Appx20; *Proclamation 10101*, 85 Fed. Reg. at 65,639-40 (relying on both sources).

Even accepting appellees' reading of the statute, however, *Proclamation 10101* should not be set aside because any "[f]ailure to satisfy" a requirement to request relief specifically on the basis of positive adjustment would "be an interpretive error by the representatives of [the] *domestic industry*, rather than the President – and would result in a flawed petition." Appx21 (emphasis added). The petition's procedural failure "to comply with this requirement would not render Proclamation 10101 unlawful." *Id*. This is because, as the trial court correctly explained, "procedural inadequacies in recommendations provided to the President do not provide a basis for rejecting the resultant Presidential action." *Id.* (citing *Silfab*, 892 F.3d at 1347; *Dalton v. Specter*, 511 U.S. 462, 476 (1994)).

Moreover, the President did not commit a significant procedural violation. The President received a petition consisting of three letters comprising a majority of the domestic industry. Appx19. Two letters specifically requested withdrawal of the bifacial exclusion, and two requested slowing the tariff rate reduction for the safeguard measure's fourth year. Appx47-52.

Appellees argue that the petition is a "key prerequisite" to action under section 2254(b)(1)(B). SEIA Br. 56. We agree that a significant procedural violation might have occurred had the President acted without receiving *any* petition. But here, acting upon a petition that merely fails to parrot the statutory language (or, in appellees' view, fails to offer the petitioners' *perception* about their adjustment), is not a significant procedural violation. "{T}he statute provides no requirement for the form a petition must take." Appx16.

Contrary to appellees' claims, *Corus Group PLC v. International Trade Commission*, 352 F.3d 1351 (Fed. Cir. 2003), and *USP Holdings*, 36 F.4th 1359, do not require that this Court set aside *Proclamation 10101*. SEIA Br. 54-58. In *USP Holdings*, this Court affirmed *Corus Group*'s holding that this Court may review a "predicate affirmative agency finding of an injury or threat . . . ." 36 F.4th at 1368. Both cases involved challenges to requirements that the Court interprets as a condition of the President's power to act. Because an affirmative injury or threat finding is a fundamental aspect of the relevant statutory scheme, it makes sense to ensure that this statutory precondition is met. *See id.* at 1366-68; *Corus*, 352 F.3d at 1359. *Corus* and *USP*, however, do not resolve the question presented here: whether the President is forbidden to act upon a flawed petition. The answer to *that* question is no.

Unless directed by statute, the President is not required to determine whether a subordinate advisor "committed any procedural violations in making their recommendations, nor does [the relevant statute] prohibit the President from approving recommendations that are procedurally flawed." *Michael Simon Designs, Inc. v. United States*, 609 F.3d 1335, 1341 (Fed. Cir. 2010) (quoting *Dalton*, 511 U.S. at 476); *see Silfab*, 892 F.3d at 1347. That principle extends to the President's ability to offer relief based upon the domestic industry petition. As we established above, it is the *President*—and not the domestic industry—who "determines . . . that the domestic industry has made a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1)(B); *see* Appx21 (statute does not preclude President's acceptance of flawed petition). Hence, the statute neither forbids the President from acting on an imperfect petition, nor requires the President to check domestic industry paperwork for specific language. *Cf. Dalton*, 511 U.S. at 476 ("Nothing in § 2903(e) requires the President to determine whether the Secretary or Commission committed any procedural violations . . . .").

Appellees distinguish *Silfab* and *Michael Simon* by arguing that those appellants sought to "shoehorn requirements found elsewhere in the statute into the provision authorizing presidential action." SEIA Br. 57. But the location of the predicate action in the statute is immaterial. In fact, the holdings have more force in the context of section 2254(b)(1)(B). Unlike the ITC recommendations in *Corus*

and Department of Commerce investigation in *USP Holdings*, private parties do not make findings that *could* be subject to judicial review. Even when the Court reviews procedural errors by Government officials, it does so for substantial prejudice; that is, injury to an interest the rule is designed to protect. *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 396 (Fed. Cir. 1996) (citations omitted). The petition requirement here protects the domestic industry. Just as it is "difficult to believe that Congress would have wanted an injury to go unremedied, simply because" the ITC failed to make a uniform remedy recommendation, it makes no sense to bar the President from acting on the domestic industry's request for a safeguard modification simply because those private parties failed to opine on industry adjustment. *Silfab*, 892 F.3d at 1346.

