# United States Court of Appeals for the Federal Circuit

---

**SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, ACTING COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellants*

---

2022-1392

---

Appeal from the United States Court of International Trade in No. 1:20-cv-03941-GSK, Judge Gary S. Katzmann.

---

Decided: November 13, 2023

---

MATTHEW R. NICELY, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, argued for plaintiffs-appellees Solar Energy Industries Association, NextEra Energy, Inc. Also represented by JULIA K. EPPARD, DEVIN S. SIKES, JAMES EDWARD TYSSE, DANIEL MARTIN WITKOWSKI.

AMANDA SHAFER BERMAN, Crowell & Moring, LLP,

Washington, DC, argued for plaintiff-appellee Invenergy Renewables LLC. Also represented by JOHN BOWERS BREW, LARRY EISENSTAT, ROBERT L. LAFRANKIE; FRANCES PIERSON HADFIELD, New York, NY.

CHRISTINE STREATFEILD, Baker & McKenzie LLP, Washington, DC, for plaintiff-appellee EDF Renewables, Inc.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for all defendants-appellants. Defendants-appellants United States, United States Customs and Border Protection, Troy Miller also represented by BRIAN M. BOYNTON, TARA K. HOGAN, PATRICIA M. MCCARTHY. Defendant-appellant United States also represented by MICHAEL THOMAS GAGAIN, Office of the General Counsel, Office of the United States Trade Representative, Washington, DC.

JONATHAN STOEL, Hogan Lovells US LLP, Washington, DC, for amici curiae Chamber of Commerce of the United States of America, American Clean Power Association. Also represented by MICHAEL JACOBSON, MOLLY NEWELL; KATHERINE BOOTH WELLINGTON, Boston, MA. Amicus curiae Chamber of Commerce of the United States of America also represented by TARA S. MORRISSEY, United States Chamber Litigation Center, Washington, DC.

---

Before LOURIE, TARANTO, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

In 2018, the President adopted certain safeguard measures to protect the domestic solar panel industry. In particular, the President issued Proclamation 9693, which imposed duties on imports of solar panels into the United States. *See Proclamation 9693: To Facilitate Positive*

*Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541 (Jan. 23, 2018). The duties of Proclamation 9693 began at 30% and were scheduled to decrease each year to 25%, 20%, and then, in their final, fourth year, 15%. *See id.* at 3548. Importers of a certain type of solar panel – called bifacial solar modules, which "consist of cells that convert sunlight into electricity on both the front and back of the cells," J.A. 4 – petitioned the United States Trade Representative ("USTR") for an exclusion, asking that bifacial solar panels not be subjected to the duties. The USTR granted the exclusion, but then quickly reversed course, with the consequence that the duties of Proclamation 9693 remained scheduled to be imposed on bifacial panels. Following litigation in the Court of International Trade ("trade court"), and additional actions by the USTR, bifacial solar panels were again excluded from the duties.

In October 2020, the President issued Proclamation 10101, "modifying" Proclamation 9693 to withdraw the exclusion of bifacial solar panels from the scheduled duties, and also to increase the fourth-year duty rate from 15% to 18%. *See Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products)*, 85 Fed. Reg. 65639 (Oct. 16, 2020). In response to Proclamation 10101, importers of bifacial solar panels brought suit against the United States in the trade court on the grounds that the proclamation exceeded the power of the President. Their principal contention was that the statute authorizing the President to "modify" Proclamation 9693 only allowed him to make previously adopted safeguard measures more trade-liberalizing, but eliminating the exclusion of bifacial panels and raising the fourth-year duty were trade-restrictive. The suing parties further argued that even if the

President had the authority to "modify" safeguards in a trade-restrictive direction, he failed to follow appropriate procedures in doing so.

The trade court agreed with the importers that the statutory authority to "modify" a safeguard is limited to trade-liberalizing changes. While the trade court rejected the importers' procedural challenges, it nonetheless set aside Proclamation 10101 for exceeding the President's authority. The government now appeals from the trade court's judgment in favor of the importers.

We conclude that the President's interpretation of the applicable statute, which allows him to "modify" an existing safeguard, is not a clear misconstruction. That is, the President's view that a "modification" may include a change in a trade-restricting direction, and is not limited to trade-liberalizing changes, is not unreasonable. We further determine that, in adopting Proclamation 10101, the President did not commit any significant procedural violation of the Trade Act. Accordingly, we reverse the judgment of the trade court.

## I

### A

Section 201 of the Trade Act of 1974, codified at 19 U.S.C. § 2251, provides the President of the United States with the power to impose "safeguards" (also referred to as "safeguard measures") that protect domestic industries from serious injury caused by imports. Statutory Section 2251 broadly directs the President to "take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs." 19 U.S.C. § 2251(a).

