No. 2022-1392

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,
*Plaintiffs-Appellees*

v.

UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, CHRISTOPHER MAGNUS, Commissioner of U.S. Customs and Border Protection,
*Defendants-Appellants*

Appeal from the United States Court of International Trade in No. 1:20-cv-03941-GSK, Judge Gary S. Katzmann

### PLAINTIFFS-APPELLEES' PETITION FOR REHEARING EN BANC

John Brew
  jbrew@crowell.com
Amanda Shafer Berman
  aberman@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004-2595
(202) 688-3451

Christine M. Streatfeild
  Christine.streatfeild@bakermckenzie.com
BAKER & MCKENZIE LLP
815 Connecticut Ave, NW
Washington, DC 20006
(202) 835-6111

Matthew R. Nicely
  mnicely@akingump.com
James E. Tysse
  jtysse@akingump.com
Daniel M. Witkowski
  dwitkowski@akingump.com
Devin S. Sikes
  dsikes@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4000

January 11, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**   22-1392

**Short Case Caption**   Solar Energy Industries Association v. US

**Filing Party/Entity**   Solar Energy Industries Association; NextEra Energy, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:   01/11/2024

Signature:   /s/ Matthew R. Nicely

Name:   Matthew R. Nicely

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Solar Energy Industries Association | | |
| NextEra Energy, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable          ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 22-1392 |
| **Short Case Caption** | Solar Energy Industries Association v. US |
| **Filing Party/Entity** | Invenergy Renewables LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/11/2024

Signature: /s/ Amanda Shafer Berman

Name: Amanda Shafer Berman

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Invenergy Renewables LLC | | Invenergy Renewables Holdings LLC, Invenergy IRH Holdings LLC, IIC Renewables Holdings LLC, and Invenergy Investment Company LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---:|:---|
| **Case Number** | 22-1392 |
| **Short Case Caption** | Solar Energy Industries Association v. US |
| **Filing Party/Entity** | EDF Renewables, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/11/2024

Signature: /s/ Christine M. Streatfeild

Name: Christine M. Streatfeild

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| EDF Renewables, Inc. | | EDF S.A. is the parent company and has a greater than 10% ownership interest. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable              ☐    Additional pages attached

| | | |
|---|---|---|
| Kevin M. O'Brien (Baker & McKenzie LLP) | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable              ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# <u>TABLE OF CONTENTS</u>

STATEMENT OF RELATED CASES ....................................................vi

STATEMENT OF COUNSEL PURSUANT TO RULE 35(B)(2) ........................ vii

INTRODUCTION ..................................................................................1

STATEMENT OF THE CASE.................................................................2

ARGUMENT .........................................................................................5

    I.    *MAPLE LEAF* CONTRAVENES SUPREME COURT AND
        CIRCUIT PRECEDENT ....................................................5

        A.    The *Maple Leaf* Standard Is Neither Grounded In Nor
            Consistent With Supreme Court Precedent................................5

        B.    *Maple Leaf* Also Conflicts With Federal Circuit And
            Sibling Circuit Precedent ...........................................8

    II.   THIS APPEAL RAISES A PRECEDENT-SETTING
        QUESTION OF EXCEPTIONAL IMPORTANCE...........................10

    III.  THIS APPEAL PROVIDES AN IDEAL VEHICLE FOR
        RESOLVING THE QUESTION PRESENTED ................................14

CONCLUSION ....................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Ass'n of Exps. & Imps. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) ........................................................9

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023)........................................................10

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)........................................................13

*Chamber of Commerce of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)........................................................10

*Chevron, U.S.A., Inc. v. NRDC*,
467 U.S. 837 (1984)........................................................12

*Cole v. Young*,
351 U.S. 536 (1956)........................................................7, 8

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. 2023) ........................................................10

*Dalton v. Specter*,
511 U.S. 462 (1994)........................................................6

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976)........................................................7

*Florsheim Shoe Co. v. United States*,
744 F.2d 787 (Fed. Cir. 1984) ........................................................8, 9

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ........................................................10

*Gilda Indus., Inc. v. United States*,
622 F.3d 1358 (Fed. Cir. 2010) ........................................................12

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) .................................................................7

*Invenergy Renewables LLC v. United States*,
    552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) ........................3

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) .................................................................6

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .....................................................12, 16

*Loper Bright Enters. v. Raimondo*,
    No. 22-451, 143 S. Ct. 2429 (May 1, 2023) .......................12

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ...............................................10

*Maple Leaf Fish Co. v. United States*,
    762 F.2d 86 (Fed. Cir. 1985) ........................................*passim*

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) .............................................1, 6

*Sneaker Circus, Inc. v. Carter*,
    566 F.2d 396 (2d Cir. 1977) ..................................................9

*Stark v. Wickard*,
    321 U.S. 288 (1944) .................................................................10

*Timex V.I., Inc. v. United States*,
    157 F.3d 879 (Fed. Cir. 1998) .............................................12

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (Fed. Cir. 2021) ..........................................8, 14

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ..........................................................6, 7

*United States v. George S. Bush & Co.*,
    310 U.S. 371 (1940) .................................................................6

*United States v. Mead*,
533 U.S. 218 (2001) ...................................................................................11

*United States v. Schmidt Pritchard & Co.*,
47 C.C.P.A. 152 (1960) ...........................................................................11

*United States v. Yoshida Int'l, Inc.*,
526 F.2d 560 (C.C.P.A. 1975) ................................................................11

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) .............................................................................11

**Constitution**

U.S. Const. art. I, § 8, cl. 1 ............................................................................11

U.S. Const. art. I, § 8, cl. 3 ............................................................................11

U.S. Const. art. III, § 1 ....................................................................................5

U.S. Const. art. III, § 2 ....................................................................................5

**Statutes**

19 U.S.C. § 2251 .......................................................................................2, 16

19 U.S.C. § 2251(a) ..........................................................................................2

19 U.S.C. § 2252 ...............................................................................................2

19 U.S.C. § 2253 ...............................................................................................2

19 U.S.C. § 2253(a) ..........................................................................................2

19 U.S.C. § 2254 .......................................................................................2, 16

19 U.S.C. § 2254(b) ..........................................................................................3

19 U.S.C. § 2254(b)(1)(B) .............................................................3, 4, 5, 14, 15

**Legislative History**

134 Cong. Rec. 7197 (1988) ..........................................................................15

H.R. Rep. No. 100-576 (1988), *as reprinted in* 1988 U.S.C.C.A.N.
    1547........................................................................................................15

**Presidential Proclamations and Regulations**

*Exclusion of Particular Products From the Solar Products Safeguard
    Measure*, 84 Fed. Reg. 27,684 (June 13, 2019)......................................3

Proclamation 9693, 83 Fed. Reg. 3541 (Jan. 25, 2018)............................3

Proclamation 10101, 85 Fed. Reg. 65,639 (Oct. 16, 2020) ......................3

## <u>STATEMENT OF RELATED CASES</u>

Counsel for the Plaintiffs-Appellees know of no other appeal in or from the same civil action before this or any other appellate court.

The following cases pending before the U.S. Court of International Trade ("CIT") may be affected by the Court's resolution of this petition, as they also challenge the legality of Proclamation 10101:

- *Astronergy Solar v. United States et al.*, No. 22-00308

- *Canadian Solar (USA) Inc. v. United States et al.*, No. 22-00295

- *Hanwha Q CELLS America Inc. v. United States et al.*, No. 22-00305

- *JA Solar USA Inc. v. United States et al.*, No. 22-00304

- *JinkoSolar (U.S.) Inc. et al. v. United States et al.*, No. 22-00241

- *Light & Hope Energy Co., Ltd. v. United States et al.*, No. 22-00303

- *LONGi Solar Technology (U.S.), Inc. v. United States et al.*, No. 22-00212

- *REC Americas LLC v. United States et al.*, No. 22-00314

- *Shining Solutions, Inc. v. United States et al.*, No. 22-00301

- *Trina Solar (U.S.) Inc. v. United States*, No. 22-00321

- *Trina Solar (U.S.) Inc. v. United States et al.*, No. 22-00306

- *Waaree Energies, Ltd. et al. v. United States et al.*, No. 22-00296

## **STATEMENT OF COUNSEL PURSUANT TO RULE 35(B)(2)**

Based on my professional judgment, I believe the panel decision is contrary

to the following decisions of the Supreme Court of the United States and precedents

of this Court:

- *Trump v. Hawaii*, 138 S. Ct. 2392 (2018)

- *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021)

Based on my professional judgment, I believe this appeal requires an answer

to the following precedent-setting question of exceptional importance:

- Whether the Court should change or overrule its decision in *Maple
  Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985), which
  limits judicial review of presidential action in matters related to
  international trade for "a clear misconstruction of the governing
  statute, a significant procedural violation, or action outside
  delegated authority."

