No. 2022-1392

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,

Plaintiffs-Appellees,

v.

UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, Acting Commissioner of U.S. Customs and Border Protection,

Defendants-Appellants

---

Appeal from the United States Court of International Trade
Case No. 1:20-cv-03941, Judge Gary S. Katzmann

---

**DEFENDANTS-APPELLANTS' CORRECTED RESPONSE
TO PETITION FOR REHEARING EN BANC**

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director
Civil Division
Department of Justice
OF COUNSEL:                              P.O. Box 480, Ben Franklin Station
MICHAEL T. GAGAIN                        Washington, D.C. 20044
Assistant General Counsel                Tele: (202) 616-2228
Office of the United States Trade        Email: Tara.Hogan@usdoj.gov
  Representative
Washington, D.C. 20508

February 21, 2024                        Attorneys for Defendants-Appellants

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ........................................................................ ii

BACKGROUND ................................................................................... 2

ARGUMENT ...................................................................................... 9

CONCLUSION .................................................................................. 19

i

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE(S)**

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ........................................................16

*Biden v. Texas*,
  142 S. Ct. 2528 (2022) ........................................................18

*B-West Imports, Inc. v. United States*,
  75 F.3d 633 (Fed. Cir. 1996) ................................................11

*Calif. Bankers Ass'n v. Shultz*,
  416 U.S. 21 (1974) ..............................................................16

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ...................................................... 11, 15

*Dalton v. Spector*,
  511 U.S. 462 (1994) ...................................................... 10, 18

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) ............................................................11

*Florsheim Shoe Co. v. United States*,
  744 F.2d 787 (Fed. Cir. 1984) ....................................... 11, 14

*Franklin* v. *Massachusetts*,
  505 U.S. 788 (1992) ............................................................10

*Hughes Aircraft Co. v. Jacobsen*,
  525 U.S. 432 (1999) ............................................................ 7

*Maple Leaf Fish Company v. United States*,
  762 F.2d 86 (Fed. Cir. 1985) ..................................... 1, 6, 7, 9, 11, 16

*MCI Telecomm. Corp. v. AT&T Co.*,
  512 U.S. 218 (1994) ............................................................7

*Michael Simon Design v. United States*,
609 F.3d 1335 (Fed. Cir. 2010) ............................................................11

*Motion Sys. Corp. v. Bush*,
437 F.3d 1356 (Fed. Cir. 2006) ...........................................................17

*Norwegian Nitrogen Co. v. United States*,
288 U.S. 294 (1933) ............................................................................10

*Silfab Solar, Inc. v. United States*,
892 F.3d 1340 (Fed. Cir. 2018) ..................................................... 3, 18

*Solar Energy Industries Ass'n v. United States*,
553 F. Supp. 3d 1322 (Ct. Int'l Trade 2021) ................................... 6, 18

*South Puerto Rico Sugar Co. Trading Corp. v. United States*,
334 F.2d 622 (Ct. Cl. 1964) ................................................................ 11

*Taylor v. McKeithen*,
407 U.S. 191 (1972) ............................................................................14

*Transpacific Steel LLC v. United States*,
4 F.4th 1306 (Fed. Cir. 2021) .............................................................12

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018) .......................................................... 10, 12, 18

*United States v. American-Foreign S.S. Corp.*,
363 U.S. 685 (1960) ..............................................................................9

*United States v. Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936) ............................................................................11

*United States v. George S. Bush & Co.*,
310 U.S. 371 (1940) ..................................................................... 14, 18

*United States v. Midwest Oil Co.*,
236 U.S. 459 (1915) ............................................................................12

*United States v. Torres-Flores*,
  502 F.3d 885 (9th Cir. 2007) ...............................................................17

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022)...........................................................................15

## **STATUTES**

19 U.S.C. § 2251 ..................................................................................2, 3

19 U.S.C. § 2253(a) .................................................................................3

19 U.S.C. §§ 2254(a) ...............................................................................3

19 U.S.C. § 2254(b) ............................................................................ 1, 13

19 U.S.C. § 2254(b)(1).............................................. 3, 6, 8, 10, 13, 18

19 U.S.C. § 2481(6) .................................................................................8

## **RULES**

Fed. R. App. P. 35 ...............................................................................1, 9

