# United States Court of Appeals for the Federal Circuit

———————————

**SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, EDF RENEWABLES, INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, ACTING COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellants*

———————————

2022-1392

———————————

Appeal from the United States Court of International Trade in No. 1:20-cv-03941-GSK, Judge Gary S. Katzmann.

———————————

Decided: August 13, 2024

———————————

**SUPPLEMENTAL OPINION ON PETITION FOR REHEARING**

———————————

MATTHEW R. NICELY, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, filed a petition for rehearing en banc and reply for plaintiffs-appellees. Plaintiffs-

appellees Solar Energy Industries Association, NextEra Energy, Inc. also represented by JULIA K. EPPARD, DEVIN S. SIKES, JAMES EDWARD TYSSE, DANIEL MARTIN WITKOWSKI.

JOHN BOWERS BREW, Crowell & Moring, LLP, Washington, DC, for plaintiff-appellee Invenergy Renewables LLC. Also represented by AMANDA SHAFER BERMAN, LARRY EISENSTAT, ROBERT L. LaFRANKIE; FRANCES PIERSON HADFIELD, New York, NY.

CHRISTINE STREATFEILD, Baker & McKenzie LLP, Washington, DC, for plaintiff-appellee EDF Renewables, Inc.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, filed a response for defendants-appellants. Also represented by BRIAN M. BOYNTON, TARA K. HOGAN, PATRICIA M. MCCARTHY. Defendant-appellant United States also represented by MICHAEL THOMAS GAGAIN, Office of the General Counsel, Office of the United States Trade Representative, Washington, DC.

ANASTASIA P. BODEN, Cato Institute, Washington, DC, for amicus curiae Cato Institute. Also represented by NATHANIEL ABRAHAM LAWSON.

————————————

Before LOURIE, TARANTO, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

Solar Energy Industries Association, Nextera Energy Inc., Invenergy Renewables LLC, and EDF Renewables, Inc., Plaintiffs-Appellees (collectively, "Solar"), filed a petition for rehearing. In the Petition, Solar argues that the full court should reevaluate and replace its precedential decision in *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985), in which we explained we would only

set aside presidential actions taken pursuant to Sections 201-03 of Title II of the Trade Act of 1974, 19 U.S.C. §§ 2251-53, if the statutory interpretation underlying such acts constitutes "a *clear misconstruction of the governing statute*, a significant procedural violation, or action outside delegated authority" (emphasis added). The panel previously issued an opinion reversing the Court of International Trade's decision to enjoin the president from enforcing Proclamation 10101, which (among other things) removed the exclusion of bifacial solar panels from certain duties that had been imposed a few years earlier.[1] *See Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885 (Fed. Cir. 2023) ("Panel Opinion"). In doing so, the Panel Opinion applied the *Maple Leaf* standard. *See id.* at 894-95.

Solar now argues that *Maple Leaf* conflicts with Supreme Court and Federal Circuit precedent. *See, e.g.*, Pet. at 6-7 (citing *Trump v. Hawaii*, 585 U.S. 667 (2018) (discussing presidential interpretation of Immigration and Nationality Act); *id.* at 8 (citing *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021) (reviewing presidential action under Section 232 of Trade Expansion Act of 1962). In its supplemental notice, Solar adds that *Maple Leaf* has now been overruled by the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___, 144 S. Ct. 2244 (2024). Suppl. Notice (ECF No. 107) at 2. According to Solar, the panel's adherence to the "clear misconstruction" standard of *Maple Leaf* led the court to "abdicate[] its constitutional role." Pet. at 1; *see also id.* at 13 ("[T]he decision contravenes the

---

[1]     Though *Maple Leaf* specifically concerned Sections 201 through 203 of the Trade Act of 1974, 19 U.S.C. §§ 2251-53, the parties appear to agree (and we have never suggested otherwise) that the same standard of review governs presidential actions pursuant to Section 204, 19 U.S.C. § 2254.

constitutional design and binding precedent by giving the President largely unchecked power to determine the scope of his own delegated authority."). In Solar's view, we must instead review issues of statutory construction *de novo*, even when we are considering presidential interpretation of a statute governing a field of activity largely committed to the President's authority. *See* Pet. at 9-10, 14; *see also* Suppl. Notice at 2 ("[The] panel's view that it was not called upon to decide whether the government's interpretation of the statute is correct [in trade cases] . . . cannot be reconciled with *Loper Bright*.") (internal citation and quotation marks omitted).