### B. The President Made The Requisite Factual Finding Concerning The Domestic Industry's Positive Adjustment

Appellees next argue that the President, by finding that the domestic industry "has begun to make" a positive adjustment to import competition, did not make the requisite statutory finding. SEIA Br. 58-62. This semantic argument fails to demonstrate any error that would require this Court to set aside Presidential action. Appellees' argument hinges on their theory that section 2254(b)(1)(B) applies only when the industry has completed its adjustment and safeguard relief is no longer necessary. This illusory distinction is inconsistent with the statute.

The phrase "has made a positive adjustment" is broad enough to include "has begun to make a positive adjustment" used in the proclamation. Both indicate that the action of "adjust[ing]" has moved in a positive direction. Hence, the trial court rightly held that this is a permissible construction of section 2254(b)(1)(B). Appx22. Appellees assume that the "adjustment" envisaged by the statute is binary: the industry is either unadjusted or fully adjusted. That is not the case.

Section 2254 calls for the ITC to "monitor developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition." 19 U.S.C. § 2254(a)(1). The results of this monitoring inform the ITC's midterm report, which in turn triggers the President's authority to "reduc[e], modif[y], or terminat[e]" a safeguard measure. *Id.* § 2254(b)(1). Thus, the statute foresees a process of "developments," including "progress" and "efforts" toward the goal of complete adjustment. Indeed, the plain meaning of "has begun to make a positive adjustment" requires there to have been "positive" progress towards the ultimate goal of the safeguard, and thus falls within the statutory phrase "has made a positive adjustment to import competition." *Id.* § 2254(b)(1)(B).

Moreover, interpreting section 2254(b)(1)(B) as applicable only when the domestic industry has fully adjusted—or, as appellees describe it, when the process of adjustment "has been *completed*"—is inconsistent with that section's allowance

for continuation of import restrictions at a modified or reduced level. SEIA Br. 60 (emphasis in original). "Reduction" or "modification" of the safeguard measure, as authorized by section 2254(b)(1)(B), implies that safeguard protections *remain* necessary, albeit with some change. That is unlikely to be the case when the industry has "completed" its adjustment. The statutory instruction for the ITC to report at the measure's midpoint on the industry's "progress" and "efforts" to make a "positive adjustment" would also be superfluous if the President could act only when the industry had completed its positive adjustment.

Consequently, the trial court correctly held that "the distinction between 'has made' and 'has begun to make' is too narrow to rise to the level of a clear misconstruction." Appx22. Appellees' arguments fail to persuade otherwise.

First, section 2251(b)'s definition of "positive adjustment to import competition" does not foreclose the President's action here. SEIA Br. 59. Indeed, the statute qualifies that definition by acknowledging that "the domestic industry may be considered to have made a positive adjustment to import competition even though the industry is not of the same size and composition as the industry at the time the investigation was initiated." 19 U.S.C. § 2251(b)(2). Accordingly, the statute recognizes that certain segments of an industry can improve at different speeds and that a positive adjustment may have occurred at a point when further adjustment remains possible. Indeed, the ITC found that situation to exist, stating

that "[t]he safeguard measure resulted in positive industry adjustments," while also recognizing that the bifacial exclusion had hindered that positive adjustment from reaching its full potential. *ITC Feb. 2020 Report*, USITC Pub. 5021, at 6, 7, VI-4–5; *see also*, *e.g.*, *ITC Mar. 2020 Report*, USITC Pub. 5032, at ES-3, III-4–5.