Imposition of a new safeguard is governed by 19 U.S.C. §§ 2252 and 2253, which set out a process that typically

includes: (i) a petition from the domestic industry filed with the International Trade Commission ("Commission"), setting out the purposes for which the safeguard is sought, "which may include facilitating the orderly transfer of resources to more productive pursuits, enhancing competitiveness, or other means of adjustment to new conditions of competition"; (ii) an investigation and determination by the Commission as to "whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article"; (iii) the submission of a report by the Commission to the President, which may include a recommendation of presidential action to "address the serious injury, or threat thereof, to the domestic industry," such as the imposition of or increase in duty on the imported article or a modification or imposition of a quantitative restriction on the importation of the article into the United States; and (iv) a decision by the President "to take all appropriate and feasible action" that will provide "greater economic and social benefits than costs" and will assist domestic industry. Generally, safeguards adopted pursuant to these procedures may not be in effect for longer than four years without an additional petition from the domestic industry. *See id.* §§ 2253(e)(1)(A)-(B), 2254(c). Certain types of safeguards, including imposition of duties lasting more than one year, must be "phased down at regular intervals during the period in which the action is in effect." *Id.* § 2253(e)(5).

Once a particular safeguard is in place, Section 2254 governs efforts to change the existing measure. Section 2254(a)(1) requires, among other things, that the Commission "monitor developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition." *Id.* § 2254(a)(1). If a safeguard is imposed for longer than

three years, the Commission must, no later than the midpoint of the period for which it is adopted, "submit a report ["Commission Report"] on the results of the monitoring . . . to the President and to the Congress" *Id.* § 2254(a)(2). After receiving the Commission Report, the President is empowered to take certain actions with respect to the safeguard, with different statutory provisions applying depending on whether the domestic industry has or has not made a positive adjustment to import competition.

Specifically, 19 U.S.C. § 2254(b), entitled "Reduction, modification, and termination of action," provides that "[a]ction taken under section 2253 of this title," i.e., a safeguard, "may be reduced, modified, or terminated by the President," after receiving the Commission Report,

> if the President . . .
>
> (A) . . . determines, on the basis that either –
>
> > (i) the domestic industry has *not* made adequate efforts to make a positive adjustment to import competition, or
> >
> > (ii) the effectiveness of the action taken under section 2253 of this title has been impaired by changed economic circumstances,
>
> that changed circumstances warrant such *reduction, or termination*; or
>
> (B) determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such *reduction, modification, or termination* on such basis, that the domestic industry *has made* a positive adjustment to import competition.

*Id.* § 2254(b)(1) (emphasis added). While subparagraph (b)(1)(B) permits the President to "reduc[e], *modif[y]*, or

terminat[e]" a safeguard when the domestic industry has made a positive adjustment to import competition, subparagraph A more narrowly describes the President's power as extending only to a "reduction, or termination" (and not also a "modification") of an existing safeguard where domestic industry has *not* made such an adjustment.

B

On January 23, 2018, President Trump issued Proclamation 9693, which imposed duties on imports of certain quantities of Crystalline Silicon Photovoltaic (CSPV) solar panels for a period of four years, beginning at 30% *ad valorem* in the safeguard's first year and phasing down to 25%, 20%, and 15% in the ensuing years. *Proclamation 9693*, 83 Fed. Reg. at 3548-49. Proclamation 9693 further delegated to the USTR authority to grant "exclusion of a particular product from the safeguard measure." *Id.* at 3543. Acting under this authority, in June 2019 the USTR granted an exclusion for solar panels consisting of bifacial solar cells. *See Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27684, 27685 (June 13, 2019). This exclusion had the effect of *not imposing* the new tariffs on bifacial solar panels.

However, just months later, in October 2019, the USTR withdrew the exclusion, re-imposing the duties on these same bifacial products. *See Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54244 (Oct. 9, 2019). Litigation followed. Cases (which are not directly at issue here) brought by consumers, purchasers, and importers of bifacial solar panels resulted in the October 2019 withdrawal of the exclusion never becoming effective. *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019). That meant that bifacial solar panels remained exempted from imposition of the new duties. Thereafter, in April 2020, the USTR again withdrew the exclusion, seeking thereby to impose the duties on bifacial products. *See*

*Determination on the Exclusion of Bifacial Solar Panels from the Safeguard Measure on Solar Product*, 85 Fed. Reg. 21497 (Apr. 17, 2020). After more litigation, the trade court enjoined the April 2020 withdrawal. *See Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021); *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020).