January 11, 2024

/s/ *Matthew R. Nicely*
Matthew R. Nicely
  mnicely@akingump.com
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4000

*Counsel to Plaintiffs-Appellees SEIA and
NextEra Energy, Inc.*

**INTRODUCTION**

Presidential actions involving international trade significantly impact the U.S. economy, U.S. businesses, coordinate branches of government, and other critical interests. This appeal concerns one such action: President Trump's decision in October 2020 to modify a safeguard measure to subject billions of dollars in solar panels to increased trade restrictions. After the CIT held that the President lacked authority under the relevant statutory provision, the Panel reversed—not because the President's interpretation was right, but rather because it was not "clearly" wrong.

For more than two centuries, it has been "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). But the Panel—invoking a breathtakingly deferential standard permitting courts to set aside presidential action only if it involves "a clear misconstruction of the governing statute," *Maple Leaf*, 762 F.2d at 89—abdicated its constitutional role. The Panel deferred to the President's statutory interpretations without deeming it necessary to decide "whether the government's interpretation of the statute is *correct*" or "even the better view." Op. 14, 23-24 (emphasis added). That approach effectively permits the *President* to say what the law is, regardless of this Court's (or Congress's) own views.

The Court should grant review to decide whether to change or overrule *Maple Leaf* and its progeny. Although courts properly defer to the Executive Branch in

limited circumstances, nothing in Supreme Court or Circuit precedent authorizes courts to give the President primacy in interpreting statutes. Yet the judicially created *Maple Leaf* standard *requires* the Court to defer to the President's interpretation of his own delegated authority in areas of vast economic and political importance. And because that deferential standard plainly dictated the outcome in this case, *see* Op. 4, 12, 13, 14, 16, 19, 20, 21, 23, 24, 26, 27 (using "clear misconstruction" or variant thereof dozens of times), the Court should grant the petition and consider this important issue *en banc*.

## STATEMENT OF THE CASE

Under the Trade Act of 1974, the President may impose a safeguard measure if "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article." 19 U.S.C. § 2251(a). Congress placed numerous limits and conditions on the President's authority to impose or modify safeguard measures. *See generally* 19 U.S.C. §§ 2251-2254. For example, the President cannot impose a safeguard measure unless he receives an investigative report from the International Trade Commission ("ITC"), *id.* §§ 2251(a), 2252, and considers certain factors, including the negative impacts of imposing trade restrictions, *id.* § 2253(a). As most relevant here, the President also cannot modify a safeguard measure unless he receives an

additional report from the ITC regarding the domestic industry's efforts to adjust to import competition, makes specific findings regarding the industry's positive response efforts, and follows certain additional procedures, *id.* § 2254(b).

In January 2018, President Trump imposed a safeguard measure on certain crystalline silicon photovoltaic products, commonly known as solar cells and panels, in the form of a tariff rate quota on cells and an additional duty on panels. Proclamation 9693, 83 Fed. Reg. 3541 (Jan. 25, 2018). Acting pursuant to authority delegated in Proclamation 9693 to exclude certain products from the measure, the U.S. Trade Representative ("USTR") excluded bifacial—*i.e.*, two-sided—solar panels from the measure in June 2019. *Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27,684, 27,685 (June 13, 2019). After Plaintiffs-Appellees successfully sued to enjoin USTR from withdrawing the exclusion on the ground that USTR's withdrawal violated the safeguard statute and the Administrative Procedure Act, *see Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021), the government declined to appeal.

Instead, President Trump took matters into his own hands. In October 2020, he modified the safeguard measure through Proclamation 10101, which reimposed duties on bifacial panels and increased the duty on subject products in the fourth year of the measure. 85 Fed. Reg. 65,639, 65,640-42 (Oct. 16, 2020). The President relied on 19 U.S.C. § 2254(b)(1)(B), which allows the President to reduce, modify,

or terminate a safeguard measure if he "determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition."

Plaintiffs-Appellees, purchasers of imported solar panels and the industry association representing the broader solar industry (including manufacturers, importers, and project developers), immediately challenged Proclamation 10101 for failure to comply with the Trade Act. The CIT (Judge Katzmann) set aside the Proclamation as unlawful, agreeing that 19 U.S.C. § 2254(b)(1)(B) did not authorize the President's action. Appx28-34.

On appeal, the Panel reversed Judge Katzmann's decision, and also rejected Plaintiffs-Appellees' arguments for affirmance on alternative grounds. In doing so, the Panel made clear that its decision rested on the deference owed to the President's statutory constructions. The Panel stressed that its "very limited role" allows it to set aside presidential action only "if it involves 'a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.'" Op. 13 (quoting *Maple Leaf*, 762 F.2d at 89). Thus, it would not "evaluate the relative merits of the parties' competing interpretations," nor "decide whether the government's interpretation of the statute is *correct* or how [it] would have construed the statute as an original matter." Op. 14 (emphasis added). Instead,

it was sufficient to conclude that President Trump "did not clearly misconstrue Section 2254(b)(1)(B) when he interpreted it as permitting trade-restrictive modifications." Op. 12. The Panel applied the same "clear misconstruction" standard to reject Plaintiffs-Appellees' alternative grounds for affirming the judgment. Op. 21-26.

## ARGUMENT

This Court should review *en banc* whether to continue to adhere to the standard of review set forth in *Maple Leaf* and its progeny. The *Maple Leaf* rule of extreme deference conflicts with precedents of the Supreme Court, this Court, and other circuits. *Maple Leaf* also raises significant separation-of-powers concerns because it elevates the President's interpretations over the judgments of the other branches and allows him to exercise expansive and largely unchecked power, outside his inherent Article II authority, over issues of significant economic and political importance. And because *Maple Leaf* deference was the lynchpin of the Panel's decision, this case is a perfect vehicle to consider the question presented.

## I.   *MAPLE LEAF* CONTRAVENES SUPREME COURT AND CIRCUIT PRECEDENT

### A.   The *Maple Leaf* Standard Is Neither Grounded In Nor Consistent With Supreme Court Precedent

Article III of the Constitution vests "the judicial Power of the United States" in the Supreme Court and the lower courts established by Congress. U.S. Const. art.

III, §§ 1, 2. It is therefore the Judiciary's role—not the Executive's—"to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177. Statutory interpretation is a "recurring and accepted task for the federal courts," and they "cannot shirk this responsibility merely because [their] decision may have significant political overtones." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). It is true that the Supreme Court traditionally defers to presidential factfinding and discretionary calls in appropriate circumstances. *E.g.*, *Dalton v. Specter*, 511 U.S. 462, 474-76 (1994) (no review of decision committed to presidential discretion); *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) (no review of presidential factfinding). But it has never embraced a rule of deference to presidential *statutory constructions* when (as here) the case solely concerns adherence to statutory mandates and limits.

On the contrary, the Supreme Court has long evaluated presidential compliance with legislative standards without deference—including in cases involving international trade, foreign affairs, and national security. For example, in *Trump v. Hawaii*, the Supreme Court did not defer to President Trump's interpretation of the Immigration and Nationality Act in evaluating whether he lawfully banned certain foreign nationals from entering the United States. 138 S. Ct. 2392 (2018). Although the case involved core considerations of foreign affairs,

national security, and immigration, the Court interpreted the "plain language" of the statute along with its purpose, structure, and legislative history. *See id.* at 2408–15.

Similarly, in *Hamdan v. Rumsfeld*, the Court held that the President unlawfully established military commissions to try suspected terrorists because the commissions were not authorized by Congress's Authorization for Use of Military Force or the Detainee Treatment Act of 2005, and inconsistent with the Uniform Code of Military Justice. 548 U.S. 557, 593-94, 613-25 (2006). Despite implicating core Executive Branch foreign-affairs and national-security powers, the Court based its conclusions on its own review of the statutes' text and legislative history, without deference to the Executive Branch's statutory constructions. *See id.* at 593-625.

Likewise, in *Federal Energy Administration v. Algonquin SNG, Inc.*, the Court upheld the President's actions under Section 232 of the Trade Expansion Act of 1962—but only after thoroughly reviewing the statute's text, structure, purpose, and legislative history. 426 U.S. 548, 561-71 (1976). It neither invoked nor applied a rule of special deference.