Fed. R. App. P. 43(c)(2) ..........................................................................1

## **OTHER AUTHORITIES**

*Proclamation 10101: To Further Facilitate Positive Adjustment to Competition
from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not
Partially or Fully Assembled into Other Products),*
  85 Fed. Reg. 65,639 (Oct. 16, 2020) ................................................. 4, 5

*Exclusion of Particular Products From the Solar Products Safeguard Measure,*
  84 Fed. Reg. 27,684 (USTR June 13, 2019) ......................................... 4

*Proclamation 9693: To Facilitate Positive Adjustment to Competition From
Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not
Partially or Fully Assembled Into Other Products) and for Other Purposes,*
  83 Fed. Reg. 3,541 (Jan. 23, 2018) ..................................................... 3, 4

iv

Pursuant to Rule 35 of the Federal Circuit Rules and the Federal Rules of Appellate Procedure and this Court's order dated January 19, 2024, defendant-appellants, the United States, U.S. Customs & Border Protection, and Troy A. Miller, Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection,[1] respectfully submit this response in opposition to the petition for rehearing *en banc*.  The plaintiffs-appellees fail to demonstrate that the Panel's decision conflicts with precedent or that this case involves an issue of exceptional importance.  Fed. R. App. P. 35.

Plaintiffs-appellees contend that the Panel failed to engage in appropriate statutory construction and instead simply adopted the President's interpretation of the operative statute.  Asserting that the source of this error was the Panel's reliance upon *Maple Leaf Fish Company v. United States*, 762 F.2d 86 (Fed. Cir. 1985), they ask this Court to overrule that decision.  Plaintiffs-appellees' characterization of the Panel's decision and its reliance on *Maple Leaf Fish* lack merit.

In this appeal, the Panel carefully evaluated whether 19 U.S.C. § 2254(b) authorized the President to make trade-restrictive modifications to safeguard measures.  The Panel relied on traditional tools of statutory construction:

---

[1]  Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Mr. Miller, as the public officer appearing in an official capacity, should be substituted for Mr. Magnus.

dictionary definitions, Congress' use of the term "modification" in other portions of the Trade Act, the structure and purpose of the safeguard statute, and legislative history. The Panel concluded that the statutory term "modification" encompassed trade-restrictive measures. Consequently, the Panel sustained Proclamation 10101 because the President had not "significantly misconstrued" the statute.

The Panel's citation to *Maple Leaf Fish* reflected the principle that statutes authorizing Presidential action in the realm of international affairs should be construed broadly. In so doing, the Panel neither abdicated its duty to say what the law is, nor acted inconsistently with any precedent of this Court or the Supreme Court. Moreover, the Panel's conclusion that the Trade Act authorized the modification contained in Proclamation 10101 was correct as a matter of statutory interpretation, even aside from any special considerations arising from the President's role in administering the Trade Act. The petition should be denied.

## BACKGROUND

This case arises from the President's exercise of statutory duties under Section 201 of the Trade Act of 1974 (19 U.S.C. § 2251, *et seq*.). Section 201 provides a mechanism for the President to provide relief to domestic industries facing serious injury from import competition through temporary trade measures known as "safeguards." Safeguard measures are intended to facilitate domestic industry efforts to "make a positive adjustment to import competition" and to

"provide greater economic and social benefits than [their] costs."  19 U.S.C.

§ 2251(a).  When the prerequisites for imposing a safeguard measure are met, the

President shall "take all appropriate and feasible action within his power" that the

President determines will meet these objectives.  *Id.*; 19 U.S.C. § 2253(a)(1).

    If the President implements a safeguard measure, the International Trade

Commission (ITC) must monitor developments in the domestic industry's progress

and adjustment efforts, and if the initial safeguard measure or any extension lasts

longer than three years, provide a report to the President and Congress.  19 U.S.C

§§ 2254(a)(1), (a)(2).  Upon receipt of this midterm report, the President may make

certain changes to the safeguard measure.  *Id*. § 2254(b)(1).