The Petition is granted to the limited extent that the panel supplements the Original Opinion with the additional reasoning set out in this Supplemental Opinion. Specifically, we write to explain that whatever merit there may be to Solar's contention that our *Maple Leaf* standard would benefit from review in light of recent Supreme Court jurisprudence, this case does not present an appropriate vehicle for undertaking such a task. This is because, as we show below, the same conclusions result from application of *de novo* review that the Panel Opinion reached by application of *Maple Leaf*.

I

This appeal involves *Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products)*, 85 Fed. Reg. 65639 (Oct. 10, 2020), issued by President Trump. Previously, in January 2018, President Trump had issued Proclamation 9693, which imposed duties on imports of solar panels into the United States. *See Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541

(Jan. 23, 2018). After the issuance of Proclamation 9693, importers of a certain type of solar panels – called bifacial solar modules, which "consist of cells that convert sunlight into electricity on both the front and back of the cells," J.A. 4, 5 – petitioned the United States Trade Representative ("USTR") for an exclusion, asking that bifacial solar panels not be subjected to the duties. The USTR initially granted the exclusion, though shortly thereafter it attempted to withdraw it to again make bifacial solar panels subject to the duties. In Proclamation 10101, the President removed the exclusion of bifacial solar panels from the scheduled duties and increased the fourth-year duty from 15% to 18%. *See* 85 Fed. Reg. at 65639-40, Annex. In response to Proclamation 10101, importers of bifacial solar panels, including Solar, sued the United States in the Court of International Trade, contending that Proclamation 10101 exceeded the President's powers, as his pertinent statutory authority is purportedly limited to "modifying" Proclamation 9693, while Proclamation 10101 – in Solar's view – did something more than merely "modify." The Court of International Trade agreed with Solar, setting aside Proclamation 10101 and enjoining the government from enforcing it. The government appealed and, in the Panel Opinion, we reversed.

The Panel Opinion, in reviewing the President's interpretation of the applicable statutory provisions, explicitly applied *Maple Leaf's* "clear misconstruction" standard. *See* Panel Op. at 894. We explained:

> It is important to stress at the outset that our review of Proclamation 10101 is limited to whether the President *clearly misconstrued* Section 2254(b)(1)(B). . . . We are not called upon to decide whether the government's interpretation of the statute is correct or how we would have construed the statute as an original matter. Nor do we evaluate the relative merits of the parties' competing interpretations. Rather, our sole inquiry is

whether the President's interpretation, that he is permitted to make trade-restricting modifications and not just trade-liberalizing ones, is a clear misconstruction of the statute.

Panel Op. at 895. Although the *Maple Leaf* standard does not require us to review the disputes in this case *de novo*, doing so leads us to the same conclusions we reached in the Panel Opinion, rendering it unnecessary to decide if the *Maple Leaf* standard conflicts with other precedents. We provide the analysis behind these conclusions below.

## II

The principal issue raised by the government in this appeal is whether 19 U.S.C. § 2254(b)(1)(B)'s authorization that the President may grant a requested "reduction, modification, or termination" of an existing safeguard includes authorization to "modify" the safeguard to make it more trade restrictive (within the constraints of other applicable statutory provisions). Solar argued that the President's authority is limited to trade-liberalizing (or neutral) modifications. The government countered that, instead, the statute's structure, legislative history, and purpose all support the conclusion that the statute also authorizes the President to make trade-restrictive modifications. The Panel Opinion sided with the government. *See* Panel Op. at 896-98. Although our analysis in the Panel Opinion expressly applied *Maple Leaf*'s "clear misconstruction" standard, we considered the same sources and arguments that Solar now asserts must be evaluated *de novo*.

The Panel Opinion began its review with the statutory text itself, observing that the "statute does not expressly indicate whether 'modify' includes trade-restrictive changes or is limited to trade-liberalizing alterations." Panel Op. at 895. We viewed this "statutory silence as favoring the government's broader view," as the statute does not contain a "narrowing limitation." *Id.* We also noted that, "[o]rdinarily, Congress uses words consistent with

their well-understood meaning." *Id.* In ascertaining the "well-understood" meaning of "modify," we cited Supreme Court precedent in which "modify" was held to include moderate changes in either direction. *Id.* at 896 (citing *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 225 (1994)). We also pointed to dictionary definitions to the same effect. *See id.* at 895-96. We additionally observed that Solar "concede[d] that the government's definition [of 'modify'] is a correct one." *Id.* at 896.