Second, consideration of verb tense does not resolve the issue in appellees' favor. *See* SEIA Br. 59-60. In characterizing the present perfect tense to mean only an action completed *entirely* in the past, appellees depart from standard grammatical usage. This tense can be used for two different purposes, depending on the context. Although appellees' interpretation of the verb tense "has made" is grammatical, the President's interpretation squares with section 2254(b)(1)(B)'s context and purpose. The Columbia Guide to Standard American English explains that the "[present perfect tense] expresses action completed in the present time, as in *He has promised* and *She has slept*, or still going on, as in *We have lived here for years*." Kenneth G. Wilson, *The Columbia Guide to Standard American English* 342 (Columbia Univ. Press 1993) (emphasis in original). Thus, the present perfect tense can express actions that began in the past and are still continuing.

The inclusive nature of the present perfect tense is illustrated by *Barrett v. United States*, 423 U.S. 212 (1976), on which appellees rely. SEIA Br. 59-61. The Supreme Court in *Barrett* construed 18 U.S.C. § 922(h), which makes it unlawful for certain persons, including felons, "to receive any firearm or ammunition which

*has been shipped or transported* in interstate or foreign commerce." 423 U.S. at 215 (emphasis added). The Court held that because "the interstate commerce reference is in the present perfect tense, denoting an act that has been completed," the statute applied without "warping or stretching of language" when the interstate movement of the handgun ended prior to any transaction involving the defendant. *Id.* at 216-17. However, contrary to that being the present perfect tense's *sole* meaning—and consistent with the President's actions here—the statute clearly still applies when the firearm continues to move in interstate commerce until it is in the defendant's hands. Thus, the Court's holding on the present perfect tense did not restrict that statute solely to actions completed in the past. *Id.* at 216 (holding that statute is not *limited to* "a receipt which itself is part of the interstate movement").

Moreover, as appellees acknowledge elsewhere, SEIA Br. 16, context can resolve the meaning of the statute. The context and purpose of the safeguard statute do not preclude the President from acting to address situations falling somewhere between the entire domestic industry's complete recovery and its demise. After all, there would be no reason to authorize the President to modify or reduce safeguards if the domestic industry has completely adjusted to import competition. Accordingly, Congress' use of the present perfect tense does not bar the President from exercising section 2254(b)(1)(B) authority when the domestic industry has made a positive adjustment, but further adjustment is necessary.

Third, the fact that the safeguard statute includes extension provisions at 19 U.S.C. § 2254(c) and 2253(e)(1)(B)(i) indicates that there may be a need for the President to make a supportive "modification" when the domestic industry "has made" a positive adjustment, but additional adjustment is necessary. Appellees emphasize the different verb tense used in section 2254(b)(1)(B) compared to the extension provisions, which permit extensions if the domestic industry "is making" a positive adjustment to import competition. SEIA Br. 60-61. But safeguards need to be extended *only* when the domestic industry's adjustment is ongoing, whereas the need to reduce, modify, or terminate a safeguard measure may arise *both* when adjustment is ongoing and when it is complete. Both provisions contemplate situations in which the industry has not fully adjusted to import competition, such that reducing, modifying, or extending a safeguard measure would be beneficial. By contrast, if the domestic industry has *fully* adjusted, the basis to apply a safeguard measure would cease, there would be no reason to extend it, and the only logical action under section 2254 would be to "terminate" the measure.

Language in the ITC report concerning extension of the safeguard measure is consistent with this statutory distinction. SEIA Br. 61-62 (quoting *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*, Inv. No. TA-201-075 (Extension), USITC Pub. 5266 (Dec. 2021), *available at* https://www.usitc.gov/publications/other/pub5266.pdf). The ITC

explained that the "statutory standard" for extension under 19 U.S.C. § 2254(c)(1) is whether the domestic industry "'is making' a positive adjustment to import competition, not that it 'has made' a positive adjustment," *precisely because it was rejecting* SEIA's argument that the domestic industry's adjustments to date were insufficient to support extension. USITC Pub. 5266, at 32. In fact, the ITC continued that "the existence of evidence of aspects in which the domestic industry has not as yet 'made' a full positive adjustment to import competition does not negate the *ample evidence in this investigation of the domestic industry's progress in making a positive adjustment*, and does not warrant a negative extension determination, contrary to SEIA's assertions." *Id.* (emphasis added). That is consistent with the President's finding that the domestic industry had begun to make a positive adjustment but more remained necessary, and with the trial court's holding that the phrase "has made a positive adjustment" in section 2254(b)(1)(B) is broad enough to include such circumstances. Appx22.