In the meantime, the Commission completed its statutorily required midpoint review of the safeguards imposed by Proclamation 9693 and, in February 2020, provided the Commission Report to the President and Congress. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*, Inv. No. TA-201-075, USITC Pub. 5021, at 2 (Feb. 2020). In March 2020, pursuant to 19 U.S.C. § 2254(a)(4) and in response to the USTR's request, the Commission additionally published a report containing its advice "regarding the probable economic effect on the domestic crystalline silicon photovoltaic (CSPV) cell and module manufacturing industry of modifying the safeguard measure on CSPV products." *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure*, Inv. No. TA-201-075, USITC Pub. 5032, at ES-1 (Mar. 2020). That report contained the Commission's determination that the "exclusion for imports of bifacial modules . . . is likely to have significant effects on prices and trade in both modules and cells," having the effect of limiting the positive impact of the safeguard adopted in Proclamation 9693. *Id.* at ES-4. In the wake of these two reports, the President, through the USTR, received a petition, consisting of three letters,[1] from representatives of a

---

[1] The trade court held these "letters submitted to the Trade Representative are, taken collectively, sufficient to

majority of the bifacial solar panel domestic industry requesting, among other things, that the President (1) withdraw the bifacial exclusion and (2) slow down the rate of reduction of the safeguard duty for the remainder of the scheduled term.

On October 16, 2020, the President issued Proclamation 10101. *See Proclamation 10101*, 85 Fed. Reg. at 65640. As pertinent here, Proclamation 10101 modified safeguards that had been implemented in Proclamation 9693, including by withdrawing the exclusion of bifacial solar panels, thereby again re-imposing the duties on these panels. Proclamation 10101 further provided that the fourth-year duty rate on CSPV modules, including bifacial solar panels, would be increased from 15% to 18%. *See* 85 Fed. Reg. at 65540-42. In particular, Proclamation 10101 provided that:

> [T]he domestic industry has begun to make positive adjustment to import competition, shown by the increases in domestic module production capacity, production, and market share. . . .
>
> [T]he exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in Proclamation 9693 in light of the increased imports of competing products such exclusion entails, and that it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels; . . .
>
> [T]he exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-year action I proclaimed in Proclamation 9693, and that to achieve the full remedial

---

constitute a petition to the President." J.A. 13. Appellees do not challenge this finding on appeal.

> effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent.

*Proclamation 10101*, 85 Fed. Reg. at 65640. The appeal now before us requires us to determine whether the President had authority to make these modifications to Proclamation 9693 by adoption of Proclamation 10101.[2]

C

On December 29, 2020, Plaintiffs-Appellees – Solar Energy Industries Associates ("SEIA") as well as Nextera Energy Inc., Invenergy Renewables LLC, and EDF Renewables, Inc. – filed suit at the trade court challenging Proclamation 10101's modifications to the safeguards imposed by Proclamation 9693. *See Solar Energy Indus. Ass'n v. United States*, 553 F. Supp. 3d 1322 (Ct. Int'l Trade 2021) ("SEIA Decision"). Defendants-Appellants – the United States, the United States Customs and Border Protection ("CBP"), and Christopher Magnus in his capacity as Commissioner of CBP (collectively, the "government") – moved to dismiss, and Appellees cross-moved for summary judgment. The trade court granted summary judgment to Appellees and set aside the modifications contained in Proclamation 10101.

---

[2] In February 2022, President Biden, acting pursuant to his authority under Section 2253, extended the safeguard measure and excluded bifacial panels from the extended measure. *See Proclamation 10339, To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 87 Fed. Reg. 7357 (Feb. 9, 2022). Thus, as the parties agree, this appeal only affects bifacial panels that were imported into the U.S. after October 25, 2020 and before February 7, 2022.

In reaching its decision, the trade court concluded that "while Proclamation 10101 complied with the procedural requirements of the safeguard statute, it nevertheless clearly misconstrued the reach of Section [2254](b)(1)(B) of the Trade Act, and thus constituted an action outside the President's delegated authority."[3] J.A. 34. More specifically, the trade court reasoned that Section 2254(b)(1)(B) "permits only trade-liberalizing modifications to existing safeguard measures," yet "Proclamation 10101's withdrawal of the exclusion of bifacial solar panels and increase of the safeguard duties on CSPV modules" were trade-restrictive. J.A. 6. Therefore, the trade court held that the modifications of Proclamation 10101 were based on a clear misconstruction of the statute. *See* J.A. 6, 28. The trade court was persuaded that, as Appellees argued, Section 2254(b)(1)(B) "was intended to provide an escape hatch" from previously imposed safeguards "where domestic industry has adequately adapted to import competition." J.A. 32. It was not, in the court's view, Congress's intent to allow for a safeguard to be "modified" so as to make it more restrictive of free trade when domestic industry had already adjusted to such competition. *See id*. Hence, the