Finally, in *Cole v. Young*, the Court rejected the President's interpretation of the term "national security" in a statute granting unreviewable dismissal powers to federal agencies over civilian employees when deemed necessary "in the interest of the national security of the United States." 351 U.S. 536 (1956). Based on the statute, its purpose, and the legislative history, the Court rejected the government's

argument that the President's interpretation of "national security" supported the challenged dismissal, affording no deference to the President's interpretation. *Id.* at 544-51, 557-58.

In short, in each of these decisions (and others) involving international trade, national security, or foreign relations, the Supreme Court deferred, where appropriate, to the President's factfinding and discretionary determinations. But, unlike the Panel, the Court did not defer to the President's *statutory* interpretations, let alone suggest that its review was confined to whether the President had "clear[ly] misconstru[ed]" the relevant statutes.

### B.   *Maple Leaf* Also Conflicts With Federal Circuit And Sibling Circuit Precedent

Apart from contravening Supreme Court precedent, *Maple Leaf* conflicts with decisions of this Court and its sibling Circuits. For example, *Maple Leaf* conflicts with this Court's recent decision in *Transpacific Steel LLC v. United States*, which examined presidential action under Section 232 of the Trade Expansion Act of 1962. 4 F.4th 1306 (Fed. Cir. 2021). The Court reviewed the challenged action against the statute's "text and context, including purpose and history," without deferring to the President's statutory interpretation. *See id*. at 1318-19.

*Maple Leaf* is also inconsistent with the very cases it cited for its rule of extreme deference. *Maple Leaf* chiefly relied on *Florsheim Shoe Co. v. United States*, which held that:

8

> Both Supreme Court and Court of Customs and Patent Appeals precedent have established that the Executive's decisions in the sphere of international trade are reviewable only to determine *whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms with the relevant procedural requirements.*

744 F.2d 787, 795 (Fed. Cir. 1984) (emphasis added). But *Maple Leaf* goes much further: rather than determine whether the Executive's interpretation is "proper" or consistent with "relevant" procedural requirements, *Maple Leaf* required a "*clear* misconstruction" of the statute or a "*significant* procedural violation" for a court to intervene. 762 F.2d at 89 (emphases added). The judicially invented *Maple Leaf* standard thus sprang from an exaggerated misreading of *Florsheim*.[1]

The fact that there is no basis in Federal Circuit law for *Maple Leaf* is unsurprising, as that standard also contravenes the decisions of other Circuits. Relying on Supreme Court precedent, the D.C. Circuit confirmed that "the responsibility of determining the limits of statutory grants of authority" to the President—performed without deference—"is a judicial function entrusted to the

---

[1] Nor do the other two cases *Maple Leaf* cites presage its rule. In *American Association of Exporters & Importers v. United States*, this Court engaged in statutory interpretation without deference by "find[ing] no basis, either within [the statutory provision] itself, the overall statutory scheme, or the legislative history, to add more to the statute than meets the eye." 751 F.2d 1239, 1247 (Fed. Cir. 1985). And in *Sneaker Circus, Inc. v. Carter*, the Second Circuit found that plaintiff's lawsuit was justiciable because it "challenges the procedures employed by the Executive in concluding these [trade] agreements, procedures which are mandated by statute, *and which accordingly are within the proper supervision of the federal courts*." 566 F.2d 396, 401-02 (2d Cir. 1977) (emphasis added).

courts by Congress by the statutes establishing courts and marking their jurisdiction." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944)); *see id.* at 1332-39 (holding that President violated Procurement Act and National Labor Relations Act). The Fifth, Sixth, and Eleventh Circuits (at least) all align with the D.C. Circuit's approach. *Louisiana v. Biden*, 55 F.4th 1017, 1022-1033 (5th Cir. 2022) (holding that President exceeded authority under Procurement Act, based on "*de novo*" review of the legal issues raised); *Commonwealth v. Biden,* 57 F.4th 545, 550-55 (6th Cir. 2023) (holding that President exceeded authority under Property Act, without deferring to President's statutory interpretation); *Georgia v. President of the United States*, 46 F.4th 1283, 1292-1301 (11th Cir. 2022) (same).

In short, "Congress can and often does cabin the discretion it grants the President and it remains the responsibility of the judiciary to ensure that the President act within those limits." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023). The *Maple Leaf* standard is deeply out of step with these sibling Circuits' decisions (and many of this Court's own).

## II. THIS APPEAL RAISES A PRECEDENT-SETTING QUESTION OF EXCEPTIONAL IMPORTANCE

The extreme deference to the President's statutory interpretation under *Maple Leaf* raises significant and recurring questions regarding the separation of powers. Article I of the Constitution gives *Congress* the authority to "lay and collect Taxes,

Duties, Imports and Excises" and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3; *see also United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 572 (C.C.P.A. 1975) ("It is nonetheless clear that no undelegated power to regulate commerce, or to set tariffs, inheres in the Presidency.").  Although Congress is free to delegate its authority to the Executive Branch, the President's authority to impose tariffs is subject to whatever conditions Congress may attach to that delegation, because the Executive Branch has only the authority that "Congress in fact meant to confer" on it. *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022); *see United States v. Schmidt Pritchard & Co.*, 47 C.C.P.A. 152, 162 (1960) ("It requires no elaborate argument to support the proposition that Congress in so delegating its powers may prescribe whatever procedures and limitations it sees fit to enact for limiting the exercise by its agents of such delegated powers.").

But who decides whether the President has transgressed Congress's limits— the courts or the President?  The answer must be the courts, which (as noted) have always had the primary prerogative to interpret statutes.  That is true even in those limited circumstances in which Executive Branch deference is warranted.  For example, although courts historically have deferred to administrative agency legal interpretations in cases of genuine ambiguity, they have done so because Congress delegated that interpretive responsibility to the Executive.  *See United States v. Mead*, 533 U.S. 218, 229 (2001) (courts should defer to an agency's interpretation

only when it is "apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law" (citation omitted)).  Even then, the Supreme Court has made clear that "[t]he *judiciary* is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984) (emphasis added). And courts "must exhaust all the 'traditional tools' of construction" and conclude that a statute or agency rule is "genuinely ambiguous" before it may consider granting deference to an agency's interpretation.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *see id.* at 2448 (Kavanaugh, J., concurring) ("If a reviewing court employs all of the traditional tools of construction, the court will almost always reach a conclusion about the best interpretation" before resorting to deference.).[2]

This Court, too, has recognized these principles.  *See Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010) (irrespective of *Maple Leaf*, "[t]he judiciary is the final authority on issues of statutory construction" (quoting *Chevron*, 467 U.S. at 843 n.9)); *id.* at 1363-66 (rejecting agency's interpretation as contrary to Congressional intent); *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881

---

[2] The Supreme Court recently granted certiorari to evaluate whether to abrogate or overrule *Chevron* and its progeny.  *See Loper Bright Enterprises v. Raimondo*, No. 22-451, 143 S. Ct. 2429 (May 1, 2023).

(Fed. Cir. 1998) ("We do not fulfill our duty to say what the law is by merely agreeing to [the agency's] interpretation of the statutory provision at issue if it is 'reasonable,' regardless of whether we think it correct. Rather, before granting an agency's statutory interpretation such great deference …, we must first carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." (citations omitted)).

Yet the Panel eschewed these well-established principles and abdicated the judicial role by allowing the *Maple Leaf* standard—which was created by this Court, does not require genuine statutory ambiguity, and is not based on any delegation of interpretive responsibility to the President—to drive its analysis. By *explicitly* declining to "decide whether the government's interpretation of the statute is correct or how we would have construed the statute as an original matter" (Op. 14), the decision contravenes the constitutional design and binding precedent by giving the President largely unchecked power to determine the scope of his own delegated authority. That would be problematic in any case, but it is especially problematic here, where Proclamation 10101 increased duties on imports whose value exceeded several billion dollars, and greatly impacted downstream industries, consumer electricity prices, and efforts to address climate change. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (requiring "clear congressional authorization" for administrative actions of "deep economic and political significance").

## III.    THIS APPEAL PROVIDES AN IDEAL VEHICLE FOR RESOLVING THE QUESTION PRESENTED

This case presents an excellent vehicle for reconsidering *Maple Leaf*.  The Panel afforded extreme deference to the President, even after Plaintiffs-Appellees urged the Court to "decide[] pure 'legal issues'—even those implicating the President's proffered statutory interpretations—'de novo,' based on 'text and context, including purpose and history.'"  Pls.' C.A. Br. 14-15 (quoting *Transpacific*, 4 F.4th at 1319); *see also id.* at 15 (noting that "[s]uch review includes the authority to determine whether the President failed to meet statutory prerequisites for presidential action").