    As relevant to this appeal, the President may proclaim a "reduction,

*modification*, or termination" of the measure if the President "determines, after a

majority of the representatives of the domestic industry submits to the President a

petition requesting such reduction, modification, or termination on such basis, that

the domestic industry has made a positive adjustment to import competition."  19

U.S.C. § 2254(b)(1)(B) (emphasis added).

    In January 2018, following an ITC investigation, the President issued

*Proclamation 9693*, 83 Fed. Reg. 3,541 (Jan. 23, 2018), imposing a safeguard

measure on imports of certain solar products.  *See generally Silfab Solar, Inc. v.*

*United States,* 892 F.3d 1340 (Fed. Cir. 2018). The safeguard measure, in broad terms, imposed additional duties on imports of solar panels and on imports of solar cells above a quota (known as a tariff-rate quota). *Proclamation 9693*, 83 Fed. Reg. at 3,542 ¶ 8. The President also authorized the United States Trade Representative (USTR) to consider product-specific exclusions from the safeguard measure. *Id*. at 3,543.

In 2019, the USTR granted an exclusion for bifacial solar panels consisting of bifacial solar cells.[2] *Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27,684, 27,685 (USTR June 13, 2019). Concerns subsequently arose that this exclusion would provide a significant loophole for purchasers to avoid the safeguard duties. The USTR's attempt to withdraw the bifacial exclusion was set aside by the Court of International Trade on procedural grounds. *See* Op. at 7.

In February 2020, the ITC reported to the President the results of its monitoring of developments regarding the domestic solar cell manufacturing industry. The President also received a petition consisting of three letters filed by a majority of the representatives of the domestic industry.

Subsequently, the President issued Proclamation 10101. *Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of*

---

[2] "Bifacial" refers to products that generate power on both sides.

*Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products),* 85 Fed. Reg. 65,639 (Oct. 16, 2020).  The President acknowledged the ITC's findings that domestic solar cell prices had declined since the safeguard's imposition, consistent with historical trends, and that the prices were higher than they would have been without the safeguard.  *Id*. at ¶ 2.  The President also acknowledged the ITC's findings that bifacial modules are "likely to account for a greater share of the market in the future," can substitute for monofacial products, and that continuing to exempt imports of bifacial modules from the safeguard "would apply significant downward pressure on prices" of domestically produced solar modules.  *Id*. at 65,640 ¶ 6.

The President found that the domestic industry "has begun to make positive adjustment to import competition, shown by the increases in domestic module production capacity, production, and market share."  *Id*. at ¶ 9.  The President thus determined that certain actions would need to be modified to ensure the full remedial effect envisaged for the original safeguard measure.  Proclamation 10101 restored application of the safeguard duties to bifacial panels and eased the reduction in the duty rate so that it would reduce from 20 to 18 (rather than 15) percent in the measure's fourth year.  *Id.* at Annex.

Several parties, including a renewable energy company and a trade association representing solar importers and installers, filed a complaint in the

Court of International Trade challenging Proclamation 10101. They principally argued that 19 U.S.C. § 2254(b)(1)(B) authorized the President to take only trade-liberalizing modifications. The United States argued that numerous aspects of the statute indicate that Congress gave the President flexibility to modify safeguard measures consistent with the prevailing circumstances, flexibility that might include tightening measures designed to continue to protect the domestic industry's positive response to the safeguards.

While rejecting procedural challenges to Proclamation 10101, the trial court held that the President's actions violated a substantive requirement of the statute. Specifically, although finding the term "modification" in section 2254(b)(1)(B) to be ambiguous, the court held that section 2254(b)(1)(B) must be read in context "to authorize only trade-liberalizing modifications to safeguard measures." *Solar Energy Industries Ass'n v. United States*, 553 F. Supp. 3d 1322, 1342 (Ct. Int'l Trade 2021) (*SEIA*). The United States appealed.