We also addressed legislative history, particularly an unenacted version of what became 19 U.S.C. § 2254(b)(1)(B), which would have expressly defined "modify" as *not* including "increase[s]" in tariffs (i.e., "modify (*but not increase*)"). *Id.* at 895 n.5. That unambiguous prohibition on trade-restrictive modifications was deleted during the legislative process, strong evidence that Congress ultimately chose not to limit the scope of the term "modify" only to trade-liberalizing changes. *See id.*

We then evaluated the term "modify" in the context of the broader structure and purpose of the Trade Act, as Solar had asked (and again in its Petition asks) us to do. *See* Panel Op. at 896-98; *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (internal quotation marks omitted). We began by addressing Solar's contention that Section 2251(a) supported its narrow interpretation of "modify." *See* SEIA Br.[2] at 20 (relying on Section 2251 as purportedly indicative of "Congress's

---

[2]     Appellees SEIA and Nextera Energy, Inc. filed a joint brief (ECF No. 35) which we refer to as the "SEIA Brief" or "SEIA Br." Appellees Invenergy Renewables LLC and EDF Renewables, Inc. filed a separate brief (ECF No. 34) which we refer to as the "EDF Brief" or "EDF Br."

explicit desire to ensure that safeguard measures impose no undue social or economic costs," and arguing Congress "surely did not invite the President in section 204(b)(1)(B) to further restrict trade *after* the [domestic] industry succeeds in positively adjusting"). We rejected this contention, explaining that instead "Section 2251 provides that the safeguard statute has a broad remedial purpose." Panel Op. at 896. Thus, we concluded that, rather than bolstering Solar's position, Section 2251 (to the extent it was applicable to the President's modification authority, as Solar advocated)[3] actually favored the government's view that the President is empowered to make modifications as necessary to provide continued relief to a domestic industry. *See id.*

We also looked at the Trade Act's general definition of "modification," noting it is open-ended and does not exclude anything, including further restrictions. Panel Op. at 896 (discussing Section 2481(6)). Other provisions of the Trade Act too, we noted, use the term "modify" to include changes made in a trade-restrictive direction. *See id.* at 896-97 (discussing Sections 2252(e)(2)(C), 2253(a)(3)(C), and 2254(b)(3)).

───────────────

[3]    Solar faults the Panel Opinion for "uncritically deferring to the President's internally inconsistent interpretation" of Section 2251, accusing us of concluding that this section "both does and does not apply to presidential modification authority *simultaneously*." Pet. at 16. This is incorrect. The Panel Opinion was consistent in its holding that Section 2251(a) does not operate to restrict the President's safeguard modification authority, whether by limiting permitted modifications to those that are trade-liberalizing or by requiring a cost-benefit analysis of a modification.

Moreover, we rejected Solar's policy concern that permitting the President to make trade-restrictive modifications pursuant to Section 2254(b)(3) creates an impermissible loophole. We reasoned that Congress has cabined the President's modification authority in other significant ways (e.g., by imposing a phase-down requirement), though we also recognized that Congress is free to create "loopholes" if it wishes. Panel Op. at 897. Nor did historical practice help Solar because the record reflected at least one instance in which a President appears to have acted pursuant to Section 2254(b)(1) to take trade-restrictive action. Panel Op. at 897-98.

Finally, we addressed Solar's argument that it would be backwards for Congress to permit the President to "modify" trade restrictions to become more restrictive where domestic industry has positively adjusted to competition while depriving the President of such trade-restricting power where domestic industry has not. *See* SEIA Br. at 20-21 (noting distinction between subsection (b)(1)(A), which limits President only to "reduce" or "terminate" safeguard when "domestic industry has not made adequate efforts to" adjust to import competition, and subsection (b)(1)(B), which permits President more broadly to "reduce, *modify*, or terminate" safeguard when "domestic industry has made a positive adjustment to import competition"). We disagreed with Solar, finding more persuasive the government's position that the "'distinction [between subsections (b)(1)(A) and (b)(1)(B)] logically suggests that Congress intended to give the President greater flexibility to take action when progress is being made, to protect and ensure the continuation of that progress.'" Panel Op. at 898 (quoting Opening Br. at 34).

All of the foregoing statements from the Panel Opinion are equally correct in the context of *de novo* review. Our review of the plain text of Section 2254(b)(1)(B), other provisions and the overall structure of the Trade Act, and legislative history leads us to agree with the government that

"modify" here includes trade-restrictive changes.  We reach this determination without according any deference to the President's interpretation.  Our conclusion in the Panel Opinion based on the "clear misconstruction" standard of *Maple Leaf* remains unchanged under *de novo* review.

## III

In addition to the proper construction of "modify," the Panel Opinion considered Solar's contention that the President committed procedural errors in connection with issuing Proclamation 10101.  While the Panel Opinion applied the "clear misconstruction" standard of *Maple Leaf* to these issues as well, we again reach the same conclusions applying *de novo* review.