## V. ***Proclamation 10101* Satisfied Any Applicable Cost/Benefit Requirement**

Appellees Invenergy Renewables LLC and EDF Renewables, Inc. argue that *Proclamation 10101* is invalid because the President failed to perform a new cost/benefit analysis. This claim suffers from two flaws: (1) section 2254(b)(1)(B) does not require the President to perform a new cost/benefit analysis to modify a pre-existing safeguard and (2) *Proclamation 10101* satisfied any such requirement.

### A. <u>Section 2254(b)(1) Does Not Require A New Cost/Benefit Analysis</u>

The President weighed the economic and social costs and benefits of the solar safeguard measure when he initially proclaimed it in 2018. *Proclamation 9693*, 83 Fed. Reg. at 3,542 ¶ 12. Appellees argue that the President was required to re-weigh those costs and benefits when modifying the measure under section 2254(b)(1). Invenergy Br. 17-25. But the statute does not include that requirement. The only provisions that refer to weighing costs and benefits are sections 2251(a) and 2253(a), both of which govern initial adoption of a safeguard. By contrast, section 2254(b)(1) does not mandate a new cost/benefit determination.

Specifically, section 2251(a) provides that, if the ITC makes an affirmative serious injury determination, "the President, in accordance with this part, shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs." 19 U.S.C. § 2251(a). This provision requires consideration of costs and benefits at the time of the affirmative ITC serious injury determination.

Appellees argue that the phrase "in accordance with this part"—which solely appears in section 2251(a)—obliges the President to re-evaluate costs and benefits for "all actions" under sections 2251 through 2254. Invenergy Br. 19-20. It is evident, however, from section 2251's general nature within the broader scheme

that this phrase refers to the President complying with the rest of the requirements in the safeguard statute. Moreover, that section 2251(a) proceeds from the ITC's serious injury determination signals that it applies when the President responds to the ITC's injury finding under section 2252(b), not findings under section 2254.

Section 2253 further supports this conclusion. Section 2253(a)(1)(A) largely restates the President's authority to take safeguard action under section 2251(a), while omitting the "in accordance with this part" language. Section 2253(a)(2) then provides that "[i]n determining what action to take *under paragraph (1)*," the President must consider factors including the costs and benefits of taking safeguard action. 19 U.S.C. § 2253(a)(2)(E) (emphasis added). Neither subsection refers to section 2254(b)(1) or requires a cost/benefit balancing for determinations under other parts of the statute.[8] Likewise, section 2253(e)(1)(B) authorizes the President to extend a safeguard, without referring to a new cost/benefit determination. 19 U.S.C. § 2254(e)(1)(B).

Nor does section 2254(b)(1)(B) itself say anything about re-weighing costs and benefits before modifying, reducing, or terminating an existing measure. The only determination required is for the President to "determine[]" that the domestic industry has made a positive adjustment. 19 U.S.C. § 2254(b)(1)(B).

[8] Indeed, 19 U.S.C. § 2253(a)(2)(F)(i) requires the President to consider the costs of *not taking action* when determining whether to impose a safeguard, but appellees do not suggest that any decision declining to modify a safeguard measure under section 2254 would be invalid absent such a determination.

Collectively, these omissions indicate that the cost/benefit requirement does not apply to modifications under section 2254(b)(1)(B). *See Jama*, 543 U.S. at 341 ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply[.]"). That is especially so here because the President's actions consisted of modifications that fall within the parameters of the original safeguard measure.