---

[3] The trade court found the President acted outside his delegated authority solely because it found the President's interpretation of Section 2254(b)(1)(B) was a clear misconstruction. *See* J.A. 33. There was no separate analysis of the "acting outside of authority" issue. Nor do the parties identify any other basis, besides the construction of Section 2254(b)(1)(B) and its associated procedural requirements, on which Proclamation 10101 could be deemed an action taken outside of the President's delegated authority. Thus, our conclusion that the President did not clearly misconstrue his statutory authority leads to the conclusion that the President also did not act outside of his delegated authority.

trade court set aside Proclamation 10101 and enjoined the government from enforcing it. *See* J.A. 6.

The government timely appealed. Before us, the government challenges the trade court's holding that the President clearly misconstrued Section 2254(b)(1)(B) when he interpreted it as permitting trade-restrictive modifications to safeguard measures. The government also disputes the trade court's conclusion that Proclamation 10101's modifications were actually trade-restrictive. Appellees ask us to affirm the trade court's determination that the President's interpretation of "modify" in Section 2254(b)(1)(B) as permitting trade-restrictive changes is a clear misconstruction of the statute.[4] Appellees also propose alternative grounds for affirmance, namely that the President failed to comply with the procedural requirements of the safeguard statute.

We conclude that the President did not clearly misconstrue Section 2254(b)(1)(B) when he interpreted it as permitting trade-restrictive modifications. We further conclude that, in issuing Proclamation 10101, the President did not commit any significant procedural violation of the Trade Act. Accordingly, we reverse and remand for the trade court to enter judgment for the government.

## II

The trade court had jurisdiction pursuant to 28 U.S.C. § 1581(i). We have jurisdiction under 28 U.S.C. § 1295(a)(5).

"We review the Court of International Trade's grant of summary judgment de novo, including by deciding de novo

---

[4] Appellees SEIA and Nextera Energy, Inc. filed a joint brief (ECF No. 35) which we refer to as the "SEIA Brief" or "SEIA Br." Appellees Invenergy Renewables LLC and EDF Renewables, Inc. filed a separate brief (ECF No. 34) which we refer to as the "EDF Brief" or "EDF Br."

the proper interpretation of governing statutes and regulations." *Shinyei Corp. of Am. v. United States*, 524 F.3d 1274, 1282 (Fed. Cir. 2008). In the absence of any genuine dispute of facts, we apply de novo review to the question of whether statutory prerequisites for presidential action under the safeguard statute were satisfied. *See Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1359-61 (Fed. Cir. 2003). "Although we apply a de novo standard of review, we give great weight to the informed opinion of the Court of International Trade." *Aspects Furniture Int'l, Inc. v. United States*, 42 F.4th 1366, 1369 (Fed. Cir. 2022). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." U.S. CIT R. 56(a).

Notwithstanding the de novo standard we generally apply to review of grants of summary judgment, "[i]n international trade controversies of th[e] highly discretionary kind" we confront today, which "involv[e] the President and foreign affairs," this court has a "very limited role . . . ." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985). We may only set aside presidential action taken pursuant to statutory Sections 2251-53 of the Trade Act if it involves "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Id.*; *see also USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1366 n.3 (Fed. Cir. 2022). "[T]he President's findings of fact and the motivations for his action are not subject to review." *Maple Leaf*, 762 F.2d at 89 (citation omitted); *see also Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018).

## III

The trade court granted summary judgment to Appellees based on its determination that the President clearly misconstrued Section 2254(b)(1)(B) by interpreting it as permitting trade-restricting modifications. On appeal, the

government challenges this conclusion on two grounds. First, the government contends that "[n]othing in the safeguard statute limits the President's authority under section [2254(b)(1)(B)] only to making modifications that liberalize trade." Opening Br. at 26. Second, the government argues that even if Section 2254(b)(1)(B) does not extend to trade-restricting modifications, the modifications that Proclamation 10101 makes to Proclamation 9693 do not "increase" restrictions and, hence, are permitted by the statute. We agree with the government's first contention and find it unnecessary to address the second.

A

It is important to stress at the outset that our review of Proclamation 10101 is limited to whether the President *clearly misconstrued* Section 2254(b)(1)(B). Because presidential action to impose a safeguard measure, as well as the decision to modify such a measure, involves presidential action in the context of foreign affairs, our review is "very limited." *Maple Leaf*, 762 F.2d at 89. We are not called upon to decide whether the government's interpretation of the statute is correct or how we would have construed the statute as an original matter. Nor do we evaluate the relative merits of the parties' competing interpretations. Rather, our sole inquiry is whether the President's interpretation, that he is permitted to make trade-restricting modifications and not just trade-liberalizing ones, is a clear misconstruction of the statute. Applying this standard of review, we hold the President did not clearly misconstrue Section 2254(b)(1)(B).