*En banc* review is especially warranted in this case because the deferential standard of review was so obviously outcome-determinative—as indicated by the fact that the Panel used the phrase "clear misconstruction" (or the like) literally dozens of times.  For example, Plaintiffs-Appellees argued that the phrase "on such basis" in 19 U.S.C. § 2254(b)(1)(B) required the domestic industry's petition to base any request to modify a safeguard measure on the domestic industry's positive adjustment to import competition (something the petition indisputably did not do), while the government suggested that "on such basis" referred to the President making a finding based on a separate ITC report.  Op. 22.  Expressly *because* the Panel explicitly found both interpretations "to be reasonable," it felt compelled to side with the President:  "It follows, then, that the government's interpretation is *not*

a clear misconstruction and, hence, we must affirm the trade court's conclusion on this point."  Op. 23 (citing *Maple Leaf*, 762 F.2d at 89).

But the proper interpretation of "on such basis" is purely a legal question, and the intended meaning is judicially ascertainable.  Plaintiffs-Appellees highlighted that the placement of the commas in the statute grammatically creates separate clauses, and "on such basis" appears in the clause with the request from the domestic industry, *not* the clause referencing the ITC's report or the President's determination. *See* 19 U.S.C. § 2254(b)(1)(B) (authorizing action "if the President … determines, *after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination* **on such basis,** that the domestic industry has made a positive adjustment to import competition" (emphases added)).  Moreover, the legislative history unequivocally links the phrase "on such basis" to the domestic industry's petition, without referencing the ITC's report or any presidential finding. *E.g.*, H.R. Rep. No. 100-576, at 688 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1721 (President authorized to modify safeguard action if "a majority of representatives of the domestic industry request such reduction, modification or termination on the basis that the domestic industry has made a positive adjustment to import competition."); 134 Cong. Rec. 7197 (1988) (same).  Yet the Panel never addressed the comma placement or the legislative history in addressing the correct interpretation of "on

such basis." *See* Op. 21-23. Instead, it relied on *Maple Leaf* to "wave the ambiguity flag just because it found the [statute] impenetrable on first read" and acceded to the President's interpretation. *Kisor*, 139 S. Ct. at 2415.

The Panel similarly erred in uncritically deferring to the President's internally inconsistent interpretation of the statute. At one point, the Panel cited a sentence from 19 U.S.C. § 2251 setting forth the "purpose" of the "safeguard statute," and— "stress[ing] … that [its] review of Proclamation 10101 is limited" under *Maple Leaf* (Op. 14)—accepted the President's argument that this purpose supported his interpretation of the modification authority under 19 U.S.C. § 2254. Op. 20; *see* Op. 16 ("our review [is] restricted to whether the President's interpretation of 'modify' is a clear misconstruction"). But later, the Panel rejected Plaintiffs-Appellees' citation to a different portion of the same sentence, deferring to the President's interpretation that 19 U.S.C. § 2251 "appl[ies] to the initial adoption of a safeguard measure and make[s] no reference to modification of such measures" under 19 U.S.C. § 2254. Op. 25-26. Instead of determining the meaning itself, the Panel simply held that "the President's view … is not a clear misconstruction," Op. 26— with the result being that Section 2251 both does and does not apply to presidential modification authority *simultaneously*.

Finally, that erroneous approach of uncritical deference also dictated the Panel's conclusion on the remaining issue of whether the President adequately found

that the domestic industry "has made" the statutorily required positive adjustment to competition.   *See* Op. 23-24 ("Once again, we are not required to decide if Appellees' interpretation is reasonable *or even the better view*." (emphasis added)).

The extreme deference afforded by the Panel to the President's interpretations is incompatible with the Constitution and inconsistent with courts' obligation to say what the law is.   The Panel's decision should be reconsidered under a proper standard.

## **CONCLUSION**

For the foregoing reasons, the Court should grant rehearing *en banc*.

Respectfully submitted,

John Brew
  jbrew@crowell.com
Amanda Shafer Berman
  aberman@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004-2595
(202) 688-3451
*Counsel to Plaintiff-Appellee Invenergy Renewables LLC*

Christine M. Streatfeild
  Christine.streatfeild@bakermckenzie.com
BAKER & MCKENZIE LLP
815 Connecticut Ave, NW
Washington, DC 20006
(202) 835-6111
*Counsel to Plaintiff-Appellee EDF Renewables, Inc.*

January 11, 2024

/s/ *Matthew R. Nicely*
Matthew R. Nicely
  mnicely@akingump.com
James E. Tysse
  jtysse@akingump.com
Daniel M. Witkowski
  dwitkowski@akingump.com
Devin S. Sikes
  dsikes@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4000
*Counsel to Plaintiffs-Appellees SEIA and NextEra Energy, Inc.*

18

# ADDENDUM

(Panel Opinion filed November 13, 2023)

# United States Court of Appeals for the Federal Circuit

―――――――――――

**SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, ACTING COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellants*

―――――――――――

2022-1392

―――――――――――

Appeal from the United States Court of International Trade in No. 1:20-cv-03941-GSK, Judge Gary S. Katzmann.

―――――――――――

Decided: November 13, 2023

―――――――――――

MATTHEW R. NICELY, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, argued for plaintiffs-appellees Solar Energy Industries Association, NextEra Energy, Inc. Also represented by JULIA K. EPPARD, DEVIN S. SIKES, JAMES EDWARD TYSSE, DANIEL MARTIN WITKOWSKI.

AMANDA SHAFER BERMAN, Crowell & Moring, LLP,

Washington, DC, argued for plaintiff-appellee Invenergy Renewables LLC. Also represented by JOHN BOWERS BREW, LARRY EISENSTAT, ROBERT L. LaFRANKIE; FRANCES PIERSON HADFIELD, New York, NY.

CHRISTINE STREATFEILD, Baker & McKenzie LLP, Washington, DC, for plaintiff-appellee EDF Renewables, Inc.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for all defendants-appellants. Defendants-appellants United States, United States Customs and Border Protection, Troy Miller also represented by BRIAN M. BOYNTON, TARA K. HOGAN, PATRICIA M. McCARTHY. Defendant-appellant United States also represented by MICHAEL THOMAS GAGAIN, Office of the General Counsel, Office of the United States Trade Representative, Washington, DC.

JONATHAN STOEL, Hogan Lovells US LLP, Washington, DC, for amici curiae Chamber of Commerce of the United States of America, American Clean Power Association. Also represented by MICHAEL JACOBSON, MOLLY NEWELL; KATHERINE BOOTH WELLINGTON, Boston, MA. Amicus curiae Chamber of Commerce of the United States of America also represented by TARA S. MORRISSEY, United States Chamber Litigation Center, Washington, DC.

———————————

Before LOURIE, TARANTO, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

In 2018, the President adopted certain safeguard measures to protect the domestic solar panel industry. In particular, the President issued Proclamation 9693, which imposed duties on imports of solar panels into the United States. *See Proclamation 9693: To Facilitate Positive*

*Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541 (Jan. 23, 2018). The duties of Proclamation 9693 began at 30% and were scheduled to decrease each year to 25%, 20%, and then, in their final, fourth year, 15%. *See id.* at 3548. Importers of a certain type of solar panel – called bifacial solar modules, which "consist of cells that convert sunlight into electricity on both the front and back of the cells," J.A. 4 – petitioned the United States Trade Representative ("USTR") for an exclusion, asking that bifacial solar panels not be subjected to the duties. The USTR granted the exclusion, but then quickly reversed course, with the consequence that the duties of Proclamation 9693 remained scheduled to be imposed on bifacial panels. Following litigation in the Court of International Trade ("trade court"), and additional actions by the USTR, bifacial solar panels were again excluded from the duties.

In October 2020, the President issued Proclamation 10101, "modifying" Proclamation 9693 to withdraw the exclusion of bifacial solar panels from the scheduled duties, and also to increase the fourth-year duty rate from 15% to 18%. *See Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products)*, 85 Fed. Reg. 65639 (Oct. 16, 2020). In response to Proclamation 10101, importers of bifacial solar panels brought suit against the United States in the trade court on the grounds that the proclamation exceeded the power of the President. Their principal contention was that the statute authorizing the President to "modify" Proclamation 9693 only allowed him to make previously adopted safeguard measures more trade-liberalizing, but eliminating the exclusion of bifacial panels and raising the fourth-year duty were trade-restrictive. The suing parties further argued that even if the

President had the authority to "modify" safeguards in a trade-restrictive direction, he failed to follow appropriate procedures in doing so.

The trade court agreed with the importers that the statutory authority to "modify" a safeguard is limited to trade-liberalizing changes. While the trade court rejected the importers' procedural challenges, it nonetheless set aside Proclamation 10101 for exceeding the President's authority. The government now appeals from the trade court's judgment in favor of the importers.