On appeal, the Panel reversed the judgment and held that Proclamation 10101 was "not invalid." Op. at 27. Citing *Maple Leaf Fish*, the Panel recognized its "very limited role" in review of discretionary international trade decisions. The Panel explained that it could "only set aside presidential action … if it involves 'a clear misconstruction of the governing statute, a significant procedural violation, or

action outside of delegated authority."  Op. at 13 (citing *Maple Leaf Fish*, 762 F.3d at 89).

Identifying its inquiry in this case as whether Proclamation 10101 involved a "clear misconstruction of the statute," the Panel began with "the language of the statute."  Op. at 14 (citing *Hughes Aircraft Co. v. Jacobsen*, 525 U.S. 432, 438 (1999)).  The Panel observed that the statute did not expressly limit "modifications" to "trade-liberalizing alterations," *id.* at 15, holding that "the statute simply does not contain the narrowing limitation the trade court read into it."  *Id*.  In support of its textual analysis, the Panel considered the competing dictionary definitions of "modification" proposed by both parties.  The Panel observed that "'modify' typically connotes change without indicating which direction such change must take."  Op. at 16 (citing *MCI Telecomm. Corp. v. AT&T Co*., 512 U.S. 218, 225 (1994)).  The Panel rejected the plaintiffs-appellees' argument that the statutory context required a departure from this traditional understanding of the term.  *Id*.

The Panel also explained that its interpretation was consistent with the legislative history.  As the Panel observed, Congress considered, but did not adopt, a version of the legislation that would have expressly limited the President to modifications that did "not increase" any action.  *Id.* at 15 n.5.

The Panel held that the "structure and purpose" of the statute "only solidified its conclusion" that the President did not "clearly misconstrue" his authority under section 24254(b)(1)(B). *Id*. (cleaned up). The Panel observed that the Trade Act's general statute defining "modification," 19 U.S.C. § 2481(6), contained an open-ended definition that did not refer to "the direction of the change." *Id*. at 17. Thus, the Panel concluded that other provisions of the Trade Act, as well as historical usage, supported the interpretation set forth by the United States. *Id*. at 17, 19.

Finding that Proclamation 10101 was not based on a clear misconstruction of the President's authority to modify an earlier action, the Panel found no need to entertain the Government's alternative argument that the modifications announced in Proclamation 10101 were, in fact, trade-neutral. Op. at 20-21.

Finally, the Panel rejected each of the plaintiffs-appellees' alternative arguments that the President committed procedural errors. *Id*. at 22-26. The Panel found that the statutory prerequisites for modification were met, notably that the President did not act until after he received the ITC midterm report, received a petition from the majority of the domestic industry, and made a determination that the domestic industry had begun to make a positive adjustment to import competition.

In parsing the phrase "on such basis," as used in section 2254(b), the Panel found the Government's proffered interpretation, that the phrase referenced the ITC midterm report discussed in the introductory language of 19 U.S.C. § 2254(b)(1), was reasonable. Op. at 22-24. Because the President's interpretation was reasonable, the Panel held that it was not a "clear misconstruction of the statute." Op. at 23 (citing *Maple Leaf Fish*, 762 F.2d at 89). The Panel also held, based on ordinary grammar usage, that the statute's reference to whether the domestic industry "*has made* a positive adjustment to import competition" was broad enough to encompass the President's determination that the domestic industry "*has begun to make* a positive adjustment." Op. at 23-24. The Panel therefore declined to set aside Proclamation 10101.

## ARGUMENT

"An en banc . . . rehearing is not favored and ordinarily will not be ordered" unless it is necessary to secure or maintain uniformity of the Court's decisions or the case involves a question of "exceptional importance." Fed. R. App. P. 35(a). "En banc courts are the exception, not the rule." *United States v. American-Foreign S.S. Corp.*, 363 U.S. 685, 689 (1960).