## A

Section 2254(b)(1)(B) provides:

> (1) Action taken under section 2253 [i.e., a safeguard] . . . may be reduced, modified, or terminated by the President (but not before the President receives the [Commission's] report . . . ) if the President . . . (B) determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination *on such basis*, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b)(1) (emphasis added).  In the Panel Opinion, we endorsed the government's interpretation of this provision, such that a presidential reduction, modification, or termination of a safeguard must be made based on a report from the International Trade Commission.  Panel Op. at 899.  In other words, "on such basis" in Section 2254(b) refers to a Commission report.  *See* Reply Br. at 29.  Solar had argued, and reiterates in its Petition, that "on such basis" refers instead to a domestic industry request for a change, which must itself be based on the domestic

industry's positive adjustment to import competition. *See* SEIA Br. at 53; Pet. at 15.

While both readings of the statute are broadly reasonable, we are persuaded that the government's position is more reasonable. Because "such" as used in text like this typically refers to something that has already appeared earlier in a sentence or paragraph, *see, e.g.*, *Such, Black's Law Dictionary* (11th ed. 2019) (definition including "[t]hat or those; having just been mentioned"), and the provision here refers to the domestic industry's positive adjustment to import competition only *after* "on such basis," the plain language of the statute is more supportive of the government's position. That is, because the plain meaning of "such" is to refer backward to something previously mentioned – and the provision mentions the Commission report before "such" – rather than referring forward to something not yet mentioned – and the provision does not mention the requirement of domestic industry positive adjustment until after "such" – the text provides a strong indication that "on such basis" is referring to the Commission report and not to the domestic industry's positive adjustment. That commas subdivide the provision into several clauses does not alter our conclusions. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning.").

The overall structure of the Trade Act provides further support for the government's view, as its reading of the statute promotes the Trade Act's goals by predicating the President's authority to act on his own Commission's report – an independent, expert analysis – rather than leaving his authority entirely dependent on whether the domestic industry submits a petition expressly making the supposedly necessary representation. It would be an unusual choice for Congress to mandate that the President base his fact-finding on assertions by industry participants when, in the very same statutory provision, Congress

requires that the President wait to act until after he receives a report from his own expert agency. We see nothing in the statute, including its text and structure, commending to us this improbable reading.

The government's position is further favored by the inquiry into "context" that is essential to determining the best reading of statutory language. *See Loper Bright*, 603 U.S. at ___, 144 S. Ct. at 2261 n.4 ("[S]tatutes can be sensibly understood only by reviewing text in context.") (internal quotation marks omitted). As we explained above, *see supra* Part II, the President only has power to modify a safeguard when domestic industry has made a positive adjustment to import competition. The President *lacks* authority to make a modification, and may only reduce or terminate a safeguard, when domestic industry has *not* made a positive adjustment, i.e., the situation governed by Section 2254(b)(1)(A). It follows that any industry petition seeking a modification under Section 2254(b)(1)(B) necessarily and inherently must be urging the President that there has been a positive adjustment, rendering it redundant for Congress to write into the text a requirement that the petition expressly recite that assertion. There is no such redundancy under the government's reading.

The legislative history does not undermine our conclusion. A conference report Solar contends "unequivocally links the phrase 'on such basis' to the domestic industry's petition, without referencing the ITC's report or any presidential finding," Pet. at 15 (citing 1988 U.S.C.C.A.N. 1547, 1721), does not overcome the plain meaning of "such." *See generally Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 400 (Fed. Cir. 1990) ("[A]bsent a clearly expressed legislative intention to the contrary, a statute's plain meaning must ordinarily be regarded as conclusive.") (internal citation and quotation marks omitted). Furthermore, the conference report's description of the statutory language does not match the enacted language in important respects, including in the specific standards of subsection (b)(1)(B).

*Compare* 19 U.S.C. § 2254(b)(1)(B) (modification author-
ized if "*the President . . . determines,* after a majority of the
representatives of the domestic industry submits to the
President a petition requesting such reduction, modifica-
tion, or termination on *such basis*, that the domestic indus-
try has made a positive adjustment to import competition")
(emphasis added)*, with* 1988 U.S.C.C.A.N. at 1721 (modifi-
cation authorized if "*a majority of representatives of the do-
mestic industry request* such reduction, modification or
termination on *the basis* that the domestic industry has
made a positive adjustment to import competition") (em-
phasis added); *compare also* 19 U.S.C. § 2254(b)(1)(A) (lim-
iting relief under (A) to "reduction" or "termination"), *with*
1988 U.S.C.C.A.N. at 1721 (describing (A) as including
"modification"). Additionally, the relied-on language of the
conference report does not by its terms require what Solar
urges – an *express* recitation in the petition of positive ad-
justment even when the request for modification neces-
sarily, inherently asserts such a positive adjustment.
Thus, the conference report is simply not a reliable basis
for adopting Solar's position on the meaning of the words
of the actual legislation that became law.