The trial court nonetheless identified a cost/benefit requirement (which it ultimately found satisfied) based on its concern that section 2254 could be a loophole enabling the President to proclaim new tariffs that would "swallow the Section 201 rule" and destroy its effectiveness. Appx27. Appellees similarly allege that the statute could be misused. Invenergy Br. 24.

These concerns are again misplaced. The President's modification authority remains subject to the section 2253(e)(5) phase-down requirement, meaning that the President could not invoke it in the "bait-and-switch" manner appellees posit (which does not resemble the facts here). Nor could a modification under section 2254 add new products to a safeguard measure, as appellees hypothesize, because safeguards are limited to product(s) covered by the ITC's serious injury finding.[9] Further, as described elsewhere, section 2254(b)(1)(B) contains preconditions

---

[9] Conversely, appellees' comparison to requirements to take anti-circumvention actions under 19 U.S.C. § 2254(b)(2) is misplaced, given the "additional action" that may be appropriate in that context. Invenergy Br. 23-24.

distinct from those applicable to initiating action. Gov't Br. 40. These limit the hypothetical scenarios, while showing that Congress enacted different requirements applicable to modifying a safeguard.

Appellees additionally contend that allowing the President to modify safeguard measures without re-weighing costs and benefits would be inconsistent with the safeguard statute's objectives. Invenergy Br. 23-25. The objective, however, is to facilitate the domestic industry's positive adjustment to import competition. Weighing costs and benefits is a condition on the exercise of the President's discretion, not an "objective." In any event, because Congress has spoken as to when cost/benefit weighing is required, the Court must presume that its omission in section 2254(b)(1) is purposeful. *See Bates*, 522 U.S. at 29-30.

Additionally, appellees claim that the President's statements regarding the potential for further action when he proclaimed the safeguard in *Proclamation 9693* acknowledge the need for further cost/benefit analysis. Invenergy Br. 7. This is a mischaracterization. The President stated: "If I determine that further action is appropriate and feasible to facilitate efforts by the domestic industry to make a positive adjustment to import competition and to provide greater economic and social benefits than costs, *or if I determine that the conditions under section [2254(b)(1)] are met*, I shall reduce, modify, or terminate the action established in this proclamation accordingly." *Proclamation 9693*, 83 Fed. Reg. at 3,542 ¶ 12

(emphasis added). The President thus *distinguished* "further action" requiring a new cost/benefit determination from actions under section 2254(b)(1). Appellees omit this language, which refutes their claim that the President "explicitly recognized . . . that any modifications to the safeguard measure must be preceded by *another* cost/benefit analysis."[10] Invenergy Br. 2, 7, 22, 26.

The language also contradicts appellees' argument that the President's cost/benefit determination in *Proclamation 9693* did not fulfill his obligations under the statute. *See* Invenergy Br. 21-23. That is because it appears immediately after his cost/benefit determination. *Proclamation 9693*, 83 Fed. Reg. at 3,542 ¶ 12. The paragraph indicates that the original cost/benefit determination applied to the President's announcement of a plan of action including potential modifications under section 2254(b)(1). *Cf. Transpacific*, 4 F.4th at 1318-19, 1321-22 (President could announce continuing course of action and modify it accordingly, without applying requirements to "each individual discrete imposition on imports").

### B. Alternatively, The Trial Court Correctly Held That *Proclamation 10101* Evidenced The President's Cost/Benefit Determination

Even assuming section 2254(b)(1)(B) requires further cost/benefit analysis, the trial court correctly found the requirement satisfied. Appx27-28. The court

[10] Moreover, that the President later stated that extending the safeguard under 19 U.S.C. § 2253(e)(1)(B) "will provide greater economic and social benefits than costs" does not mean that section 2254(b)(1)(B)—or section 2253(e)(1)(B) for that matter—*requires* such a cost/benefit analysis. Invenergy Br. 22; *Proclamation 10339*, 87 Fed. Reg. 7,357, 7,359 ¶ 10 (Feb. 4, 2022).