Our review "begins with the language of the statute" itself. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal quotation marks omitted); *see also PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1357 (Fed. Cir. 2018). Section 2254(b)(1)(B) provides that safeguards previously adopted under Section 2253 "may be reduced, modified, or terminated" by the President. The

statute does not expressly indicate whether "modify" includes trade-restrictive changes or is limited to trade-liberalizing alterations. We view this statutory silence as favoring the government's broader view, as the statute simply does not contain the narrowing limitation the trade court read into it. *See generally Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . .").[5]

Ordinarily, Congress uses words consistent with their well-understood meaning. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). Here, both sides find support for their interpretations of "modify" in dictionary definitions. Appellees direct us to a definition of "modify" as "to make 'less extreme.'" SEIA Br. at 17 (quoting J.A. 30). The government, by contrast, points us to a dictionary definition of "modify" as "making of a limited change in something." Opening Br. at 24 (citing J.A. 30). Other courts, including the Supreme Court, have applied the government's non-

---

[5] By contrast, an earlier, unenacted version of the legislation that ultimately became Section 2254(b)(1)(B) would have expressly restricted the President's authority, upon receiving the Commission Report, as being to "reduce, modify *(but not increase)* or terminate any action." H.R. Conf. Rep. 100-576, at 687, *reprinted in* 1988 USCCAN 1547, 1720 (emphasis added). The parenthetical prohibiting trade-restrictive modifications was deleted during the legislative process. Generally, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23-24 (1983).

directionally restricted definition of "modify" in other contexts. *See MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 225 (1994) (collecting definitions and noting that "modify" typically connotes moderate change without indicating which direction such change must take). Appellees concede that the government's definition is a correct one but then attempt to persuade us that their preferred definition is better supported by the broader structure and purpose of the safeguard statute. *See* SEIA Br. at 17-18 ("'[M]odify' can *also* mean 'to change moderately or in minor fashion.'"). With our review restricted to whether the President's interpretation of "modify" is a clear misconstruction, we view the government's dictionary support, other courts' precedents, and Appellees' concession as strong indicators that Appellees have failed to show the President's interpretation of "modification" is a clear misconstruction.

Appellees emphasize that the meaning of "modify" in Section 2254(b)(1)(B) can only be properly understood in the context of "[t]he broader structure and stated purpose of the statute." SEIA Br. at 18-19, 26. While we agree that structure and purpose should be taken into account, here these considerations only solidify our conclusion that Section 2254(b)(1)(B) was not clearly misconstrued to permit trade-restricting modifications to existing safeguards.

First, Section 2251 provides that the safeguard statute has a broad remedial purpose, directing the President to "*take all appropriate and feasible action within his power*" to meet the statute's objectives and provide relief to domestic industry. 19 U.S.C. § 2251 (emphasis added). This expansive directive supports the view that the President is empowered to make modifications as necessary to provide continued relief to domestic industry, regardless of whether that modification is in the direction of trade-restriction or trade-liberalization. Certainly, there is no suggestion in Section 2251 that if the President determines a slightly more restrictive safeguard is necessary, he is,

nevertheless, permitted only to adopt a trade-liberalizing modification.

Second, the Trade Act has its own general definition of "modification." It provides: "[t]he term 'modification', as applied to any duty or other import restriction, includes the elimination of any duty or other import restriction." *Id.* § 2481(6). Plainly, this is an open-ended definition and does not *exclude* anything, including further restrictions. Nor does it even suggest that assessment of whether a change qualifies as a "modification" is based to any extent on the direction of the change (i.e., trade-liberalizing or -restricting).

Other provisions of the Trade Act are similarly supportive of the government's interpretation. Section 2254(b)(3), for example, provides that the President may "modify" a safeguard to bring it into conformity with a decision of the World Trade Organization ("WTO"), which could require a trade-liberalizing or trade-restricting modification, depending on the relative relationship between an existing U.S. safeguard and a WTO determination. *See id.* § 2254(b)(3). Similarly, Sections 2252(e)(2)(C) and 2253(a)(3)(C) authorize the Commission to recommend, and the President to impose, "modification . . . of any quantitative restriction on importation," modifications which Appellees do not dispute may include changes in a more trade-restrictive direction.