We conclude that the President's interpretation of the applicable statute, which allows him to "modify" an existing safeguard, is not a clear misconstruction. That is, the President's view that a "modification" may include a change in a trade-restricting direction, and is not limited to trade-liberalizing changes, is not unreasonable. We further determine that, in adopting Proclamation 10101, the President did not commit any significant procedural violation of the Trade Act. Accordingly, we reverse the judgment of the trade court.

## I

### A

Section 201 of the Trade Act of 1974, codified at 19 U.S.C. § 2251, provides the President of the United States with the power to impose "safeguards" (also referred to as "safeguard measures") that protect domestic industries from serious injury caused by imports. Statutory Section 2251 broadly directs the President to "take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs." 19 U.S.C. § 2251(a).

Imposition of a new safeguard is governed by 19 U.S.C. §§ 2252 and 2253, which set out a process that typically

includes: (i) a petition from the domestic industry filed with the International Trade Commission ("Commission"), setting out the purposes for which the safeguard is sought, "which may include facilitating the orderly transfer of resources to more productive pursuits, enhancing competitiveness, or other means of adjustment to new conditions of competition"; (ii) an investigation and determination by the Commission as to "whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article"; (iii) the submission of a report by the Commission to the President, which may include a recommendation of presidential action to "address the serious injury, or threat thereof, to the domestic industry," such as the imposition of or increase in duty on the imported article or a modification or imposition of a quantitative restriction on the importation of the article into the United States; and (iv) a decision by the President "to take all appropriate and feasible action" that will provide "greater economic and social benefits than costs" and will assist domestic industry. Generally, safeguards adopted pursuant to these procedures may not be in effect for longer than four years without an additional petition from the domestic industry. *See id.* §§ 2253(e)(1)(A)-(B), 2254(c). Certain types of safeguards, including imposition of duties lasting more than one year, must be "phased down at regular intervals during the period in which the action is in effect." *Id.* § 2253(e)(5).

Once a particular safeguard is in place, Section 2254 governs efforts to change the existing measure. Section 2254(a)(1) requires, among other things, that the Commission "monitor developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition." *Id.* § 2254(a)(1). If a safeguard is imposed for longer than

three years, the Commission must, no later than the mid-point of the period for which it is adopted, "submit a report ["Commission Report"] on the results of the monitoring . . . to the President and to the Congress" *Id.* § 2254(a)(2). After receiving the Commission Report, the President is empowered to take certain actions with respect to the safeguard, with different statutory provisions applying depending on whether the domestic industry has or has not made a positive adjustment to import competition.

Specifically, 19 U.S.C. § 2254(b), entitled "Reduction, modification, and termination of action," provides that "[a]ction taken under section 2253 of this title," i.e., a safeguard, "may be reduced, modified, or terminated by the President," after receiving the Commission Report,

> if the President . . .
>
> (A) . . . determines, on the basis that either –
>
>> (i) the domestic industry has *not* made adequate efforts to make a positive adjustment to import competition, or
>>
>> (ii) the effectiveness of the action taken under section 2253 of this title has been impaired by changed economic circumstances,
>
> that changed circumstances warrant such *reduction, or termination*; or
>
> (B)    determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such *reduction, modification, or termination* on such basis, that the domestic industry *has made* a positive adjustment to import competition.

*Id.* § 2254(b)(1) (emphasis added). While subparagraph (b)(1)(B) permits the President to "reduc[e], *modif[y]*, or

terminat[e]" a safeguard when the domestic industry has made a positive adjustment to import competition, subparagraph A more narrowly describes the President's power as extending only to a "reduction, or termination" (and not also a "modification") of an existing safeguard where domestic industry has *not* made such an adjustment.

## B

On January 23, 2018, President Trump issued Proclamation 9693, which imposed duties on imports of certain quantities of Crystalline Silicon Photovoltaic (CSPV) solar panels for a period of four years, beginning at 30% *ad valorem* in the safeguard's first year and phasing down to 25%, 20%, and 15% in the ensuing years. *Proclamation 9693*, 83 Fed. Reg. at 3548-49. Proclamation 9693 further delegated to the USTR authority to grant "exclusion of a particular product from the safeguard measure." *Id.* at 3543. Acting under this authority, in June 2019 the USTR granted an exclusion for solar panels consisting of bifacial solar cells. *See Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27684, 27685 (June 13, 2019). This exclusion had the effect of *not imposing* the new tariffs on bifacial solar panels.

However, just months later, in October 2019, the USTR withdrew the exclusion, re-imposing the duties on these same bifacial products. *See Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54244 (Oct. 9, 2019). Litigation followed. Cases (which are not directly at issue here) brought by consumers, purchasers, and importers of bifacial solar panels resulted in the October 2019 withdrawal of the exclusion never becoming effective. *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019). That meant that bifacial solar panels remained exempted from imposition of the new duties. Thereafter, in April 2020, the USTR again withdrew the exclusion, seeking thereby to impose the duties on bifacial products. *See*

*Determination on the Exclusion of Bifacial Solar Panels from the Safeguard Measure on Solar Product*, 85 Fed. Reg. 21497 (Apr. 17, 2020).  After more litigation, the trade court enjoined the April 2020 withdrawal.  *See Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021); *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020).

In the meantime, the Commission completed its statutorily required midpoint review of the safeguards imposed by Proclamation 9693 and, in February 2020, provided the Commission Report to the President and Congress.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*, Inv. No. TA-201-075, USITC Pub. 5021, at 2 (Feb. 2020).  In March 2020, pursuant to 19 U.S.C. § 2254(a)(4) and in response to the USTR's request, the Commission additionally published a report containing its advice "regarding the probable economic effect on the domestic crystalline silicon photovoltaic (CSPV) cell and module manufacturing industry of modifying the safeguard measure on CSPV products."  *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure*, Inv. No. TA-201-075, USITC Pub. 5032, at ES-1 (Mar. 2020).  That report contained the Commission's determination that the "exclusion for imports of bifacial modules . . . is likely to have significant effects on prices and trade in both modules and cells," having the effect of limiting the positive impact of the safeguard adopted in Proclamation 9693.  *Id.* at ES-4.  In the wake of these two reports, the President, through the USTR, received a petition, consisting of three letters,[1] from representatives of a

---

[1]    The trade court held these "letters submitted to the Trade Representative are, taken collectively, sufficient to

majority of the bifacial solar panel domestic industry requesting, among other things, that the President (1) withdraw the bifacial exclusion and (2) slow down the rate of reduction of the safeguard duty for the remainder of the scheduled term.

On October 16, 2020, the President issued Proclamation 10101. *See Proclamation 10101*, 85 Fed. Reg. at 65640. As pertinent here, Proclamation 10101 modified safeguards that had been implemented in Proclamation 9693, including by withdrawing the exclusion of bifacial solar panels, thereby again re-imposing the duties on these panels. Proclamation 10101 further provided that the fourth-year duty rate on CSPV modules, including bifacial solar panels, would be increased from 15% to 18%. *See* 85 Fed. Reg. at 65540-42. In particular, Proclamation 10101 provided that:

> [T]he domestic industry has begun to make positive adjustment to import competition, shown by the increases in domestic module production capacity, production, and market share. . . .

> [T]he exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in Proclamation 9693 in light of the increased imports of competing products such exclusion entails, and that it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels; . . .

> [T]he exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-year action I proclaimed in Proclamation 9693, and that to achieve the full remedial

---

constitute a petition to the President." J.A. 13. Appellees do not challenge this finding on appeal.

effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent.

*Proclamation 10101*, 85 Fed. Reg. at 65640.  The appeal now before us requires us to determine whether the President had authority to make these modifications to Proclamation 9693 by adoption of Proclamation 10101.[2]

C

On December 29, 2020, Plaintiffs-Appellees – Solar Energy Industries Associates ("SEIA") as well as Nextera Energy Inc., Invenergy Renewables LLC, and EDF Renewables, Inc. – filed suit at the trade court challenging Proclamation 10101's modifications to the safeguards imposed by Proclamation 9693.  *See Solar Energy Indus. Ass'n v. United States*, 553 F. Supp. 3d 1322 (Ct. Int'l Trade 2021) ("SEIA Decision").  Defendants-Appellants – the United States, the United States Customs and Border Protection ("CBP"), and Christopher Magnus in his capacity as Commissioner of CBP (collectively, the "government") – moved to dismiss, and Appellees cross-moved for summary judgment.  The trade court granted summary judgment to Appellees and set aside the modifications contained in Proclamation 10101.