\*\*\*

The premise of the petition, and its request to overturn *Maple Leaf Fish*, is that the Panel applied a rule of "extreme deference" to the President, abdicating its

9

duty to say what the law is. Pet. at 8, 14, 17; Amic. Br. at 12 (similar argument).[3] This premise is faulty. The Panel did not ignore the plain meaning of the statute or merely rubber-stamp "approved" over the proclamation. Instead, the Panel ascertained 19 U.S.C. § 2254(b)(1)(B)'s meaning using traditional tools of statutory construction, and then determined whether the President's conduct conformed to a permissible construction of the statute. The Panel's acknowledgment of the court's role in reviewing Presidential action was not error, let alone significant error warranting *en banc* review.

The President's actions are subject only to a narrow form of review "outside the framework of the APA." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Courts in appropriate circumstances may review presidential actions for compliance with the Constitution and Federal statutes. *See Dalton v. Spector*, 511 U.S. 462, 474 (1994) ("assum[ing] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA"); *Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018).

That form of judicial review excludes consideration of the President's findings of fact and exercise of discretion, as the plaintiffs-appellees concede, Pet. at 6. *See Norwegian Nitrogen Co. v. United States*, 288 U.S. 294, 318 (1933);

---

[3] "Amic. Br." refers to the corrected brief of the Cato Institute as amicus in support of the petition, ECF Docket No. 95.

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 114 (1948); *Michael Simon Design v. United States*, 609 F.3d 1335, 1340 (Fed. Cir. 2010).

Particularly in matters where the President exercises coexistent powers with Congress, the Supreme Court and this Court have cautioned against narrow readings of statutes that would constrain the power delegated to the President. *E.g., United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936); *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976).

"[S]tatutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed." *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996).  In the area of international trade, which is "intimately involved in foreign affairs," "congressional authorizations of presidential power should be given a broad construction and not 'hemmed in' or 'cabined, cribbed, confined' by anxious judicial blinders." *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 793 (Fed. Cir. 1984) (quoting *South Puerto Rico Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 632 (Ct. Cl. 1964)).  As this authority makes clear, if the Court concludes that the authorizing statute is capacious enough to include the President's actions, the Court will sustain the action.

*Maple Leaf Fish*'s statement, that the Court may not set aside Presidential action absent a "clear misconstruction of the governing statute," simply reflects

this principle.  *Maple Leaf Fish* did not purport to displace or limit the tools that the Court employs to ascertain the meaning of a statute.  While remaining mindful of the President's constitutional role in international trade, this Court has never suggested that traditional tools of statutory construction do not apply or that the Court has no role to "decide[] whether the President has transgressed Congress's limits."  Pet. at 11; Amic. Br. at 1-2.  The cases cited by plaintiffs-appellees and amicus confirm that this Court has, both before and in the 40 years since *Maple Leaf Fish*, correctly exercised its role in ascertaining the meaning of a statutory delegation to the President.  *See* Pet. at 6-10; Amic. Br. at 8- 9; 12.

For example, in *Transpacific Steel LLC v. United States*, the Court considered dictionary definitions, the statute's "context," "evident purpose," and "the history of predecessor enactments and their implementation" in concluding that the President's action taken to modify an initial action was within the scope of his statutory authority to "implement … action" that the President determined was needed to avert the threat of impairment to national security.  4 F.4th 1306, 1319 (Fed. Cir. 2021).[4]  The Court concluded that the trial court's "categorical narrow reading" of the statute, *id*. at 1323, was inconsistent with the statutory purpose.

---

[4]  This Court found the President's prior administration of the statute to provide "strong confirmation" of the statute's meaning. *Transpacific*, 4 F.4th at 1326-28.  Similarly, the Supreme Court has considered the President's historical exercise of delegated authority in determining a statute's meaning. *See, e.g., Hawaii*, 138 S. Ct. at 2415; *United States v. Midwest Oil Co*., 236 U.S. 459, 472-

So, too here, the Panel evaluated dictionary definitions, statutory structure, historical usage, and "the broad remedial purpose" of the safeguard statute, before concluding that the term "modification," as used in 19 U.S.C. § 2254(b)(1)(B), permitted the President to adopt to trade-restrictive changes to safeguard measures. Op. at 14-20.