In sum, we conclude that the best reading of Section
2254(b)(1)(B) is that the President's modification power re-
quires (i) a Commission report, (ii) a request from a major-
ity of representatives of the domestic industry, and (iii) a
Presidential determination that the domestic industry has
made a positive adjustment to import competition. The
Presidential determination must be based at least on the
Commission report and may also (but need not) be based
on the industry petition. Accordingly, our resolution of the
parties' dispute as to the meaning of "on such basis" is the
same under *de novo* review as it is under *Maple Leaf*'s
"clear misconstruction" standard of review.

B

Section 2254(b)(1)(B) further requires that the President determine "that the domestic industry *has made* a positive adjustment to import competition," before ordering a reduction, modification, or termination of a safeguard (emphasis added). On *de novo* review, we continue to read this provision as sufficiently broad to be satisfied by the President's determination in connection with Proclamation 10101 that the applicable domestic industry "has begun to make" the required positive adjustment.

As we noted in the Panel Opinion, Section 2254(b)(1)(B) is written in the present perfect tense, which can be used to refer to an action that was completed entirely in the past *as well as* an action still in progress. Panel Op. at 901. This plain-meaning understanding of "has made" is supported by other parts of the Trade Act, *see, e.g.*, 19 U.S.C. § 2254(c)(1), (d)(1), which recognize that "positive adjustment" to import competition can be a process that takes some time. In addition, two of the conditions that the statutory scheme expressly identifies as constituting components of "a positive adjustment" – when "the domestic industry *experiences* an orderly transfer of resources" and "workers in the industry *experience* an orderly transition," *id.* § 2251 (emphasis added) – use the present tense, contributing to the understanding that a positive adjustment by domestic industry is not just an end goal but may also describe a domestic industry that is in the process of an orderly transfer and transition.

Accordingly, our resolution of the parties' dispute as to the meaning of "has made a positive adjustment" is the same under *de novo* review as it is under *Maple Leaf*'s "clear misconstruction" standard of review.

C

On *de novo* review, we also adhere to the Panel Opinion's conclusion that the President is not required to re-

weigh costs and benefits when modifying a safeguard pursuant to Section 2254(b)(1).  As we explained in the Panel Opinion, Section 2254(b)(1) makes no mention whatsoever of cost-benefit determinations.  *See* Panel Op. at 901. While Sections 2251(a) and 2253(a)(1)(A) set out presidential obligations to weigh costs and benefits, nothing in the Section 2254 safeguard statute ties these cost-benefit analysis requirements to the President's power to reduce, modify, or terminate a safeguard.  In addition to the fact that the plain language of the statutory provisions does not require a cost-benefit analysis at the reduction, modification, or termination stage, we also explained in the Panel Opinion that the overall structure of the Trade Act supports our conclusion because only relatively small changes are permitted as "modifications" to safeguards and the overall phase-down requirement, *see* 19 U.S.C. § 2253(e)(5), already provides sufficient checks against the "absurd results" feared by the Court of International Trade.  Panel Op. at 901-02.

Accordingly, our resolution of the parties' dispute over the need for a renewed cost-benefit analysis at the modification stage is the same under *de novo* review as it is under *Maple Leaf*'s "clear misconstruction" standard of review.

## IV

Solar denigrates the *Maple Leaf* standard as "breathtakingly deferential" and as springing from "an exaggerated misreading" of our earlier precedent.  Pet. at 1, 9 (citing *Florsheim Shoe Co. v. United States*, 744 F.2d 787 (Fed. Cir. 1984)).  It emphasizes that *Maple Leaf* is even more deferential than the now-discarded standard of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which was overruled in *Loper Bright*. *See* Pet. at 12 ("Even then, the Supreme Court has made clear that '[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional

intent.'") (quoting *Chevron*, 467 U.S. at 843 n.9); *see also generally Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363-67 (Fed. Cir. 2010) (suggesting link between *Maple Leaf* formulation and *Chevron*). As we have demonstrated, the outcome in this case is unaffected by whether or not we apply *Maple Leaf*'s "clear misconstruction" standard. Thus, we do not believe this case presents an appropriate vehicle for deciding whether the *Maple Leaf* standard should be retained.