explained that "there is no requirement in either Section [2251(a)] or Section [2254(b)(1)(B)] that the President set forth his analysis in specific detail." *Id.* Here, the President found that the bifacial exclusion "has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in *Proclamation 9693*" such that "it is necessary to revoke that exclusion," and that "to achieve the full remedial effect envisaged for [*Proclamation 9693*], it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent." *Proclamation 10101*, 85 Fed. Reg. at 65,640 ¶ 9. The President twice determined that the exclusion "impaired" the safeguard he had found necessary to facilitate positive adjustment and provide greater benefits than costs, and that modifications were thus "necessary" to achieve its purpose. *Id.*

Moreover, by withdrawing the bifacial exclusion and slowing the reduction in the safeguard measure's fourth year, the President sought to restore the balance upset by the flood of imports from the bifacial exclusion. *See id.; ITC Mar. 2020 Report*, USITC Pub. 5032, at II-15–18. Thus, *Proclamation 10101* did not impose economic or social costs beyond those envisaged in *Proclamation 9693*. It simply restored relief the President had determined was necessary to facilitate a positive adjustment to import competition and provide greater benefits than costs.

Accordingly, "[b]y determining that the bifacial exclusion 'impaired' the action taken under *Proclamation 9693*, which was itself deemed necessary to

'facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs,' the President weighed the necessity of *Proclamation 10101's* alterations." Appx27-28. Further, "by referring back to the purpose of the safeguards issued by *Proclamation 9693* and thus to that proclamation's express consideration of the economic and social costs and benefits of the safeguard measures, the President evinced his general consideration of the costs and benefits of the changes." Appx28. To the extent that section 2254(b)(1)(B) requires appraisal of a modification's costs and benefits, "the assessment of costs and benefits apparent here satisfies the statutory requirement." *Id.*

Appellees' contrary arguments are unpersuasive. Invenergy Br. 26-33. First, appellees are incorrect to claim that the President acted contrary to an explicit statutory mandate because the trial court correctly concluded that the President's determinations in *Proclamation 10101* evidence his cost/benefit assessment. *Id.* at 26, 31. Indeed, given that there is no language whatsoever concerning a cost/benefit requirement in section 2254(b)(1)(B), the trial court was clearly correct in holding that "there is no requirement . . . that the President set forth his analysis in specific detail." Appx28.

Appellees disagree that the President's determinations evidence his cost/benefit consideration. Invenergy Br. 27-29. But the trial court's conclusion is

sensible, whereas appellees make speculative assumptions that the President's findings only concern the domestic industry's adjustment, rather than costs and benefits of modification. *Id.* at 28-31. Appellees concede that the President grounded his determinations in the ITC reports—including the report on potential modifications to the measure—which paint a thorough picture of their effects. *Id.*; *Proclamation 10101*, 85 Fed. Reg. at 65,640 ¶¶ 6, 9.

Finally, appellees' argument that the President's cost/benefit determination in *Proclamation 9693* "cannot substitute" for a new determination in *Proclamation 10101* misses the point. Invenergy Br. 31-33. The trial court found, correctly, that *Proclamation 10101* sufficiently indicated that the President had considered the costs and benefits of his actions. Appx27-28.

## CONCLUSION

For these reasons, we respectfully renew our request that the Court reverse the trial court's judgment and direct judgment in favor of defendants.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Joshua E. Kurland
JOSHUA E. KURLAND
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Fax: (202) 353-0461
Email: Joshua.E.Kurland@usdoj.gov

*Attorneys for Defendants-Appellants*

OF COUNSEL:
MICHAEL T. GAGAIN
Assistant General Counsel
Office of the United States Trade Representative
Washington, D.C. 20508

October 17, 2022

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Circuit Rule 32(b) and the Court's order of October 3, 2022, undersigned counsel certifies that the word processing software used to prepare this brief indicates that it contains a total of 10,829 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, a proportionally spaced typeface.

/s/ Joshua E. Kurland