Because the Trade Act clearly uses "modify" and "modification" in ways that permit trade-restricting changes, Appellees next insist that "Congress clearly did not give the word 'modification' the same connotation throughout the Trade Act." SEIA Br. at 32. We are not persuaded. "[A] term appearing in several places in a statutory text is generally read the same way each time it appears." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994). Appellees insist that Section 2254(b)(3)'s inclusion of the phrase "notwithstanding paragraph (1)" signifies that Section 2254(b)(1)'s

modification power is different from that power as delineated in Section 2254(b)(3). But we agree with the government that "[n]otwithstanding paragraph (1)" means that modifications under Section 2254(b)(3) may be accomplished without having to fulfill the procedural requirements of Section 2254(b)(1) (e.g., receipt of the Commission Report or a domestic industry petition). *See* Reply Br. at 10.

Appellees, echoing the trade court, further contend that permitting the President to make trade-restrictive modifications pursuant to Section 2254(b)(3) creates a loophole through which the President can bypass the procedural requirements Section 2253 establishes for adopting a safeguard measure in the first place. *See* SEIA Br. at 25; J.A. 32. We disagree. Even under the government's reading of Section 2254(b)(1)(B), the President's modification power is far from unbounded. For instance, Section 2253(e)(5) requires duties to be "phased down at regular intervals," ensuring that any duty rate modification cannot exceed the highest rate imposed by the original safeguard measure. Thus, here, because the maximum tariff rate imposed by Proclamation 9693 was 30% – a measure adopted only after the President followed all of the procedures set out in Section 2253 – the President could not, through his modification power under Section 2254, impose a tariff greater than 30%. Additionally, the President may not modify a safeguard pursuant to Section 2254 any time he wishes; instead, he must wait until after receiving the Commission Report as well as a petition from the majority of domestic industry (which may not ever be forthcoming).[6]

---

[6] As we explain below, however, the President's power is not limited to making the modifications that are advocated by the Commission Report and requested by the petition. Still, the receipt of the Commission Report and of

Furthermore, because the power to "modify" a safeguard is included only in subparagraph (b)(1)(B), and not also in (b)(1)(A), the President may only make a modification after determining that domestic industry is making a positive adjustment to import competition. *See infra* at pp. 21, 23-26. While Congress is free to create a "loophole" if it wishes, here we think it has, instead, cabined the President's modification authority – just not with the further constraint of limiting modifications to only trade-liberalizing changes.

As yet another argument, Appellees contend that "[t]he total lack of historical usage" of Section 2254(b)(1)(B) "to restrict trade is further evidence weighing in favor of the trade court's interpretation." SEIA Br. at 26. Even assuming historical practice, or the lack of it, could transform an otherwise-reasonable reading of a statute into a clear misconstruction, the government has directed us to one instance in which it appears President Clinton acted pursuant to Section 2254(b)(1) to take trade-restrictive action. *See* Opening Br. at 39-40 & n.8 (citing *Proclamation 7314: To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*, 65 Fed. Reg. 34899 (May 26, 2000)); Reply Br. at 17-18. Hence, there does appear to be historical support for President Trump's construction of presidential authority under Section 2254(b)(1)(B).

Finally, Appellees point to the distinction between subsection (b)(1)(A), which applies where "domestic industry has *not* made adequate efforts to" adjust to import competition, and subsection (b)(1)(B), which applies where "domestic industry *has made* a positive adjustment to import competition." SEIA Br. at 20-21 (emphasis added). In the former circumstance, where domestic industry has not responded positively, Section 2254(b)(1)(A) provides the

a domestic industry petition are the prerequisites to a Presidential modification of a safeguard.

President authority only to "reduce" or "terminate" the safeguard while in the latter scenario, where domestic industry "has made a positive adjustment, Section 2254(b)(1)(B) more broadly provides the President authority to "reduce, *modify*, or terminate" a safeguard. Appellees insist it would be backwards for Congress to permit the President to "modify" trade restrictions to become more restrictive where domestic industry has positively adjusted to competition while depriving the President of such trade-restricting power where domestic industry has not. *See, e.g.*, SEIA Br. at 18 ("It would make no sense for Congress to authorize further trade *restrictions* after the domestic industry already 'has made' a positive adjustment . . . ."). We side with the government on this point, agreeing with it that "[t]his distinction logically suggests that Congress intended to give the President greater flexibility to take action when progress is being made, to protect and ensure the continuation of that progress." Opening Br. at 34. In sum, we find this argument of Appellees no more persuasive than their many other contentions.

For all of these reasons, we conclude it was not a clear misconstruction for the President to interpret his authority under Section 2254(b)(1)(B) as permitting him to adopt trade-restrictive modifications, as well as trade-liberalizing modifications.