––––––––––––––

[2]    In February 2022, President Biden, acting pursuant to his authority under Section 2253, extended the safeguard measure and excluded bifacial panels from the extended measure.  *See Proclamation 10339, To Continue Facilitating Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 87 Fed. Reg. 7357 (Feb. 9, 2022).  Thus, as the parties agree, this appeal only affects bifacial panels that were imported into the U.S. after October 25, 2020 and before February 7, 2022.

In reaching its decision, the trade court concluded that "while Proclamation 10101 complied with the procedural requirements of the safeguard statute, it nevertheless clearly misconstrued the reach of Section [2254](b)(1)(B) of the Trade Act, and thus constituted an action outside the President's delegated authority."[3] J.A. 34. More specifically, the trade court reasoned that Section 2254(b)(1)(B) "permits only trade-liberalizing modifications to existing safeguard measures," yet "Proclamation 10101's withdrawal of the exclusion of bifacial solar panels and increase of the safeguard duties on CSPV modules" were trade-restrictive. J.A. 6. Therefore, the trade court held that the modifications of Proclamation 10101 were based on a clear misconstruction of the statute. *See* J.A. 6, 28. The trade court was persuaded that, as Appellees argued, Section 2254(b)(1)(B) "was intended to provide an escape hatch" from previously imposed safeguards "where domestic industry has adequately adapted to import competition." J.A. 32. It was not, in the court's view, Congress's intent to allow for a safeguard to be "modified" so as to make it more restrictive of free trade when domestic industry had already adjusted to such competition. *See id.* Hence, the

---

[3]    The trade court found the President acted outside his delegated authority solely because it found the President's interpretation of Section 2254(b)(1)(B) was a clear misconstruction. *See* J.A. 33. There was no separate analysis of the "acting outside of authority" issue. Nor do the parties identify any other basis, besides the construction of Section 2254(b)(1)(B) and its associated procedural requirements, on which Proclamation 10101 could be deemed an action taken outside of the President's delegated authority. Thus, our conclusion that the President did not clearly misconstrue his statutory authority leads to the conclusion that the President also did not act outside of his delegated authority.

trade court set aside Proclamation 10101 and enjoined the government from enforcing it. *See* J.A. 6.

The government timely appealed. Before us, the government challenges the trade court's holding that the President clearly misconstrued Section 2254(b)(1)(B) when he interpreted it as permitting trade-restrictive modifications to safeguard measures. The government also disputes the trade court's conclusion that Proclamation 10101's modifications were actually trade-restrictive. Appellees ask us to affirm the trade court's determination that the President's interpretation of "modify" in Section 2254(b)(1)(B) as permitting trade-restrictive changes is a clear misconstruction of the statute.[4] Appellees also propose alternative grounds for affirmance, namely that the President failed to comply with the procedural requirements of the safeguard statute.

We conclude that the President did not clearly misconstrue Section 2254(b)(1)(B) when he interpreted it as permitting trade-restrictive modifications. We further conclude that, in issuing Proclamation 10101, the President did not commit any significant procedural violation of the Trade Act. Accordingly, we reverse and remand for the trade court to enter judgment for the government.

## II

The trade court had jurisdiction pursuant to 28 U.S.C. § 1581(i). We have jurisdiction under 28 U.S.C. § 1295(a)(5).

"We review the Court of International Trade's grant of summary judgment de novo, including by deciding de novo

---

[4]    Appellees SEIA and Nextera Energy, Inc. filed a joint brief (ECF No. 35) which we refer to as the "SEIA Brief" or "SEIA Br." Appellees Invenergy Renewables LLC and EDF Renewables, Inc. filed a separate brief (ECF No. 34) which we refer to as the "EDF Brief" or "EDF Br."

the proper interpretation of governing statutes and regulations." *Shinyei Corp. of Am. v. United States*, 524 F.3d 1274, 1282 (Fed. Cir. 2008). In the absence of any genuine dispute of facts, we apply de novo review to the question of whether statutory prerequisites for presidential action under the safeguard statute were satisfied. *See Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1359-61 (Fed. Cir. 2003). "Although we apply a de novo standard of review, we give great weight to the informed opinion of the Court of International Trade." *Aspects Furniture Int'l, Inc. v. United States*, 42 F.4th 1366, 1369 (Fed. Cir. 2022). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." U.S. CIT R. 56(a).

Notwithstanding the de novo standard we generally apply to review of grants of summary judgment, "[i]n international trade controversies of th[e] highly discretionary kind" we confront today, which "involv[e] the President and foreign affairs," this court has a "very limited role . . . ." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985). We may only set aside presidential action taken pursuant to statutory Sections 2251-53 of the Trade Act if it involves "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Id.*; *see also USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1366 n.3 (Fed. Cir. 2022). "[T]he President's findings of fact and the motivations for his action are not subject to review." *Maple Leaf*, 762 F.2d at 89 (citation omitted); *see also Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018).

## III

The trade court granted summary judgment to Appellees based on its determination that the President clearly misconstrued Section 2254(b)(1)(B) by interpreting it as permitting trade-restricting modifications. On appeal, the

government challenges this conclusion on two grounds. First, the government contends that "[n]othing in the safeguard statute limits the President's authority under section [2254(b)(1)(B)] only to making modifications that liberalize trade." Opening Br. at 26. Second, the government argues that even if Section 2254(b)(1)(B) does not extend to trade-restricting modifications, the modifications that Proclamation 10101 makes to Proclamation 9693 do not "increase" restrictions and, hence, are permitted by the statute. We agree with the government's first contention and find it unnecessary to address the second.

## A

It is important to stress at the outset that our review of Proclamation 10101 is limited to whether the President *clearly misconstrued* Section 2254(b)(1)(B). Because presidential action to impose a safeguard measure, as well as the decision to modify such a measure, involves presidential action in the context of foreign affairs, our review is "very limited." *Maple Leaf*, 762 F.2d at 89. We are not called upon to decide whether the government's interpretation of the statute is correct or how we would have construed the statute as an original matter. Nor do we evaluate the relative merits of the parties' competing interpretations. Rather, our sole inquiry is whether the President's interpretation, that he is permitted to make trade-restricting modifications and not just trade-liberalizing ones, is a clear misconstruction of the statute. Applying this standard of review, we hold the President did not clearly misconstrue Section 2254(b)(1)(B).

Our review "begins with the language of the statute" itself. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal quotation marks omitted); *see also PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1357 (Fed. Cir. 2018). Section 2254(b)(1)(B) provides that safeguards previously adopted under Section 2253 "may be reduced, modified, or terminated" by the President. The

statute does not expressly indicate whether "modify" includes trade-restrictive changes or is limited to trade-liberalizing alterations. We view this statutory silence as favoring the government's broader view, as the statute simply does not contain the narrowing limitation the trade court read into it. *See generally Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . .").[5]

Ordinarily, Congress uses words consistent with their well-understood meaning. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). Here, both sides find support for their interpretations of "modify" in dictionary definitions. Appellees direct us to a definition of "modify" as "to make 'less extreme.'" SEIA Br. at 17 (quoting J.A. 30). The government, by contrast, points us to a dictionary definition of "modify" as "making of a limited change in something." Opening Br. at 24 (citing J.A. 30). Other courts, including the Supreme Court, have applied the government's non-

---

[5] By contrast, an earlier, unenacted version of the legislation that ultimately became Section 2254(b)(1)(B) would have expressly restricted the President's authority, upon receiving the Commission Report, as being to "reduce, modify *(but not increase)* or terminate any action." H.R. Conf. Rep. 100-576, at 687, *reprinted in* 1988 USCCAN 1547, 1720 (emphasis added). The parenthetical prohibiting trade-restrictive modifications was deleted during the legislative process. Generally, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23-24 (1983).

directionally restricted definition of "modify" in other contexts. *See MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 225 (1994) (collecting definitions and noting that "modify" typically connotes moderate change without indicating which direction such change must take). Appellees concede that the government's definition is a correct one but then attempt to persuade us that their preferred definition is better supported by the broader structure and purpose of the safeguard statute. *See* SEIA Br. at 17-18 ("'[M]odify' can *also* mean 'to change moderately or in minor fashion.'"). With our review restricted to whether the President's interpretation of "modify" is a clear misconstruction, we view the government's dictionary support, other courts' precedents, and Appellees' concession as strong indicators that Appellees have failed to show the President's interpretation of "modification" is a clear misconstruction.