Equally without merit is the plaintiffs-appellees' suggestion that the Panel abdicated its role in considering the meaning of section 2254(b)'s phrase "on such basis." *See* Pet. at 14-15. They argue that the President was not authorized to act because the petition received from the majority of the domestic industry was procedurally deficient; that is, the petition did not specifically request relief "on such basis" that the domestic industry had made a positive adjustment.

The Panel considered whether the phrase "on such basis" refers to the contents of the industry's petition or to the President's own determination, based on the ITC's report, that the domestic industry had made a positive adjustment. Op. at 22-23. The Panel held both interpretations to be "reasonable." Op. at 22. Because the President's view was reasonable, and therefore was not a

---

73 (1915) ("long-continued action of the Executive Department" is useful "in determining the meaning of a statute or the existence of a power" given "the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice"). These examples undermine the assertion that courts never consider the President's own understanding of his own authority. *See* Pet. at 8.

13

misconstruction of the statute, the Panel declined to interfere in the President's lawful exercise of authority.

Plaintiffs-appellees complain that the Panel felt "compelled to side with the President" because of the limited scope of review recognized in *Maple Leaf Fish*. Pet. at 14. The Panel did not simply defer to the President's reading of the statute, however, but rather used standard tools of construction to initially assess the statutory meaning of the phrase "on such basis." Only once the Panel determined that the President's interpretation was reasonable and therefore authorized under the statute, did the Court then correctly conclude that "there is no further role for . . . this court." *Florsheim Shoe*, 744 F.2d at 795; *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) (finding no further question for judicial review after finding that the President "acted in full conformity with the statute").

Plaintiffs-appellees infer that the Panel would have reached a different conclusion had it devoted more space in the opinion addressing arguments concerning "comma placement" and "legislative history." Pet. at. 15-16. But courts have wide latitude in deciding whether and how to write an opinion. *See Taylor v. McKeithen*, 407 U.S. 191, 194 n.4 (1972). In any event, this assertion amounts to a disagreement with the Panel's conclusion about the meaning of the statute, which the plaintiffs-appellees have failed to show is wrong, let alone warrants *en banc* review.

14

Plaintiffs-appellees also observe, unremarkably, that Congress can and may cabin the President's delegated authority. Pet. at 10. But this argument fails on many levels. First, it begs the question of what authority Congress intended to authorize. After carefully analyzing the statute, the Panel concluded that the modifications proclaimed by the President were consistent with the authority that Congress conferred on the President to modify a safeguard action.

Second, this argument ignores that the Panel did not hand over to the President "largely unchecked power to determine the scope of his own delegated authority," as alleged by plaintiffs-appellees. Pet. at 13; Amic. Br. at 6. The Panel concluded that any concerns about an overly broad delegation were unfounded, identifying procedural and substantive limitations on the President's modification authority. Op. at 18-19.

Third, and most fundamentally, Congress may "delegate very large grants of its power over foreign commerce to the President," who "also possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs." *Chicago & Southern Air Lines*, 333 U.S. at 109. "The plenary authority of Congress to regulate foreign commerce, and to delegate significant portions of this power to the Executive, is well established."

*Calif. Bankers Ass'n v. Shultz*, 416 U.S. 21, 59 (1974).[5]  The legislation authorizing the President to impose safeguards "undoubtedly involves the President and his close relationship to foreign affairs, our nation's connections with other countries, and the external ramifications of international trade." *Maple Leaf Fish*, 762 F.2d at 89.

The sensitivity with which the Court treats the President's actions in matters of international trade and foreign affairs does not displace the Court's role to interpret the law.  But once, as here, the Panel concluded that the President's actions conformed to a permissible construction of the statute, the Panel correctly declined to "interpose," *Maple Leaf Fish*, 762 F.2d at 89, and second-guess the President's lawful exercise of authority to make trade-restrictive modifications.  The Panel correctly reversed the Court of International Trade.