B

The government additionally argues that "even if 'modification' in Section 2254(b)(1)(B) were construed as prohibiting the President from implementing an 'increase' to the safeguard measure, Proclamation 10101 should still be sustained as lawful because the modifications at issue are neutral in relation to the original safeguard measure." Opening Br. at 20. In the government's view, all that Proclamation 10101 accomplished was "to restore application of the safeguard measure to bifacial panels and to slow the rate at which the measured phased down in its fourth

year," neither of which were trade-restricting "increases" in measures imposed on imports. *Id.* at 2. Because we find it was not a clear misconstruction to interpret Section 2254(b)(1)(B) as permitting trade-restrictive modifications to safeguard measures, we need not, and do not, reach this issue.

IV

Our siding with the government on whether the President's statutory interpretation was a clear misconstruction is not enough to resolve this appeal. Appellees offer, as alternative grounds for affirmance, the arguments they presented to the trade court for a finding that, in adopting Proclamation 10101, the President failed to comply with the procedural requirements of the safeguard statute. In particular, Appellees renew their contentions that: (1) the petition leading to Proclamation 10101 was inadequate to meet the "on such basis" requirement of Section 2254(b)(1)(B); (2) the President's finding that the domestic industry "has begun to make" a positive adjustment to import competition does not meet the statutory requirement that domestic industry "has made" such adjustment; and (3) the President failed to meet his obligation to weigh the economic and social costs and benefits of his alterations to the safeguard tariffs imposed by Proclamation 9693 before issuing Proclamation 10101. SEIA Br. at 4, 20 n.1 (adopting arguments from EDF Brief); EDF Br. at 15-16. The trade court rejected each of these positions and we do so as well.

A

Appellees argue that the President lacked authority under Section 2254(b)(1)(B) to modify the safeguards imposed by Proclamation 10101 because the petition submitted by domestic industry did not base the modification request on domestic industry having made a positive adjustment to import competition. The portion of Section 2254(b)(1)(B) on which this argument is based provides:

> Action taken under section 2253 [i.e., a safeguard] . . . may be reduced, modified, or terminated by the President (but not before the President receives the [Commission] report . . .) . . . if the President . . . determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination *on such basis*, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b) (emphasis added). Appellees contend that the phrase "on such basis" refers to the petition, such that the petition itself must be based on domestic industry's view that it has made a positive adjustment to import competition. The trade court, agreeing with the government, held instead that "on such basis" refers to the President's determination, which may be based on the Commission Report's finding that domestic industry has made a positive adjustment, regardless of whether the petition also contends the same. In other words, the parties agree that "such" in "on such basis" refers back to something indicated or implied earlier in the provision, but the government contends that the thing being referred to is the Commission mid-point Report while Appellees insist the thing is, by contrast, the domestic industry petition.

We find both views to be reasonable. Section 2254(b) expressly refers to both the Commission Report and the domestic industry petition before it sets out the requirement that the President make a determination, that domestic industry has made a positive adjustment, "on such basis." That "basis" could be the Commission Report or could just as easily be the industry petition. *See* J.A. at 20 (trade court explaining that "a determination made on the basis of the [Commission] report would reflect the views of an independent body based on information and argument provided by all market participants, and would therefore align with . . . Section [2254](b)(1)(B)'s overall aim of permitting

the adjustment of safeguard measures when the industry as a whole begins to adapt to competition") (internal quotation marks omitted). It follows, then, that the government's interpretation is *not* a clear misconstruction and, hence, we must affirm the trade court's conclusion on this point. *See Maple Leaf*, 762 F.2d at 89. We agree with the trade court that the President did not violate the "on such basis" procedural requirement for adopting a modification.

The trade court also concluded that even if Appellees' interpretation on this point were a clear misconstruction, "the failure of petitioners to comply with [the petition] requirement would not render Proclamation 10101 unlawful." J.A. 21. Given our other conclusions, it is unnecessary for us to review this determination of the trade court.

B

Appellees next argue that the President failed to comply with Section 2254(b)(1)(B)'s requirement to determine that "the domestic industry *has made* a positive adjustment to import competition" (emphasis added). As Appellees correctly observe, in Proclamation 10101 the President found that "the domestic industry *has begun to make* positive adjustment to import competition." *Proclamation 10101*, 85 Fed. Reg. at 65640 (emphasis added). According to Appellees, this is insufficient, as the President merely made a finding that positive adjustment had started but did not make the purportedly required finding that such positive adjustment be completed. Appellees insist that "'[h]as made' and 'has begun to make' do not mean the same thing." SEIA Br. 58.

Once again, we are not required to decide if Appellees' interpretation is reasonable or even the better view. Instead, we are asked only to determine if the government's view, that the statutory language "has made a positive adjustment" is broad enough to include circumstances in which domestic industry "has begun to make a positive adjustment," is a clear misconstruction. Like the trade court,

we hold that "the distinction between 'has made' and 'has begun to make' is too narrow to rise to the level of a clear misconstruction." J.A. 22.