Appellees emphasize that the meaning of "modify" in Section 2254(b)(1)(B) can only be properly understood in the context of "[t]he broader structure and stated purpose of the statute." SEIA Br. at 18-19, 26. While we agree that structure and purpose should be taken into account, here these considerations only solidify our conclusion that Section 2254(b)(1)(B) was not clearly misconstrued to permit trade-restricting modifications to existing safeguards.

First, Section 2251 provides that the safeguard statute has a broad remedial purpose, directing the President to *"take all appropriate and feasible action within his power"* to meet the statute's objectives and provide relief to domestic industry. 19 U.S.C. § 2251 (emphasis added). This expansive directive supports the view that the President is empowered to make modifications as necessary to provide continued relief to domestic industry, regardless of whether that modification is in the direction of trade-restriction or trade-liberalization. Certainly, there is no suggestion in Section 2251 that if the President determines a slightly more restrictive safeguard is necessary, he is,

nevertheless, permitted only to adopt a trade-liberalizing modification.

Second, the Trade Act has its own general definition of "modification." It provides: "[t]he term 'modification', as applied to any duty or other import restriction, includes the elimination of any duty or other import restriction." *Id.* § 2481(6). Plainly, this is an open-ended definition and does not *exclude* anything, including further restrictions. Nor does it even suggest that assessment of whether a change qualifies as a "modification" is based to any extent on the direction of the change (i.e., trade-liberalizing or -restricting).

Other provisions of the Trade Act are similarly supportive of the government's interpretation. Section 2254(b)(3), for example, provides that the President may "modify" a safeguard to bring it into conformity with a decision of the World Trade Organization ("WTO"), which could require a trade-liberalizing or trade-restricting modification, depending on the relative relationship between an existing U.S. safeguard and a WTO determination. *See id.* § 2254(b)(3). Similarly, Sections 2252(e)(2)(C) and 2253(a)(3)(C) authorize the Commission to recommend, and the President to impose, "modification . . . of any quantitative restriction on importation," modifications which Appellees do not dispute may include changes in a more trade-restrictive direction.

Because the Trade Act clearly uses "modify" and "modification" in ways that permit trade-restricting changes, Appellees next insist that "Congress clearly did not give the word 'modification' the same connotation throughout the Trade Act." SEIA Br. at 32. We are not persuaded. "[A] term appearing in several places in a statutory text is generally read the same way each time it appears." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994). Appellees insist that Section 2254(b)(3)'s inclusion of the phrase "notwithstanding paragraph (1)" signifies that Section 2254(b)(1)'s

modification power is different from that power as deline-ated in Section 2254(b)(3). But we agree with the govern-ment that "[n]otwithstanding paragraph (1)" means that modifications under Section 2254(b)(3) may be accom-plished without having to fulfill the procedural require-ments of Section 2254(b)(1) (e.g., receipt of the Commission Report or a domestic industry petition). *See* Reply Br. at 10.

Appellees, echoing the trade court, further contend that permitting the President to make trade-restrictive modifications pursuant to Section 2254(b)(3) creates a loop-hole through which the President can bypass the proce-dural requirements Section 2253 establishes for adopting a safeguard measure in the first place. *See* SEIA Br. at 25; J.A. 32. We disagree. Even under the government's read-ing of Section 2254(b)(1)(B), the President's modification power is far from unbounded. For instance, Section 2253(e)(5) requires duties to be "phased down at regular intervals," ensuring that any duty rate modification cannot exceed the highest rate imposed by the original safeguard measure. Thus, here, because the maximum tariff rate im-posed by Proclamation 9693 was 30% – a measure adopted only after the President followed all of the procedures set out in Section 2253 – the President could not, through his modification power under Section 2254, impose a tariff greater than 30%. Additionally, the President may not modify a safeguard pursuant to Section 2254 any time he wishes; instead, he must wait until after receiving the Commission Report as well as a petition from the majority of domestic industry (which may not ever be forthcoming).[6]

---

[6]   As we explain below, however, the President's power is not limited to making the modifications that are advocated by the Commission Report and requested by the petition. Still, the receipt of the Commission Report and of

Furthermore, because the power to "modify" a safeguard is included only in subparagraph (b)(1)(B), and not also in (b)(1)(A), the President may only make a modification after determining that domestic industry is making a positive adjustment to import competition. *See infra* at pp. 21, 23-26. While Congress is free to create a "loophole" if it wishes, here we think it has, instead, cabined the President's modification authority – just not with the further constraint of limiting modifications to only trade-liberalizing changes.

As yet another argument, Appellees contend that "[t]he total lack of historical usage" of Section 2254(b)(1)(B) "to restrict trade is further evidence weighing in favor of the trade court's interpretation." SEIA Br. at 26. Even assuming historical practice, or the lack of it, could transform an otherwise-reasonable reading of a statute into a clear misconstruction, the government has directed us to one instance in which it appears President Clinton acted pursuant to Section 2254(b)(1) to take trade-restrictive action. *See* Opening Br. at 39-40 & n.8 (citing *Proclamation 7314: To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*, 65 Fed. Reg. 34899 (May 26, 2000)); Reply Br. at 17-18. Hence, there does appear to be historical support for President Trump's construction of presidential authority under Section 2254(b)(1)(B).

Finally, Appellees point to the distinction between subsection (b)(1)(A), which applies where "domestic industry has *not* made adequate efforts to" adjust to import competition, and subsection (b)(1)(B), which applies where "domestic industry *has made* a positive adjustment to import competition." SEIA Br. at 20-21 (emphasis added). In the former circumstance, where domestic industry has not responded positively, Section 2254(b)(1)(A) provides the

---

a domestic industry petition are the prerequisites to a Presidential modification of a safeguard.

President authority only to "reduce" or "terminate" the safeguard while in the latter scenario, where domestic industry "has made a positive adjustment, Section 2254(b)(1)(B) more broadly provides the President authority to "reduce, *modify*, or terminate" a safeguard. Appellees insist it would be backwards for Congress to permit the President to "modify" trade restrictions to become more restrictive where domestic industry has positively adjusted to competition while depriving the President of such trade-restricting power where domestic industry has not. *See, e.g.*, SEIA Br. at 18 ("It would make no sense for Congress to authorize further trade *restrictions* after the domestic industry already 'has made' a positive adjustment . . . ."). We side with the government on this point, agreeing with it that "[t]his distinction logically suggests that Congress intended to give the President greater flexibility to take action when progress is being made, to protect and ensure the continuation of that progress." Opening Br. at 34. In sum, we find this argument of Appellees no more persuasive than their many other contentions.

For all of these reasons, we conclude it was not a clear misconstruction for the President to interpret his authority under Section 2254(b)(1)(B) as permitting him to adopt trade-restrictive modifications, as well as trade-liberalizing modifications.

## B

The government additionally argues that "even if 'modification' in Section 2254(b)(1)(B) were construed as prohibiting the President from implementing an 'increase' to the safeguard measure, Proclamation 10101 should still be sustained as lawful because the modifications at issue are neutral in relation to the original safeguard measure." Opening Br. at 20. In the government's view, all that Proclamation 10101 accomplished was "to restore application of the safeguard measure to bifacial panels and to slow the rate at which the measured phased down in its fourth

year," neither of which were trade-restricting "increases" in measures imposed on imports. *Id.* at 2. Because we find it was not a clear misconstruction to interpret Section 2254(b)(1)(B) as permitting trade-restrictive modifications to safeguard measures, we need not, and do not, reach this issue.

## IV

Our siding with the government on whether the President's statutory interpretation was a clear misconstruction is not enough to resolve this appeal. Appellees offer, as alternative grounds for affirmance, the arguments they presented to the trade court for a finding that, in adopting Proclamation 10101, the President failed to comply with the procedural requirements of the safeguard statute. In particular, Appellees renew their contentions that: (1) the petition leading to Proclamation 10101 was inadequate to meet the "on such basis" requirement of Section 2254(b)(1)(B); (2) the President's finding that the domestic industry "has begun to make" a positive adjustment to import competition does not meet the statutory requirement that domestic industry "has made" such adjustment; and (3) the President failed to meet his obligation to weigh the economic and social costs and benefits of his alterations to the safeguard tariffs imposed by Proclamation 9693 before issuing Proclamation 10101. SEIA Br. at 4, 20 n.1 (adopting arguments from EDF Brief); EDF Br. at 15-16. The trade court rejected each of these positions and we do so as well.