***

---

[5]  Because the President is a Constitutional officer and not an agency, predictions about *Chevron* deference are irrelevant.  *See* Pet. at. 12; Amic. Br. at 6-7.  Similarly, *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), does not support plaintiffs-appellees' cause.  Given the President's constitutional and historical exercise of power over international trade and the modest exercise of that authority here, the major questions doctrine is inapplicable.  The doctrine has been invoked only in "certain extraordinary cases," *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022), which the Supreme Court has described as involving "decisions of vast economic and political significance," *id*. at 2605; assertions of "extravagant statutory power over the national economy," *id*. at 2609; or assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted."  *Id*.

Plaintiffs-appellees suggest that *en banc* review is warranted because the alleged error was "obviously outcome determinative." Pet. at 14. In fact, overruling *Maple Leaf Fish* would not lead to a different result, which weighs against *en banc* review. *See, e.g.*, *United States v. Torres-Flores*, 502 F.3d 885, 891 n.11 (9th Cir. 2007) (despite admitting the existence of an intracircuit conflict, finding it "unnecessary for us to call the case en banc to resolve the conflict" where the same result would obtain under either of competing modes of analysis).

Had the Panel not invoked *Maple Leaf Fish*, the Panel would have still concluded that the statute authorized the President's action. For the reasons set forth by the Panel and in our merits briefs, the statute's structure, legislative history, and purpose all support the conclusion that the statute authorizes the President to make trade-restrictive modifications. Op. at 16-20. In other words, when employing traditional tools of statutory construction, the President's actions plainly fall within the statutory delegation. *See also Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (recognizing the Court's authority to review whether "the President has violated an explicit statutory mandate"). This was not a close case, nor did the Panel have to "strain" to reach its conclusion. *See* Amic. Br. at 9.

The Panel simply declined to read a trade-liberalizing requirement into safeguard modifications that Congress could have, but did not, include. Op. at 15.

In doing so, the Panel acted consistently with Supreme Court authority interpreting delegations to the President. *George S. Bush*, 310 U.S. at 378-79 (after finding no "express provision" in the statute requiring treatment of exchange rates in a certain way, declining to "imply" what Congress "omitted"); *Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022) (declining to "rewrite" a statutory delegation to the President to include a limitation not found in the statute); *Hawaii*, 138 S. Ct. at 2410 (declining to read an "unspoken tailoring requirement" into a statute).

***

Finally, this appeal is a poor vehicle for *en banc* consideration because there are alternative bases to sustain Proclamation 10101, even accepting plaintiff-appellees' faulty reading of 19 U.S.C. § 2254(b)(1)(B).  As we explained (Applnt. Br. at 42-45; Reply Br. at 30-33), the President's restoration of safeguard coverage on bifacial solar products and slowing of the rate of decrease of the safeguard duties, were, in fact, trade-neutral actions.  Similarly, even assuming that the phrase "on such basis" referred to the domestic petition, any procedural deficiencies in the domestic industry's petition would not invalidate Presidential action.  *SEIA*, 553 F. Supp. 3d at 1336 (citing *Silfab*, 892 F.3d at 1347; *Dalton*, 511 U.S. at 476).  The Panel did not reach these alternative bases to sustain Proclamation 10101.  *See* Op. at 21; 23.

<u>CONCLUSION</u>

Rehearing *en banc* is not appropriate because the decision is consistent with precedent and the plaintiffs-appellees have not identified an issue of exceptional importance that must be addressed by the Court *en banc*.  We respectfully request that the Court deny the petition.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

<u>/s/Patricia M. McCarthy</u>
PATRICIA M. MCCARTHY
Director

<u>/s/ Tara K. Hogan</u>
TARA K. HOGAN
Assistant Director
Civil Division
OF COUNSEL:                            Commercial Litigation Branch
MICHAEL T. GAGAIN                Department of Justice
Senior Associate General Counsel    P.O. Box 480, Ben Franklin Station
Office of the United States Trade      Washington, D.C. 20044
  Representative                         Tele: (202) 616-2228
Washington, D.C.  20508             Email: Tara.Hogan@usdoj.gov


February 16, 2024                      *Attorneys for Defendants-Appellants*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-1392

**Short Case Caption:** Solar Energy Industries Association v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 3842 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 02/16/2024

Signature: /s/Tara K. Hogan

Name: Tara K. Hogan

Save for Filing