It is reasonable to interpret "has made a positive adjustment" as relating to a process, which might be ongoing, rather than being limited to periods following a completed, successful adjustment. As the government notes, the statutory phrase is written in the present perfect tense, which can be used to refer to an action completed entirely in the past and also to action still in process. *See* Reply Br. at 36 (citing Kenneth G. Wilson, *The Columbia Guide to Standard American English* 342 (1993)). This plain meaning understanding of "has made" is supported by other parts of the Trade Act, which recognize that "positive adjustment" to import competition will occur over time and not on a single date. *See, e.g.,* 19 U.S.C. § 2254(c)(1) ("[T]here is evidence that the industry *is making* a *positive adjustment* to import competition.") (emphasis added); *id.* § 2254(d)(1) ("[T]he Commission shall evaluate the effectiveness of the actions in facilitating positive adjustment by the domestic industry to import competition."). Indeed, two of the conditions that the statute expressly identifies as constituting components of "a positive adjustment" – when "the domestic industry *experiences* an orderly transfer of resources" and "workers in the industry *experience* an orderly transition," *id.* § 2251 (emphasis added) – use the present tense, again reflecting that positive adjustment by domestic industry can involve an ongoing process.

Thus, we agree with the trade court that the President did not violate the procedural requirement that he determine that domestic industry "has made" a positive adjustment to competition from imports.

## C

Finally, we consider whether the President is required to re-weigh costs and benefits when modifying a safeguard pursuant to Section 2254(b)(1). The trade court concluded

that the President must do so and also that, in connection with Proclamation 10101, he did so. J.A. 27-28. We conclude, by contrast, that the President is not required to reweigh costs and benefits when modifying a safeguard measure. Thus, we need not decide whether the President complied with this non-requirement in issuing Proclamation 10101.

Two statutory provisions mention the President's obligation to weigh costs and benefits. The first is Section 2251(a), which provides:

> If the United States International Trade Commission (hereinafter referred to in this part as the "Commission") determines under [S]ection 2252(b) of this title that an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article, the President, in accordance with this part, shall take all appropriate and feasible action within his power which *the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.*

19 U.S.C. § 2251(a) (emphasis added). Section 2253(a) restates the President's authority to take safeguard action under Section 2251(a), reciting the requirement that the President must consider both long- and short-term benefits and costs. *See* 19 U.S.C. § 2253(a)(2)(E) ("In determining what action to take . . ., the President shall take into account . . . the short- and long-term economic and social costs of the actions authorized . . . relative to their short- and long-term economic and social benefits.").

These provisions expressly apply to the initial adoption of a safeguard measure and make no reference to

modification of such measures. The President's power to reduce, modify, or terminate an existing safeguard is governed by Section 2254(b)(1), which makes no mention whatsoever of cost-benefit determinations. Nor does any portion of the safeguard statute tie the requirement of a cost-benefit analysis, set out in Sections 2251(a) and 2253(a)(1)(A), to the President's power to reduce, modify, or terminate a safeguard, as provided for in Section 2254.

The trade court seems to have been persuaded to adopt the contrary view due, at least in part, to its concern that the government's interpretation "risks permitting absurd results" (e.g., a 1% initial tariff followed by a 50% modified tariff, with no cost-benefit analysis of the 50% rate) and might allow the modification "exception" of Section 2254 to "swallow . . . the rule" of Section 2251. J.A. 27. We do not share this fear. On any reading, a "modification" must be a relatively minor adjustment; expansion of a 1% duty to a 50% duty is obviously not a minor change. And any modification to a duty rate must comply with the phase-down requirement, preventing the modified tariff from being any higher than the tariff that was imposed in the preceding year. *See* Reply Br. at 42 (Government conceding "[t]he President's modification authority remains subject to the section 2253(e)(5) phase-down requirement"). More importantly, the trade court failed to explain how its conclusion is consistent with the actual language of the statute, or how the government's interpretation is a clear misconstruction.

We conclude that the President's view that he was not required to re-weigh the costs and benefits when modifying the safeguard pursuant to Section 2254(b)(1) is not a clear misconstruction. Thus, Appellees have failed to show that the President committed any procedural violation in issuing Proclamation 10101.

V

Because the President's interpretation of 19 U.S.C. § 2254(b)(1)(B) as permitting trade-restricting modifications is not a clear misconstruction, and because the President did not violate the procedural requirements of the statute, we reverse the trade court's judgment. Proclamation 10101 is not invalid.

**REVERSED AND REMANDED**

COSTS

No costs.