## A

Appellees argue that the President lacked authority under Section 2254(b)(1)(B) to modify the safeguards imposed by Proclamation 10101 because the petition submitted by domestic industry did not base the modification request on domestic industry having made a positive adjustment to import competition. The portion of Section 2254(b)(1)(B) on which this argument is based provides:

> Action taken under section 2253 [i.e., a safeguard]
> . . . may be reduced, modified, or terminated by the
> President (but not before the President receives the
> [Commission] report . . .) . . . if the President . . .
> determines, after a majority of the representatives
> of the domestic industry submits to the President a
> petition requesting such reduction, modification, or
> termination *on such basis*, that the domestic indus-
> try has made a positive adjustment to import com-
> petition.

19 U.S.C. § 2254(b) (emphasis added). Appellees contend
that the phrase "on such basis" refers to the petition, such
that the petition itself must be based on domestic indus-
try's view that it has made a positive adjustment to import
competition. The trade court, agreeing with the govern-
ment, held instead that "on such basis" refers to the Presi-
dent's determination, which may be based on the
Commission Report's finding that domestic industry has
made a positive adjustment, regardless of whether the pe-
tition also contends the same. In other words, the parties
agree that "such" in "on such basis" refers back to some-
thing indicated or implied earlier in the provision, but the
government contends that the thing being referred to is the
Commission mid-point Report while Appellees insist the
thing is, by contrast, the domestic industry petition.

We find both views to be reasonable. Section 2254(b)
expressly refers to both the Commission Report and the do-
mestic industry petition before it sets out the requirement
that the President make a determination, that domestic in-
dustry has made a positive adjustment, "on such basis."
That "basis" could be the Commission Report or could just
as easily be the industry petition. *See* J.A. at 20 (trade
court explaining that "a determination made on the basis
of the [Commission] report would reflect the views of an
independent body based on information and argument pro-
vided by all market participants, and would therefore align
with . . . Section [2254](b)(1)(B)'s overall aim of permitting

the adjustment of safeguard measures when the industry as a whole begins to adapt to competition") (internal quotation marks omitted).  It follows, then, that the government's interpretation is *not* a clear misconstruction and, hence, we must affirm the trade court's conclusion on this point.  *See Maple Leaf*, 762 F.2d at 89.  We agree with the trade court that the President did not violate the "on such basis" procedural requirement for adopting a modification.

The trade court also concluded that even if Appellees' interpretation on this point were a clear misconstruction, "the failure of petitioners to comply with [the petition] requirement would not render Proclamation 10101 unlawful." J.A. 21.  Given our other conclusions, it is unnecessary for us to review this determination of the trade court.

## B

Appellees next argue that the President failed to comply with Section 2254(b)(1)(B)'s requirement to determine that "the domestic industry *has made* a positive adjustment to import competition" (emphasis added).  As Appellees correctly observe, in Proclamation 10101 the President found that "the domestic industry *has begun to make* positive adjustment to import competition."  *Proclamation 10101*, 85 Fed. Reg. at 65640 (emphasis added).  According to Appellees, this is insufficient, as the President merely made a finding that positive adjustment had started but did not make the purportedly required finding that such positive adjustment be completed.  Appellees insist that "'[h]as made' and 'has begun to make' do not mean the same thing." SEIA Br.  58.

Once again, we are not required to decide if Appellees' interpretation is reasonable or even the better view.  Instead, we are asked only to determine if the government's view, that the statutory language "has made a positive adjustment" is broad enough to include circumstances in which domestic industry "has begun to make a positive adjustment," is a clear misconstruction.  Like the trade court,

we hold that "the distinction between 'has made' and 'has begun to make' is too narrow to rise to the level of a clear misconstruction." J.A. 22.

It is reasonable to interpret "has made a positive adjustment" as relating to a process, which might be ongoing, rather than being limited to periods following a completed, successful adjustment. As the government notes, the statutory phrase is written in the present perfect tense, which can be used to refer to an action completed entirely in the past and also to action still in process. *See* Reply Br. at 36 (citing Kenneth G. Wilson, *The Columbia Guide to Standard American English* 342 (1993)). This plain meaning understanding of "has made" is supported by other parts of the Trade Act, which recognize that "positive adjustment" to import competition will occur over time and not on a single date. *See, e.g.,* 19 U.S.C. § 2254(c)(1) ("[T]here is evidence that the industry *is making* a *positive adjustment* to import competition.") (emphasis added); *id.* § 2254(d)(1) ("[T]he Commission shall evaluate the effectiveness of the actions in facilitating positive adjustment by the domestic industry to import competition."). Indeed, two of the conditions that the statute expressly identifies as constituting components of "a positive adjustment" – when "the domestic industry *experiences* an orderly transfer of resources" and "workers in the industry *experience* an orderly transition," *id.* § 2251 (emphasis added) – use the present tense, again reflecting that positive adjustment by domestic industry can involve an ongoing process.

Thus, we agree with the trade court that the President did not violate the procedural requirement that he determine that domestic industry "has made" a positive adjustment to competition from imports.

## C

Finally, we consider whether the President is required to re-weigh costs and benefits when modifying a safeguard pursuant to Section 2254(b)(1). The trade court concluded

that the President must do so and also that, in connection
with Proclamation 10101, he did so.  J.A. 27-28.  We con-
clude, by contrast, that the President is not required to re-
weigh costs and benefits when modifying a safeguard
measure.  Thus, we need not decide whether the President
complied with this non-requirement in issuing Proclama-
tion 10101.

Two statutory provisions mention the President's obli-
gation to weigh costs and benefits.  The first is Section
2251(a), which provides:

> If the United States International Trade Commis-
> sion (hereinafter referred to in this part as the
> "Commission") determines under [S]ection 2252(b)
> of this title that an article is being imported into
> the United States in such increased quantities as
> to be a substantial cause of serious injury, or the
> threat thereof, to the domestic industry producing
> an article like or directly competitive with the im-
> ported article, the President, in accordance with
> this part, shall take all appropriate and feasible ac-
> tion within his power which *the President deter-
> mines will facilitate efforts by the domestic industry
> to make a positive adjustment to import competition
> and provide greater economic and social benefits
> than costs.*

19 U.S.C. § 2251(a) (emphasis added).  Section 2253(a) re-
states the President's authority to take safeguard action
under Section 2251(a), reciting the requirement that the
President must consider both long- and short-term benefits
and costs.  *See* 19 U.S.C. § 2253(a)(2)(E) ("In determining
what action to take . . ., the President shall take into ac-
count . . . the short- and long-term economic and social
costs of the actions authorized . . . relative to their short-
and long-term economic and social benefits.").

These provisions expressly apply to the initial adoption
of a safeguard measure and make no reference to

modification of such measures.  The President's power to reduce, modify, or terminate an existing safeguard is governed by Section 2254(b)(1), which makes no mention whatsoever of cost-benefit determinations.  Nor does any portion of the safeguard statute tie the requirement of a cost-benefit analysis, set out in Sections 2251(a) and 2253(a)(1)(A), to the President's power to reduce, modify, or terminate a safeguard, as provided for in Section 2254.

The trade court seems to have been persuaded to adopt the contrary view due, at least in part, to its concern that the government's interpretation "risks permitting absurd results" (e.g., a 1% initial tariff followed by a 50% modified tariff, with no cost-benefit analysis of the 50% rate) and might allow the modification "exception" of Section 2254 to "swallow . . . the rule" of Section 2251.  J.A. 27.  We do not share this fear.  On any reading, a "modification" must be a relatively minor adjustment; expansion of a 1% duty to a 50% duty is obviously not a minor change.  And any modification to a duty rate must comply with the phase-down requirement, preventing the modified tariff from being any higher than the tariff that was imposed in the preceding year.  *See* Reply Br. at 42 (Government conceding "[t]he President's modification authority remains subject to the section 2253(e)(5) phase-down requirement").  More importantly, the trade court failed to explain how its conclusion is consistent with the actual language of the statute, or how the government's interpretation is a clear misconstruction.

We conclude that the President's view that he was not required to re-weigh the costs and benefits when modifying the safeguard pursuant to Section 2254(b)(1) is not a clear misconstruction.  Thus, Appellees have failed to show that the President committed any procedural violation in issuing Proclamation 10101.

V

Because the President's interpretation of 19 U.S.C. § 2254(b)(1)(B) as permitting trade-restricting modifications is not a clear misconstruction, and because the President did not violate the procedural requirements of the statute, we reverse the trade court's judgment. Proclamation 10101 is not invalid.

## REVERSED AND REMANDED

### COSTS

No costs.

## **CERTIFICATE OF COMPLIANCE**

This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 35(b)(2)(A). The petition contains 3,896 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).


January 11, 2024                    */s/ Matthew R. Nicely*
                                    Matthew R. Nicely

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court of the United States Court of the Federal Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.


January 11, 2024                      */s/ Matthew R. Nicely*
                                       Matthew R. Nicely